UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
Missoula Division

*************************************************************************
|  |  |  |
| --- | --- | --- |
| CROW INDIAN TRIBE, CROW CREEK | * |  |
| SIOUX TRIBE; STANDING ROCK | * |  |
| SIOUX TRIBE; PIIKANI NATION, THE | * | CIV. 17-_____ |
| CRAZY DOG SOCIETY, HOPI | * |  |
| NATION BEAR CLAN, NORTHERN | * |  |
| ARAPAHO ELDERS SOCIETY, DAVID | * |  |
| BEARSHIELD, KENNY BOWEKATY, | * | COMPLAINT |
| LLEVANDO FISHER, ELISE GROUND, | * |  |
| ARVOL LOOKING HORSE, TRAVIS | * | AND |
| PLAITED HAIR, JIMMY ST. | * |  |
| GODDARD, PETE STANDING ALONE, | * | PETITION FOR PERMANENT |
| and NOLAN YELLOW KIDNEY, | * | INJUNCTION AND DECLARATORY |
| | * | RELIEF |
| Plaintiffs, | * |  |
| | * |  |
| vs. | * |  |
| | * |  |
| UNITED STATES OF AMERICA, and | * |  |
| RYAN ZINKE, Secretary, United States | * |  |
| Department of the Interior, and the | * |  |
| UNITED STATES DEPARTMENT OF | * |  |
| INTERIOR, and JIM KURTH, Acting | * |  |
| Director, United States Fish and Wildlife | * |  |
| Service, or his Successor in Office, and | |  |
| the UNITED STATES FISH AND | |  |
| WILDLIFE SERVICE, and HILARY | |  |
| COOLEY, Grizzly Bear Recovery | |  |
| Coordinator, | |  |
| | |  |
| Defendants. | |  |

*************************************************************************

## INTRODUCTION

1. Plaintiffs, Crow Indian Tribe, Crow Creek Sioux Tribe, Standing Rock Sioux Tribe, Piikani Nation, the Crazy Dog Society, Hopi Nation Bear Clan, Northern Arapaho Elders Society, David Bearshield, Kenny Bowekaty, Llevando Fisher, Elise Ground, Arvol Looking Horse, Travis Plaited Hair, Jimmy St. Goddard, Pete Standing Alone and Nolan Yellow Kidney for their Complaint against Defendants challenging the United States Fish and Wildlife Service's Final Rule establishing a Distinct Population Segment ("DPS") for the grizzly bear population of the Greater Yellowstone ecosystem ("GYE grizzly bear") and delisting the GYE grizzly bear from the Federal List of Endangered and Threatened Wildlife, as well as the Conservation Strategy accompanying the Final Rule, 82 Fed. Reg. 30502 (June 30, 2017) (to be codified at 50 C.F.R. pt. 17), hereby allege as follows:

2. Plaintiffs seek a permanent injunction pursuant to Fed.R.Civ.P. Rule 65 and Declaratory Relief pursuant to 28 U.S.C. § 2201 *et seq*., and an Order enjoining Defendants from proceeding with their announced plan to remove grizzly bears in the Greater Yellowstone region from the Endangered Species Act's threatened species.

3. The United States Congress enacted the Endangered Species Act ("ESA") in an effort to avoid wildlife extinction by reversing the trend of dramatic population losses of listed species.  The purpose of listing is to recover a species to self-sustaining, viable populations that no longer need protection.

4. Operating under the authority of the Endangered Species Act, the United States Fish and Wildlife Service ("FWS") listed grizzly bears as "threatened" in 1975.  40 Fed. Reg. 31, 734 (July 28, 1975).

5.  At the time of the grizzly bear's listing, FWS noted that the species had been reduced to approximately two-percent (2%) of its former habitat range.

6.  FWS also noted that approximately eight-hundred (800) to one-thousand (1,000) bears remained in the lower forty-eight states.  Of the remaining grizzly population, approximately one-hundred and thirty-six (136) resided in the Greater Yellowstone area.

7.  FWS has recently observed that the rate of population growth among grizzly bears in the Greater Yellowstone area has slowed.

8.  Despite the recent slowdown in population growth, there has been <u>some</u> dispersal into habitat outside of the Greater Yellowstone area, such as the Wind River Range, the Gallatin Range, and east of the Absaroka Mountains, indicating that grizzly bears may be in the early stages of reoccupying <u>some</u> of the historical habitat from which they had long since disappeared.

9.  Defendants have made previous premature attempts to delist GYE grizzly bears from the threatened species list.  Specifically, in 2007, FWS labeled the GYE grizzly bear population in the Greater Yellowstone ecosystem as being a distinct population segment and subsequently promulgated a proposed order to delist GYE grizzly bears from the threatened species list.  72 Fed. Reg. 14866 (March 29, 2007).  In response, a variety of environmental groups filed lawsuits challenging the delisting decision.  In September 2009, a federal district judge for the district of Montana overturned the delisting decision and placed GYE grizzly bears back on the threatened species list, reasoning that FWS did not adequately consider the impacts that the loss of a particularly important food source would have on the long-term viability of GYE grizzly bears.  *Greater Yellowstone Coal., Inc. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), aff'd in part, rev'd in part and remanded,

665 F.3d 1015 (9th Cir. 2011). FWS filed an appeal in the Ninth Circuit Court. The Ninth Circuit rejected FWS's argument and upheld the district court's ruling to relist. In reaching its decision, the Ninth Circuit stated that FWS failed to articulate a rational connection between data in the record and FWS's determination that the decline in whitebark pine as a food source would not threaten the long term recovery of GYE grizzly bears. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011).

10. Since the Defendants' loss in the Ninth Circuit, FWS has been steadily working towards a second effort to delist the GYE grizzly bear. These efforts have culminated in the promulgation of a Final Rule designating the GYE grizzly bear as a distinct population segment, delisting the GYE grizzly bear from the threatened species list, and the adoption of a concomitant Conservation Strategy establishing the regulatory framework for local, state, and federal management the GYE grizzly bear population following delisting. Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife, 82 Fed. Reg. 30502 (June 30, 2017) (to be codified at 50 C.F.R. pt. 17).

