UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
Missoula Division

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| CROW INDIAN TRIBE, CROW CREEK SIOUX TRIBE, STANDING ROCK SIOUX TRIBE, LOWER BRULE SIOUX TRIBE, PONCA TRIBE OF NEBRASKA, PIIKANI NATION, THE CRAZY DOG SOCIETY, HOPI NATION BEAR CLAN, NORTHERN ARAPAHO ELDERS SOCIETY, DAVID BEARSHIELD, KENNY BOWEKATY, LLEVANDO FISHER, ELISE GROUND, ARVOL LOOKING HORSE, TRAVIS PLAITED HAIR, JIMMY ST. GODDARD, PETE STANDING ALONE, NOLAN YELLOW KIDNEY, and GARY DORR, | \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | CIV. 17-CV-00089-DLC-JCL |

CROW INDIAN TRIBE, CROW CREEK
SIOUX TRIBE, STANDING ROCK
SIOUX TRIBE, LOWER BRULE SIOUX
TRIBE, PONCA TRIBE OF
NEBRASKA, PIIKANI NATION, THE
CRAZY DOG SOCIETY, HOPI
NATION BEAR CLAN, NORTHERN
ARAPAHO ELDERS SOCIETY, DAVID
BEARSHIELD, KENNY BOWEKATY,
LLEVANDO FISHER, ELISE GROUND,
ARVOL LOOKING HORSE, TRAVIS
PLAITED HAIR, JIMMY ST.
GODDARD, PETE STANDING ALONE,
NOLAN YELLOW KIDNEY, and GARY
DORR,

CIV. 17-CV-00089-DLC-JCL

            Plaintiffs,

FIRST AMENDED COMPLAINT

vs.

AND

UNITED STATES OF AMERICA, and
RYAN ZINKE, Secretary, United States
Department of the Interior, and the
UNITED STATES DEPARTMENT OF
INTERIOR, and GREG SHEEHAN,
Acting Director, United States Fish and
Wildlife Service, or his Successor in
Office, and the UNITED STATES FISH
AND WILDLIFE SERVICE, and
HILARY COOLEY, Grizzly Bear
Recovery Coordinator,

PETITION FOR PERMANENT
INJUNCTION AND DECLARATORY
RELIEF

            Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

1.   Plaintiffs, Crow Indian Tribe, Crow Creek Sioux Tribe, Standing Rock Sioux Tribe, Lower Brule Sioux Tribe, Ponca Tribe of Nebraska, Piikani Nation, the Crazy Dog Society, Hopi Nation Bear Clan, Northern Arapaho Elders Society, David Bearshield, Kenny Bowekaty, Llevando Fisher, Elise Ground, Arvol Looking Horse, Travis Plaited Hair, Jimmy St. Goddard, Pete Standing Alone, Nolan Yellow Kidney, and Gary Dorr for their Complaint against Defendants challenging the United States Fish and Wildlife Service's Final Rule. 82 Fed. Reg. 30502 (June 30, 2017) ("Final Rule"), establishing a Distinct Population Segment ("DPS") for the grizzly bear population of the Greater Yellowstone ecosystem ("GYE grizzly bear") and delisting the GYE grizzly bear from the Federal List of Endangered and Threatened Wildlife, as well as the Conservation Strategy accompanying the Final Rule (to be codified at 50 C.F.R. pt. 17), hereby allege as follows:

2.   Plaintiffs seek a permanent injunction pursuant to Federal Rule of Civil Procedure 65 and Declaratory Relief pursuant to 28 U.S.C. § 2201 *et seq.*, and an Order enjoining Defendants from proceeding with their announced plan to remove grizzly bears in the Greater Yellowstone region from the Endangered Species Act's threatened species list.

3.   The United States Congress enacted the Endangered Species Act ("ESA") in an effort to avoid wildlife extinction by reversing the trend of dramatic population losses of listed species.  The purpose of listing is to recover a species to self-sustaining, viable populations that no longer need protection.

4.   Operating under the authority of the ESA, the United States Fish and Wildlife Service ("FWS") listed grizzly bears within the conterminous United States as "threatened" in 1975.  40 Fed. Reg. 31, 734 (July 28, 1975).  Subsequently, in 1978, the ESA was amended

to expressly include Distinct Population Segments within the definition of "species" eligible to be listed as threatened or endangered under the ESA. P.L. 95-632, 92 Stat. 3752 (Nov. 10, 1978). In its 2011 Status Review, FWS concluded that the grizzly bear population listed as "threatened" in 1975 is "discrete and significant" and thus "warrants recognition as a DPS under the ESA." U.S. Fish and Wildlife Service, 5 Year Review: Summary and Evaluation at 12 (Aug. 2011).

5. At the time of the grizzly bear's 1975 listing, FWS noted that the species had been reduced to approximately two-percent (2%) of its former habitat range.

6. FWS has recently observed that the rate of population growth among grizzly bears in the Greater Yellowstone area has slowed.

7. Despite the recent slowdown in population growth, there has been some dispersal into habitat outside of the Greater Yellowstone area, such as the Wind River Range, the Gallatin Range, and east of the Absaroka Mountains, indicating that grizzly bears may be in the early stages of reoccupying some of the historical habitat from which they had long since disappeared.

8. Defendants have made previous premature attempts to delist GYE grizzly bears from the threatened species list. Specifically, in 2007, FWS promulgated a proposed order to delist GYE grizzly bears from the threatened species list. 72 Fed. Reg. 14866 (March 29, 2007). In response, a variety of environmental groups filed lawsuits challenging the delisting decision. In September 2009, a federal district judge for the district of Montana overturned the delisting decision and placed GYE grizzly bears back on the threatened species list, reasoning that FWS did not adequately consider the impacts that the loss of whitebark pine – a particularly important food source – would have on the long-term viability of GYE

grizzly bears. *Greater Yellowstone Coal., Inc. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), *aff'd in part, rev'd in part and remanded*, 665 F.3d 1015 (9th Cir. 2011).  FWS filed an appeal in the Ninth Circuit Court.  The Ninth Circuit rejected FWS's argument and upheld the district court's ruling to relist.  In reaching its decision, the Ninth Circuit stated that FWS failed to articulate a rational connection between data in the record and FWS's determination that the decline in whitebark pine as a food source would not threaten the long-term recovery of GYE grizzly bears.  *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011).

9.    Since the Defendants' loss in the Ninth Circuit, FWS has been steadily working towards a second effort to delist the GYE grizzly bear.  These efforts have culminated in the promulgation of a Final Rule designating the GYE grizzly bear as a distinct population segment and simultaneously delisting the GYE grizzly bear from the threatened species list; and the adoption of a concomitant Conservation Strategy establishing the regulatory framework for local, state, and federal management of the GYE grizzly bear population following delisting.  *Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife*, 82 Fed. Reg. 30502 (June 30, 2017) (to be codified at 50 C.F.R. pt. 17).

10.   Defendants engaged in an intensive pre-decisional consultation with state governments in anticipation of handing over conservation and protection duties, including the drafting and publishing of state conservation plans.  Yet, Indian tribes, including Plaintiff Indian Tribes, were not included in the decision making process.  Defendants failed to adequately consult with Plaintiffs prior to the decision to delist the grizzly bear from the GYE.

11. Without the protections afforded to species listed on the threatened species list, states will classify GYE grizzly bears as game animals, and will be free to set hunting seasons and issue hunting permits for the GYE grizzly bear population in the Greater Yellowstone area prior to the bears' sustainable recovery throughout its traditional habitat range, including traditional tribal lands.  82 Fed. Reg. at 30528.  Such killing and/or other reduction in population of grizzly bears in the Greater Yellowstone area profoundly disrupts, if not entirely prevents, the GYE grizzly bears' sustainable recovery to its full habitat range, including lands within the jurisdictional boundaries of the Tribes and/or their treaty or aboriginal lands, including culturally and spiritually significant homelands.

12. The Clan and the Societies are traditional religious and/or leadership groups, and Individual Plaintiffs are traditional tribal spiritual, religious, cultural, and/or societal leaders.  Grizzly bears in general, and grizzly bears located in the Greater Yellowstone region specifically, are of deep cultural and religious importance to all of the Plaintiffs.  Plaintiffs have shared their collective homelands with the grizzly bear since time immemorial, and the continued growth of the GYE grizzly population and reoccupation of these bears' traditional habitat range is of considerable cultural and religious importance to the Tribes, the Clan, the Societies and the Individual Plaintiffs.  The spiritual health of both the tribal and individual Plaintiffs depends upon the health and protection of the GYE grizzly bear.  The continued existence and expansion of grizzly bears back into their traditional habitat range is necessary to ensure that the Plaintiffs have the ability to freely express their religious faith.

