RECEIVED

JUN 08 2018

Clerk, U.S. Courts
District of Montana
Missoula Division

# UNITED STATES DISTRICT COURT

# DISTRICT OF MONTANA, MISSOULA DIVISION

| | | |
|---|---|---|
| **ROBERT H. ALAND**, | ) | |
| | ) | CV-17-89-M-DLC (Lead) |
| Plaintiff, | ) | |
| | ) | Consolidated with: |
| v. | ) | CV-17-117-M-DLC |
| | ) | CV-17-118-M-DLC |
| **UNITED STATES DEPARTMENT** | ) | CV-17-119-M-DLC |
| **OF THE INTERIOR, ET AL.,** | ) | CV-17-123-M-DLC |
| | ) | CV-18-16-M-DLC (Aland) |
| Federal Defendants, | ) | |
| | ) | **MEMORANDUM OF LAW** |
| and | ) | **IN SUPPORT OF PLAINTIFF** |
| | ) | **ALAND'S MOTION FOR** |
| **STATE OF WYOMING, ET AL.,** | ) | **SUMMARY JUDGMENT** |
| | ) | **WITH REGARD TO** |
| Intervenors-Defendants. | ) | **CLAIMS 1, 3, 5, 6 AND 7** |



"Blondie" and yearling cubs, photograph by Plaintiff Aland, Grand Teton National Park, Wyoming, May 18, 2018.

# Table of Contents

| **No.** | **Topic** | **Page** |
|---|---|---|
| I. | Introduction | 1 |
| II. | Nature of Claims 1, 3, 5, 6 and 7 | 2 |
| III. | Plaintiff's Findings of Facts | 3 |
| | A. Claim 1 - Relitigation Precluded by Collateral Estoppel | 4 |
| | B. Claim 3 - Flawed Public Comment Process | 8 |
| | C. Claim 5 - No Recovery | 10 |
| | D. Claim 6 - Erroneous DPS Classification | 14 |
| | E. Claim 7 - Failure To Satisfy Statutory Delisting Factors | 14 |
| IV. | Summary Judgment Standard | 15 |
| V. | Argument | 16 |
| | A. Claim 1 - Relitigation Precluded by Collateral Estoppel | 16 |
| | B. Claim 3 - Flawed Public Comment Process | 20 |
| | C. Claim 5 - No Recovery | 25 |
| | D. Claim 6 - Erroneous DPS Classification | 28 |
| | E. Claim 7 - Failure To Satisfy Statutory Delisting Factors | 28 |
| VI. | Conclusion | 29 |

# Table of Authorities

**Page**

## Cases:

*Aland v. Kempthorne*, U. S. District Court, Idaho District, Case No.     4
1:08-cv-00024-EJL
*Center for Biological Diversity v. Jewell*, 2018 WL 1586651(D.     25
Ariz. March 31, 2018).
*Collins v. D. R. Horton, Inc.*, 505 F.3d 874 (9th Cir. 2007)     18, 19
*Commonwealth of Pennsylvania v. Trump*, 2017 WL 6398465     21
(W.D. Pa. Dec. 15, 2017)
*Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1006 (D.     25
Mont. 2016), appeal dismissed, 9th Cir., No. 16-35466, Oct. 7, 2016
*Defenders of Wildlife v. Kempthorne*, 2006 WL 8435908 (D. Mont.     27
2006)
*Greater Yellowstone Coalition v. Servheen*, 2008 WL 11348320     4
(D. Mont. 2008)
*Greater Yellowstone Coalition v. Servheen*, 672 F. Supp. 2d 1105     5, 6, 7, 8,
(D. Mont. 2009), aff'd, 665 F.3d 1015 (9th Cir. 2011)     17, 18, 19
*Humane Society of the United States v. Zinke*, 865 F.3d 585 (D. C.     8
Cir. 2017)
*Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir.     21
1995)
*Markle Interests, LLC v. U. S. Fish & Wildlife Service*, 827 F.3d     25
452 (5th Cir. 2016)
*Mid-Continent Nail Corp.v. United States*, 846 F.3d 1364 (Fed. Cir.     20
2017)
*Montana v. United States*, 440 U.S. 147 (1979)     16
*Ober v. U. S. Environmental Protection Agency*, 84 F.3d 304 (9th     21
Cir. 1996)
*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979)     16, 18
*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011)     21
*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)     21
*Shell Offshore Inc. v. Babbitt*, 238 F. 3d 622 (5th Cir. 2001)     21
*Sierra Club v. U. S. Fish & Wildlife Service*, 245 F.3d 434 (5th Cir.     25
2001)

22

*Spirit of the Sage Council v. Norton*, 294 F.Supp.2d 67 (D. D.C. 2003), clarified & amended, 2004 WL 1326279 (D. D.C. 2004), appeal vacated as moot, 411 F.3d 225 (D.C. Cir. 2005)     21

*State of California v. Bureau of Land Management*, 2018 WL 1014644 (N.D. Cal. Feb. 22, 2018)     21

*Wilderness Society v. Rey*, 180 F. Supp. 2d 1141 (D. Mont. 2002)

## Statutes:

Freedom of Information Act, 5 U.S.C. § 552     8
Administrative Procedure Act, 5 U.S.C. § 553(c)     20
Administrative Procedure Act, 5 U.S.C. §§ 704 & 706(2)(A) & (D)     1
Endangered Species Act, 16 U.S.C. § 1532(16)     1
Endangered Species Act, 16 U.S.C. § 1533(a)(1)     3
Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A)     1

