Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
bishop@westernlaw.org

John R. Mellgren, *admitted PHV*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
mellgren@westernlaw.org

Kelly E. Nokes
WildEarth Guardians
2590 Walnut Street
Denver, Colorado 80205
knokes@wildearthguardians.org

*Counsel for Plaintiff in CV 17-118-M-DLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE et al., | CV 17-89-M-DLC |
| Plaintiffs, | (Consolidated with Case Nos. CV 17-117-M-DLC, CV 17-118-M-DLC, CV 17-119-M-DLC, and CV 17-123-M-DLC) |
| vs. | |
| UNITED STATES OF AMERICA et al., | |
| Federal-Defendants. | MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| And | |
| STATE OF WYOMING, et al., | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

LIST OF EXHIBITS ...................................................................... viii

GLOSSARY ................................................................................ ix

MAP DEPICTING YELLOWSTONE GRIZZLY SEGMENT .................. x

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 3

STANDARD OF REVIEW .................................................................. 6

ARGUMENT ................................................................................. 7

    I.    The Service's decision conflicts with the lower-48 grizzly listing rule ........................................................... 10

    II.   The Service cannot designate and delist a segment of an already established lower-48 segment .................................. 13

    III.  The Service cannot "delist" a segment that was never previously listed .................................................... 17

    IV.  The Service never considered or consulted on how its decision to delist a Yellowstone grizzly segment may impact the remnant population in the lower-48 .............................. 19

    V.   The Service failed to consider and analyze the implications of historic range loss on grizzlies within and outside the Yellowstone grizzly segment ................................... 22

    VI.  The Service's determination that the Yellowstone grizzly segment is biologically "recovered" is arbitrary and conflicts with the best available science ....................................... 23

VII.  The Service's threats assessment is arbitrary and not in
      accordance with the ESA ....................................................... 28

CONCLUSION  ........................................................................... 34

CERTIFICATE OF SERVICE  ............................................................. 35

CERTIFICATE OF COMPLIANCE  ....................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Association v. Jewell,*
 815 F. 3d 544 (9th Cir. 2016) ............................................................ 7

*Alaska Oil & Gas Association v. Pritzker,*
 840 F.3d 671 (9th Cir. 2017) ................................................... 23, 24

*Alaska Oil & Gas Association v. Ross,*
 2018 WL 821866 (9th Cir. Feb. 12, 2018) ...................................... 25

*Alsea Valley Alliance v. Deparment of Commerce,*
 358 F.3d 1181 (9th Cir. 2004) .......................................................... 34

*Alsea Valley Alliance v. Evans,*
 161 F. Supp. 2d 1154 (D. Or. 2001) ......................................... 14, 16

*California ex rel. Lockyer v. U.S. Department of Agriculture,*
 575 F.3d 999 (9th Cir. 2009) ............................................................ 22

*California State Grange v. National Marine Fisheries Service,*
 620 F. Supp. 2d 1111 (E.D. Cal. 2008) ........................................... 14

*Center for Biological Diversity v. Jewell,*
 2018 WL 1586651 (D. Ariz. Mar. 31, 2018)........................ 23, 24, 28

*Center for Biological Diversity v. U.S. Fish & Wildlife Service,*
 2011 WL 73494 (C.D. Cal. Jan. 8, 2011) ........................................ 32

*Citizens of Overton Park v. Volpe,*
 401 U.S. 402 (1971) ........................................................................... 6

*Coos County Board of County Commissioners v. Kempthorne,*
 531 F.3d 792 (9th Cir. 2008) ............................................................ 15

*Defenders of Wildlife v. Jewell,*
    176 F. Supp. 3d 975 (D. Mont. 2016)................................ 6

*Defenders of Wildlife v. Norton,*
    258 F.3d 1136 (9th Cir. 2001) ........................................ 9

*Defenders of Wildlife v. Salazar,*
    729 F. Supp. 2d 1207 (D. Mont. 2010) .................... 9, 10, 13–14, 16

*Friends of the Wild Swan v. Weber,*
    767 F.3d 936 (9th Cir. 2014) ........................................ 32

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service,*
    378 F.3d 1059 (9th Cir. 2004) .................................... 7, 23

*Greater Yellowstone Coalition v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011) ...................................... 28

*Greater Yellowstone Coalition v. Servheen,*
    672 F. Supp.2d 1105 (D. Mont. 2009), *aff'd and rev'd in part by*
    665 F.3d 1015 (9th Cir. 2011) ...................................... 12

*Humane Society v. Jewell,*
    76 F. Supp.3d 69 (D.D.C. 2014), *aff'd and rev'd in part by Humane*
    *Society v. Zinke,* 865 F.3d 585 (D.C. Cir. 2017) ................ 17, 18–19

*Humane Society v. Kempthorne,*
    579 F. Supp. 2d 7 (D.D.C. 2008) ................................ 17, 18–19

*Humane Society v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) ........................................ 7

*Humane Society v. Zinke,*
    865 F. 3d 585 (D.C. Cir. 2017) .................................... 12, 19

*Karuk Tribe of California v. U.S. Forest Service,*
    681 F.3d 1006 (9th Cir. 2012) ...................................... 20

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Management,*
    387 F. 3d 989 (9th Cir. 2004) .................................................. 29, 30

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v.*
*U.S. Forest Service,*
    549 F.3d 1211 (9th Cir. 2008) ......................................... 6–7

*National Association of Home Builders v. Norton,*
    340 F. 3d 835 (9th Cir. 2003) ........................................... 8

*National Parks Conservation Association v. Jewell,*
    62 F. Supp. 3d 7 (D.D.C. 2014) ...................................... 22

*National Wildlife Federation v. Norton,*
    386 F. Supp. 2d 553 (D. Vt. 2005)................................... 14

*Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Service,*
    475 F.3d 1136 (9th Cir. 2007) ........................................... 7

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ........................................... 6

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) ........................................... 7, 9, 10, 28

*Tennessee Valley Authority v. Hill,*
    437 U.S. 153 (1978) .......................................................... 7