11. Defendants engaged in an intensive pre-decisional consultation with state governments in anticipation of handing over conservation and protection duties, including the drafting and publishing of state conservation plans. Yet, Indian tribes, including Plaintiff Indian Tribes were left out of this decision making process. Defendants failed to adequately consult with Plaintiffs prior to the decision to delist the grizzly bear from the GYE.

12. Without the protections afforded to species listed on the threatened species list, states will classify GYE grizzly bears as game animals, and will be free to set hunting seasons and

issue hunting permits for the GYE grizzly bear population in the Greater Yellowstone area prior to the bears' sustainable recovery throughout its traditional habitat range, including traditional tribal lands.  82 Fed. Reg. at 30528.  Such killing and/or other reduction in population of grizzly bears in the Greater Yellowstone area profoundly disrupts, if not entirely prevents, the GYE grizzly bears' sustainable recovery to its full habitat range, including lands within the jurisdictional boundaries of the Tribes and/or their treaty or aboriginal lands, including culturally and spiritually significant homelands.

13. The Clan and the Societies are traditional religious and/or leadership groups, and Individual Plaintiffs are traditional tribal spiritual, religious, cultural, and/or societal leaders.  Grizzly bears in general, and grizzly bears located in the Greater Yellowstone region specifically, are of deep cultural and religious importance to all of the Plaintiffs.  Plaintiffs have shared their collective homelands with the grizzly bear since time immemorial, and the continued growth of the GYE grizzly population and reoccupation of these bears' traditional habitat range is of considerable cultural and religious importance to the Tribes, the Clan, the Societies and the Individual Plaintiffs.  The spiritual health of both the tribal and individual Plaintiffs depends upon the health and protection of the GYE grizzly bear.  The continued existence and expansion of grizzly bears back into their traditional habitat range is necessary to ensure that the Plaintiffs have the ability to freely express their religious faith.

14. Therefore, Plaintiffs argue the decision to delist the GYE grizzly bear population form the list of threatened species, as well as the adoption of the concomitant Conservation Strategy, violates the religious freedom of the Plaintiffs, and is arbitrary, capricious, not in accordance with applicable law, and should be set aside.

## JURISDICTION AND VENUE

15. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as a defendant); 28 U.S.C § 1367 (arising under same operative facts); 28 U.S.C. § 1362 (Indian "arising under"); 5 U.S.C. § 701 *et seq*. (Administrative Procedure Act); and 42 U.S.C. § 2000bb-1(c) (Religious Freedom Restoration Act).

16. The Court has authority to grant the requested relief pursuant to 28 U.S.C. § 2201 *et seq.* (declaratory and injunctive relief); 28 U.S.C. §1346; the Administrative Procedures Act, 5 U.S.C. § 701 *et seq*.; Rule 65 of the Federal Rules of Civil Procedure (restraining order relief).

17. Plaintiff Tribes brings this Complaint on its own behalf and on behalf of their individual tribal members.

18. Plaintiff Clan and Societies bring this Complaint on their own behalf and on behalf of their individual members.

19. Individual Plaintiffs bring this Complaint on their own behalf.

20. Venue lies in this Court under 28 U.S.C. § 1391(e).

21. This action arises under Article 1, Section 8, Clause 3 of the United States Constitution; the First Amendment to the United States Constitution; the Administrative Procedures Act at 5 U.S.C. § 701 *et seq*.; the special trust relationship between the Federal government and the Indians; the plenary power of Congress; and the Religious Freedom Restoration Act at 42 U.S.C. § 2000bb *et seq*.

## PARTIES

22. Plaintiff Crow Tribe of Indians, Crow Creek Tribe, and Standing Rock Sioux Tribe are each federally recognized Indian Tribes.  The Crow Tribe is located in Montana, the Crow Creek Tribe in South Dakota, and the Standing Rock Sioux Tribe in North Dakota.

23. Plaintiff Piikanii Nation is an Indian tribes located in and recognized by the Nation of Canada with Treaty rights to land in the United States under an 1855 Treaty with the United States.

24. All plaintiff tribes are responsible for the health, safety and welfare of their individual tribal members.  A large number of their tribal members hold traditional religious beliefs and engage in traditional religious practices.

25. Plaintiff Hopi Bear Clan is a traditional religious society of the Hopi Tribe. Its principal headquarters are located on the Hopi Indian Reservation.

26. Plaintiff Crazy Dog Society is a traditional religious society of the Blackfeet Nation.

27. Plaintiff Northern Arapaho Elders Society is the leadership for the Northern Arapaho Tribe are Northern Arapaho Tribe respectively.

28. Plaintiff individuals are each tribal spiritual, religious or societal leaders.

29. Plaintiff Arvol Looking Horse is a Lakota traditional religious leader.  His principle residence is in South Dakota.

30. Plaintiff Llevando Fisher is the Chairman of the Northern Cheyenne Tribe.  His principal residence is located on the Northern Cheyenne Indian Reservation in Montana.

31. Plaintiff Kenny Bowekary is a traditional religious leader of the Zuni Religious Society. His principal residence is Zuni, New Mexico.

32. Plaintiff Pete Standing Alone is a traditional religious leader of the Horn Society. His principal residence is within the Blackfoot Confederacy.

33. Plaintiff Elise Ground is a traditional religious leader of the Crazy Dog Society. Her principal residence is located on the Blackfeet Reservation in Montana.

34. Plaintiff Travis Plaited Hair is a leader of the Horn Society. His principal residence is located within the Blackfoot Confederacy.

35. Plaintiff Nolan Yellow Kidney is a Blackfeet traditional religious leader. His principal residence is located within the Blackfeet Nation.

36. Defendant Ryan Zinke is the Secretary of the United States Department of the Interior, an executive department of the United States Government. He is the most senior executive branch official under the President of the United States, and is responsible for executing and carrying out in good faith the federal government's government-to-government relationship with Indian tribes, including consulting with affected Indian tribes whenever a federal action has tribal implications.