13. The decision to delist the GYE grizzly bear population from the list of threatened species, as well as the adoption of the concomitant Conservation Strategy, violates the religious

freedom of the Plaintiffs, and is arbitrary, capricious, not in accordance with applicable law, and should be set aside.

14. The decision to delist the GYE grizzly bear violates the ESA both procedurally and substantively.

## **JURISDICTION AND VENUE**

15. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as a defendant); 28 U.S.C. § 1367 (arising under same operative facts); 28 U.S.C. § 1362 (Indian "arising under"); 5 U.S.C. § 701 *et seq.* (Administrative Procedure Act); 42 U.S.C. § 2000bb-1(c) (Religious Freedom Restoration Act); and 16 U.S.C. §1540(g) (the citizen suit provision of the ESA).

16. The Court has authority to grant the requested relief pursuant to 28 U.S.C. § 2201 *et seq.* (declaratory and injunctive relief); the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*; Rule 65 of the Federal Rules of Civil Procedure (restraining order relief), and 16 U.S.C. §1540 (ESA).

17. Plaintiff Tribes bring this Complaint on their own behalf and on behalf of their individual tribal members.

18. Plaintiff Clan and Societies bring this Complaint on their own behalf and on behalf of their individual members.

19. Individual Plaintiffs bring this Complaint on their own behalf.

20. Venue lies in this Court under 28 U.S.C. § 1391(e).

21. This action arises under Article 1, Section 8, Clause 3 of the United States Constitution; the First Amendment to the United States Constitution; the Administrative Procedures Act at 5 U.S.C. § 701 *et seq.*; the special trust relationship between the Federal government and

the Indians; the plenary power of Congress; and the Religious Freedom Restoration Act at 42 U.S.C. § 2000bb *et seq* and the ESA.

22.   Plaintiffs have met the prefiling notice requirement contained in 16 U.S.C. §1540(g) by sending Defendants notice of Plaintiffs intent to sue on each of the claims stated in this amended complaint and waiting 60 days before bringing this amended complaint.

## **PARTIES**

23.   Plaintiff Crow Tribe of Indians, Crow Creek Tribe, Standing Rock Sioux Tribe, Lower Brule Sioux Tribe, and Ponca Tribe of Nebraska are each federally recognized Indian Tribes.  The Crow Tribe is located in Montana, the Crow Creek Tribe and Lower Brule Sioux Tribe in South Dakota, the Standing Rock Sioux Tribe in North Dakota, and the Ponca Tribe of Nebraska in Nebraska.

24.   Plaintiff Piikanii Nation is an Indian tribe located in and recognized by the Nation of Canada with Treaty rights to land in the United States under an 1855 Treaty with the United States.

25.   All Plaintiff tribes are responsible for the health, safety and welfare of their individual tribal members.  A large number of their tribal members hold traditional religious beliefs and engage in traditional religious practices.

26.   Plaintiff Hopi Bear Clan is a traditional religious society of the Hopi Tribe.  Its principal headquarters are located on the Hopi Indian Reservation.

27.   Plaintiff Crazy Dog Society is a traditional religious society of the Blackfeet Nation.

28.   Plaintiff Northern Arapaho Elders Society is a traditional cultural leader of the Northern Arapaho tribe.  The Elders Society is not a governmental agency but is looked to as traditional leadership for the Tribe.

29. Individual Plaintiffs are each tribal spiritual, religious, or societal leaders.

30. Plaintiff Arvol Looking Horse is a Lakota traditional religious leader.  His principal residence is in South Dakota.

31. Plaintiff Llevando Fisher is the Chairman of the Northern Cheyenne Tribe.  His principal residence is located on the Northern Cheyenne Indian Reservation in Montana.

32. Plaintiff Kenny Bowekary is a traditional religious leader of the Zuni Religious Society.  His principal residence is Zuni, New Mexico.

33. Plaintiff Pete Standing Alone is a traditional religious leader of the Horn Society.  His principal residence is within the Blackfoot Confederacy.

34. Plaintiff Elise Ground is a traditional religious leader of the Crazy Dog Society.  Her principal residence is located on the Blackfeet Reservation in Montana.

35. Plaintiff Travis Plaited Hair is a leader of the Horn Society.  His principal residence is located within the Blackfoot Confederacy.

36. Plaintiff Nolan Yellow Kidney is a Blackfeet traditional religious leader.  His principal residence is located within the Blackfeet Nation.

37. Plaintiff Gary Dorr is the Chairman of the Nez Perce Tribe General Council.  His principal residence is within the Nez Perce Indian Reservation.

38. Defendant Ryan Zinke is the Secretary of the United States Department of the Interior, an executive department of the United States Government.  He is the most senior executive branch official under the President of the United States, and is responsible for executing and carrying out in good faith the federal government's government-to-government relationship with Indian tribes, including consulting with affected Indian tribes whenever a federal action has tribal implications.

39. Defendant United States Department of Interior ("DOI") is an executive department of the United States Government organized and existing under 5 U.S.C. § 101, as amended. Defendant DOI is responsible for, among other things, the supervision, management, direction, and oversight of Defendant FWS, which is a federal agency subsidiary of the DOI, pursuant to the provisions of 16 U.S.C. § 742b *et seq*.

40. Defendant Greg Sheehan is the Acting Director of FWS, an executive agency within DOI. He is the most senior official within FWS, responsible for executing and carrying out the United States' statutory duties pursuant to 16 U.S.C. § 1531 *et. seq.,* the Endangered Species Act, including listing and delisting species on the threatened species list.

41. Defendant FWS is an executive agency within DOI responsible for executing and carrying out the United States' statutory duties pursuant to 16 U.S.C. § 1531 *et. seq.,* the Endangered Species Act, including listing and delisting species on the threatened species list.

42. Defendant Hilary Cooley, or her Successor in Office, is the Grizzly Bear Recovery Coordinator. The Grizzly Bear Recovery Coordinator is an official of FWS responsible for overseeing the recovery of the bears.

## FACTS

### Endangered Species Act

43. The ESA is a federal statute designed to conserve endangered and threatened species and the ecosystems upon which those species depend. ESA §2(b), 16 U.S.C. § 1531(b).

44. To achieve these objectives, FWS is required to protect such imperiled species by listing them as either "threatened" or "endangered" if they are facing extinction due to any one, or any combination of, the following factors:

9

    a.   The present or threatened destruction, modification, or curtailment of its habitat or range;

    b.   Over-utilization for commercial, recreational, scientific, or educational purposes;

    c.   Disease or predation;

    d.   The inadequacy of existing regulatory mechanisms; or

    e.   Other natural or manmade factors affecting its continued existence.

ESA § 4(a)(1), 16 U.S.C. § 1533(a)(1).

45.   FWS may remove a species from the "threatened" or "endangered" species list if such a decision is based on the same five (5) criteria described in § 4(a)(1) and such decision is made in light of the best available scientific evidence.  *Id.*

46.   A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  ESA § 3(6), 16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all of a significant portion of its range."  ESA § 3(20), 16 U.S.C. § 1532(20).

47.   A species receives mandatory substantive protections under the Endangered Species Act if and only if it is listed as endangered or threatened.

48.   Premature delisting of the GYE grizzly bear would eliminate the ESA's statutory protections and allow states to regulate hunting and other activities detrimental to the sustained recovery of GYE grizzly bears.

49.   The definition of "species" in the ESA includes any "distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. §1532(16).

50. FWS adopted a Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy") to clarify their interpretation of "DPS" for the purposes of listing, delisting, and reclassifying species under the ESA. 61 Fed. Reg. 4722 (Feb. 7, 1996).

51. To qualify as a DPS, a population must be discrete and significant.  The status of a DPS is measured by five listing factors of the ESA.

52. According to the DPS Policy, Congress has instructed the Secretary to exercise this authority with regard to DPSs "sparingly."  DPS Policy at 4722.

53. Any use of a DPS designation should be to carry out the conservation purposes of the ESA.

54. The effects of the DPS Policy are to allow FWS to "protect and conserve species and the ecosystems on which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  DPS Policy at 4725.