## Federal Register:

2005 Proposed Delisting Rule, 70 Fed. Reg. 69854 (Nov. 17, 2005)     4
2007 Final Delisting Rule, 72 Fed. Reg. 14866 (March 29, 2007)     4
2016 Proposed Delisting Rule, 81 Fed. Reg. 61658 (March 11, 2016)     6
2017 Final Delisting Rule, 82 Fed. Reg. 30502 (June 30, 2017)     1

## Regulations:

50 C.F.R. § 17.11     1
50 C.F.R. § 424.11(d)(2)     25

## Other:

S. Rep. No. 752, 79th Cong., 1st Sess. 15 (Nov. 19, 1945)     20
H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3, 1946)     20
Report, U. S. Senate Judiciary Comm., *Administrative Procedure Act, Legislative History 1944-46*, 79th Cong. (July 26, 1946)     20
Federal Rules of Civil Procedure 56     15
Montana Local of Civil Procedure Rule 56.1     2

# I. **Introduction**

This is a citizen suit by Plaintiff Aland pursuant to the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1540(g)(1)(A), and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 704 and 706(2)(A) and (D). Plaintiff requests this Court to declare invalid, vacate and set aside and enjoin implementation of, *Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife* (Dkt. No. FWS-R6-ES-2016- 0042), published by Federal Defendants in the Federal Register on June 30, 2017 (82 Fed. Reg. 30502; "2017 Final Rule"), establishing grizzly bears in the Greater Yellowstone Ecosystem ("GYE") as a distinct population segment ("DPS") pursuant to 16 U.S.C. § 1532(16) and removing that DPS from the list of threatened and endangered species under the ESA, as set forth in 50 C.F.R. § 17.11, effective July 31, 2017.

On May 11, 2018, Federal Defendants filed the final Administrative Record ("2018 AR"), including deliberative documents list and privilege log, with the Court. ECF 175, 175-1.

Plaintiff, on April 20, 2018, in accordance with the Court's Order dated March 14, 2018 (ECF 135), filed a motion to supplement the 2018 AR and allow limited discovery (ECF 169) and supporting memorandum of law (ECF 170);

Federal Defendants' response (ECF 173) was filed on May 4, 2018; and Plaintiff's reply (ECF 177; corrected version) was filed on May 11, 2018.[1]

Plaintiff submits this Memorandum of Law in support of his Motion under Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and Local Rule 56.1 for summary judgment with regard to Claims 1, 3, 5, 6 and 7 in the Complaint filed on September 8, 2017 (ECF #1).[2]

## II. Nature of Claims 1, 3, 5, 6 and 7

Claim 1 asserts that Federal Defendants are precluded by offensive non-mutual collateral estoppel from relitigating the validity of removing ESA protection for GYE grizzly bears.

Claim 3 alleges that Federal Defendants violated the APA public comments requirements, 5 U.S.C. § 553(c).

Claim 5 alleges that the GYE grizzly bears had not recovered as required by the ESA, 50 C.F.R. § 424.11(d)(2), for the purpose of removing the GYE grizzly bears' ESA protection.

---

[1] Plaintiff's motion currently is pending before the Court. The Court's grant of the motion could have a significant impact on the evidence in this case.

[2] On February 23, 2018, prior to consolidation of Plaintiff's case, Plaintiff filed a Motion for Summary Judgment with regard to Claim 2 (ESA deadline violation), together with supporting Statement of Undisputed Facts, Memorandum of Law and Declaration. ECF 44-47. By Order dated May 14, 2018, the Court bifurcated and stayed Plaintiff's Claims 2, 4 and 8. ECF 178.

Claim 6 alleges that the GYE population of grizzly bears was not a DPS within the meaning of the ESA and that, even if the GYE bears did constitute a DPS, Federal Defendants erroneously removed their ESA protection without taking into account the (a) effect of that DPS's removal on the remnant grizzly bear population and (b) loss of historic range.

Claim 7 alleges that Federal Defendants erroneously applied the five delisting factors set forth in the ESA, 16 U.S.C. § 1533(a)(1), for the purpose of removing the GYE grizzly bears' ESA protection.

### III. Plaintiff's Findings of Facts ("PFF")

**General**

1. Grizzly bears, the subjects of this litigation, are an iconic species in American history and "the great symbol of American wildness." They played a prominent role in the 1804-06 Lewis & Clark expedition as stated in Clark's journal. Plaintiff's Statement of Undisputed Facts ("PSUF"; attached as **Exhibit A** to Organization Plaintiffs' Statement of Undisputed Facts), ¶ 1.

2. Plaintiff has standing, and has satisfied all preconditions, to prosecute this citizen suit. PSUF ¶ 2.

3. This Court has jurisdiction over Plaintiff's Claims Nos. 1, 3, 5, 6 and 7 and authority to grant the relief requested by Plaintiff. PSUF ¶ 3.

**Specific**

## A. Claim 1 - Relitigation Precluded by Collateral Estoppel

4. On November 17, 2005, Federal Defendants published in the Federal Register a proposed rule to remove ESA protection for the GYE population of grizzly bears ("2005 Proposed Rule"). PSUF 4.

5. On March 29, 2007, Federal Defendants published in the Federal Register the final rule to remove ESA protection for the GYE population of grizzly bears ("2007 Final Rule"). PSUF 5.