*Western Watersheds Project v. Foss,*
    2005 WL 2002473 (D. Idaho Aug. 19, 2005) .................................. 25

*Western Watersheds Project v. Kraayenbrink,*
    632 F. 3d 472 (9th Cir. 2011) ......................................... 20

*WildEarth Guardians v. Salazar,*
    741 F.Supp.2d 89 (D.D.C. 2010) ............................................. 29, 31

**Statutes**

5 U.S.C. § 701 ..................................................................... 6

5 U.S.C. § 706(2)(A) ...................................................... 6, 34

16 U.S.C. § 1531(c) ............................................................. 9

16 U.S.C. § 1532(6) ........................................................... 23

16 U.S.C. § 1532(16) ........................................ 13, 15, 17, 18

16 U.S.C. § 1532(20) ......................................................... 23

16 U.S.C. § 1533(a)(1)(A)–(E) ............................................. 9

16 U.S.C. § 1533(a) ........................................................... 18

16 U.S.C. § 1533(c) ..................................................... 17, 18

16 U.S.C. § 1533(c)(2) ....................................................... 15

16 U.S.C. § 1533(d) ........................................................... 13

16 U.S.C. § 1536(a)(1) ....................................................... 17

16 U.S.C. § 1536(a)(2) ....................................................... 20

16 U.S.C. § 1536(b) ........................................................... 21

16 U.S.C. § 1538(a)(1) ....................................................... 17

## Rules and Regulations

50 C.F.R. § 402.02 ........................................................ 20, 23

50 C.F.R. § 402.13 ............................................................. 20

50 C.F.R. § 402.14(a) ................................................................. 20

50 C.F.R. § 402.14(a)–(b) ........................................................... 20

50 C.F.R. § 402.14(b)(1) ............................................................. 20

50 C.F.R. § 402.14(g)(4) ............................................................. 21

50 C.F.R. § 424.11(c) ............................................................ 28, 29

50 C.F.R. § 424.11(d) ........................................... 9, 17, 18, 28, 29

50 C.F.R § 424.11(d)(1) ................................................................ 9

50 C.F.R § 424.11(d)(2) .................................................... 9, 23, 32

50 C.F.R. § 424.11(d)(3) ............................................................... 9

40 Fed. Reg. 31,734 (July 28, 1975) .......................... 1, 3, 10, 11, 13, 14

61 Fed. Reg. 4,722 (February 7, 1996) ................................ 1, 7, 8, 15, 19

76 Fed. Reg. 76,987 (December 9, 2011) ...................................... 14

81 Fed. Reg. 13,174 (March 11, 2016) .......................................... 3

82 Fed. Reg. 30,502 (June 30, 2017) ................................... Passim

83 Fed. Reg. at 18,737 (April 30, 2018) ................................. 10, 21

# LIST OF EXHIBITS[i]

EXHIBIT 1      Declaration of Bethany Cotton

EXHIBIT 2      Declaration of Dameon V. Hansen

EXHIBIT 3      Declaration of Dara Cutler McDevitt

EXHIBIT 4      Declaration of Louisa Livingston Willcox

EXHIBIT 5      Declaration of Norman A. Bishop

EXHIBIT 6      Declaration of Sam Parks

EXHIBIT 7      Declaration of Sarah McMillan

---

[i] Plaintiff's Exhibits are properly before this Court because they are submitted for the sole purpose of demonstrating Plaintiff satisfies the minimum requirements for Article III standing.

# GLOSSARY

APA                     Administrative Procedures Act

Conservation Area       Primary Conservation Area or "PCA"

ESA                     Endangered Species Act

Guardians               WildEarth Guardians

Monitoring Area         Demographic Monitoring Area or "DMA"

Service                 U.S. Fish and Wildlife Service

Segment                 Distinct Population Segment or "DPS"

Yellowstone region      The Greater Yellowstone Ecosystem or "GYE"

# MAP DEPICTING YELLOWSTONE GRIZZLY SEGMENT



# INTRODUCTION

The U.S. Fish and Wildlife Service's ("Service's") decision to simultaneously designate grizzlies in the Yellowstone region a "distinct population segment" and declare this population segment "recovered" under the Endangered Species Act ("ESA") has no support in the law or science. *See* 82 Fed. Reg. 30,502 (June 30, 2017).

The Service's decision carves out and removes an isolated population of grizzlies in the Yellowstone region from the lower-48 listing, effectively delisting an already-protected species by balkanization. This piecemeal approach conflicts with the ESA and the lower-48 listing rule. *See* 40 Fed. Reg. 31,734 (July 28, 1975). The approach also runs afoul of the Service's distinct population segment policy. *See* 61 Fed. Reg. 4,722 (February 7, 1996). Grizzlies are already protected as a single segment in the lower-48 so listing distinctions below this level cannot be made. The Service also cannot "delist" a Yellowstone grizzly segment that was never previously listed.

Notably, the Service's entire decision, including its "recovery" finding and threats assessment for the Yellowstone grizzly segment is entirely a function of where the Service chose to draw the segment

boundary, i.e., where the Service chose to draw the circle and focus its attention. A different (perhaps wider) boundary would result in a different analysis and findings. And, because the Service's decision focuses solely on grizzlies and threats *inside* the segment boundary, everything outside the boundary was considered "outside the scope" of the decision and ignored. 82 Fed. Reg. at 30,546; FWS-Del-Doc-154503.[1] No consideration, consultation, or analysis of how the Service's decision may affect the remnant grizzly population in the lower-48 was therefore undertaken. Nor did the Service analyze how the loss of over 98 percent of the grizzly's historic range may impact the species.

The Service's finding that an isolated population of 600-700 grizzlies is biologically "recovered" is also flawed and contrary to the best available science. Not a single published, peer-reviewed paper supports this determination. The Service also neglected to analyze the cumulative threats facing grizzlies in the Yellowstone region. For these reasons, the Service's decision should be declared unlawful and set aside.