37. Defendant United States Department of Interior ("DOI") is an executive department of the United States Government organized and existing under 5 U.S.C. § 101, as amended. Defendant DOI is responsible for, among other things, the supervision, management, direction, and oversight of Defendant FWS, which is a federal agency subsidiary of the DOI, pursuant to the provisions of 16 U.S.C. § 742b *et seq*.

38. Defendant Jim Kurth, or his Successor-in-Office, is the Acting Director of FWS, an executive agency within DOI. He is the most senior official within FWS, responsible for executing and carrying out the United States' statutory duties pursuant to 16 U.S.C. § 1531

*et. seq.,* the Endangered Species Act, including listing and delisting species on the threatened species list.

39. Defendant FWS is an executive agency within DOI responsible for executing and carrying out the United States' statutory duties pursuant to 16 U.S.C. § 1531 *et. seq.,* the Endangered Species Act, including listing and delisting species on the threatened species list.

40. Defendant Hilary Cooley, or her Successor in Office, is the Grizzly Bear Recovery Coordinator.  The Grizzly Bear Recovery Coordinator is an official of FWS responsible for overseeing the recovery of the bears.

## **FACTS**

### Endangered Species Act

41. The ESA is a federal statute designed to conserve endangered and threatened species and the ecosystems upon which those species depend. ESA §2(b), 16 U.S.C. § 1531(b).

42. To achieve these objectives, FWS is required to protect such imperiled species by listing them as either "threatened" or "endangered" if they are facing extinction due to any one, or any combination of, the following factors:

    a.   The present or threatened destruction, modification, or curtailment of its habitat or range;

    b.   Over-utilization for commercial, recreational, scientific, or educational purposes;

    c.   Disease or predation;

    d.   The inadequacy of existing regulatory mechanisms; or

    e.   Other natural or manmade factors affecting its continued existence.

ESA § 4(a)(1), 16 U.S.C. § 1533(a)(I).

43. FWS may remove a species from the "threatened" or "endangered" species list if such a decision is based on the same five (5) criteria described in § 4(a)(1) and such decision is made in light of the best available scientific evidence. *Id.*

44. A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." ESA § 3(6), 16 U.S.C. § 1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all of a significant portion of its range." ESA § 3(20), 16 U.S.C. § 1532(20).

45. A species receives mandatory substantive protections under the Endangered Species Act if and only if it is listed as endangered or threatened.

46. Premature delisting of GYE grizzly bear would eliminate the ESA's statutory protections and allow states to regulate hunting and other activities detrimental to the sustained recovery of GYE grizzly bears throughout their traditional historic habitat range.

<u>Consultation Policies</u>

47. In 1997, the Secretary of Interior issued Secretarial Order No. 3206, "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" pursuant to the ESA, the federal-tribal trust relationship, and other federal law. DOI S.O. No. 3206, Sec. 1. The Order clarifies the responsibilities of agencies when actions taken under the authority of the ESA affect or may affect Indian lands, resources, or rights. *Id.*

48. Order 3206 recognizes the special federal trust responsibility and government-to-government relationship with tribes, defined by treaties, statutes, executive orders, judicial decisions, and agreements. *Id.* at Sec. 4. The Departments are to recognize, respect, and consider the value of traditional tribal knowledge to resource management activities. *Id.*

49. Order 3206 notes that Departments shall be sensitive to Indian cultures, religions, and spirituality, which often involve animals and specific geographic places. *Id.* The Department must establish and maintain an effective working relationship and mutual partnership to promote the conservation of sensitive species and the health of the ecosystems upon which they depend. *Id.*

50. Order 3206 directs the Department of the Interior and its constituent agencies to engage in direct, meaningful government-to-government consultation with affected Indian tribes and that all agencies should take into consideration the religious, spiritual, and cultural significance of listed species when taking an action pursuant to the ESA. *Id.* at Sec. 5.

51. It is the responsibility of FWS to maintain current lists of tribal contact persons and to ensure that meaningful government-to-government communication occurs regarding actions taken under the ESA. Appendix to S.O. 3206 Sec. 2. Consultation should also occur with the Bureau of Indian Affairs ("BIA"), which has the primary responsibility for carrying out the federal trust responsibility. *Id.*

52. FWS must provide Indian tribes the opportunity to actively review and comment on proposed listing actions, and provide Indian tribes with a written explanation whenever a final decision conflicts with comments provided by a tribe. *Id.* at Sec. 3(B).

53. The Appendix to Secretarial Order 3206, which by its own language is considered an integral part of the Secretarial Order, directs FWS to solicit input from tribes during the consultation process, to provide tribes with copies of any Biological Assessments to the extent permitted by law, and provides for formal consultation with the BIA on issues affecting tribal rights, with tribes encouraged to participate in the consultation process. *Id.* at Sec. 3(C).

11

54. In order to establish regular and meaningful consultation with Indian tribes, in 2000 the President promulgated Executive Order No. 13175, "Consultation and Coordination with Indian Tribal Governments," recognizing the unique legal relationship between the United States and Indian Tribes including the trust responsibility of the United States and the right of Tribes to self-government.   E.O. No. 13175, Sec. 2, Fed. Reg. Vol. 65, No. 218, November 9, 2000.

55. The Executive Order directs all agencies to adhere to these fundamental principles when formulating and implementing policies that have tribal implications.  *Id.* at Sec. 3.  The Executive Order requires each agency to have an accountable process to insure meaningful and timely consultation with and input by tribal officials.  *Id.* at Sec. 5.

56. On issues that relate to tribal treaty and other rights, the agencies are to use consensual mechanisms for developing regulations.  *Id.*

57. Executive Order 13175 ensures all agencies respect the sovereignty of Indian tribes as well as the government-to-government relationship between tribes and the United States by engaging in meaningful pre-decisional consultation early in policy decision-making processes whenever an agency action will have tribal implications.  *Id.*

58. Executive Order No. 13175 defines "policies that have tribal implications" as "…regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes."

59. Pursuant to the consultation duty promulgated in Executive Order No. 13175, the Secretary of Interior issued Secretarial Order No. 3317, "DOI Policy on Consultation with Indian

Tribes," in 2011. DOI S.O. No. 3317, Sec 1.  Order 3317 requires the Department of Interior and its constituent agencies to engage in meaningful government-to-government consultation with affected tribes early in the planning process whenever an action has tribal implications.  *Id.* at Sec. 4.