Consultation Policies

55. In 1997, the Secretary of Interior issued Secretarial Order No. 3206, "American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act" pursuant to the ESA, the federal-tribal trust relationship, and other federal law.  DOI S.O. No. 3206, Sec. 1.  The Order clarifies the responsibilities of agencies when actions taken under the authority of the ESA affect or may affect Indian lands, resources, or rights.  *Id.*

56. In Order 3206, the Secretary of the Interior recognizes the special federal trust responsibility and government-to-government relationship with tribes, defined by treaties, statutes, executive orders, judicial decisions, and agreements.  *Id.* at Sec. 4.  The Secretary directs that Departments are to recognize, respect, and consider the value of traditional tribal knowledge to resource management activities.  *Id.*

57. The Secretary further ordered that Departments are required to be sensitive to Indian cultures, religions, and spirituality, which often involve animals and specific geographic places.  *Id.*  The Department must establish and maintain an effective working relationship and mutual partnership to promote the conservation of sensitive species and the health of the ecosystems upon which they depend.  *Id.*

58. In Order 3206, the Secretary directs that Department of the Interior and its constituent agencies must engage in direct, meaningful government-to-government consultation with affected Indian tribes and that all agencies should take into consideration the religious, spiritual, and cultural significance of listed species when taking an action pursuant to the ESA.  *Id.* at Sec. 5.

59. It is the responsibility of FWS to maintain current lists of tribal contact persons and to ensure that meaningful government-to-government communication occurs regarding actions taken under the ESA.  Appendix to S.O. 3206 Sec. 2.  Consultation should also occur with the Bureau of Indian Affairs ("BIA"), which has the primary responsibility for carrying out the federal trust responsibility.  *Id.*

60. FWS must provide Indian tribes the opportunity to actively review and comment on proposed listing actions, and provide Indian tribes with a written explanation whenever a final decision conflicts with comments provided by a tribe.  *Id.* at Sec. 3(B).

61. Through he Appendix to Secretarial Order 3206, which by its own language is considered an integral part of the Secretarial Order, the Secretary directs FWS to solicit input from tribes during the consultation process, to provide tribes with copies of any Biological Assessments to the extent permitted by law, and provides for formal consultation with the

BIA on issues affecting tribal rights, with tribes encouraged to participate in the consultation process.  *Id.* at Sec. 3(C).

62.  In order to establish regular and meaningful consultation with Indian tribes, in 2000 the President promulgated Executive Order No. 13175, "Consultation and Coordination with Indian Tribal Governments," recognizing the unique legal relationship between the United States and Indian Tribes including the trust responsibility of the United States and the right of Tribes to self-government.  E.O. No. 13175, Sec. 2, 65 Fed. Reg.  67249 (November 9, 2000).

63.  Through the Executive Order, the President ordered that all agencies adhere to these fundamental principles when formulating and implementing policies that have tribal implications.  *Id.* at Sec. 3.  The President ordered that each agency establish accountable process to insure meaningful and timely consultation with and input by tribal officials.  *Id.* at Sec. 5.

64.  On issues that relate to tribal treaty and other rights, the agencies are to use consensual mechanisms for developing regulations.  *Id.*

65.  Executive Order 13175 ensures all agencies respect the sovereignty of Indian tribes as well as the government-to-government relationship between tribes and the United States by engaging in meaningful pre-decisional consultation early in policy decision-making processes whenever an agency action will have tribal implications.  *Id.*

66.  Executive Order No. 13175 defines "policies that have tribal implications" as "…regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian tribes, or on the

distribution of power and responsibilities between the Federal Government and Indian tribes."

67.   Pursuant to the consultation duty promulgated in Executive Order No. 13175, the Secretary of Interior issued Secretarial Order No. 3317, "DOI Policy on Consultation with Indian Tribes," in 2011.  DOI S.O. No. 3317, Sec 1.  In Order 3317, the Secretary ordered the Department of Interior and its constituent agencies to engage in meaningful government-to-government consultation with affected tribes early in the planning process whenever an action has tribal implications.  *Id.* at Sec. 4.

68.   Executive Order 13175, Secretarial Order 3206, and Secretarial Order 3317 apply to Defendants as "agencies" and to the federally recognized Indian tribes who are plaintiffs.

69.   Consultation must be a collaborative effort with tribes that emphasizes trust, respect, and shared responsibility.  *Id.*

70.   When a departmental action with tribal implications arises, bureaus and offices are required to seek to promote cooperation between agencies with special expertise and related responsibilities.  *Id.*

71.   The DOI Manual on American Indian and Alaska Native programs lays out policies, responsibilities, and procedures for operating on a government-to-government basis with federally recognized Indian tribes, including consultation.  512 DM 2.

72.   FWS published notice of its new Native American Policy in the Federal Register January 27, 2016.  81 Fed. Reg. 14, 4638 (Jan 27, 2016).  This policy recognizes the unique relationship with tribes and the importance of the trust responsibility.  *Id.* at Sec. 1.  The authorities cited for FWS' policy include the ESA, the Religious Freedom Restoration Act ("RFRA"), E.O. 13175, and S.O. 3206 (Exhibit 3 to the notice).  The policy describes

communication, consultation, and information sharing between FWS and tribes and sets out collaborative management and co-management opportunities. *Id.* at Sec. 3-4. It also recognizes that meaningful cultural and religious practices of tribal members may require access to land and animals for which FWS has management responsibility. *Id.* at Sec. 5. Pursuant to this policy, FWS updated its U.S. Fish and Wildlife Service Tribal Consultation Handbook ("Handbook").

73. FWS has an extensive tribal policy set out in its Tribal Consultation Handbook. Section 4.3 of the Handbook, "When is Consultation Necessary?", notes that consultation is required when FWS proposes regulations or policies that may have Tribal Implications such as "activities…that may affect…endangered species."

74. Section 4 of the Handbook cites to the DOI Policy on Consultation with Indian Tribes, which states "consultation protocol must be followed when it is known that a decision about a 'Departmental Action with Tribal Implications' must be made, including any rulemaking."

75. The Handbook discusses cultural awareness, as well as pre-meeting, meeting, and post-meeting follow-up protocols. *Id.* at Sec. 3, 6. Consultation is to happen early and often. *Id.* at Sec. 8.1.

76. Both the Handbook and the 2016 Native American Policy emphasize transparency as a critical component of meaningful consultation with tribes.

77. In addition, both the Handbook and the 2016 Native American Policy reflect a larger departmental policy that government-to-government consultation between Indian tribes and the United States and its agencies extends beyond mere "public comment" available to the general public. Executive Order No. 13175 and Secretarial Order Nos. 3317 and 3206,

along with FWS's own policies, require meaningful, pre-decisional consultation that occurs early in an agency's decision making process.

78. The Department of the Interior has maintained its commitment to meaningful tribal consultation into the current administration. On March 8, 2017, Secretary Ryan Zinke testified before the Senate Committee on Indian Affairs, stressing the need to engage in meaningful consultation with Indian tribes on a consistent basis. Secretary Zinke stated "…our duty as Americans is to uphold our trust responsibilities and consult and collaborate on a government-to-government basis with Tribes from Maine to Alaska." *Identifying Indian Affairs Priorities for the Trump Administration*: *Hearing before the S. Comm. on Indian Affairs*, 115 Cong. (2017) (statement of Ryan Zinke, Secretary, United States Department of the Interior).

79. Similarly, on June 22, 2017, only eight (8) days before publishing the Final Rule, Secretary Zinke testified under oath to Congress. In response to questions by Rep. Lacy Clay, Secretary Zinke acknowledged that the United States was required to consult with tribes prior to delisting, and he testified "I will commit to" such consultation. Although Secretary Zinke acknowledged the duty to consult prior to delisting the GYE grizzly bear, that promise to Congress and tribes was broken when the Final Rule was published without such consultation eight (8) days later.

80. The tribal consultation policies of administrative agencies are also informed by the American Indian Religious Freedom Act, which states that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and

16

possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."  42 U.S.C. § 1996.

<u>Religious Significance of the GYE Grizzly Bear</u>

81. Grizzly bears once occupied habitat throughout the western United States.  Their historic range stretches from Mexico to New Mexico and Arizona to Montana and Idaho, lands where Plaintiffs historically or currently reside.

82. Grizzly bears lost about ninety-eight percent (98%) of their historic range in the western United States prior to listing in 1975.

83. Plaintiffs attach sincere religious significance to the GYE grizzly bear.  This spiritual import of the GYE grizzly bear encompasses not only the continued health and vitality of the animals themselves, but also the coexistence of Plaintiffs and GYE grizzly bears within these bears' traditional and historic habitat range and within these bears' current range. The practice of such religious faith depends on the continued health within the current range and the regrowth of the GYE grizzly bear population throughout the entirety of its traditional and historic habitat range, which includes Plaintiffs' culturally and religiously significant homelands.