6. The 2007 Final Rule was challenged in three ESA citizen suits filed in 2007, including a suit filed by Plaintiff, *Aland v. Kempthorne*, U. S. District Court, Idaho District, Case No. 1:08-cv-00024-EJL ("Aland 2008").[3] One suit was filed in the Idaho District Court; Plaintiff's suit was filed in the Illinois District Court but was transferred to the Idaho District Court; and the third suit was filed in this Court. PSUF 6.

7. Federal Defendants requested this Court to transfer the third suit to the Idaho District Court, but this Court rejected that request. *Greater Yellowstone Coalition v. Servheen*, 2008 WL 11348320 (D. Mont. 2008). PSUF 7.

---

[3] The docket number of Aland 2008 in the Illinois District Court was 1:07-cv-04358-JBZ.

8.  In 2009 this Court held that the 2007 Final Rule was invalid; and in 2011 the U.S. Court of Appeals for the Ninth Circuit unanimously affirmed this Court's decision. *Greater Yellowstone Coalition v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), aff'd, 665 F.3d 1015 (9th Cir. 2011).  PSUF 8.

9.  The Ninth Circuit entered its Mandate in *Greater Yellowstone* on January 18, 2012, and its November 22, 2011, judgment in favor of plaintiff took effect on January 18, 2012.  This Court entered an Order on January 20, 2012, confirming its September 21, 2009, judgment for plaintiff, except as modified by the Ninth Circuit, and closed the case on March 30, 2012.  PSUF 9.

10.  Federal Defendants, having reviewed the records and opinions from this Court and the Ninth Circuit, decided not to request (a) a panel rehearing or rehearing en banc by the Ninth Circuit; (b) reconsideration by the Ninth Circuit; or (b) review by the U. S. Supreme Court upon writ of certiorari.   PSUF 10.

11.  The *Greater Yellowstone* case was fully, fairly and competently litigated by Federal Defendants in this Court and the Ninth Circuit.  The evidence was set forth in an Administrative Record ("2008 AR"), which (a) was compiled by Federal Defendants, (b) contained over 50,000 pages and (c) was filed with this Court (and with the Idaho District Court in Aland 2008 and the other case) with a Declaration executed by Christopher Servheen, Federal Defendants' then-Grizzly Bear Recovery Coordinator, stating that it was accurate and complete.  PSUF 11.

12. By letter dated May 24, 2012, only four months after this Court's judgment in *Greater Yellowstone* became effective, Wyoming Governor Matthew Mead requested then-Secretary of the Interior Ken Salazar to make another effort to remove the GYE grizzly bears ESA protection. PSUF 12.

13. Governor Mead's May 24, 2012, letter erroneously and substantially overstated -- by 60% -- the State of Wyoming's annual management costs with regard to GYE grizzly bears based upon records prepared by the State of Wyoming; and Governor Mead, despite being advised of the error by Plaintiff, appears never to have corrected the error. PSUF 13.

14. By letter dated July 19, 2012, replying to Governor Mead's May 24, 2012, letter, Secretary Salazar stated that Federal Defendants would make another effort to remove the GYE grizzly bears' ESA protection. PSUF 14.

15. On March 11, 2016, Federal Defendants published *Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife; Proposed Rule*, again proposing to remove ESA protection for the GYE grizzly bears ("2016 Proposed Rule"). PSUF 15.

16. Federal Defendants published the 2017 Final Rule removing ESA protection for the GYE grizzly bears in the Federal Register on June 30, 2017, effective July 31, 2017. PSUF 16.

17. Federal Defendants relied upon *Greater Yellowstone* throughout the 2017 Final Rule. PSUF 17.

18. There have been significant factual developments adverse to Federal Defendants since the 2007 Final Rule and the *Greater Yellowstone* decisions, including, among others, increased human-caused mortalities of GYE grizzly bears, continued loss of food sources (including the lure of GYE grizzly bears into highly lethal environments as they search for alternate food sources) and climate changes; and those developments support retention of ESA protection for the GYE grizzly bears because those changes indicate that the bears' chances of survival deteriorated to the date of the 2017 Final Rule. For example, the States of Idaho, Montana and Wyoming, with Federal Defendants' encouragement, entered into a Memorandum of Agreement ("MOA") in August 2016 that will divvy up annual "discretionary mortalities" (i.e., trophy hunting deaths) and reduce the number of GYE grizzly bears annually to a minimum level (below the current population level) specified in the MOA. The States of Idaho and Wyoming have already adopted hunting seasons for GYE grizzly bears beginning September 1, 2018. There have been no factual developments that counteract the MOA or the hunting seasons or otherwise increase the GYE grizzly bears' chances of survival; and Federal Defendants did not set forth any such changes in the 2017 Final Rule. PSUF 18.

19. There have been significant legal developments adverse to Federal

Defendants since the 2007 Final Rule and *Greater Yellowstone* decisions,

including *Humane Society of the United States v. Zinke*, 865 F.3d 585 (D. C. Cir.

2017). PSUF 19.

## B. **Claim 3 - Flawed Public Comment Process**

20. Over 195,000 comments were submitted by the public pursuant to the

APA in response to the 2005 Proposed Rule. According to statistics prepared

contemporaneously by Federal Defendants, 99.3%, including 90.4% from Idaho,

Montana and Wyoming, opposed delisting. Despite that overwhelming sentiment,

Federal Defendants issued the 2007 Final Rule, which was invalidated in the

*Greater Yellowstone* litigation. PSUF 20.