---

[1] Citations are to Plaintiffs' statement of facts ("Facts") and bate-stamped pages from the record.

## BACKGROUND

Grizzlies once roamed from the Great Plains to the Pacific coast and from central Mexico to Alaska, inhabiting hot deserts, alpine mountains, and everything in between. 81 Fed. Reg. 13,174, 13,178 (March 11, 2016). Grizzlies fed on bison in Yellowstone and beached whales along the Pacific coast. *Id.* With European settlement, however, grizzlies were soon "shot, poisoned, and trapped wherever they were found." *Id.* at 13,181. By 1950, humans reduced the grizzly's range and numbers in the western United States by over 98 percent. *Id.*

In 1975, the Service listed all grizzlies in the lower-48 as a single, "threatened" species under the ESA. 40 Fed. Reg. at 31,734. The Service committed itself to recovering grizzlies in the lower-48 and prioritized recovery in six areas, including the Cabinet-Yaak, Selkirks, Northern Continental Divide, Selway-Bitterroot, North Cascades, and Yellowstone region. 82 Fed. Reg. at 30,509. The Service also committed to evaluating Colorado's San Juan Mountains as an additional recovery area. FWS-Lit-14552; FWS-Lit-014556–57. These ambitious recovery efforts, however, never materialized.

The Service ignored its commitment to evaluate Colorado's San Juan Mountains for recovery, abandoned plans to reintroduce grizzlies to the Selway-Bitterroot, and has delayed (and is now questioning) plans to restore grizzlies to the North Cascades. Facts at ¶¶38–42. The Service's efforts to conserve grizzlies in the Selkirks and Cabinet-Yaak ecosystems are ongoing, but largely failing. Only 48 grizzlies remain in the Cabinet-Yaak and only 88 in the Selkirks. 82 Fed. Reg. at 30,509.

Grizzlies are doing better in the Northern Continental Divide ecosystem and numbers have increased in the Yellowstone region. *Id.* The Yellowstone population, however, remains isolated and any improvement in the status of a single subpopulation (or two) should not be confused with recovery. *See* FWS-Lit-14330–31. Nor does an isolated population of approximately 600-700 grizzlies qualify as "recovered" under the ESA. *See* Facts at ¶¶59–83.  The best available science also tells us that Yellowstone's grizzlies — which continue to experience high levels of human-caused mortality and low reproductive rates — face an uncertain future due to climate change and losses of important food sources. *See* Facts at ¶¶58, 84–128.

Despite these circumstances, on June 30, 2017, the Service published a final rule simultaneously designating and delisting an allegedly "recovered" Yellowstone grizzly segment. *See* 82 Fed. Reg. at 30,502. This decision removes ESA-protective status from grizzlies inside the segment boundary where grizzlies are now considered "game" species managed by Montana, Idaho, and Wyoming and subject to trophy hunting. *See* Facts at ¶115. Wyoming will even allow "baiting" to kill grizzlies and will not protect female grizzlies with cubs outside the monitoring area. *Id*. at ¶120. There will also be no buffers to protect grizzlies leaving Yellowstone National Park from trophy hunters. Nor are there any prohibitions on hunting in areas where grizzlies are known to congregate (root fields and moth sites). Facts at ¶¶117–118.

The Service insists it will ensure management of a "stable" Yellowstone grizzly segment, 82 Fed. Reg. at 30,514–15, but no enforceable mechanisms are in place to ensure this occurs. *See* Facts at ¶¶129–169. Under pressure from the states, the Service also reneged on its commitment to use the Chao2 estimator to calculate grizzly population size, allocate mortality limits, and set population goals in perpetuity. *Id*. at ¶157. This change could potentially allow hundreds of

additional bears to be killed every year. *Id.* As explained by Chris Servheen, the Service's former grizzly bear coordinator, this approach is "biologically and legally indefensible." *Id.*

## STANDARD OF REVIEW

ESA claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq., NEC v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Courts shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA standard is deferential but courts must nonetheless engage in a "thorough, probing, in depth review." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Courts will not "rubber stamp administrative decisions they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying the statute.*" Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 998 (D. Mont. 2016). Courts must also reject decisions based on an "erroneous interpretation of law," decisions that fail "to consider an important aspect of the problem," or agency explanations that run counter to evidence in the record. *League of Wilderness Defenders v. Forest Service*, 549 F.3d 1211, 1215 (9th Cir.

2008). A "rational connection between the facts found and the choice made" is required. *Humane Society v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010).

## ARGUMENT

The ESA's mandate is to "halt and reverse the trend towards species extinction whatever the cost." *TVA v. Hill*, 437 U.S. 153, 184 (1978). The ESA seeks to recover species to the point where protective status is no longer necessary. *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1070 (9th Cir. 2004). The "goal of species recovery is paramount." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F. 3d 544, 551 (9th Cir. 2016).

The Service's first task under the ESA is to decide whether to list a species, subspecies, or "distinct population segment." *Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009). The term distinct population segment ("segment") is not defined in the statute but in 1996 the Service adopted a policy for designating segments under the ESA ("segment policy"), 61 Fed. Reg. at 4,722. The Ninth Circuit upheld this policy as a reasonable construction of the ESA. *Northwest Ecosystem Alliance v. USFWS*, 475 F.3d 1136 (9th Cir. 2007).

Under the segment policy, three elements are evaluated to determine whether a segment qualifies for protective status: (1) the discreteness of the segment to the remainder of the species; (2) the significance of the segment to the remainder of the species; and (3) the conservation status of the segment in relation to the ESA's standards, i.e., if the segment is discrete and significant, does it qualify as threatened or endangered? 61 Fed. Reg. at 4,725.