60. Executive Order 13175, Secretarial Order 3206, and Secretarial Order 3317 apply to Defendants as "agencies" and to the federally recognized Indian tribes who are plaintiffs.

61. Consultation must be a collaborative effort with tribes that emphasizes trust, respect, and shared responsibility.  *Id.*

62. When a departmental action with tribal implications arises, bureaus and offices are to seek to promote cooperation between agencies with special expertise and related responsibilities.  *Id.*

63. The DOI Manual on American Indian and Alaska Native programs lays out policies, responsibilities, and procedures for operating on a government-to-government basis with federally recognized Indian tribes, including consultation.  512 DM 2.

64. FWS published notice of its new Native American Policy in the Federal Register January 27, 2016.  81 Fed. Reg. 14, 4638 (Jan 27, 2016).  This policy recognizes the unique relationship with tribes and the importance of the trust responsibility.  *Id.* at Sec. 1.  The authorities cited for FWS' policy include the ESA, the Religious Freedom Restoration Act ("RFRA"), EO 13175, and SO 3206 (Exhibit 3 to the notice).  The policy describes communication, consultation, and information sharing between FWS and tribes and sets out collaborative management and co-management opportunities.  *Id.* at Sec. 3-4.  It also recognizes that meaningful cultural and religious practices of tribal members may require access to land and animals for which FWS has management responsibility.  *Id.* at Sec. 5.

Pursuant to this policy, FWS updated its U.S. Fish and Wildlife Service Tribal Consultation Handbook ("Handbook").

65. FWS has an extensive tribal policy set out in its Tribal Consultation Handbook.  Section 4.3 of the Handbook "When is Consultation Necessary?" notes that consultation is required when FWS proposes regulations or policies that may have Tribal Implications such as "activities…that may affect…endangered species."

66. Section 4 of the Handbook cites to the DOI Policy on Consultation with Indian Tribes, which states "consultation protocol must be followed when it is known that a decision about a 'Departmental Action with Tribal Implications' must be made, including any rulemaking."

67. The Handbook discusses cultural awareness, as well as pre-meeting, meeting, and post-meeting follow-up protocols.  *Id.* at Sec. 3, 6.   Consultation is to happen early and often. *Id.* at Sec. 8.1.

68. Both the Handbook and the 2016 Native American Policy emphasize transparency as a critical component of meaningful consultation with tribes.

69. In addition, both the Handbook and the 2016 Native American Policy reflect a larger departmental policy that government-to-government consultation between Indian tribes and the United States and its agencies extends beyond mere "public comment" available to the general public.  Executive Order No. 13175 and Secretarial Order Nos. 3317 and 3206, along with FWS' own policies, require meaningful, pre-decisional consultation that occurs early in an agency's decision making process.

70. The Department of the Interior has maintained its commitment to meaningful tribal consultation into the current administration.  On March 8, 2017, Secretary Ryan Zinke

testified before the Senate Committee on Indian Affairs, stressing the need to engage in meaningful consultation with Indian tribes on a consistent basis. Secretary Zinke stated "…our duty as Americans is to uphold our trust responsibilities and consult and collaborate on a government-to-government basis with Tribes from Maine to Alaska." *Identifying Indian Affairs Priorities for the Trump Administration*: *Hearing before the S. Comm. on Indian Affairs*, 115 Cong. (2017) (statement of Ryan Zinke, Secretary, United States Department of the Interior).

71. The tribal consultation policies of administrative agencies are also informed by the American Indian Religious Freedom Act, which states that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996.

<u>Religious Significance of the GYE Grizzly Bear</u>

72. Plaintiffs attach sincere religious significance to the GYE grizzly bear. This spiritual import of the GYE grizzly bear encompasses not only the continued health and vitality of the animals themselves, but also the coexistence of Plaintiffs and GYE grizzly bears within these bears' traditional and historic habitat range. The practice of such religious faith depends on the continued health and regrowth of the GYE grizzly bear population

15

throughout the entirety of its traditional and historic habitat range, which includes Plaintiffs' culturally and religiously significant homelands.

73. In addition, GYE grizzly bears play an indispensable role in religious ceremonies which are essential to the exercise of Plaintiffs' religious beliefs.

74. Grizzly bears serve as far more than a tangible religious symbol for Plaintiffs. Plaintiffs' spiritual connection with the GYE grizzly bear is, in large part, rooted in the dynamic between the grizzly bear, humans, and the land. For this reason, there is a particular significance to removing protections for the GYE grizzly bear population within an entire ecosystem.

75. Because the sincerely held spiritual or religious beliefs of some of the Plaintiffs or some of their members compels them to protect the Grizzly Bears, to prevent trophy hunting, or to prevent other hunting. Those Plaintiffs or members will be at risk of injury, or criminal or civil prosecution for the exercise of those sincerely held spiritual or legal beliefs when they take action to prevent such hunting. In each state where hunting is planned, interference with hunting carries criminal penalties and neither those laws nor the delisting provides accounts for religious or spiritual-based exception.

### GYE Grizzly Population Delisting: Conservation Strategy and Final Rule

76. Grizzly bears were classified as a "threatened" species under the Endangered Species Act in 1975.

77. Upon designating grizzly bears as "threatened," FWS was required to institute a recovery plan setting forth "(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species; (ii) objective, measurable criteria which, when met, would result in a determination, in

accordance with the provisions of this section, that the species be removed from the list; and 10 (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal."  16 U.S.C. § 1533(f)(1).

78. FWS instituted an initial Recovery Plan in 1982 and amended the Recovery Plan in 1993. The 1993 Recovery Plan requires that any delisting be conditioned upon the completion of an interagency conservation strategy ensuring that "adequate regulatory mechanisms will continue to be present after delisting."   U.S. Fish and Wildlife Service, Grizzly Bear Recovery Plan 1, 16 (Sept. 10, 1993) [hereinafter "Recovery Plan"].  The Recovery Plan also requires that "a conservation strategy specific to an ecosystem be *completed prior to any* process to delist the grizzly population within that ecosystem in order to ensure that adequate regulatory mechanisms will continue to conserve the grizzly bear and its habitat." *Id.* (emphasis added).