84. In addition, GYE grizzly bears play an indispensable role in religious ceremonies which are essential to the exercise of Plaintiffs' religious beliefs.

85. Grizzly bears serve as far more than a tangible religious symbol for Plaintiffs.  Plaintiffs' spiritual connection with the GYE grizzly bear is, in large part, rooted in the dynamic between the grizzly bear, humans, and the land.  For this reason, there is a particular significance to removing protections for the GYE grizzly bear population within an entire ecosystem.

86.   The sincerely held spiritual or religious beliefs of some of the Plaintiffs or some of their members compels them to protect the grizzly bears, to prevent trophy hunting, or to prevent other hunting.  Those Plaintiffs or members will be at risk of injury, or criminal or civil prosecution for the exercise of those sincerely held spiritual or legal beliefs when they take action to prevent such hunting.  In each state where hunting is planned, interference with hunting carries criminal penalties and neither those laws nor the delisting provide accounts for religious or spiritual-based exception.

87.   In its decision to delist the GYE grizzly bears, Defendants expressly refused to consider the religious beliefs of Plaintiffs, based upon Defendant's interpretation that consideration of those beliefs was precluded under the ESA.  That interpretation of the ESA in light of the Religious Freedom Restoration Act was legally erroneous, and the agency's refusal to consider Native American spiritual and religious beliefs was therefore legally erroneous and/or arbitrary and capricious.

### GYE Grizzly Population Delisting: Conservation Strategy and Final Rule

88.   Grizzly bears were classified as a "threatened" species under the Endangered Species Act in 1975.  Classification of the grizzly bear aimed to protect and promote conservation of grizzly bear populations and any members of the species occurring elsewhere in the 48 coterminous states.  40 Fed. Reg. at 31735.

89.   Upon designating grizzly bears as "threatened," FWS was required to institute a recovery plan setting forth "(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species; (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list;

and 10 (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal."  16 U.S.C. § 1533(f)(1).

90.  FWS instituted an initial Recovery Plan in 1982 [hereinafter "1982 Recovery Plan"] and amended the Recovery Plan in 1993.  U.S. Fish and Wildlife Service, Grizzly Bear Recovery Plan 1, 16 (Sept. 10, 1993) [hereinafter "1993 Recovery Plan"].  Under the 1993 Recovery Plan, the United States is required to complete an interagency conservation strategy that ensures that "adequate regulatory mechanisms will continue to be present after delisting."  1993 Recovery Plan at 1, 16.  The 1993 Recovery Plan also requires that "a conservation strategy specific to an ecosystem be *completed prior to any* process to delist the grizzly population within that ecosystem in order to ensure that adequate regulatory mechanisms will continue to conserve the grizzly bear and its habitat."  *Id*. (emphasis added).

91.  The 1982 Recovery Plan recognizes six largely unconnected recovery ecosystems.  The updated 1993 Recovery Plan notes that island populations, especially those of wide ranging mammals are subject to high rates of extinction, and that the GYE grizzly bear is vulnerable to the loss of genetic diversity and variations in their environment; and therefore one component of FWS's own 1993 Recovery Plan was to reintroduce grizzly bears to the Bitterroot area of Idaho and Montana.  Without explanation or adequate record, FWS has now abandoned its own prior decision to comply with that component of its 1993 Recovery Plan.  The grizzly bear populations in ecosystems outside Yellowstone are in decline.  The GYE grizzly bear population has been in decline in recent years.

92. The interagency committee delegated with the responsibility of developing the requisite Conservation Strategy was the Yellowstone Ecosystem Subcommittee of the Interagency Grizzly Bear Committee ("IGBC-YES").  The IGBC-YES membership consists of representatives from FWS; national parks and forests in the region; and state/county agencies from Idaho, Montana, and Wyoming.  Of the currently listed members, the only two that represent tribal interests are Leander Watson from the Shoshone Bannock Tribes and Ben Snyder from the Wind River Tribal Fish and Game Department.

93. During the period leading up to FWS publically announcing its decision to delist the GYE grizzly bear, IGBC-YES developed a draft Conservation Strategy outlining a regulatory framework purportedly designed to ensure the continued protection of the GYE grizzly bear following delisting.  This draft Conservation Strategy identified thirteen (13) signatories representing various state and federal agencies who would be responsible for implementing one or more components of the Conservation Strategy.  None of the identified signatories represented any Indian tribe or tribal agency.

94. On March 3, 2016, FWS released to the media a statement that the agency had made the decision to delist grizzly bears from the ESA in the Greater Yellowstone area.  In this statement, FWS stated that it "…will be seeking review and comment by the public, other federal and state agencies, and independent scientists."  *Id.*

95. On March 11, 2016, FWS published a Proposed Rule to delist the GYE grizzly in the Federal Register, with a sixty (60) day public comment period ending on May 5, 2016.  The draft Conservation Strategy was made available to the public and opened for comment concurrent with the Proposed Rule.

96. Prior to the publication of the Proposed Rule, FWS had put forth minimal effort to consult with affected tribes regarding the delisting of the GYE grizzly bear.  FWS first sent out a letter in April of 2014 to four regional tribes advising these tribes of FWS's consideration of delisting the GYE grizzly bear.  FWS recognized this outreach was too narrow and inadequate to meet any consultation duty.  82 Fed. Reg. at 30552-3 ("… the Service was made aware of many more Tribes having an interest in the GYE grizzly bear and expanded our efforts in explaining the status of the grizzly bear and offering government-to-government consultation to Tribes.").  In February 2015, and again in June 2015, FWS issued a new letter to a wider array of tribal leaders, conceding that "reaching out only to tribes in close proximity to the GYE was insufficient and did not appreciate the breadth of the historical, cultural, and spiritual connection to tribes outside of the geographic area have to the GYE grizzly bear."  On October 29, 2015, FWS purportedly sent a letter to fifty-three (53) tribes inviting them to participate in a webinar on the status of the GYE grizzly bear.  This webinar was uniformly rejected by the tribes.  FWS has conceded that the March 10, 2016 webinar was not government-to-government consultation.  82 Fed. Reg. at 30553.  Finally, on March 3, 2016, the same day on which it announced its proposal to delist the GYE grizzly bear, FWS purportedly sent out two subsequent letters to fifty-three tribes inviting these tribes to attend one of two prescheduled, four-hour "consultation" meetings: one on April 28, 2016 in Bozeman, Montana, and another on May 5, 2016 in Rapid City, South Dakota.

97. Irrespective of whether or not all of the tribes with a religious stake in the GYE grizzly bear received the communications referenced above, such communications do not constitute meaningful, pre-decisional consultation.

98. Significantly, the communications referenced above discuss only the potential decision to remove the GYE grizzly bear from the threatened species list, and not the imposition of new and harmful regulatory mechanisms under the concomitant Conservation Strategy. The draft Conservation Strategy was not made available to the public until FWS had already made its decision to delist the GYE grizzly bear.

99. While the Proposed Rule remained pending, the IGBC-YES, led by FWS, proceeded in revising and finalizing the requisite Conservation Strategy.  Despite FWS indicating in the Proposed Rule that both the Northern Arapaho Tribe and Eastern Shoshone Tribe were members of the IGBC-YES and, thus, contributors to the development of the Conservation Strategy, neither of these tribes participated in composing, revising, or finalizing the Conservation Strategy.  In fact, in an October 18, 2016 letter to then Interior Secretary Sally Jewell, the Northern Arapaho Elders Society expressed its opposition to the delisting rule and repudiated all representations from FWS that the tribes which comprise a portion of the IGBC-YES support the delisting.  There was also no consultation on the final Conservation Strategy with any other tribes, including Plaintiffs.

100. At a meeting held on November 16-17, 2016, members of the IGBC-YES voted to approve purportedly "final" revisions to the Conservation Strategy.  No one from either the Northern Arapaho Tribe or Eastern Shoshone Tribe was present at this meeting.  In fact, the only tribal representative present at this meeting was Leander Watson of the Shoshone Bannock Tribe, who was present only in his capacity as technical staff for the Tribe and was not authorized to vote at the meeting.  As communicated in a subsequent letter from the Northern Arapaho Elders Society to the chairperson of the IGBC-YES, the Northern Arapaho Tribe was not even notified that this November 16-17 meeting was taking place.