21. Defendants justified their disregard of the overwhelming public

sentiment against delisting on the ground that the public comments were not a

"vote count" or a "binding referendum." PSUF 21.

22. The public submitted over 665,000 comments with regard to the 2016

Proposed Rule. However, by letter dated November 1, 2017, from their Region 6

Office, Federal Defendants informed Plaintiff, in a response to a request filed by

Plaintiff under the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

on May 11, 2017, that Federal Defendants did not prepare statistical analyses for

those comments comparable to the statistical analyses they prepared for the public comments relating to the 2005 Proposed Rule.  PSUF 22.

23.  Federal Defendants have attempted to justify their disregard of the public's overwhelming sentiment against the 2005 Proposed Rule, 2007 Final Rule, 2016 Proposed Rule and 2017 Final Rule on the ground that for ESA purposes they are only required to consider science-based comments.  By email dated January 18, 2017, Federal Defendants' Region 6 Office informed Plaintiff as follows (PSUF 23):

> It is no longer common practice for us to analyze public comments in the way you describe since the standard in the Endangered Species Act requires us to make determinations based on the best scientific and commercial information available.  However, all comments received during the comment period are available to the public on regulations.gov and it is thus possible for anyone to determine what proportion of comments received agreed with or disagreed with our proposal.

24.  Federal Defendants' January 18, 2017, email did not state why they abandoned the prior "common practice" of preparing statistical analyses of public comments under the APA.  It is reasonable to assume that the abandonment was a strategic decision to avoid drawing judicial attention to the overwhelming public sentiment in litigation challenging the 2017 Final Rule.  Moreover, Federal Defendants' January 18, 2017, email confirms that Federal Defendants in fact did disregard the public's overwhelming sentiment against the 2016 Proposed Rule and 2017 Final Rule.  PSUF 24.

25. The public submitted a substantial number of scientific comments after the 2016 Proposed Rule in opposition to removing ESA protection for GYE grizzly bears. These comments were submitted by numerous experienced and highly-respected grizzly bear specialists such as the world-renowned scientist, Dr. Jane Goodall, who submitted a comment for herself and 65 other named experts and renowned grizzly bear expert, Dr. David Mattson, who submitted various comments and is relied upon by Federal Defendants throughout the 2017 Final Rule. PSUF 25.

26. Federal Defendants summarized many of these scientific comments in the 2017 Final Rule in the format of 117 "Issues" but summarily dismissed the comments without meaningful analyses. For example, comments presented by Dr. Mattson, who was relied upon heavily elsewhere in the 2017 Final Rule, were summarily dismissed when those comments contradicted points relied upon by Federal Defendants to support the 2017 Final Rule. PSUF 26.

## C. **Claim 5 - No Recovery**

27. Grizzly bears at one time roamed in very large numbers across the western United States. Estimates between 1800 and the early 1900s put the number as high as 100,000, but by 1975 the number was reduced to fewer than 1,000 almost entirely due to human-caused mortalities. In addition, over 98% of their habitat had been lost due to population expansion and other causes. As stated

in the 2017 Final Rule: "With European settlement of the American West, grizzly bears were shot, poisoned, and trapped wherever they were found, and the resulting range and population declines were dramatic." PSUF 27.

28. In 1975 approximately 136 – 312 grizzly bears in lived in the GYE, a vast, mountainous and relatively unpopulated area consisting of over 20 million acres in northeast Idaho, southwest Montana and northwest Wyoming that includes some of America's most cherished wild lands and wildlife. PSUF 28.

29. In 1975 Federal Defendants listed grizzly bears in the coterminus 48 states as a threatened species under the ESA. Federal Defendants considered the five statutory listing factors and determined that four of the five were satisfied. Federal Defendants did not designate grizzly bears in the GYE as a DPS in 1975. PSUF 29.

30. Grizzly bears have one of the lowest reproductive rates among terrestrial mammals for a number of reasons, including late age of first reproduction, small average litter size, long intervals between litters and cub mortalities. PSUF 30.

31. The GYE grizzly bear population has not crossed the numerical threshold for recovery in the vast GYE as indicated by the following table (PSUF 31):

| Date | Total # (Est.) | GYE # (Est.) |
|------|----------------|--------------|
| 1800 | 46,500-72,200  | --- |
| 1850 | 40,700-63,200  | --- |
| 1910 | 4,300-6,700    | --- |

| 1960 | 1,600-2,400 | --- |
| 1975 | 800-1,000 | 136-312 |
| 1982 | 800-1,000 | 236 |
| 1984-2006 | NA | 400 |
| 2007 | 1,000 | 500 |
| 2010 | 1,800 | --- |
| 2016 | 1,800 | 700 |

32. Defendants relied in the 2017 Final Rule (and before) upon an abstract, unscientific formula (Chao2) to estimate the number of bears in the GYE and in total; and all estimates are likely to be erroneously high. PSUF 32.