A "segment" is not a scientific term that describes a lower "taxonomic rank" of a species or subspecies. 61 Fed. Reg. at 4,723. The term is solely a creature of the statute designed to give the Service the ability to "provide different levels of protection for populations of the same species." *Nat'l Ass'n of Home Builders v. Norton*, 340 F. 3d 835, 842 (9th Cir. 2003). The Service "does not have to list an entire species . . . when only one of its populations faces extinction." *Id.* The Service can protect individual populations before "large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. at 4,725. Canada lynx and grizzly bears can be protected in the lower-48 even though they are abundant in Canada and Alaska. This approach is guided by the maxim that protecting

species only in Alaska and Canada is not good enough: "Relegating grizzlies to Alaska is about like relegating happiness to heaven; one may never get there." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 n. 10 (9th Cir. 2001) (citation omitted).

Once identified, the Service must determine whether the segment qualifies as "endangered" or "threatened." *Trout Unlimited*, 559 F.3d at 949. This decision must be based on the best available science, *id.*, and involves review of five threat factors: (1) the loss of habitat and range; (2) overutilization; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors, 16 U.S.C. § 1533(a)(1)(A)–(E).

Once listed, the Service must then seek to recover the listed entity. 16 U.S.C. § 1531(c). Any future decision by the Service to "delist" a species also involves consideration of the five threat factors. 50 C.F.R. §424.11(d). A species may only be delisted if it no longer qualifies for "endangered" or "threatened" status due to extinction, errors in the original listing, or if it is "recovered." *Id.* at § 424.11(d)(1)–(3). Delisting decisions must be based on the best available science. *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1214 (D. Mont. 2010).

Delisting cannot be based on "the constituent interests of economic, recreational or other purposes." *Id*. Nor can it be based on "emotion or sentiment." *Id*.

In this case, the Service's decision to designate and delist a Yellowstone grizzly segment is arbitrary and not in accordance with the ESA for at least *seven* related, but separate, reasons.

## I.  The Service's decision conflicts with the lower-48 grizzly listing rule.

The Service's ESA obligations to recover a species stem directly from the listing rule itself. *Defenders*, 729 F. Supp. at 1214; s*ee also Trout Unlimited*, 559 F.3d at 949–50 (describing the listing process).

Here, the Service's decision to designate and delist a Yellowstone grizzly segment conflicts with the original lower-48 grizzly listing rule which, as the Service concedes, remains in effect and was never "reopen[ed]." 83 Fed. Reg. 18,737 (Apr. 30, 2018). This listing rule protected *all* grizzly bears in the lower-48 as a single, threatened species. FWS-Lit-18564–66; 40 Fed. Reg. at 31,734–36. At the time, grizzlies were restricted to three small populations and the Service committed itself to insuring the bear's "conservation in all three of these [populations], and to protect any member of the species occurring

elsewhere in the 48 conterminous States." FWS-Lit-18565; 40 Fed. Reg. at 31,735. The Service's original recovery plan reflects this commitment: the Service will provide for the "conservation and recovery of the grizzly bear in the selected areas of the conterminous 48 states . . . [our] [o]bjectives are to . . . [e]stablish recovery of at least three populations in three distinct grizzly bear ecosystems in order to delist the species in the conterminous 48 states." FWS-Lit-14330. The Service explains that "[n]o one would recommend a single population in a single ecosystem" as being adequate for recovery. FWS-Lit-14331. On the contrary, the "conservation and recovery of three populations, as opposed to only one or two populations, is believed to be necessary to assure perpetuation of the species to a point that no longer requires the protection of the ESA." *Id.*

As such, having determined that all grizzlies in the lower-48 were "threatened," the Service committed itself to recovering this listed entity. FWS-Lit-18565; 40 Fed. Reg. at 31,735; *see also* FWS-Lit-14330 (delisting would require recovery in at least three populations). This approach is consistent with the ESA's focus on conserving the listed-entity and not individual populations of that listed-entity. As explained

by leading scientific experts, grizzly bear recovery and the ESA

"obligate [the Service] to manage the metapopulation of grizzlies in the

lower 48 states, not just each subpopulation ("[segment]") individually."

FWS-Pub-Cmt-004192.

Indeed, any interpretation to the contrary would undermine the

ESA's conservation mandates. The Service could easily circumvent the

ESA's conservation goals by "riving an existing listing into a recovered

sub-group" and delist an already-protected species "by balkanization."

*Humane Society v. Zinke*, 865 F. 3d 585, 602–03 (D.C. Cir. 2017); *see*

*also Greater Yellowstone Coalition v. Servheen*, 672 F. Supp.2d 1105,

1125 n. 9 (D. Mont. 2009) (recognizing that allowing the Service to

remove a species simply by drawing a line around it and designating it

a population segment would be "illogical").

For this reason, the lower-48 grizzly listing rule includes no

provisions for piecemeal delisting, i.e., no provision that would allow

removal of ESA-protections for allegedly "healthy" populations of grizzly

bears — like the Yellowstone segment at issue here — that may reach

certain population targets. Instead, and consistent with the ESA, the

lower-48 listing rule explains that any and all "healthy" populations

should remain threatened but subject to regulatory modifications pursuant to section 4(d) of the ESA, 16 U.S.C. § 1533(d), which could be amended to allow more (or less) discretionary mortality. *See* FWS-Lit-18565, 40 Fed. Reg. at 31,735. But here, instead of merely adjusting the grizzly's section 4(d) rule to account for increasing (or decreasing) numbers of bears in specific populations — as envisioned by the lower-48 listing rule — the Service carves out and removes the Yellowstone grizzly population from the ESA's protections altogether and ultimately allows for the delisting of isolated populations prior to recovery in the lower-48. This is arbitrary and contrary to the ESA and the lower-48 listing rule. "This is yet another example of [a] piecemeal approach, in which a fragment of a species' current range is declared 'recovered' before the species is recovered at the larger, regional scale." FWS-Pub-Cmt-004192.