79. The interagency committee delegated with the responsibility of developing the requisite Conservation Strategy was the Yellowstone Ecosystem Subcommittee of the Interagency Grizzly Bear Committee ("IGBC-YES").   The IGBC-YES membership consists of representatives from FWS; national parks and forests in the region; and state/county agencies from Idaho, Montana, and Wyoming.  Of the currently listed members, the only two that represent tribal interests are Leander Watson from the Shoshone Bannock Tribes and Ben Snyder from the Wind River Tribal Fish and Game Department.

80. During the period leading up to FWS publically announcing its decision to delist the GYE grizzly bear, IGBC-YES developed a draft Conservation Strategy outlining a regulatory framework purportedly designed to ensure the continued protection of the GYE grizzly

bear following delisting.  This draft Conservation Strategy identified thirteen (13) signatories representing various state and federal agencies who would be responsible for implementing one or more components of the Conservation Strategy.  None of the identified signatories represented any Indian tribe or tribal agency.

81. On March 3, 2016, FWS released to the media a statement that the agency had made the decision to delist grizzly bears from the ESA in the Greater Yellowstone area.  In this statement, FWS stated that it "…will be seeking review and comment by the public, other federal and state agencies, and independent scientists." *Id*.

82. On March 11, 2016. FWS published a Proposed Rule to delist the GYE grizzly in the Federal Register, with a sixty (60) day public comment period ending on May 5, 2016.  The draft Conservation Strategy was made available to the public and opened for comment concurrent with the Proposed Rule.

83. Prior to the publication of the Proposed Rule, FWS had put forth minimal effort to consult with affected tribes regarding the delisting of the GYE grizzly bear.  FWS first sent out a letter in April of 2014 to four regional tribes advising these tribes of FWS's consideration of delisting the GYE grizzly bear.  The FWS recognized this outreach was too narrow and inadequate to meet any consultation duty.  82 Fed. Reg. at 30552-3 ("… the Service was made aware of many more Tribes having an interest in the GYE grizzly bear and expanded our efforts in explaining the status of the grizzly bear and offering government-to-government consultation to Tribes.").  In February 2015, and again in June 2015, FWS issued a new letter to wider array of tribal leaders, conceding that "reaching out only to tribes in close proximity to the GYE was insufficient and did not appreciate the breadth of the historical, cultural, and spiritual connection to tribes outside of the geographic area

have to the GYE grizzly bear."  On October 29, 2015, FWS purportedly sent a letter to fifty-three (53) tribes inviting them to participate in a webinar on the status of the GYE grizzly bear.  This webinar was uniformly rejected by the tribes.  The FWS has conceded that the March 10, 2016 webinar was not government-to-government consultation.  82 Fed. Reg. at 30553.  Finally, on March 3, 2016, the same day on which it announced its proposal to delist the GYE grizzly bear, FWS purportedly sent out two (2) subsequent letters to fifty-three (53) tribes inviting these tribes to attend one (1) of two (2) prescheduled, four-hour "consultation" meetings: one (1) on April 28, 2016 in Bozeman, Montana, and another on May 5, 2016 in Rapid City, South Dakota.

84. Irrespective of whether or not all of the tribes with a religious stake in the GYE grizzly bear received the communications referenced above, such communications do not constitute meaningful, pre-decisional consultation, offering little more than that available to the public at large.  Significantly, the communications referenced above reference only the potential decision to remove the GYE grizzly bear from the threatened species list, and not the imposition of new and harmful regulatory mechanisms under the concomitant Conservation Strategy.  The draft Conservation Strategy was not made available to the public until FWS had already made its decision to delist the GYE grizzly bear.

85. While the Proposed Rule remained pending, the IGBC-YES, led by FWS, proceeded in revising and finalizing the requisite Conservation Strategy.  Despite FWS indicating in the Proposed Rule that both the Northern Arapaho Tribe and Eastern Shoshone Tribe were members of the IGBC-YES and, thus, contributors to the development of the Conservation Strategy, neither of these tribes participated in composing, revising, or finalizing the Conservation Strategy.  In fact, in an October 18, 2016 letter to then Interior Secretary

Sally Jewell, the Northern Arapaho Business Council expressed its opposition to the delisting rule and repudiated all representations from FWS that the tribes which comprise a portion of the IGBC-YES support the delisting.  There was also no consultation on the final Conservation Strategy with any other tribes, including Plaintiffs.

86. At a meeting held on November 16-17, 2016, members of the IGBC-YES voted to approve purportedly "final" revisions to the Conservation Strategy.  No one from either the Northern Arapaho Tribe or Eastern Shoshone Tribe was present at this meeting.  In fact, the only tribal representative present at this meeting was Leander Watson of the Shoshone Bannock Tribe, who was present only in his capacity as technical staff for the Tribe and was not authorized to vote at the meeting.  As communicated in a subsequent letter from the Northern Arapaho Elders Society to the chairperson of the IGBC-YES, the Northern Arapaho Tribe was not even notified that this November 16-17 meeting was taking place.

87. The approved revisions to the Conservation Strategy substantially altered the draft that had been available to the public during the initial comment period.  By way of example, the final Conservation Strategy expressly declares that the Conservation Strategy would be in operation for an indefinite period of time, while there was no such declaration in the draft which was available for public comment.  The final Conservation Strategy also contained amendments to critical information supplied in the initial draft.  For instance, a sentence on page fifty of the Conservation Strategy was changed from "[t]he GYE grizzly bear population exceeds 500 total bears as of 2006" to "[t]he GYE grizzly bear population has exceeded 500 total bears *since* 2006."  [emphasis added].  This revision gives these two sentences different meanings.  Despite these, and many other, significant changes, the

approved revisions were not opened public comment, much less brought to the attention of affected tribes to facilitate government-to-government consultation.