22

101. The non-Indian members of the IGBC-YES invited to attend the November 16-17 meeting purported to substantially alter the draft that had been available to the public during the initial comment period.  By way of example, the final Conservation Strategy expressly declares that the Conservation Strategy would be in operation for an indefinite period of time, while there was no such declaration in the draft which was available for public comment.  Those present at the meeting also revised critical factual information from that contained in the published draft.  For instance, a sentence on page fifty of the Conservation Strategy was changed from "[t]he GYE grizzly bear population exceeds 500 total bears as of 2006" to "[t]he GYE grizzly bear population has exceeded 500 total bears *since* 2006." [emphasis added].  This revision gives these two sentences different meanings.  Despite these, and many other, significant changes, the approved revisions were not opened to public comment, much less brought to the attention of affected tribes to facilitate government-to-government consultation.

102. Between December 9 and December 16, 2016, representatives from each of the agencies identified as signatories to the Conservation Strategy, except for the Regional Chief Biologist for the Central Region of the USGS Biological Resources Division, whose signature line was removed from the Conservation Strategy at some point *after* the "final" revisions were made for reasons unknown at this time.  As in the draft Conservation Strategy, none of the signatories of the final and executed Conservation Strategy represented any Indian tribe or tribal agency.

103. The final and executed Conservation Strategy enumerates its objective of "manag[ing] grizzly bears as a game animal; including allowing regulating hunting when and where appropriate."  In furtherance of this objective, the Conservation Strategy defers to the states

of Idaho, Montana, and Wyoming to develop their own grizzly bear management plans, which includes setting their own hunting regulations and mortality rates for the GYE grizzly bears with no accountability to affected tribes.

104. Despite a lack of tribal participation in developing the Conservation Strategy, the Conservation Strategy also states that the Wind River Reservation has developed its own grizzly bear management plan to be incorporated into the Conservation Strategy. Examination of the appendices to the Conservation Strategy reveals that the Wind River management plan referenced in the Conservation Strategy was executed back in 2009, prior to the initial rule delisting the GYE grizzly bear being overturned in federal court.

105. Plaintiffs were never given an opportunity to engage in meaningful, pre-decisional consultation regarding the development and/or finalization of the Conservation Strategy.

106. On June 30, 2017, FWS published in the Federal Register the Final Rule Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife ("Final Rule").  82 Fed. Reg. 30502.  The Final Rule contains FWS's determination that the GYE grizzly bear no longer meets the definition of an endangered or threatened species under the ESA.  According to FWS this determination is based on the best available science.  The Final Rule also adopts the Grizzly Bear Recovery Plan Supplement and makes effective the 2016 Conservation Strategy.  This rule became effective at the end of July 2017.

107. Grizzly bears inside the GYE ecosystem are no longer protected by the ESA and can be subject to game hunting outside of national parks.  These areas where grizzly bears are potentially exposed to hunting include locations of important food sources as well as connectivity areas for linkage or dispersal.

108. Main food sources for grizzly bears, including cutworm moths, cutthroat trout, and whitebark pine, are in decline or threatened to decline due to climate change, invasive species, and other factors.

109. FWS has made an official finding that listing whitebark pine as endangered or threatened with critical habitat is "warranted." *See* 76 Fed. Reg. 42631 (July 19, 2011) (listing is precluded by higher priority actions at this time but is added to the candidate species list).

110. There is significant research by experts, including by noted Bear biologist Dr. David Mattson, that contradicts FWS's conclusions that the GYE grizzly bear has recovered.  Dr. Mattson has pointed out flaws in the population scheme used by FWS that substantially over-estimates the number of bears which will be in the GYE in subsequent years, masking the decline that has been occurring and will continue to occur now that protections have been removed.

111. Upon issuing their Final Rule, Defendants have not only made their decision to delist the GYE grizzly bear, but have also completed the process of determining how the decision will be implemented, all without formal consultation with affected Indian tribes.  Any comments made by tribes on April 28, 2016 in Bozeman, Montana and May 5, 2016 in Rapid City, South Dakota are not meaningful, pre-decisional collaborative consultation between governments.

112. Grizzly bears, including the GYE grizzly bear, remain in need of ESA protections.  Just recently, this Court held that FWS violated the ESA in determining that the Cabinet-Yaak grizzly bear was not warranted for listing as an endangered species. *Alliance for the Wild Rockies v. Zinke*, CV 16-21-M-DLC (D. Mont. 2017).

## COUNT I

**THE FINAL RULE AND ACCOMPANYING CONSERVATION STRATEGY VIOLATE THE ADMINISTRATIVE PROCEDURE ACT FOR FAILURE TO ENGAGE IN MEANINGFUL, PRE-DECISIONAL CONSULTATION WITH AFFECTED INDIAN TRIBES EARLY IN THE PLANNING PROCESS**

113. Paragraphs 1 through 112 are incorporated by reference as if fully set forth herein.

114. DOI and FWS policy, protocols, and manuals require FWS to engage in meaningful, pre-decisional consultation that occurs early in the ESA delisting decision-making process prior to making a decision on any action having any tribal implications.

115. The Final Rule does not mention the policies of the FWS Handbook, though it does cite to other sources of the consultation duty and acknowledge the obligation for government-to-government consultation.

116. FWS has a duty to meaningfully consult with tribes prior to making the delisting decision. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979); *Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395, 400 (D.S.D. 1995).

117. The Eighth Circuit has held that where an agency has "established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before … policy is made, that opportunity must be afforded. Failure of the [Bureau] to make any real attempt to comply with its own policy of consultation not only violates those general principles which govern administrative decision-making, but also violates "'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *Oglala*, 603 F.2d at 721 (internal citations omitted).

118. Meetings with tribes on an issue after an agency action has already been decided cannot fulfill the requirement of meaningful consultation. *Id.* at 720.

26

119. In a federal claims case challenging FWS's handling of cooperative farming agreements, the court held that FWS's failure to comply with the departmental manual was arbitrary and capricious. *Hymas v. United States*, 117 Fed. Cl. 466, 491 (2014), *vacated and remanded on other grounds*, 810 F.3d 1312 (Fed. Cir. 2016).

120. The Plaintiff in *Hymas* argued that the selection process FWS used did not comply with either the Departmental Manual or the Service Manual governing evaluation of cooperative farming agreement applications. 117 Fed. Cl. at 491. The FWS departmental manual at issue in *Hymas* required that FWS conduct an objective review of qualified applicants prior to awarding the agreements stating "Competition in making awards through cooperative agreements is strongly encouraged and is expected in awarding discretionary grants, unless otherwise directed by Congress. In all cases, bureaus and offices are required to make awards based on the merits in accordance with the law." *Id.* at 503-04.

121. The court in *Hymas* reviewed the manual under the test laid out in *Hamlet v. United States*, 63 F.3d 1097 (Fed. Cir. 1995). *Id.* at 503. Agency personnel manuals or handbooks are entitled to the force and effect of law if (1) the promulgating agency was vested with the authority to create such a regulation; (2) the promulgating agency conformed to all procedural requirements, if any, in promulgating the regulation; (3) the promulgating agency intended the provision to establish a binding rule; and (4) the provision does not contravene a statute. In determining whether a provision was intended to be binding, the court should consider (a) whether the language of the provision is mandatory or advisory; (b) whether the provision is "substantive" or "interpretive"; (c) the context in which the provision was promulgated; and (d) any other extrinsic evidence of intent. *Id.* (citing *Hamlet*, 63 F.3d at 1103-05).

27

122. As in *Hymas*, here, FWS had authority to issue its Tribal Consultation Handbook and Interior had authority to issue its Policy on Consultation with Indian Tribes. The handbooks conform to the requisite procedural requirements as noted in each handbook's appendix. The language used by the handbooks is mandatory language, not advisory, and the provisions are substantive. The consultation requirements in the handbooks do not contravene a statute; rather they further the objectives of many statutes including the ESA. Thus, FWS was required to comply with both the departmental manual and the FWS manual. Their failure to comply makes the decision to delist arbitrary and capricious.

123. Federal courts have also held an agency's failure to comply with departmental policies and procedures requiring meaningful consultation to be arbitrary and capricious. *Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1346 (D. Wyo. 2015), *vacated and remanded sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016). Noting the DOI policy requires "extra, *meaningful* efforts to involve tribes in the decision making process" the court in *Wyoming* found that holding four regional tribal consultation meetings, distributing copies of a draft rule to affected tribes and offering to meet individually with tribes after the regional meeting was "little more than that offered to the public in general." *Id.* The court went on to note that the BLM seemed to have made up its mind prior to initiating discussions with tribes, failing to comply with departmental policies in an arbitrary and capricious action. *Id.* FWS's failure to adhere to the same policy is also arbitrary and capricious, and the delisting decision must be overturned.