33. Numerous scientists, biologists and grizzly bear specialists submitted comments with regard to the 2005 Proposed Rule, and a number of those persons set forth minimum numerical thresholds to be achieved before the GYE grizzly bears could be determined to be recovered from the scientific standpoint within the meaning of the ESA as summarized in the following table (PSUF 33):

| (1)<br><br>Expert(s) | (2)<br><br>Date | (3)<br>Threshold<br>Number |
| --- | --- | --- |
| Brian Peck for the Great Bear Foundation | 3/18/06 | 2,000 – 5,000 |
| Craig M. Pease, Prof. of Science & Law, Vermont Law School | 2/18/06 | 1,850 – 18,500 |
| Louisa Willcox for the Natural Resources Defense Council | 3/20/06 | 3,000+ |
| Lance Craighead for the Craighead Environmental Research Institute & 268 other listed scientists | 3/20/06 | 2,000 – 3,000 |

34. The threshold numbers set forth in the 2008 AR were equally valid with regard to the 2016 Proposed Rule and 2017 Final Rule due to the (a) absence of

any significant factual changes that would lower the threshold numbers and (b)

occurrence of factual changes that probably would increase those numbers such as

increased human-caused mortalities of GYE grizzly bears, continued loss of food

sources (including the lure of GYE grizzly bears into highly lethal environments as

they search for alternate food sources) and climate changes. PSUF 34.

35. Numerous scientists, biologists and grizzly bear specialists also

submitted comments with regard to the 2016 Proposed Rule and 2017 Final Rule,

and a number of those persons set forth minimum numerical thresholds to be

achieved before the GYE grizzly bears could be determined to be recovered from

the scientific standpoint within the meaning of the ESA as summarized in the

following table (PSUF 35):

| (1)<br><br>Expert(s) | (2)<br><br>Date | (3)<br>Threshold<br>Number |
|---|---|---|
| Dr. Jane Goodall & 65 other experts | 5-5-16 | number not provided |
| Henry B. Lacey | 5-7-16<br><br>5-9-16 | number not provided<br><br>9,000 |
| Brian Peck | 5-10-16 | 2,000 – 5,000 |
| American Society of Mammalogists &<br>Society for Conservation Biology | 5-10-16 | 9,000 – 19,800 |
| David J. Mattson, PhD | 1-8-18 | 8,900 |

36. Federal Defendants summarily rejected these threshold population

numbers in the 2017 Final Rule: "We disagree with the suggestion that there must

be 2,500 - 5,000 grizzly bears throughout the lower 48 States for recovery to be

achieved in the GYE." However, Federal Defendants did not provide any reasons why they believed these experts were wrong. PSUF 36.

37. The GYE has not reached its carrying capacity for grizzly bears and can accommodate the additional grizzly bears needed for a recovery within the meaning of the ESA. Federal Defendants agree, stating in the 2017 Final Rule that "regarding carrying capacity, this has never been one of our recovery criteria." PSUF 37.

38. It is critical for the long-term survival of GYE grizzly bears to terminate their isolated status and reconnect with other grizzly bear populations, especially the significant Northern Continental Divide Ecosystem population. PSUF 38.

## D. Claim 6 - Erroneous DPS Classification

39. Plaintiff adopts as if fully set forth herein the undisputed facts set forth in briefs and related documents to be filed on or before June 13, 2018, by Organization Plaintiffs with regard to Claim 6.

## E. Claim 7 - Failure To Satisfy Statutory Delisting Factors

40. Plaintiff adopts as if fully set forth herein the undisputed facts set forth in briefs and related documents to be filed on or before June 13, 2018, by Organization Plaintiffs with regard to Claim 7.

## IV. Summary Judgment Standard

FRCP 56(a) provides that this Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Pursuant to FRCP 56(c)(1)(A), the movant can establish the absence of a factual dispute by citing various items, including declarations, admissions and other materials.

This Court stated in *Greater Yellowstone*, 672 F. Supp. 2d at 1111-12, that "summary judgment is a particularly appropriate tool for resolving claims challenging agency action . . . . because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes." (Citation omitted.)

After the movant has demonstrated the absence of a genuine dispute with regard to material facts by specific citations, the non-moving party must set forth specific facts showing that there is a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").

## V. **Argument**

### A. **Claim 1 - Relitigation Precluded by Collateral Estoppel**

The Supreme Court of the United States described the "dual purpose" of collateral estoppel as (a) protecting litigants from the burden of relitigating an identical issue and (b) promoting judicial economy by preventing needless litigation.[4] *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 (1979). The issue in *Parklane Hosiery* was whether a corporate defendant and other defendants in a class action lawsuit were precluded by collateral estoppel from relitigating a federal securities law issue by an earlier decision against the defendants with regard to that issue by a federal district court in favor of a government agency, the Securities Exchange Commission. The Supreme Court applied estoppel even though the SEC was not a party to the later class action lawsuit.

Before *Parklane Hosiery*, "the scope of collateral estoppel was limited by the doctrine of mutuality of parties," which meant that "neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Id.* However, in *Parklane Hosiery* the Court abandoned this limitation and approved non-mutual offensive use of collateral estoppel in which

---

[4] See *Montana v. United States*, 440 U.S. 147, 153-54 (1979) ("To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.").

"a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Id.* at 329.

The Supreme Court recognized two potential problems with non-mutual offensive use of collateral estoppel: (a) Increase of the total amount of litigation as a result of the plaintiff's failure to participate in the earlier litigation and (b) unfairness to the defendant if (i) it failed to vigorously defend the first litigation because it involved small or nominal damages or (ii) the second litigation gives the defendant procedural opportunities that were not available in the first litigation and could have caused a different result. *Id.* at 329-31. However, the Court concluded that "the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts ***broad discretion*** to determine when it should be applied." *Id.* at 331 (emphasis added.)