## II. The Service cannot designate and delist a segment of an already established lower-48 segment.

The ESA only authorizes the Service to list (and subsequently delist) a species, subspecies, or segment, nothing smaller. 16 U.S.C. § 1532(16). There is no authority to make listing distinctions below the segment level, i.e., no authority to divide populations contained within a

segment into smaller parts. *Defenders*, 729 F. Supp. 2d at 1215–17. "Congress expressly limited the [Service's] ability to make listing distinctions among species below that of a subspecies or a [segment] of a species." *Alsea Valley Alliance v. Evans*, 161 F. Supp. 2d 1154, 1163 (D. Or. 2001). The law does not allow the Service to create a "sub-[population segment] taxonomy." *Defenders,* 729 F. Supp. 2d at 1215. The ESA "stops at a designated [segment] — nothing smaller." *Id.* at 1215–16. The Service conceded this point in other cases and in other contexts. *See, e.g., National Wildlife Federation v. Norton,* 386 F. Supp. 2d 553, 564 (D. Vt. 2005) (acknowledging that listing distinctions below that of a population segment are improper); *California State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1129 (E.D. Cal. 2008) (same); 76 Fed. Reg. 76,987, 76,991 (Dec. 9, 2011)(discussing cases prohibiting listing distinctions below the segment level and stating "we agree with that view.").

Here, the Service's decision conflicts with the ESA because the original lower-48 listing (discussed above) was — in effect — the listing of a lower-48 segment. *See* 40 Fed. Reg. at 31,734–36. This listing occurred prior to the 1978 amendment of the ESA (adding the

"segment" language) and prior to the Service's adoption of the 1996 segment policy, but it was a *de-facto* lower-48 segment listing. It had to be because: (a) the lower-48 listing was not a listing of an entire species (the grizzly bear is a subspecies of brown bear); and (b) it was not a listing of an entire subspecies because grizzly bears are not protected in Alaska or Canada. *Id.* Thus, the lower-48 grizzly bear listing necessarily must be a listing of grizzly bears in the lower-48 as a segment under the ESA. *See* 16 U.S.C. § 1532(16).

This was confirmed by the Service during its five-year status review of grizzly bears in 2011. *See* FWS-Lit-016170, 016195. Segments that were listed prior to adoption of the 1996 segment policy — like grizzlies — are re-evaluated by the Service on a case-by-case basis to determine consistency with the segment policy. 61 Fed. Reg. at 4,725. This is done in five-year status reviews required by section 4(c)(2) of the ESA, 16 U.S.C. § 1533(c)(2). *Id.*; *see also Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 798 (9th Cir. 2008) (describing re-evaluation process). The Service's five-year status review for grizzlies resulted in a formal determination that the lower-48 listing complies with the segment policy and that grizzlies were listed as a single

segment in the lower-48: we "find that the lower 48 State listing is discrete from other grizzly populations and significant to the remainder of the taxon . . . Because the lower 48 State grizzly bear population is discrete and significant, it warrants recognition as a [segment] under the ESA." FWS-Lit-01678. "This review confirms that the lower 48 State listing qualifies as a [segment] and recommends the current entity, on the whole, should retain its threatened status." FWS-Lit-016195; *see also* FWS-Lit-016170 ("This review confirms that the lower 48 state listing qualifies as a [segment]. . .").

Having determined that grizzlies are part of a single, lower-48 segment, the Service cannot now — as it is attempting to do here — make listing distinctions below that level. *Defenders*, 729 F. Supp. 2d at 1211, 1215–16; *Alsea Valley*, 161 F.Supp. 2d at 1162. The Service cannot further subdivide the lower-48 grizzly listing. *Id*.

This is not to suggest the Service is prohibited from designating and listing (or reclassifying and delisting) populations of grizzly bears within the lower-48 as multiple segments. Such an approach may help the Service focus its limited resources on where recovery actions are most needed. *See Humane Soc'y*, 865 F.3d at 598. To avoid conflict with

the ESA and its own segment policy however, the Service must first remove the lower-48 segment listing and then designate and list multiple segments consistent with its own policy. This is something the Service previously considered doing but never followed though on. *See* Facts at ¶54 (discussing various options, including carving up the lower-48 segment into multiple segments).

## III. The Service cannot "delist" a segment that was never previously listed.

The ESA's provisions only apply to listed species. *See* 16 U.S.C. §§ 1536(a)(1), 1538(a)(1). "[W]hether a group of organisms is a 'species' within the meaning of 16 U.S.C. § 1532(16), a definition that includes [segments], is of no legal consequence under the ESA until a determination is made that the group is an endangered or threatened species." *Humane Soc'y v. Jewell*, 76 F. Supp.3d 69, 110–13 (D.D.C. 2014), *aff'd and rev'd in part by* 865 F.3d 585 (D.C. Cir. 2017). It is axiomatic, therefore, that a species must first be listed before it can be delisted. *See* 16 U.S.C. § 1533(c); 50 C.F.R. § 424.11(d). The ESA "quite strongly suggests — consistent with its common usage — that the listing of any species . . . is a precondition to the delisting of that species." *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7, 17 (D.D.C.

2008) (J. Freidman); *see also Humane Soc'y*, 76 F. Supp. 3d at 112 (J. Howell) (same). Pursuant to Section 4(c) of the ESA, 16 U.S.C. § 1533(c), for example, there is no "listing status" to review and revise if the species is not already listed. Delisting must involve the removal of a species from a list of protected species. *See id*.; *see also* 50 C.F.R. § 424.11(d).

A segment — like the Yellowstone grizzly segment — must therefore be listed as either "threatened" or "endangered" before it can be declared "recovered" and delisted. *Humane Soc'y*, 76 F. Supp. 3d at 113. But this precondition never occurred. The Service never previously listed the Yellowstone grizzly segment as a "species" defined by the ESA, 16 U.S.C. § 1532(16). The Yellowstone grizzly segment was not considered, managed, or protected as a segment. Nor did the Service determine that the segment qualified for listing, engage in the five-factors threats assessment, or evaluate designating critical habitat for the segment as required by Section 4 of the ESA, 16 U.S.C. § 1533(a). Rather, in a rush to delist, the Service skipped the crucial and critical first step. This is a major oversight. The Service cannot "delist" a Yellowstone grizzly segment that was never previously listed. *Cf.*

*Humane Soc'y*, 76 F. Supp. 3d at 113; *Kempthorne*, 579 F. Supp.2d at 17.[2]

## IV. The Service never considered or consulted on how its decision to delist a Yellowstone grizzly segment may impact the remnant population in the lower-48.