88.  Between December 9 and December 16, 2016, representatives from each of the agencies identified as signatories to the Conservation Strategy, except for the Regional Chief Biologist for the Central Region of the USGS Biological Resources Division, whose signature line was removed from the Conservation Strategy at some point *after* the "final" revisions were made for reasons unknown at this time.  As in the draft Conservation Strategy, none of the signatories of the final and executed Conservation Strategy represented any Indian tribe or tribal agency.

89. The final and executed Conservation Strategy enumerates its objective of "manag[ing] grizzly bears as a game animal; including allowing regulating hunting when and where appropriate."  In furtherance of this objective, the Conservation Strategy defers to the states of Idaho, Montana, and Wyoming to develop their own grizzly bear management plans, which includes setting their own hunting regulations and mortality rates for the GYE grizzly bears with no accountability to affected tribes.

90. Despite a lack of tribal participation in developing the Conservation Strategy, the Conservation Strategy also states that the Wind River Reservation has developed its own grizzly bear management plan to be incorporated into the Conservation Strategy. Examination of the appendices to the Conservation Strategy reveals that the Wind River management plan referenced in the Conservation Strategy was executed back in 2009, prior to the initial rule delisting the GYE being overturned in federal court.

91. Plaintiffs were never given an opportunity to engage in meaningful, pre-decisional consultation regarding the development and/or finalization of the Conservation Strategy.

92. On June 30, 2017, the FWS published in the Federal Register the Final Rule Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife ("Final Rule").  82 Fed. Reg. 30502.  The rule contains the FWS's determination that the GYE grizzly bear no longer meets the definition of an endangered or threatened species under the ESA.  According to the FWS this determination is based on the best available science.  The final rule also adopts the Grizzly Bear Recovery Plan Supplement and makes effective the 2016 Conservation Strategy.  This rule becomes effective July 31, 2017.

93. Upon issuing their Final Rule, Defendants have not only made their decision to delist the GYE grizzly bear, but have also completed the process of determining how the decision will be implemented, all without formal consultation with affected Indian tribes.  Any comments made by tribes at the two meetings scheduled by the Defendants certainly cannot be construed as meaningful, pre-decisional collaborative consultation between governments.

**COUNT I:**

**THE FINAL RULE AND ACCOMPANYING CONSERVATION STRATEGY VIOLATE THE ADMINISTRATIVE PROCEDURE ACT FOR FALURE TO ENGAGE IN MEANINGFUL, PRE-DECISIONAL CONSULTATION WITH AFFECTED INDIAN TRIBES EARLY IN THE PLANNING PROCESS**

94. Paragraphs 1 through 93 are incorporated herein by reference as if fully set forth herein.

95. DOI and FWS policy, protocols, and manuals require FWS to engage in meaningful, pre-decisional consultation that occurs early in the ESA delisting decision-making process prior to making a decision on any action having any tribal implications.

96. The Final Rule does not mention the policies of the FWS Handbook, though it does cite to other sources of the consultation duty and acknowledge its obligation for government-to-government consultation.

97. FWS has a duty to meaningfully consult with the Tribe prior to making the delisting decision. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979); *Lower Brule Sioux Tribe v. Deer*, 911 F.Supp 395, 400 (D.S.D. 1995).

98. The Eighth Circuit has held that where an agency has "established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before … policy is made, that opportunity must be afforded. Failure of the [Bureau] to make any real attempt to comply with its own policy of consultation not only violates those general principles which govern administrative decision-making, but also violates "'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *Oglala*, 603 F.2d at 721 (internal citations omitted).

99. Meetings with tribes on an issue after an agency action has already been decided cannot fulfill the requirement of meaningful consultation. *Id.* at 720.

100.    In a federal claims case challenging FWS's handling of cooperative farming agreements, the court held that FWS' failure to comply with the departmental manual was arbitrary and capricious. *Hymas v. United States*, 117 Fed. Cl. 466, 491 (2014), vacated and remanded on other grounds, 810 F.3d 1312 (Fed. Cir. 2016).

101.    The Plaintiff in *Hymas* argued that the selection process FWS used did not comply with either the Departmental Manual or the Service Manual governing evaluation of cooperative farming agreement applications.  117 Fed. Cl. at 491.  FWS departmental

manual at issue in *Hymas* required that FWS conduct an objective review of qualified applicants prior to awarding the agreements stating "Competition in making awards through cooperative agreements is strongly encouraged and is expected in awarding discretionary grants, unless otherwise directed by Congress.  In all cases, bureaus and offices are required to make awards based on the merits in accordance with the law."  *Id.* at 503-04.

102.    The court in *Hymas* reviewed the manual under the test laid out in *Hamlet v. United States*, 63 F.3d 1097 (Fed. Cir. 1995).  *Id.* at 503.  Agency personnel manuals or handbooks are entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent.  *Id.* (citing *Hamlet*, 63 F.3d at 1103-05).

103.    As in *Hymas*, here, FWS had authority to issue its Tribal Consultation Handbook and Interior had authority to issue its Policy on Consultation with Indian Tribes.  The handbooks conform to the requisite procedural requirements as noted in each handbook's appendix.  The language used by the handbooks is mandatory language, not advisory, and the provisions are substantive.  The consultation requirements in the handbooks do not contravene a statute; rather they further the objectives of many statutes including the ESA.

Thus, FWS was required to comply with both the departmental manual and FWS manual. Their failure to comply makes the decision to delist arbitrary and capricious.

104. Federal courts have also held an agency's failure to comply with departmental policies and procedures requiring meaningful consultation to be arbitrary and capricious. *Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1346 (D. Wyo. 2015), vacated and remanded sub nom. *Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016). Noting the DOI policy requires "extra, *meaningful* efforts to involve tribes in the decision making process" the court in *Wyoming* found that holding four regional tribal consultation meetings, distributing copies of a draft rule to affected tribes and offering to meet individually with tribes after the regional meeting was "little more than that offered to the public in general." *Id.* The court went on to note that the BLM seemed to have made up its mind prior to initiating discussions with tribes, failing to comply with departmental policies in an arbitrary and capricious action. *Id.* Here too, FWS' failure to adhere to the same policy is also arbitrary and capricious, and the delisting decision must be overturned.