124. The DOI and FWS handbooks and policies at issue here were published in the Federal Register, unlike the policies at issue in *Hoopa Valley Tribe v. Christie*. 812 F.2d 1097 (9th Cir. 1986) (citing *Morton v. Ruiz*, 415 U.S. 199 (1974)).

125. The Court in *Morton v. Ruiz* noted that "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." 415 U.S. at 235. (*citing Service v. Dulles*, 354 U.S. 363, 388 (1957)); *Vitarelli v. Seaton*, 359 U.S. 535, 539—540 (1959). In *Morton*, the manual at issue was not published in the Federal Register, and there had been inconsistency with BIA's interpretation of the policy, making it unenforceable. *Id.* at 230. Here, the Handbook and policies have been published and the duty of consultation is clear, making Defendants' failure to meaningfully consult arbitrary and capricious.

126. Defendants have failed to provide the Plaintiff Tribes and those within the Tribes who would participate in such consultation (which includes most or all of the individual Plaintiffs) with an opportunity to participate constructively in the ESA delisting decision-making process through government-to-government consultation. FWS's letters and subsequent invitation for the dozens of affected tribes to attend pre-scheduled and time-restricted "consultation" after the Proposed Rule was already published is an inadequate substitute for the meaningful, pre-decisional consultation required under applicable federal policies. To the contrary, these meetings merely constituted a limited forum for voicing concerns relating to Defendants' already decided-upon actions, a process which is functionally no different from notice and comment.

127. Even if FWS's "consultation" meetings did qualify as meaningful, pre-decisional consultation with affected tribes, it is unrealistic that these meetings could have encompassed all components of the delisting process that could affect tribes, including, but not limited to, the contents of both a 54-page Proposed Rule and a 133-page draft Conservation Strategy.

128. Further, Defendants' failure to complete and publish the Conservation Strategy prior to initiating the supposed "consultation" process with Plaintiffs and other affected tribal governments, as is required under FWS's own 1993 Recovery Plan, undermined the transparency of the consultation process.   Defendants have supplied incomplete information regarding the nature and implications of the actions contemplated by the agency, including, but not limited, information relating to: 1) the imposition of a new and harmful regulatory framework surrounding the killing of GYE grizzly bears; 2) the omission of tribal representatives in the development and implementation of the Conservation Strategy; and 3) the participation of tribal voices in the development and implementation of the Conservation Strategy.  By undermining the transparency of the consultation process, Defendants have once again violated their own consultation policies.

129. Defendants' numerous distinct failures to follow their own policies requiring that they engage in meaningful, transparent, and pre-decisional consultation early in the decision-making process regarding the delisting of the GYE grizzly bear and the development and approval of the accompanying Conservation Strategy each render the promulgation of the Final Rule arbitrary, capricious, and not in accordance with law.

130. The initial outreach through form letters by FWS was too narrow and perfunctory to be considered meaningful consultation, and that consultation did not extend to Plaintiffs.  The

later attempts at consultation with tribes, while still insufficient, also came too late in the decision making process to be considered sufficient to meet the consultation duty of FWS.

131. FWS did not consult with tribes and the delisting therefore was not informed by the wisdom and experience of tribes and tribal people, or by the connection between tribes, tribal people and the Grizzlies.

## COUNT II

## DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURE ACT AND THE ESA BY INITIATING THE PROCESS OF DELISTING THE GYE GRIZZLY BEAR PRIOR TO THE COMPLETION OF THE CONSERVATION STRATEGY

132. Paragraphs 1-131 are incorporated by reference as if fully set forth herein.

133. The 1993 Recovery Plan requires that the Conservation Strategy be "completed prior to any process to delist the grizzly population within that ecosystem in order to ensure that adequate regulatory mechanisms will continue to conserve the grizzly bear and its habitat." 1993 Recovery Plan at 16.

134. The Conservation Strategy was not finalized until November 2016, several months after the Proposed Rule to delist the GYE grizzly bear was published by FWS.

135. FWS's publication of the Proposed Rule falls within the scope of "any process to delist the grizzly population" as set forth in the 1993 Recovery Plan.

136. By initiating the delisting process prior to the completion of the Conservation Strategy, FWS violated its own requirements under the 1993 Recovery Plan, rendering its delisting of the GYE grizzly bear, capricious, an abuse of discretion, and otherwise not in accordance with law.

137. In addition, instituting the 1993 Recovery Plan was a direct mandate of the ESA, designed to ensure the existence of uniform and predictable management framework to govern the continued protection of the threatened species.   It would be an unduly restrictive

construction of the ESA to interpret it as requiring the 1993 Recovery Plan to be instituted without also requiring adherence to the 1993 Recovery Plan.  Accordingly, Defendants violated the ESA by initiating the delisting process prior to the completion of the Conservation Strategy.

### COUNT III

**DEFENDANTS' ENACTMENT OF THE CONSERVATION STRATEGY IN SPITE OF ITS LACK OF TRIBAL REPRESENTATION, MISLEADING CONTENT, AND NONCOMPLIANCE WITH THE 1993 GRIZZLY BEAR RECOVERY PLAN VIOLATES THE ADMINISTRATIVE PROCEDURE ACT AND THE ESA**

138. Paragraphs 1-137 are incorporated by reference as if fully set forth herein.

139. Pursuant to FWS's 1993 Recovery Plan, the implementation of which was required under the ESA, the function of the Conservation Strategy is to ensure the existence of "adequate regulatory mechanisms" post-delisting; as such, the Conservation Strategy constitutes an indispensable component of the delisting process.

140. Following the publication of the Proposed Rule, the IGBC-YES finalized the Conservation Strategy without any meaningful input from Indian tribes – including those tribes who would purportedly share responsibility for implementing the Conservation Strategy – and ultimately executed the Conservation Strategy without obtaining any signatures from representatives of Tribes or Tribal agencies signifying their commitment to cooperate in the implementation of the Conservation Strategy.

141. Rather than incorporate meaningful input or commitment from affected tribes, the IGBC-YES incorporated the 2009 Wind River Grizzly Bear Management Plan into the Conservation Strategy, a management plan which is outdated and does not reflect the current positions or commitments of the Tribes of the Wind River Reservation.

142. By issuing a Final Rule activating a Conservation Strategy that is both 1) devoid of meaningful tribal input and 2) falsely reflective of tribal commitment to participate in its implementation, Defendants have acted in a manner which is arbitrary, capricious, an abuse of discretion, and in violation of the ESA.

143. Furthermore, the final Conservation Strategy differs significantly from earlier drafts and FWS did not reopen the public comment period for the amended Conservation Strategy. Therefore, in addition to the lack of consultation, Tribes also had no opportunity to comment on the adopted Conservation Strategy.

## COUNT IV

### DEFENDANTS' FINAL RULE DELISTING THE GYE GRIZZLY BEAR AND ACCOMPANYING CONSERVATION STRATEGY VIOLATE THE RELIGIOUS FREEDOM RESTORATION ACT

144. Paragraphs 1 through 143 are incorporated by reference as if fully set forth herein.

145. The Religious Freedom Restoration Act (RFRA), codified at 42 U.S.C. § 2000bb *et seq.*, guarantees to Tribes and their individual tribal members rights to free expression of traditional religious faith by expressly requiring the Defendants to "…not substantially burden [the] exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." Section (b), in turn, allows the Defendants to substantially burden Tribes and their tribal members rights to free expression only if "…it demonstrates that application of the burden…is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1.

146. The term "government" is defined by the RFRA as "…a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 § 2000bb-2.

147. The term "exercise of religion" is defined by the RFRA as "…that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion. 42 § 2000bb-2; 42 § 2000cc-5.

148. The RFRA "…applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."  42 U.S.C. § 2000bb-3.

149. Defendants have placed a substantial burden upon Plaintiffs' religious freedom by issuing a Final Rule that removes protections necessary for the GYE grizzly bears to repopulate their traditional homeland, threatening the continuity of Plaintiffs' traditional religious practices – a threat which extends significantly beyond subjective spiritual fulfillment.