The Supreme Court then reviewed the prior litigation involving the SEC and defendants and concluded:

> [N]one of the considerations that would justify a refusal to allow the use of offensive collateral estoppel is present in this case. Since [defendants] received a "full and fair" opportunity to litigate their claims in the SEC action, the contemporary law of collateral estoppel leads inescapably to the conclusion that [defendants] are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading.

The Ninth Circuit Court of Appeals has accepted the *Parklane Hosiery* non-mutual offensive use of collateral estoppel doctrine with four conditions. *Collins v. D. R. Horton, Inc.*, 505 F.3d 874, 882 n. 8 (9th Cir. 2007). These conditions were satisfied in this case as a result of the *Greater Yellowstone* litigation:

| # | *Collins* Condition | Satisfied in This Case? |
|---|---|---|
| 1 | There was a full and fair opportunity to litigate the identical issue in the prior litigation. | **Yes.** Federal Defendants had a full and fair opportunity to litigate the identical delisting issue - validity of removal of ESA protection for GYE grizzly bears -- in the *Greater Yellowstone* litigation. PFF 6-8, 10-11. |
| 2 | The issue was actually litigated in the prior litigation. | **Yes.** The delisting issue was actually, fully and fairly litigated in this Court and the Ninth Circuit Court of Appeals in *Greater Yellowstone*. PFF 6-8, 10-11. |
| 3 | The issue in the prior litigation was decided in a final judgment. | **Yes.** The delisting issue was decided in a final judgment of this Court, affirmed by the Ninth Circuit, in *Greater Yellowstone*. PFF 9. |
| 4 | The party against whom collateral estoppel is asserted was a party or in privity with a party in the prior action. | **Yes.** Federal Defendants were parties in *Greater Yellowstone*. PFF 4-10. |

This case presents a classic example of a situation in which this Court should exercise its broad discretion and apply the *Parklane Hosiery* non-mutual offensive collateral estoppel doctrine to preclude Federal Defendants from relitigating *Greater Yellowstone*.

*First*, Federal Defendants, having reviewed the records and opinions from this Court and the Ninth Circuit, decided not to request (a) a panel rehearing or

rehearing en banc by the Ninth Circuit; (b) reconsideration by the Ninth Circuit; or (b) review by the U. S. Supreme Court upon writ of certiorari. PFF 10. Presumably Federal Defendants recognized that the delisting issue had been fully and fairly litigated in this Court and the Ninth Circuit and were prepared at that point to accept the result of that litigation rather than take actions that they determined would be hopeless and waste judicial resources.

*Second*, outside interference appears to have entered the picture and caused Federal Defendants to pursue a different option. By letter dated May 24, 2012, less than four months after the Ninth Circuit's decision in *Greater Yellowstone* became effective, Governor Mead of Wyoming sent a letter to then-Secretary of the Interior Ken Salazar requesting Federal Defendants to make another effort to delist the GYE grizzly bears (PFF 12); by letter dated July 19, 2012, Secretary Salazar stated that Federal Defendants would comply with that request (PFF 14); and so began the course of action by Federal Defendants that gave rise to the 2016 Proposed Rule, the 2017 Final Rule and this litigation.

*Third*, **all** tests prescribed by the Ninth Circuit in *Collins v. D. R. Horton, Inc.* for application of non-mutual offensive collateral estoppel are satisfied as discussed above.

This Court should terminate this unnecessary and wasteful -- in terms of the resources of the Court and the parties -- litigation and restore the GYE grizzly bears' ESA protection.

## B. **Claim 3 - Flawed Public Comment Process**

The APA required Federal Defendants to (a) give general notice of proposed rule-making in the Federal Register and thereafter (b) "give interested persons an opportunity to participate in rule-making by submitting written data, views and arguments." 5 U.S.C. § 553(c).

The House and Senate reports state that "the agency must analyze and consider *all* relevant matter presented." S. Rep. No. 752, 79th Cong., 1st Sess. 15 (Nov. 19, 1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3, 1946). (Emphasis added.) "[Public] participation . . . in the rule-making process is *essential* in order to permit administrative agencies to inform themselves . . . ." Report submitted by Pat McCarran, Chairman, U. S. Senate Committee on the Judiciary, *Administrative Procedure Act, Legislative History 1944-46*, 79th Cong. (July 26, 1946) (Emphasis added.).

Courts have frequently recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rule-making without having the opportunity to participate in that rule-making. E.g., *Mid-Continent Nail Corp.v. United States*,

846 F.3d 1364, 1373 (Fed. Cir. 2017) ("Adequate notice 'is crucial to ensure that
agency regulations are tested via exposure to diverse public comment, . . . to
ensure fairness to affected parties, and . . . to give affected parties an opportunity to
develop evidence in the record to support their objections to the rule and thereby
enhance the quality of judicial review.' "; citations omitted.); *Prometheus Radio
Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011); *Rural Cellular Ass'n v. FCC*,
588 F.3d 1095, 1101 (D.C. Cir. 2009) ("The opportunity for comment must be a
meaningful opportunity, and we have held that in order to satisfy this requirement,
an agency must also remain sufficiently open-minded." Emphasis added.); *Shell
Offshore Inc. v. Babbitt*, 238 F. 3d 622, 630 (5th Cir. 2001); *Ober v. EPA*, 84 F.3d
304, 312-15 (9th Cir. 1996); *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392,
1401-06 (9th Cir. 1995); *State of California v. Bureau of Land Management*, 2018
WL 1014644 at 12-13 (N.D. Cal. Feb. 22, 2018); *Commonwealth of Pennsylvania
v. Trump*, 2017 WL 6398465 at 9-10 (W.D. Pa. Dec. 15, 2017); *Wilderness Society
v. Rey*, 180 F. Supp. 2d 1141, 1143 (D. Mont. 2002).