In designating and delisting a Yellowstone grizzly segment, the Service failed to analyze the impact this decision would have on the remaining grizzlies in the lower-48. *See Humane Soc'y*, 865 F.3d at 599–603. Pursuant to this Court's order (Doc. 178), Guardians incorporates *Northern Cheyenne Tribe et al.'s,* plaintiffs in CV 17-119-M-DLC, briefing on this claim.

Relatedly, the Service also failed to initiate and complete section 7 consultation on how its decision to designate and delist a Yellowstone grizzly segment "may affect" grizzlies in the lower-48. Section 7 is the

[2] This Court should reject any argument that the lower-48 listing "implicitly" includes a Yellowstone grizzly segment. This "implied segment" theory was called into question in *Kempthorne*, 579 F. Supp. 2d at 17 n.10, and rejected in *Humane Soc'y*, 76 F. Supp. 3d at 122–24, though ultimately accepted by the D.C. Circuit in *Humane Soc'y*, 865 F. 3d at 597. Notwithstanding, this Court should reject the "implied segment" theory because: (1) a segment is a legal term – a creature of the statute – not a "lower taxonomic unit," 61 Fed. Reg. at 4,723; (2) the ESA, regulations, and segment policy do not recognize "implied segment" listings; and (3) such an interpretation would undermine the ESA's delisting process.

"heart of the ESA," *Western Watersheds Project v. Kraayenbrink*, 632 F.

3d 472, 495 (9th Cir. 2011), because it requires federal agencies to

ensure that any action it authorizes, funds, or carries out does not

jeopardize the continued existence of a listed species. 16 U.S.C. §

1536(a)(2). Congress intended the term "agency action" to have broad

meaning. *Karuk Tribe of Cal. v. Forest Service*, 681 F.3d 1006, 1020 (9th

Cir. 2012).

Section 7's consultation duties are triggered by agency actions

that "may affect" a listed species. *Id.* at 1027 (citing 50 C.F.R. §

402.14(b)(1)). "May affect" is a low standard: "Any possible effect,

whether beneficial, benign, adverse, or of an undetermined character"

triggers the consultation requirement. *Id.* (citation omitted). For all

actions that "may affect" a listed species, the agency must then

determine whether its action is likely or not to adversely affect the

species. 50 C.F.R. § 402.14(a)–(b). A "not likely to adversely affect"

determination leads to informal consultation. *Id.* § 402.13. If the action

is "likely to adversely affect" a listed species, formal consultation is

required. *Id.* at §§ 402.02, 402.14(a). The end product of formal

consultation is a biological opinion from the Service on whether the

action will jeopardize the survival of the species and, if so, what reasonable and prudent alternatives are available to avoid that result. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)(4).

Here, the Service's decision "may affect" the remaining grizzlies in the lower-48 because it: (a) deprives grizzlies that may travel into the segment boundary of ESA-protective status, if and when connectivity is restored; (b) subjects grizzlies inside the segment boundary to increased mortality which is likely to decrease opportunities for dispersal and genetic interchange outside the Yellowstone region; (c) creates confusion and uncertainty over the grizzly bear's listing status in the lower-48, i.e., does the remnant population still qualify as a segment for listing purposes and if so, how and where? (no segment analysis was undertaken); and (d) creates uncertainty over the Service's commitment to recover grizzlies in areas outside the segment boundary. *See* Facts at ¶56. The Service concedes as much, noting that its decision "could impede recovery of other still-listed populations." 83 Fed. Reg. at 18,739. The Service also recognizes that grizzlies outside the monitoring area — where mortality limits do not apply — will be subject to higher mortality, which could limit dispersal. *Id.* at 18,740. Concerns were also

raised about how delisting a Yellowstone segment "may preclude population expansion and connectivity with other ecosystems." 82 Fed. Reg. at 30,556.

The Service, however, neglected to initiate and complete section 7 consultation on how its decision may affect the remaining grizzlies in the lower-48. This is arbitrary, a violation of section 7 of the ESA, and provides additional grounds for vacating the delisting rule. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20–22 (D.D.C. 2014)(vacating rule for non-compliance with section 7's consultation requirements); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1020–21 (9th Cir. 2009)(same).

## V. The Service failed to consider and analyze the implications of historic range loss on grizzlies within and outside the Yellowstone grizzly segment.

Pursuant to this Court's order (Doc. 178), Guardians incorporates the *Alliance for the Wild Rockies',* plaintiffs in CV-17-123-M-DLC, briefing on this claim.

**VI.** **The Service's determination that the Yellowstone grizzly segment is biologically "recovered" is arbitrary and conflicts with the best available science.**

The goal of the ESA is to "recover" listed species, *Gifford Pinchot Task Force*, 378 F.3d at 1065, 1070, and a species can only be delisted if the best available science reveals it is fully "recovered." 50 C.F.R. § 424.11(d)(2). "Recovery" is the "improvement in the status of a listed species to the point at which listing is no longer appropriate." 50 C.F.R. § 402.02. This means a species is only "recovered" if it no longer meets the definition of a threatened species, i.e., it is "no longer likely to become an endangered species within the foreseeable future." 16 U.S.C. §§ 1532(6), (20).[3]

The Service must therefore "consider the long-term viability of the species" into the future when assessing whether a species is fully recovered. *Ctr. for Biological Diversity v. Jewell*, 2018 WL 1586651, at *4 (D. Ariz. Mar. 31, 2018). The Service cannot focus solely on the "short-term survival" or persistence but must ensure the "long-term

---

[3] The Service relies on a 2009 Solicitor's Opinion — upheld in *Alaska Oil & Gas Assoc. v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2017) — to define "foreseeable future" as a species-specific timeframe over which the best available science allows the Service to reasonably predict future threats and the response to such threats.

recovery" of a species in the wild. *Id.* at *13; *see also Alaska Oil & Gas Ass'n*, 840 F.3d at 681 (accepting the Service's basis for analyzing the threats to bearded seals over 50 to 100 years).