105. The DOI and FWS handbooks and policies at issue here were published in the Federal Register, unlike the policies at issue in *Hoopa Valley Tribe v. Joe Christie*. 812 F.2d 1097 (9th Cir. 1986) citing *Morton v. Ruiz*, 415 U.S. 199 (1974).

106. The Court in *Morton v. Ruiz* noted that "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." 415 U.S. at 235. (*citing* Service v. Dulles, 354 U.S. 363, 388 (1957)); Vitarelli v. Seaton, 359 U.S. 535, 539—540 (1959). In *Morton*, the manual at issue was not published in the Federal

Register, and there had been inconsistency with BIA's interpretation of the policy, making it unenforceable. *Id.* at 230. Here, the Handbook and policies have been published and the duty of consultation is clear, making a failure to meaningfully consult arbitrary and capricious.

107. Defendants have failed to provide the Plaintiff Tribes or other tribes and those within the Tribe who would participate in such consultation (which includes most or all of the individual Plaintiffs) with an opportunity to participate constructively in the ESA delisting decision-making process through government-to-government consultation. FWS' letters and subsequent invitation for the dozens of affected tribes to attend pre-scheduled and time-restricted "consultation" after the Proposed Rule was already published is an inadequate substitute for the meaningful, pre-decisional consultation required under applicable federal policies. To the contrary, these meetings merely constituted a limited forum for voicing concerns relating to Defendants' already decided-upon actions, a process which is functionally no different from notice and comment.

108. Even if FWS's "consultation" meetings did qualify as meaningful, pre-decisional consultation with affected tribes, it is unrealistic that these meetings could have encompassed all components of the delisting process that could affect tribes, including, but not limited to, the contents of both a 54-page Proposed Rule and a 133-page draft Conservation Strategy.

109. Further, Defendants' failure to complete and publish the Conservation Strategy prior to initiating the supposed "consultation" process with Plaintiffs and other affected tribal governments, as is required under FWS's own Grizzly Bear Recovery Plan, undermined the transparency of the consultation process. Defendants have supplied incomplete

information regarding the nature and implications of the actions contemplated by the agency, including, but not limited, information relating to 1) the imposition of a new and harmful regulatory framework surrounding the killing of GYE grizzly bears and 2) the omission of tribal representatives in the development and implementation of the Conservation Strategy, and 3) the participation of tribal voices in the development and implementation of the Conservation Strategy.  By undermining the transparency of the consultation process, Defendants have once again violated their own consultation policies.

110. Defendants' numerous distinct failures to follow their own policies requiring that they engage in meaningful, transparent, and pre-decisional consultation early in the decision-making process regarding the delisting of the GYE grizzly bear and the development and approval of the accompanying Conservation Strategy each render the promulgation of the Final Rule arbitrary, capricious, and not in accordance with law.

111. The initial outreach through form letters by the FWS was too narrow and perfunctory to be considered meaningful consultation, and that consultation did not extend to Plaintiffs.  The later attempts at consultation with tribes while still insufficient, also came too late in the decision making process to be considered sufficient to meet the consultation duty of the FWS.

112. FWS did not consult with tribes and the delisting therefore was not informed by the wisdom and experience of tribes and tribal people, or by the connection between tribes, tribal people and the Grizzlies.

## COUNT II

**DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURE ACT BY INITIATING THE PROCESS OF DELISTING THE GYE GRIZZLY BEAR PRIOR TO THE COMPLETION OF THE CONSERVATION STRATEGY**

113. Paragraphs 1-111 are incorporated herein by reference as if fully set forth herein.

114. The 1993 Recovery Plan requires that the Conservation Strategy be "completed prior to any process to delist the grizzly population within that ecosystem in order to ensure that adequate regulatory mechanisms will continue to conserve the grizzly bear and its habitat." Recovery Plan at 16.

115. The Conservation Strategy was not finalized until November, 2016, several months after the Proposed Rule to delist the GYE grizzly bear was published by FWS.

116. FWS's publication of the Proposed Rule falls within the scope of "any process to delist the grizzly population" as set forth in the Recovery Plan.

117. By initiating the delisting process prior to the completion of the Conservation Strategy, FWS violated its own requirements under the Recovery Plan, rendering its delisting of the GYE grizzly bear, capricious, and abuse of discretion, and otherwise not in accordance with law.

## COUNT III

**DEFENDANTS' ENACTMENT OF THE CONSERVATION STRATEGY IN SPITE OF ITS LACK OF TRIBAL REPRESENTATION, MISLEADING CONTENT, AND NONCOMPLIANCE WITH THE GRIZZLY BEAR RECOVERY PLAN VIOLATES THE ADMINISTRATIVE PROCEDURE ACT**

118. Paragraphs 1-116 are incorporated herein by reference as if fully set forth herein.

119. Pursuant to FWS's 1993 Grizzly Bear Recovery Plan, the function of the Conservation Strategy is to ensure the existence of "adequate regulatory mechanisms" post-delisting; as

such, the Conservation Strategy constitutes an indispensable component of the delisting process.

120. Following the publication of the Proposed Rule, the IGBC-YES finalized the Conservation Strategy without any meaningful input from Indian tribes – including those tribes who would purportedly share responsibility for implementing the Conservation Strategy – and ultimately executed the Conservation Strategy without obtaining any signatures from representatives of Tribes or Tribal agencies signifying their commitment to cooperate in the implementation of the Conservation Strategy.

121. Rather than incorporate meaningful input or commitment from affected tribes, the IGBC-YES incorporated the 2009 Wind River Grizzly Bear Management Plan into the Conservation Strategy, a management plan which does not reflect the current positions or commitments of the Tribes of the Wind River Reservation.

122. By issuing a Final Rule activating a Conservation Strategy that is both 1) devoid of meaningful tribal input and 2) falsely reflective of tribal commitment to participate in its implementation, Defendants have acted in a manner which is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

**COUNT IV:**

**DEFENDANTS' FINAL RULE DELISTING THE GYE GRIZZLY BEAR AND ACCOMPANYING CONSERVATION STRATEGY VIOLATE THE RELIGIOUS FREEDOM RESTORIATION ACT**

123. Paragraphs 1 through 121 are incorporated herein by reference as if fully set forth herein.

124. The Religious Freedom Restoration Act (RFRA), codified at 42 U.S.C. § 2000bb *et seq*., guarantees the Tribe's and its individual tribal members' rights to free expression of traditional religious faith by expressly requiring the Defendants to "…not substantially burden [the] exercise of religion even if the burden results from a rule of general

applicability, except as provided in subsection (b) of this section." Section (b), in turn, allows the Defendants to substantially burden the Tribe's and its tribal members' rights to free expression only if "…it demonstrates that application of the burden…is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1.