150. Defendants have further placed a substantial burden upon Plaintiffs' religious freedom by giving state governments the power to hunt and establish mortality rates for GYE grizzly bears without requiring any form of tribal consultation or consent, thereby placing unnatural and undue restrictions on Plaintiffs' ability to participate in the dynamic between humans, grizzly bears, and the natural world comprising the Greater Yellowstone ecosystem.

151. Defendants have placed a substantial burden upon Plaintiffs' religious freedom by establishing a regulatory framework that both directly and indirectly confers rights to hunt and kill GYE grizzly bears, such that any interference with these rights, even when such interference is compelled by sincere religious beliefs, will result in not only physical danger, but civil and criminal liability as well.  Accordingly, this conferral of rights coerces Plaintiffs into complicity with behaviors that controvert Plaintiffs' sincere religious beliefs.

152. Defendants have not shown that the substantial burden they have placed upon Plaintiffs' exercise of sincerely held religious beliefs "is in furtherance of a compelling governmental interest", much less have they demonstrated that issuing the Final Rule is "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

153. Further, the Final Rule does not contain any mention of the RFRA, or that FWS considered its obligations under the RFRA in making the decision to delist.  FWS states that they "considered issues of cultural, spiritual, and ecological importance that Tribes raised and we are sensitive to those concerns.  However, the Act requires the Service to make decisions based on the biological status of the species as informed solely by the best scientific and commercial data available."  82 Fed. Reg. 30553.  It is the position of FWS that they cannot consider the religious implications of their delisting decision because this would conflict with the ESA.  This position is in violation of the RFRA and is arbitrary and capricious.

## COUNT V

## DEFENDANTS HAVE VIOLATED THE ESA AND ACCOMPANYING REGULATIONS BY IMPROPERLY DESIGNATING A DPS AND DELISTING THAT DPS SIMULTANEOUSLY

154. Paragraphs 1 through 153 are incorporated by reference as if fully stated herein.

155. Federal regulations authorized by the ESA provide that a DPS of a species is "eligible for listing under the [ESA]."  50 C.F.R. § 424.11.  This regulation goes on to provide that a "species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species is endangered or threatened..."  *Id.*  The term "species" under this regulation includes a DPS.  50 C.F.R. § 424.02.

156. Prior to the Final Rule, the GYE grizzly bear was not designated as a DPS.  Defendants have simultaneously designated the GYE grizzly bear as a DPS and removed the GYE grizzly bear DPS from the threatened species list.

157. In order to delist a species, including a DPS, from the threatened species list, the DPS must necessarily have been listed in the first place.  The ESA and accompanying regulations reflect that a DPS is an independently recognizable "species" subject to the five-factor analysis that the Secretary must conduct in listing a species as endangered or threatened.  The GYE grizzly bear DPS has never been listed as threatened in accordance with this regulation.

158. In its delisting of the GYE grizzly bear DPS, FWS has ignored the status of the remaining population of grizzly bears.

159. Simultaneously designating and delisting the GYE grizzly bear DPS runs contrary to the purpose of the ESA, which is to "conserve endangered species and threatened species."  16 U.S.C. § 1531(c).  By simultaneously designating and delisting the GYE grizzly bear DPS, Defendants are using their authority under the ESA to diminish and deconstruct their conservation obligations to the grizzly bear of the conterminous United States by employing a piecemeal methodology for removing ESA protections.  Using the DPS mechanism to designate and delist the GYE grizzly bear also contravenes the purpose of the DPS Policy, which is to facilitate the implementation efficacious conservation measures based on the specific needs of threatened or endangered species.  Because such activity conflicts with the purpose of the ESA and the DPS Policy, such activity is arbitrary, capricious, and in violation of the ESA.

## COUNT VI

## DEFENDANTS HAVE ACTED IN A MANNER WHICH IS ARBITRARY, CAPRICIOUS, AND IN VIOLATION OF THE ESA BY DESIGNATING A DPS OF AN ALREADY EXISTING DPS

160.  Paragraphs 1 through 159 are incorporated herein by reference as if fully stated herein.

161. Neither the ESA nor the DPS Policy authorize the designation of a smaller taxonomic unit within an existing DPS for the purpose of listing or delisting a species from the threatened or endangered species list.

162. If Congress had intended to authorize the designation of a sub-DPS, it would have included this authorization in its 1978 amendments to the ESA, through which it expressly authorized the designation of a DPS.

163. According to FWS's 2011 status report, the grizzly bear population that was listed as "threatened" in 1975 constitutes a DPS.

164. When it designated the whole of the grizzly bear population in the lower 48 states as a single DPS, FWS correctly applied the factors within the ESA and implementing regulations and policies to determine that the population was a single DPS.

165. The GYE grizzly bear DPS, which Defendants have carved out of the grizzly population that was listed in 1975, constitutes an impermissible sub-DPS and is contrary to FWS's determination that the grizzly bear population in the lower 48 states is a single DPS.

166. By designating and delisting a sub-DPS, Defendants have acted in a manner which is arbitrary, capricious, and in violation of the ESA.

## COUNT VII

## DEFENDANTS HAVE ACTED IN A MANNER WHICH IS ARBITRARY, CAPRICIOUS, AND IN VIOLATION OF THE ESA BY FAILING TO ASSESS THE IMPACTS ON THE GRIZZLY BEAR POPULATION OF THE CONTERMINOUS UNITED STATES

167.  Paragraphs 1 through 166 are incorporated by reference as if fully stated herein.

168.  The ESA and accompanying regulations require that a federal agency planning to partake in any action which may adversely impact a threatened or endangered species must either obtain a biological opinion from FWS assessing the effects of the proposed action on the endangered/threatened species or, in lieu of obtaining a biological opinion, obtain written concurrence from FWS Director that the "proposed action is not likely to adversely affect any listed species or critical habitat."  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

169.  The grizzly bear of the conterminous United States was listed as "threatened" in 1975 and is thus a "listed species" under 16 U.S.C. § 1536(a)(2).

170.  By delisting the GYE grizzly bear, Defendants have divested a significant portion of the grizzly bear population as listed in 1975 of its protections under the ESA, an act which could undoubtedly have an adverse impact on the listed grizzly bear population. Defendants have not adequately assessed these potential impacts

171.  Defendants' removal of grizzly bears from the DPS of all grizzlies in the lower 48 states, also violated procedural and substantive law because that change to the prior DPS was done without compliance with the ESA's requirements for notice and opportunity to be heard by parties interested in the prior, settled decision that the whole population was a single DPS.

172.  Defendants' removal of grizzly bears from the DPS of all grizzlies in the lower 48 states violated the provisions for consultation with Indian tribes for all the reasons discussed above and because the agency did not attempt to consult with tribes which have an interest

in the "remnant" DPS of grizzly bears in the lower 48 states but outside the Yellowstone GYE.

173. The ESA requires that FWS look at "the whole picture of the listed species and not just a segment of it" when reviewing and redetermining the status of a species. *Humane Society v. Zinke*, 865 F.3d 585, 601 (D.C. Cir. 2017). FWS failed to analyze the remainder population of listed bears in its decision to delist the GYE grizzly bear.

174. By failing to adequately assess the adverse impacts that the delisting of the GYE grizzly bear could have on the grizzly bear population within the conterminous United States, Defendants have acted in a manner which is arbitrary, capricious, and in violation of the ESA.

## COUNT VIII

### DEFENDANTS HAVE ACTED IN A MANNER WHICH IS ARBITRARY, CAPRICIOUS, AND IN VIOLATION OF THE ESA BY FAILING TO EMPLOY THE REQUIRED ANALYTICAL FRAMEWORK IN ASSESSING THE "THREATENED" STATUS OF THE GYE GRIZZLY BEAR

175. Paragraphs 1 through 174 are incorporated herein by reference as if fully stated herein.

176. Section 4(b) of the ESA requires that the five factors enumerated in Paragraph 44 of this Complaint be analyzed using the "best scientific and commercial data available."

177. The Final Rule reflects that Defendants have failed to apply the best "scientific and commercial data" to its assessment of the status of the GYE grizzly bear. For example, there are numerous occasions throughout the Final Rule in which FWS cites to the regulatory mechanisms that will be put in place pursuant to the Final Rule and Conservation Strategy as a substitute for applying existing data to support the delisting of the GYE grizzly bear under a given factor.

178. If the existence of adequate regulatory mechanisms was sufficient to delist a threatened species, then there would be no need to consider any factors other than Factor (D). Therefore, the existence of regulatory mechanisms cannot suffice as a substitute for scientific and commercial data.