Federal Defendants have an established history of violating the public
comments requirement of the APA. Over 195,000 comments were filed by the
public pursuant to the APA in response to the 2005 Proposed Rule. According to
Defendants' published statistics, 99.3%, including 90.4% from Idaho, Montana and
Wyoming, *opposed* delisting. Defendants disregarded that overwhelming

sentiment and issued the 2007 Final Rule, which was invalidated in the *Greater Yellowstone* litigation. PFF 20. See *Spirit of the Sage Council v. Norton*, 294 F.Supp.2d 67, 77-78 (D. D.C. 2003), clarified & amended, 2004 WL 1326279 (D. D.C. 2004), appeal vacated as moot, 411 F.3d 225 (D.C. Cir. 2005) (94% opposition; rule invalidated).

Defendants justified their disregard of the overwhelming public sentiment against the 2005 Proposed Rule on the ground that the public comments were not a "vote count" or a "binding referendum." PFF 21.

The public submitted over 665,000 comments with regard to the 2016 Proposed Rule. However, Federal Defendants informed Plaintiff in a response to a FOIA request filed by Plaintiff that Defendants did not prepare a statistical analysis of these comments of the type they prepared for the public comments with regard to the 2005 Proposed Rule. PFF 22.

It is reasonable to assume that (a) the public sentiment with regard to the 2016 Proposed Rule was as overwhelming in opposition to delisting as the public sentiment expressed with regard to the 2005 Proposed Rule and (b) for that reason Defendants decided against preparing statistical analyses that would draw this Court's attention to that continued overwhelming public sentiment. PFF 24.

Defendants have attempted to justify their disregard of the overwhelming public sentiment against delisting on the ground that for ESA purposes they are

only required to consider science-based comments. PFF 23. However, the APA

requires Federal Defendants to consider "written data, views and arguments"; and

the legislative history requires Defendants to analyze and consider *all* relevant

matter presented by the public. The APA and legislative history do *not* say that

science-based comments are the *only* comments to be considered. Thus, the APA

and ESA together require Defendants in listing and delisting analyses to consider

science-based comments *and* all other written data, views and arguments.

This case -- involving the survival of a species, a life or death situation for

the species -- presents an extraordinarily egregious disregard of overwhelming

public sentiment by Federal Defendants. An astounding number of interested

members of the public -- over 665,000 -- availed themselves of the opportunity to

participate in rule-making provided by the APA; and they virtually unanimously

told Federal Defendants not to remove the GYE bears' ESA protection. Disregard

of that public opinion cannot be tolerated by this Court; it was the equivalent of

bad faith. It was an effective administrative repeal of the APA public comment

provision.

Federal Defendants attempted in the 2017 Final Rule to cover up their

disregard of public comments by asserting summarily that they "fully considered

and evaluated all public comments" (82 Fed. Reg. at 30547), but that assertion is

false as established by their (a) "hide the ball" strategy of refusing to prepare

statistics with regard to the 665,000 public comments[5] and (b) decision to issue the 2017 Final Rule despite the overwhelming public sentiment against delisting.

The public submitted a substantial number of scientific comments in opposition to the delisting of the GYE grizzly bears. These comments were submitted by many experienced, highly-respected grizzly bear specialists such as the world-renowned scientist, Dr. Jane Goodall, who submitted a comment for herself and 65 other named experts and renowned grizzly bear expert, Dr. David Mattson, who submitted various comments and is relied upon by Federal Defendants throughout the 2017 Final Rule. PFF 25.

Federal Defendants set forth many of these science-based comments in the 2017 Final Rule in the format of 117 "Issues" but summarily dismissed those comments without meaningful analyses in their "Responses," basically adopting a "we're right, they're wrong" attitude throughout. 82 Fed. Reg. at 30546-624. For example, issues raised by Dr. Mattson were summarily (and erroneously) dismissed when those issues contradicted key points asserted by Federal Defendants to support delisting. PFF 26.

Federal Defendants' violation of the APA's public comment process with regard to the 2017 Final Rule was not a harmless error; the violation went to the

_____

[5] Federal Defendants' "hide the ball" strategy is pervasive in this litigation as fully discussed in Plaintiff's 2018 AR motion with regard to the disorganized, difficult to navigate 2018 AR and defective privilege log. See footnote 1 and related text.

heart of the delisting process by confirming Federal Defendants' disdain for the best available science and the views of the public.

## C. __Claim 5 - No Recovery__

The fundamental requirement for delisting is "recovery," which is defined as the "point at which protection under the [ESA] is no longer required" based on the best scientific and commercial data available; Federal Defendants' "principal goal" must be to cause the species to reach that critical point. 50 C.F.R. § 424.11(d)(2).

It is not sufficient that the population is "merely [able] to survive"; it must have fully recovered from its endangered or threatened status. *Sierra Club v. U. S. Fish & Wildlife Service*, 245 F.3d 434, 438 (5th Cir. 2001). See *Markle Interests, LLC v. U. S. Fish & Wildlife Service*, 827 F.3d 452, 460-61 (5th Cir. 2016); *Center for Biological Diversity v. Jewell*, 2018 WL 1586651 at 3-4 (D. Ariz. March 31, 2018). Therefore, a ___minimum numerical threshold___ for the population, determined by the best available science, must be crossed before there is recovery. See *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1006 (D. Mont. 2016), appeal dismissed, 9th Cir., No. 16-35466, Oct. 7, 2016 ("Remarkably though, after detailing what can only be described as a grim genetic picture for the wolverine in the United States, [Federal Defendants] brushed the small population size/low genetic diversity issue aside.").