The Service insists the Yellowstone grizzly segment — which numbers approximately 600-700 bears — is biologically "recovered." *See* 82 Fed. Reg. at 30,502 and 30,557. But not a single published, peer-reviewed paper supports this finding. On the contrary, the best available science reveals an isolated population of approximately 600-700 grizzly bears is well below the number necessary to ensure the species' long-term health and viability. *See* Facts at ¶¶64–68. Thousands (not hundreds) of individuals are required for recovery. *See id.* at ¶64 (citing the published literature). An isolated population in the hundreds remains vulnerable to demographic fluctuations, environmental fluctuations, declines in fertility and survival, inbreeding depression, and loss of genetic diversity. FWS-Lit-030548; Facts at ¶65.

These findings are consistent with the International Union for Conservation of Nature ("IUCN's") classification of the Yellowstone grizzly segment as a "vulnerable" population, meaning "it is threatened

with becoming endangered" because it is fewer than 1,000 individuals. FWS-Pub-Cmt-03915; *see also* 82 Fed. Reg. at 30,558 (Service's recognition of the IUCN's "vulnerable" classification). These findings are also consistent with various peer review comments and comments from other scientific experts that call the Service's "recovery" finding into question. *See* Facts at ¶¶70–72.

In fact, the Service recently admitted that "the effective population size and heterozygosity levels of the [isolated Yellowstone grizzly segment] are only adequate *for the next several decades* [approximately 20 years]." 82 Fed. Reg. at 18,741 (emphasis added). This is not sufficient for long-term recovery under the ESA. *See, e.g., Alaska Oil & Gas Ass'n v. Ross*, 2018 WL 821866, *1 (9th Cir. Feb. 12, 2018) (accepting the Service's timeframe of 85 years for ringed seals); *Western Watersheds Project v. Foss*, 2005 WL 2002473, *15 (D. Idaho Aug. 19, 2005) (rejecting a 20-year delay in extinction risk when the Service's experts recommended a 60-100 year timeframe as the "foreseeable future"). For grizzly bears, the best available science works with a timeframe of 99% probability of surviving 40 generations, which

equates to roughly 400 years (10 years per generation). *See* Facts at ¶74 (citing literature).

Notably, the Service repeatedly emphasized that "recovery" for the Yellowstone grizzly segment is contingent upon establishing connectivity amongst populations in the lower-48. *See* FWS-Del-Em-00119567 (recovery requires linkage between recovery zones); FWS-Del-Em-00127058 (facilitating connectivity between the Yellowstone grizzlies and other ecosystems is a "significant issue" and "important recovery objective"). This is consistent with the best available science. As explained by the Service's recovery coordinator, "*all literature* dealing with isolated populations of any animal and all papers dealing specifically with Yellowstone genetics state that linkage is important." FWS-Del-Em- 00119586 (emphasis in original); *see also* Facts at ¶78 (literature). "If carnivores such as grizzly bears . . . are to survive and recover to healthy population levels in the Rocky Mountains, the issue of fragmentation must be addressed in a proactive and effective manner." FWS-Lit-029438 (Servheen (2001)). "Without female connectivity, small populations are not viable over the long-term." FWS-Lit-01061 (Proctor (2012)).

Indeed, the importance of restoring connectivity is why the Service originally insisted the states commit to no-hunting zones between Yellowstone and other subpopulations. *See* Facts at ¶81. This was considered a significant and "MAJOR issue," FWS-Del-Em-00144562 (emphasis in original), and critical to the Service's "recovery" finding. FWS-Emails-059449. The states refused, however. Montana, Idaho, and Wyoming said any regulatory commitments to provide and manage for connectivity — including the establishment of "no hunting zones" in important linkage areas — was "unacceptable." FWS-Del-Em-00144669; *see also* Facts at ¶82 (documenting states' refusal).

Because grizzlies remain isolated in the Yellowstone region, any claim of "recovery" from the Service is thus premature. Further, connectivity is unlikely to be established in the foreseeable future due to: (a) the states' refusal to take steps to facilitate connectivity in the region; (b) the Service's abandonment of reintroduction efforts in the Selway-Bitterroot, *see* Facts at ¶¶40–42; and (c) the additive mortality of dispersing bears from trophy hunters, *see* Facts at ¶¶115–125. The Service's commitment to artificially transplant two grizzlies every ten years into Yellowstone to assure genetic diversity, 82 Fed. Reg. at

30,536, also undermines any purported claim of "recovery." Recovery under the ESA occurs "in the wild," *Ctr. for Biological Diversity*, 2018 WL 1586651 at *4, and "without human interaction," *Trout Unlimited*, 559 F.3d at 957.

## VII. The Service's threats assessment is arbitrary and not in accordance with the ESA.

Prior to delisting, the Service must consider and analyze whether any one or a combination of the five threat factors causes a species to remain threatened or endangered under the ESA. *Greater Yellowstone Coalition v. Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011); 50 C.F.R. §§ 424.11(d),(c). The Service failed to properly do so in this case for three reasons.

First, the Service failed to analyze the threats from the Yellowstone grizzly segment's increased reliance on a meat-based diet. Pursuant to this Court's order (Doc. 178), Guardians incorporates *Northern Cheyenne Tribe's* (plaintiffs in CV-17-119-M-DLC) briefing on this claim.

Second, the Service failed to analyze the adequacy of the regulatory mechanisms to manage the Yellowstone grizzly segment post-delisting. Pursuant to this Court's order (Doc. 178), Guardians

28

incorporates *Humane Society's* (plaintiffs in CV-17-117-M-DLC) briefing on this claim.