125. The term "government" is defined by the RFRA as "…a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  42 § 2000bb-2.

126. The term "exercise of religion" is defined by the RFRA as "…that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion. 42 § 2000bb-2; 42 § 2000cc-5.

127. The RFRA "…applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."  42 U.S.C. § 2000bb-3.

128. Defendants have placed a substantial burden upon Plaintiffs' religious freedom by issuing a Final Rule that removes protections necessary for the GYE grizzly bears to repopulate their traditional homeland, threatening the continuity of Plaintiffs' traditional religious practices – a threat which extends significantly beyond subjective spiritual fulfillment.

129. Defendants have further placed a substantial burden upon Plaintiffs' religious freedom by giving state governments the power to hunt and establish mortality rates for GYE grizzly bears without requiring any form of tribal consultation or consent, thereby placing unnatural and undue restrictions on Plaintiffs' ability to participate in the dynamic between

humans, grizzly bears, and the natural world comprising the Greater Yellowstone ecosystem.

130. Defendants have placed a substantial burden upon Plaintiffs' religious freedom by establishing a regulatory framework that both directly and indirectly confers rights to hunt and kill GYE grizzly bears, such that any interference with these rights, even when such interference is compelled by sincere religious beliefs, will result in not only physical danger, but civil and criminal liability as well; accordingly, this conferral of rights coerces Plaintiffs into complicity with behaviors that controvert Plaintiffs' sincere religious beliefs.

131. Defendants have not shown that the substantial burden they have placed upon Plaintiffs' exercise of sincerely held religious beliefs "is in furtherance of a compelling governmental interest", much less have they demonstrated that issuing the Final Rule is "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

132. Further, the Final Rule does not contain any mention of the RFRA, or that the FWS considered its obligations under the RFRA in making the decision to delist.  The FWS states that they "considered issues of cultural, spiritual, and ecological importance that Tribes raised and we are sensitive to those concerns.  However, the Act requires the Service to make decisions based on the biological status of the species as informed solely by the best scientific and commercial data available."  82 Fed. Reg. 30553.  It is the position of the FWS that they cannot consider the religious implications of their delisting decision because this would conflict with the ESA.  This position is in violation of RFRA and is arbitrary and capricious.

133. For the foregoing reasons, Defendants have violated the RFRA by promulgating the Final Rule delisting the GYE grizzly bear and by enacting the concomitant Conservation Strategy.

## REMEDIES SOUGHT BY PLAINTIFFS

1. Defendants, contrary to their obligations under federal law, regulation, and policy, arbitrarily and capriciously have decided to delist GYE grizzly bears from the ESA's threatened species list without engaging in meaningful, pre-decisional consultation with affected Tribes beforehand, and without providing any information regarding how the delisting will avoid substantially burdening the Tribe's religious and cultural interests in GYE grizzly bears.

2. Permanent injunctive relief should be granted to restrain the Defendants from taking any actions to effect the delisting of the GYE grizzly bear from the ESA's threatened species list or to implement the Conservation Strategy, until such time as the Defendants have complied with all applicable federal laws, regulations and policies, and their own internal policies, and until such time as meaningful, pre-decisional consultation has been conducted with the Plaintiffs early in any renewed delisting decision process and the views of the Tribe has been given effect.

3. Permanent injunctive relief should be granted to restrain Defendants from effecting the delisting of the GYE grizzly bear because the decision to delist is in violation of RFRA.

4.  Further, such permanent injunctive relief should be ordered prohibiting further and/or additional efforts to delist GYE grizzly bears until Defendants engage in pre-decisional consultations with the Plaintiffs and other affected Indian tribes.

WHEREFORE, Plaintiffs pray that:

1. A Permanent Injunction be granted enjoining the Defendants from taking any actions to effect the delisting of GYE grizzly bears from the ESA's threatened species list, until such time as the Defendants have fully engaged in meaningful pre-decisional consultation with the Tribal Plaintiffs.

2. A decree of Declaratory Judgment be entered by the Court, pursuant to 28 U.S.C. § 2201 *et seq*. specifying to Defendants that:

   a. Defendants did not provide Plaintiffs with substantive, meaningful pre-decisional consultation pursuant to DOI and FWS Consultation Policies, Executive Order No. 13175 and Secretarial Order Nos. 3317, and that Plaintiffs are entitled to such.

   b. Defendants acted arbitrarily, capriciously by prematurely delisting GYE grizzly bears before conducting meaningful, pre-decisional consultation early in the ESA delisting process which takes into account the cultural and religious importance of listed species.

   c. Defendants' decision to prematurely delist GYE grizzly bears from the ESA's threatened species list unduly burdens the Plaintiffs and the Plaintiffs' individual tribal members' free exercise of their traditional religious faith.  In addition, the Defendants have failed to show that they have a compelling government interest in delisting GYE grizzly bears and that removing the bears from the ESA's threatened species list before meaningful, pre-decisional consultation early in the decision making process has occurred between Defendants and affected Indian tribes is the least restrictive means of furthering that compelling government interest

      d.  Any other decree or declaratory judgment by the Court deemed just, proper and necessary based upon the pleadings, facts, law and evidence.

3.  The Court make awards of costs, disbursements and attorney fees to the Plaintiffs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and other applicable authority.

4.  The Court provide such other and further relief as it may deem necessary and proper.

Dated this 30th day of June, 2017.

**FREDERICKS PEEBLES & MORGAN LLP**

*s/   Peter J. Breuer*
Peter J. Breuer
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 673-9600
Facsimile: (303) 673-9155/9839
Email: pbreuer@ndnlaw.com

*Attorney for the Plaintiffs*