179. In addition, Defendants have failed to apply any "scientific and commercial data" as independent support for its critical conclusion that neither climate change nor human activity within the habitat range of the GYE grizzly bear impose a threat warranting continuity of the GYE grizzly bear's "threatened status."

180. Where Defendants have purported to apply "scientific and commercial data," to their assessment, they have done so in a manner which is too superficial to yield accurate conclusions warranting the delisting of the GYE grizzly bear.  For instance, FWS's analysis of grizzly bear mortality failed to account for critical variables, such as the rates of mortality specific to female grizzly bears, which can influence what the hard data truly signifies about the continued needs of the GYE grizzly bear.  To replace their traditional but now scarce food sources, grizzly bears have much more frequent contact with armed people.  This results in increased bear mortality.  The data used by Defendants is not the "best scientific and commercial data available," and if it were, then the "best scientific and commercial data available" would fail to demonstrate that the delisting of the GYE grizzly bear is permissible at this time.

181. Finally, Defendants' analysis of the five factors in the cumulative is based solely on population trend estimates.  Defendants have failed to provide any explanation as to how or why this metric adequately encompasses each of the five factors in the cumulative, as

required under Section 4(a) of the ESA.  Defendants have failed to adequately apply the five factors under Section 4(a) in the cumulative.

182. By failing to apply "the best scientific and commercial data" to its assessment, by applying said data in a manner which does not adequately support its conclusions, and by otherwise failing to properly apply the factors enumerated under Section 4(a) of the ESA, Defendants have acted in a manner which is arbitrary, capricious, and in violation of the ESA.

## COUNT IX

## DEFENDANTS' CONCLUSION IS NOT CONSISTENT WITH THE BEST AVAILABLE SCIENTIFIC AND COMMERCIAL DATA

183. Paragraphs 1 through 182 are incorporated herein by reference as if fully state herein.

184. The decision by FWS to delist the GYE grizzly bear conflicts with the best available scientific and commercial data, and must be vacated.  The GYE grizzly bear requires continued ESA protection and continues to qualify as a threatened species.

185. The GYE grizzly bear habitat, food sources, and population are threatened and the bear is likely to become endangered in the foreseeable future throughout all or a significant portion of its range.

186. FWS has failed to consider the loss of historical range of the GYE grizzly bear in making its delisting decision.  The significant loss of historical range of the GYE grizzly bear impacts the viability of the species as it exists today and must be considered in a delisting decision.  Without ESA protections, the best scientific and commercial data does not support a recovered GYE grizzly bear through all of or a significant portion of its range.

187. FWS also concluded that the cumulative impacts of threats from lack of genetic diversity, climate change, habitat management, and human caused mortality are not substantial even though FWS notes in the Final Rule that these threats are interrelated and could be

synergistic.  FWS considered "estimates of population trend (i.e. 'lambda') to be the ultimate metric to assess cumulative impacts to the population."  82 Fed. Reg. at 30544.  Neither FWS's conclusion nor the metric it employed to reach its conclusion are consistent with the requirement that all of FWS's delisting decisions be based upon best available scientific and commercial evidence.

188.  In the Final Rule, FWS notes that due to declining staple food sources, GYE grizzly bears have shown a switch to a more meat-heavy diet.  This change in GYE grizzly bear diet will lead to increased human interaction with GYE grizzly bears and GYE grizzly bears will have to cover greater distances in search of food.

189.   FWS failed to account for the fact that this change in the GYE grizzly bear diet is likely to lead to increased mortality in a population that is already in decline due to threats to its staple foods and increased contact with humans and other predators.

190. FWS states that the increase in meat consumption by GYE grizzly bears shows the adaptability of the bear.  However, FWS offers no data to support that the GYE grizzly bear will remain recovered post-delisting while accounting for likelihood of increased mortality.

191. The available evidence clearly shows that the GYE grizzly bear remained threatened and is likely to become endangered throughout its range without ESA protections.  FWS's interpretations and conclusions that the GYE grizzly bear is no longer in need of protection is not in line with the best available evidence.

## REMEDIES SOUGHT BY PLAINTIFFS

1.  Defendants, contrary to their obligations under federal law, regulation, and policy, arbitrarily and capriciously have decided to delist GYE grizzly bears from the ESA's

threatened species list without engaging in meaningful, pre-decisional consultation with affected Tribes beforehand, and without providing any information regarding how the delisting will avoid substantially burdening the Tribe's religious and cultural interests in GYE grizzly bears.

2. Permanent injunctive relief should be granted to restrain the Defendants from taking any actions to effect the delisting of the GYE grizzly bear from the ESA's threatened species list or to implement the Conservation Strategy, until such time as the Defendants have complied with all applicable federal laws, regulations and policies, and their own internal policies, and until such time as meaningful, pre-decisional consultation has been conducted with the Plaintiffs early in any renewed delisting decision process and the views of the Plaintiffs has been given effect.

3. Permanent injunctive relief should be granted to restrain Defendants from effecting the delisting of the GYE grizzly bear because the decision to delist is in violation of RFRA.

4. Further, such permanent injunctive relief should be ordered prohibiting further and/or additional efforts to delist GYE grizzly bears until Defendants engage in pre-decisional consultations with the Plaintiffs and other affected Indian tribes.

5. The delisting decision violates the ESA both procedurally and substantively, and must be vacated.

WHEREFORE, Plaintiffs pray that:

1. A Permanent Injunction be granted enjoining the Defendants from taking any actions to effect the delisting of GYE grizzly bears from the ESA's threatened species list, until such time as the Defendants have fully engaged in meaningful pre-decisional consultation with the Tribal Plaintiffs.

2.     A decree of Declaratory Judgment be entered by the Court, pursuant to 28 U.S.C. § 2201 *et seq*. specifying to Defendants that:

    a.   Defendants did not provide Plaintiffs with substantive, meaningful pre-decisional consultation pursuant to DOI and FWS Consultation Policies, Executive Order No. 13175 and Secretarial Order Nos. 3317, and that Plaintiffs are entitled to such.

    b.   Defendants acted arbitrarily and capriciously by prematurely delisting GYE grizzly bears before conducting meaningful, pre-decisional consultation early in the ESA delisting process which takes into account the cultural and religious importance of listed species.

    c.   Defendants' decision to prematurely delist GYE grizzly bears from the ESA's threatened species list unduly burdens the Plaintiffs and the Plaintiffs' individual tribal members' free exercise of their traditional religious faith.  In addition, the Defendants have failed to show that they have a compelling government interest in delisting GYE grizzly bears and that removing the bears from the ESA's threatened species list before meaningful, pre-decisional consultation early in the decision making process has occurred between Defendants and affected Indian tribes is the least restrictive means of furthering that compelling government interest.

    d.   FWS's decision to delist the GYE grizzly bear violates the law as alleged above.

    e.   Any other decree or declaratory judgment by the Court deemed just, proper and necessary based upon the pleadings, facts, law and evidence.

2.     The court vacate the Final Rule delisting the GYE grizzly bear.

3.     The Court make awards of costs, disbursements and attorney fees to the Plaintiffs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and other applicable authority.

4.      The Court provide such other and further relief as it may deem necessary and proper.

Dated this 8th day of September, 2017.

                                        **FREDERICKS PEEBLES & MORGAN LLP**

                                        *s/   Jeffrey S. Rasmussen*
                                        Jeffrey S. Rasmussen (*Pro Hac Vice*)
                                        Peter J. Breuer
                                        Katie D. Frayler (*Pro Hac Vice*)
                                        Michael W. Holditch *(Pro Hac Vice)*
                                        1900 Plaza Drive
                                        Louisville, Colorado 80027
                                        Telephone: (303) 673-9600
                                        Facsimile: (303) 673-9155/9839
                                        Email: pbreuer@ndnlaw.com
                                        Email: jrasmussen@ndnlaw.com
                                        Email: kfrayler@ndnlaw.com
                                        Email: mholditch@ndnlaw.com

                                        *Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of September 2017, a copy of the foregoing FIRST

AMENDED COMPLAINT AND PETITION FOR PERMANENT INJUNCTION AND

DECLARATORY RELIEF was filed with the Clerk of the Court via the ECF filing system, with

service upon the parties via ECF as follows:

Coby Howell
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, Oregon 97204
Telephone: 503-727-1023
Fax: 603-727-1117
Email: coby.howell@usdoj.gov

*Counsel for Defendants*

*s/Ashley Klinglesmith*
Ashley Klinglesmith, Legal Assistant