The first and most fundamental step, therefore, was to determine the size of the GYE grizzly bear population. This determination can only be made with the requisite degree of accuracy by *actual* count, which Federal Defendants did not perform. Instead Federal Defendants relied upon an abstract formula to estimate the number of bears. PFF 32. A number of commenters informed Federal Defendants of the unreliability of the formula, but Federal Defendants persisted. PFF 32. Moreover, the formula is subject to manipulation to overstate the size of the GYE population.

The GYE grizzly bear population has not even come close, due to its slow reproduction capacity and other reasons, to crossing the numerical threshold for recovery in the vast GYE as indicated by the table at PFF 31.

Numerous scientists, biologists and grizzly bear specialists submitted written comments with regard to the 2005 Proposed Rule, and a number of those persons set forth minimum numerical thresholds to be achieved before the GYE grizzly bears could be determined to be recovered from the scientific standpoint within the meaning of the ESA indicated by the table at PFF 33. Those thresholds are equally relevant with regard to the 2017 Final Rule. PFF 34.

Numerous scientists, biologists and grizzly bear specialists also submitted comments with regard to the 2016 Proposed Rule, and a number of those persons also set forth minimum numerical thresholds to be achieved before the GYE

grizzly bears could be determined to be recovered from the scientific standpoint within the meaning of the ESA as indicated by the table at PFF 35.

Defendants summarily rejected these threshold population numbers in the 2017 Final Rule -- "We disagree with the suggestion that there must be 2,500 - 5,000 grizzly bears throughout the lower 48 States for recovery to be achieved in the GYE" -- but they did not provide any reasons why they believe these eminent scientists and biologists were wrong. PFF 36. See *Defenders of Wildlife v. Kempthorne*, 2006 WL 8435908 at 6 n. 5 (D. Mont. 2006) ("The Court need not defer to FWS expertise because they have 'not articulated a rational connection between the facts' and its decision.").[6]

The GYE has not reached its carrying capacity for grizzly bears and can accommodate the additional grizzly bears needed for a recovery within the meaning of the ESA. PFF 37. In fact, Federal Defendants agree with this

---

[6] Identical unsupported assertions of recovery by federal and state officials are found throughout the 2018 AR. Examples:

- May 24, 2012, Wyoming Governor Mead to then-Secretary of the Interior Salazar: "Many knowledgeable people, including grizzly bear scientists within the Department of the Interior, believe the species is unquestionably recovered within the Yellowstone Ecosystem." FWS_Rel Docs_007008.
- May 10, 2016, Administrator, Idaho Office of Species Conservation, to Director, U.S. Fish & Wildlife Service: "[D]espite achieving recovery in the previous decade, regulatory and legal processes have unnecessarily delayed delisting." FWS_Pub CMT_004131.

conclusion, stating in the 2017 Final Rule that "regarding carrying capacity, this has never been one of our recovery criteria." PFF 37.

Despite all indications that the GYE grizzly bears have not recovered, the States of Idaho, Montana and Wyoming, with Federal Defendants' encouragement, have taken an egregious step to assure that the GYE grizzly population cannot grow in numbers and diversity by defiantly entering into the Memorandum of Agreement that divvies up annual "discretionary mortalities" (i.e., trophy hunting deaths) beginning on September 1, 2018, and almost certainly will reduce the population to a level that is substantially below the current level. PFF 18. Thus, the States and Federal Defendants effectively have ***guaranteed*** that the GYE bears will not recover indefinitely.

### D. Claim 6 - Erroneous DPS Classification

Plaintiff adopts as if fully set forth herein the legal arguments set forth in briefs to be filed on or before June 13, 2018, by Organization Plaintiffs with regard to Claim 6.

### E. Claim 7 - Failure To Satisfy Statutory Delisting Factors

Plaintiff adopts as if fully set forth herein the legal arguments set forth in briefs to be filed on or before June 13, 2018, by Organization Plaintiffs with regard to Claim 7.

## VI. <u>Conclusion</u>

The 2017 Final Rule was arbitrary, capricious and not in accordance with law and without observance of procedure required by law for the reasons discussed herein and in the Organization Plaintiffs' memorandums of law incorporated herein by reference and, therefore, must be set aside and vacated pursuant to the ESA and APA.  5 USC § 706(2); 16 USC § 1540(g).

Robert H. Aland, Plaintiff

140 Old Green Bay Road
Winnetka, IL  60093-1512
Telephone:  (847) 784-0994
Fax:  (847) 446-0993
E-mail:  rhaland@comcast.net

June 8, 2018

## <u>CERTIFICATE OF COMPLIANCE</u>

Plaintiff certifies, pursuant to Local Rule 7.1(d)(2), that the Memorandum of Law in Support of Plaintiff Aland's Motion for Summary Judgment with Regard to Claims 1, 3, 5, 6 and 7 contains 6,356 words, exclusive of caption, Table of Contents, Table of Authorities and this Certificate, by Microsoft Word automatic count.

Robert H. Aland, Plaintiff