Third, the Service failed to analyze whether any one "or a combination" of the five threat factors causes the Yellowstone grizzly segment to remain threatened under the ESA. The Service cannot look at the five factors in isolation but must take into account and analyze the collective impacts. *WildEarth Guardians v. Salazar*, 741 F.Supp.2d 89, 102 (D.D.C. 2010); 50 C.F.R. §§ 424.11(d),(c). "Sometimes the total impact from a set of actions may be greater than the sum of the parts." *Klamath-Siskiyou v. BLM*, 387 F. 3d 989, 994 (9th Cir. 2004).

The best available science reveals the Yellowstone grizzly segment is subject to multiple threats that have the potential to synergistically affect grizzlies. These multiple threats include: (1) extremely low reproductive rates — it takes 10 years to replace the loss of a single female grizzly, *see* Facts at ¶58;  (2) loss of important food sources, *see* Facts at ¶¶84–95; (3) high levels of "background" mortality, *see* Facts at ¶¶106–110;  (4) trophy hunting, with no buffers around Yellowstone Park, no restrictions on shooting females with cubs outside the monitoring area, use of baiting in Wyoming, and no prohibitions on

hunting in places where grizzlies are known to congregate, *see* Facts at ¶¶115–125; (5) the small and isolated population, *see* Facts at ¶¶59–83; (6) the loss of suitable habitat, *see* Facts at ¶¶111–113; (7) climate change, *see* Facts at ¶114; and (8) inadequate regulatory mechanisms, *see* Facts at ¶¶129–169.

Individually, each of these threats — though serious — may not threaten the Yellowstone grizzly segment. But collectively these threats could break the proverbial camel's back. *Cf. Klamath-Siskiyou*, 387 F. 3d at 994. A "small amount here, a small amount there, and still more at another point could add up to something with a much greater impact, until there comes a point where even a marginal increase will mean" the species does not survive. *Id*. This very issue was raised during the peer review and public comment process by a number of scientific experts. *See* Facts at ¶126.

In this case, the Service admits that many "of the threats faced by grizzly bears are interrelated and could be synergistic" and that threats "may cumulatively impact" the Yellowstone grizzly segment. 82 Fed. Reg. at 30,544. But the Service then concludes — without any supporting analysis — that no cumulative threats exist. *See id*. This is

a major oversight. *See WildEarth Guardians*, 741 F.Supp.2d at 102 (holding the Service violated the ESA by failing to consider cumulative threats). Merely concluding that no cumulative threats exist does not suffice. *Id*. The Service must "examine the relevant data and articulate a satisfactory explanation for its action," including a "rational connection between the facts found and the choice made." *Id*. No such analysis or rational explanation is provided. Instead, the Service relied solely on "population trend data" as the "ultimate metric" or proxy for assessing cumulative threats. 82 Fed. Reg. at 30,544. According to the Service, because the Yellowstone grizzly segment's population trend "has been relatively constant with no evidence to date of decline" no cumulative threat or need to analyze cumulative threats exists. *Id*. This is incorrect and misleading.

The Yellowstone grizzly segment has experienced very little to no population growth since 2002 and likely experienced population declines since 2014. *See* Facts at ¶61. The Service excluded the most recent population numbers because they were unhelpful: "Adding 2015's numbers would not necessary [sic] help our case." FWS-Emails-018429; *see also* FWS-Emails-018441 (recognizing that adding 2015 numbers

would require updating population data). The Service's statement, therefore, that the population has been "constant" with "no evidence of decline" is incorrect and based on incomplete and selective data.

Further, the use of a proxy is only acceptable if the results "mirror reality." *Cf. Friends of the Wild Swan v. Weber*, 767 F.3d 936, 949 (9th Cir. 2014) (citation omitted). The Service must show "the proxy being used is a sound substitute for the underlying criterion." *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 2011 WL 73494, *4– *8 (C.D. Cal. June 8, 2011). But here, the population trend data relied on is not (and could not be) an accurate proxy because an analysis of cumulative threats requires the Service consider the current *and future* threats facing a species. *See* 50 C.F.R. § 424.11(d)(2).

Grizzlies in the Yellowstone region are facing threats now and will continue to face increasing threats into the foreseeable future, including threats from trophy hunting, the loss of food sources, and climate change. The Service's population trend data provides no insight into these synergistic, future threats. Nor could it. Increases in mortality from future trophy hunts, increased management removals, habitat alterations from climate change, and inadequate regulatory

mechanisms have yet to be fully realized or reflected in the population trend data. As noted by a peer reviewer: "What is unclear, however, is how a warming climate in this area, lower elk numbers in the [Yellowstone region], the continued impacts of invasive species (e.g., rainbow trout) and disease (whitebark pine) *will* synergistically impact the very complex trophic web in this region and affect bear numbers *in the coming decades*." FWS-Rel-Docs-005204 (emphasis added). There is also a lag effect between the time the impact occurs and when it manifests itself in the population data. *See* FWS-Pub-CMT-004022 (discussing issue); FWS-Lit-3207 (paper on lag effect). For "grizzly bears, it takes at least 6 years of monitoring as many as 30 females with radio-collars to accurately estimate average annual population growth." 82 Fed. Reg. at 30,506.

As such, using population trend data that fails to address future threats or account for a lag effect as a "metric" for analyzing cumulative threats is arbitrary and contrary to the best available science. An actual cumulative threats assessment is required.

# CONCLUSION

For the foregoing reasons, Guardians respectfully requests this Court grant its motion for summary judgment, declare the Service's delisting rule unlawful, and set aside the rule pursuant to the APA, 5 U.S.C. § 706(2)(A). Setting aside or vacating the unlawful decision normally accompanies remand under the APA. *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004).

Respectfully submitted this 13th day of June, 2018.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ John R. Mellgren
John R. Mellgren

/s/ Kelly E. Nokes
Kelly E. Nokes

*Counsel for Plaintiff in 17-118-M-DLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of June, 2018, I filed a copy of this document electronically through the CM/ECF system, which caused all ECF registered counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Matthew K. Bishop
Matthew K. Bishop

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 6,500 words.  I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop