Timothy J. Preso
Joshua R. Purtle
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
tpreso@earthjustice.org
jpurtle@earthjustice.org

*Counsel for Plaintiffs Sierra Club,
Center for Biological Diversity, and
National Parks Conservation
Association and Local Counsel for
Plaintiff Northern Cheyenne Tribe*

Joshua Osborne-Klein
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 | Phone
(206) 448-0962 | Fax
joshok@ziontzchestnut.com

*Counsel for Plaintiff Northern
Cheyenne Tribe*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, et al., ) | Case No. CV 17-89-M-DLC |
| Plaintiffs, ) | (consolidated with Case Nos. |
| v. ) | CV 17-117-M-DLC, |
| ) | CV 17-118-M-DLC, |
| UNITED STATES OF AMERICA, ) et al., | CV 17-119-M-DLC, and CV 17-123-M-DLC) |
| Federal Defendants, ) | **MEMORANDUM IN SUPPORT** |
| and ) | **OF MOTION FOR SUMMARY** |
| STATE OF WYOMING, et al. ) | **JUDGMENT IN CASE NO. CV** |
| Defendant-Intervenors. ) | **17-119-M-DLC** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...............................................................................1

STANDARD OF REVIEW ...................................................................3

BACKGROUND ................................................................................3

ARGUMENT .....................................................................................4

I.   FWS FAILED TO RATIONALLY ADDRESS THE MORTALITY
     CONSEQUENCES OF THE YELLOWSTONE GRIZZLY'S
     TRANSITION TO A MEAT-FOCUSED DIET ...........................................4

     A.   Yellowstone Grizzlies' Shift to a More Meat-Reliant Diet
          Leads to Heightened Bear Mortality ......................................5

     B.   FWS Failed To Consider the Resulting Threat to the Grizzly
          Population.....................................................................7

     C.   FWS Ignored Critical Loopholes in the Post-Delisting
          Management Framework for Grizzly Mortality....................................9

II.  FWS FAILED TO CONSIDER THE IMPACT OF ITS
     YELLOWSTONE DELISTING ON THE STATUS OF THE
     REMNANT GRIZZLY BEAR LISTING ......................................................13

     A.   Grizzly Bear Listing Under the ESA .................................13

     B.   The Challenged Delisting and the Humane Society Litigation...........15

     C.   FWS's Post-Hoc Maneuvering..........................................17

     D.   FWS Left Critical Questions Unexamined ..........................18

III. FWS VIOLATED THE ESA AND APA BY REFUSING TO
     ALLOW PUBLIC COMMENT ON MAJOR CHANGES IN THE
     FINAL CONSERVATION STRATEGY ......................................................25

CONCLUSION ..................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alsea Valley All. v. Dep't of Commerce,
    358 F.3d 1181 (9th Cir. 2004) ..............................................................30

Ctr. for Biological Diversity v. Zinke,
    868 F.3d 1054 (9th Cir. 2017) .....................................................3, 8, 19

Defs. of Wildlife v. Salazar,
    776 F. Supp. 2d 1178 (D. Mont. 2011).................................................30

Greater Yellowstone Coal. v. Serveen,
    672 F. Supp. 2d 1105 (D. Mont. 2009), aff'd 665 F.3d 1015
    (9th Cir. 2011)............................................................................. 1, 1-2, 7

Humane Soc'y of the U.S. v. Zinke,
    865 F.3d 585 (D.C. Cir. 2017).....................................................*passim*

Humane Soc'y of the U.S. v. Jewell,
    76 F. Supp. 3d 69 (D.D.C. 2014)...................................................15, 16

Idaho Farm Bureau Fed'n v. Babbitt,
    58 F.3d 1392 (9th Cir. 1995) .......................................................26, 29

Judulang v. Holder,
    565 U.S. 42 (2011)..............................................................................19

Kern Cty. Farm Bureau v. Allen,
    450 F.3d 1072 (9th Cir. 2006) ...........................................................26

Kunaknana v. Clark,
    742 F.2d 1145 (9th Cir. 1984) ...................................................... 23-24

Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.,
    138 F.3d 759 (9th Cir. 1998) ..............................................................19

Nat'l Ass'n of Home Builders v. Norton,
    340 F.3d 835 (9th Cir. 2003) ................................................................3

Ober v. EPA,
    84 F.3d 304 (9th Cir. 1996) ........................................................26, 29

Paulsen v. Daniels,
    413 F.3d 999 (9th Cir. 2005) ...............................................................30

Sacks v. Office of Foreign Assets Control,
    466 F.3d 764 (9th Cir. 2006) ...............................................................24

W. Watersheds Project v. U.S. Bureau of Land Mgmt.,
    181 F. Supp. 3d 673 (D. Ariz. 2016) ...................................................23

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 553 ......................................................................................26
    § 553(b)-(c) ....................................................................................26
    § 706 ........................................................................... 3, 29-30

16 U.S.C. § 1532(6) ..............................................................................13
    § 1532(16) .............................................................................14, 22
    § 1532(20) ....................................................................................13
    § 1533(a)(1).........................................................................13, 20, 29
    § 1533(a)(1)(D) ...............................................................................4
    § 1533(a)(1)(E) ...............................................................................4
    § 1533(b)(1)(A).....................................................................19, 21, 24
    § 1533(b)(4)..................................................................................26
    § 1533(c)(1)....................................................................18, 19, 21, 24
    § 1533(c)(2)(A) ..............................................................................19
    § 1533(c)(2)(B) ........................................................................19, 21
    § 1540(g) .......................................................................................3

Endangered Species Act of 1973,
    Pub. L. No. 93-205, 87 Stat. 884 .......................................................14

Endangered Species Act Amendments of 1978,
    Pub. L. No. 95-632, 92 Stat. 3,751 ....................................................14

## REGULATIONS AND ADMINISTRATIVE MATERIALS

50 C.F.R. § 17.40(b)(1)(i)(C)................................................................12
    § 424.11(d) ...................................................................................20

61 Fed. Reg. 4,722 (Feb. 7, 1996) ........................................................14, 22

82 Fed. Reg. 57,698 (Dec. 7, 2017) ...........................................................17

83 Fed. Reg. 18,737 (Apr. 30, 2018) .........................................18, 24, 25

**NOTE REGARDING ADMINISTRATIVE RECORD CITATIONS**

Plaintiffs cite the administrative record by referencing the Bates number designations applied by Federal Defendants.

# INTRODUCTION

Plaintiffs in this case challenge the U.S. Fish and Wildlife Service's ("FWS") decision to designate the grizzly bears occupying the Greater Yellowstone Ecosystem a "distinct population segment" and remove that population from the list of threatened species under the Endangered Species Act ("ESA"). <u>See</u> FWS_Rel_Docs_001435 (Final Rule). The challenged Final Rule marks FWS's second attempt to remove the Yellowstone population from the ESA's protections. The first failed when this Court invalidated FWS's action and the Ninth Circuit affirmed based on FWS's failure to rationally address observed and predicted catastrophic losses of one of the bears' most important food sources, the seeds of the whitebark pine tree, due to climate change and other factors. <u>See</u> <u>Greater Yellowstone Coal. v. Servheen</u>, 672 F. Supp. 2d 1105 (D. Mont. 2009), <u>aff'd</u> 665 F.3d 1015 (9th Cir. 2011). In reviewing FWS's action, the Ninth Circuit stated:

> Perhaps the Service's delisting process, based on two decades of grizzly population growth, was well underway before the whitebark pine loss problem appeared on the radar and could be studied. But now that this threat has emerged, the Service cannot take a full-speed ahead, damn-the-torpedoes approach to delisting—especially given the ESA's "policy of institutionalized caution."

665 F.3d at 1030 (citation omitted).

In the challenged Final Rule, FWS once again took "a full-speed ahead, damn-the-torpedoes approach to delisting" that defies "the ESA's 'policy of

1

institutionalized caution.'" <u>Id.</u> (citation omitted). First, FWS failed to rationally address a dramatic spike in grizzly bear mortalities that emerged as FWS attempted to put the finishing touches on its Yellowstone delisting decision. Second, FWS chose to dismiss a significant legal development during the rulemaking process that undermined its entire strategy for carving the Yellowstone bears out of the ESA-listed lower-48 grizzly population and designating them as a distinct population segment for delisting. Third, FWS refused to provide any opportunity for public comment on late changes made to a central blueprint for post-delisting grizzly management known as the 2016 Conservation Strategy, even though those changes significantly weakened protections for grizzlies in the post-delisting management framework.

The victims of FWS's latest damn-the-torpedoes delisting approach are, first and foremost, Yellowstone's iconic grizzly bears. Twenty-three of these bears are slated to be killed in recreational hunting seasons planned by Wyoming and Idaho to begin on September 1, 2018.[1] The loss of these bears threatens injury to Plaintiffs in this case. Plaintiffs include members of the Northern Cheyenne Tribe for whom the grizzly is culturally and spiritually important, as well as others from

---

[1] Wyo. Game & Fish Dep't, Chapter 68: Grizzly Bear Hunting Seasons, at 68-6–68-7, https://wgfd.wyo.gov/WGFD/media/content/May-CH-68_Final-Website.pdf (last visited June 11, 2018); Idaho Fish & Game Comm'n, Press Release (Mar. 26, 2018), https://idfg.idaho.gov/press/fg-commission-moves-forward-grizzly-bear-hunt-delays-decision-extending-wolf-hunting-and.

all walks of life for whom seeing the grizzly in one of its last refuges offers an incomparable encounter with the wild in an increasingly developed world. To prevent that injury, Plaintiffs ask this Court to vacate the Final Rule and restore the Yellowstone grizzly bears' threatened status under the ESA.

## STANDARD OF REVIEW

Plaintiffs bring this case under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which provides the standard of review. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 840-41 (9th Cir. 2003). Under this standard, ESA listing decisions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Ctr. for Biological Diversity v. Zinke, 868 F.3d 1054, 1057 (9th Cir. 2017). In particular, "agency action must be reversed when the agency has … entirely failed to consider an important aspect of the problem." Id. (quotation omitted).

## BACKGROUND

The factual background of this case is set forth in the Statement of Undisputed Facts in Support of Plaintiffs' Motions for Summary Judgment. Plaintiffs incorporate the Humane Society plaintiffs' discussion of the legal background of this case. Humane Soc'y Br., Point III.

# ARGUMENT

This Court should hold unlawful and set aside FWS's Final Rule delisting the Yellowstone grizzly bear population for the following reasons.

## I. FWS FAILED TO RATIONALLY ADDRESS THE MORTALITY CONSEQUENCES OF THE YELLOWSTONE GRIZZLY'S TRANSITION TO A MEAT-FOCUSED DIET

FWS failed to grapple with important new information demonstrating an emerging threat to Yellowstone grizzlies: heightened mortality resulting from bears' shift to a greater dependence on meat. FWS admitted that grizzly bears eat more meat—including livestock and offal and wounded animals left by hunters—in years when other food sources are scarce; that grizzly bears are more likely to get into fatal conflicts with humans in such years; and that the decline of certain traditional grizzly food sources appears to be chronic. However, the agency failed to evaluate the critical question whether the Yellowstone grizzlies' recent dietary shift toward meat consumption threatens their persistence. Further, FWS ignored significant loopholes in the regulatory framework the agency relied on to dismiss mortality threats to the grizzly bear population. Accordingly, FWS arbitrarily conducted the ESA-required analysis of threats to the grizzly under 16 U.S.C. §§ 1533(a)(1)(D) and (E).

**A. Yellowstone Grizzlies' Shift to a More Meat-Reliant Diet Leads to Heightened Bear Mortality**

After this Court and the Ninth Circuit reversed FWS's first attempt to delist Yellowstone grizzly bears, FWS principally focused its remand on examining whether bears were able to find enough to eat despite declines in whitebark pine and other foods, including cutthroat trout, that appear to be long term in nature. FWS_LIT_005772 (conclusions of 2013 Food Synthesis Report); FWS_Rel_Docs_001473 (noting recent cutthroat trout decline); see also FWS_LIT_005749-50; FWS_Rel_Docs_001548 (recognizing chronic nature of declines). FWS found that Yellowstone bears were able to find sufficient food, in particular by switching to meat sources such as livestock and offal left by hunters. FWS_LIT_005758-59 (2013 Food Synthesis Report, concluding that "animal matter can serve as an alternate fall food to whitebark pine for grizzly bears in the GYE"); FWS_Rel_Docs_001471 ("[I]n years with poor whitebark pine seed production, grizzly bears shifted their diets and consumed more meat."). Although livestock and carcasses left by hunters may be adequate for bears' nutritional requirements, bears relying on these food sources risk more deadly conflicts with humans than bears relying on other food sources, such as whitebark pine cones. Whitebark pine occurs in remote, high-elevation areas where bears are unlikely to encounter humans. FWS_LIT_007426 (study noting "whitebark pine's high elevation distribution, typically in areas more remote from human facilities");

FWS_LIT_005743 ("Whitebark pine occupies high-elevation sites ….").

However, bears seeking livestock and offal necessarily venture closer to humans.

FWS_Pub_CMT_005973, 005992-93.  Thus, as grizzly bears switch to meat in

response to a dearth of whitebark pine seeds and other foods, they increasingly

come into conflict with hunters and ranchers—conflict that often proves fatal to

bears.  FWS_Rel_Docs_001470 (noting that additional deaths in years with poor

whitebark pine production "are primarily due to defense of life encounters and

wildlife management agency removals of conflict bears").

The switch to meat poses unique threats to bear cubs, because cubs whose

mothers rely on meat suffer greater risk of predation.  As one of FWS's peer

reviewers wrote after reviewing the draft delisting rule, "[m]ore meat consumption

by adult females with cubs in replace of whitebark pine seeds could be a

[population] sink if accessing these resources results in additional cub mortalities

during confrontations with other predators or adult male grizzly bears."

FWS_Emails_027035.  Indeed, FWS found that cub and yearling survival

decreased significantly in recent years, "caus[ing] the slowing of population

growth since the early 2000s."  FWS_Rel_Docs_001544.

As a result of switching to meat, grizzly bear conflict mortality has climbed

to unprecedented levels in recent years.  Forty-five bears died due to human

conflicts in 2015 alone, up from sixteen such deaths in 2014; thirty-five died due to

conflicts in 2016.  FWS_LIT_022907 (2015 annual report), 023609 (2016 annual report), 023478 (2014 annual report).  The majority of these deaths occurred because bears preyed on livestock or encountered hunters:  in 2015, fifteen bears were killed because they were preying on livestock, including one cub killed accidentally after its mother was captured at a "cattle depredation trap site," while fourteen were killed by hunters in self-defense.  FWS_LIT_022907.  The remaining sixteen were killed because they were involved in "site conflicts," which generally involved bears seeking and obtaining human food.  FWS_LIT_022909-14 (Table 16, describing multiple bears killed because they caused property damage and obtained "food rewards").  The 2016 statistics are similar:  wildlife managers killed fifteen bears due to livestock conflicts, hunters killed seven in self-defense, and thirteen were killed due to site conflicts.  FWS_LIT_023609.  This level of mortality threatens significant consequences for the Yellowstone population—indeed, 2015's unprecedented mortality pushed FWS's point estimate for the population into decline.  See FWS_LIT_023468 (2014 estimate: 757 bears); FWS_LIT_022895 (2015 estimate: 717 bears); FWS_LIT_023598 (2016 estimate: 695 bears).

### B.     FWS Failed To Consider the Resulting Threat to the Grizzly Population

Despite this extraordinary spike in recent grizzly mortality, FWS failed, once again, to rationally "address the heart of the threat that whitebark pine loss

poses to the bears: increased proximity to humans when bears <u>do</u> adapt to seed

shortages by seeking substitute foods." <u>Greater Yellowstone Coal.</u>, 665 F.3d at

1026 (emphasis in original). Indeed, the Final Rule failed to account for this threat

despite comments from scientists raising this precise issue.

FWS_Pub_CMT_005991-93 (Letter from David J. Mattson, Ph.D.);

FWS_Emails_027035 (peer review raising threat to cubs). FWS admitted that

"[d]uring years of low availability of whitebark pine seeds, grizzly bear-human

conflicts tend to increase" and lead to additional deaths, and these deaths "are

primarily due to defense of life encounters and wildlife management agency

removals of conflict bears." FWS_Rel_Docs_001470. But FWS failed to

recognize the logical connection between the switch to meat and the spike in

conflict deaths, or to consider whether this heightened level of conflict mortality

threatens the population. As a result, FWS "entirely failed to consider an

important aspect of the problem." <u>Ctr. for Biological Diversity</u>, 868 F.3d at 1057.

FWS's only treatment of this issue was in its analysis of increased bear

mortality in poor whitebark pine years, which acknowledged that "[a]pproximately

six more independent females and six more independent males die across the

ecosystem in poor versus good whitebark pine years." FWS_Rel_Docs_001470.

That analysis, however, was based on a 2013 study evaluating stale data from

2000-2012, before the much more dramatic spike in conflict mortality began in

2015, and therefore does not accurately gauge the emerging threat of more frequent bear-human conflicts. See FWS_LIT_005761-62 (2013 Food Synthesis Report, cited in FWS_Rel_Docs_001470 (Final Rule)). FWS never considered the threat arising from a meat-focused diet in light of recent data indicating a dramatic escalation of conflict mortality. FWS_Rel_Docs_001470.

### C. FWS Ignored Critical Loopholes in the Post-Delisting Management Framework for Grizzly Mortality

Further, despite FWS's assertions to the contrary, the Final Rule and the 2016 Conservation Strategy upon which it relied offer no adequate response to rising conflict mortality. The Conservation Strategy is a multi-party federal and state agreement that "will guide post-delisting management of the GYE grizzly bear population for the foreseeable future," including by "specify[ing] and implement[ing] the population/mortality management, habitat, and conflict bear standards to maintain a recovered grizzly bear population for the future." FWS_Rel_Docs_001448. FWS claimed that the Final Rule and Conservation Strategy set limits on the total number of grizzly bears that may be killed in a given year and these limits will prevent any population decline. See, e.g., FWS_Rel_Docs_001459 (concluding that "mortality limits will preclude population-level impacts" due to bear deaths from livestock conflicts). This claim is misleading because the Conservation Strategy stipulates that state wildlife

managers may continue to kill bears involved in conflicts <u>notwithstanding these mortality limits</u>.

Specifically, the Final Rule and Conservation Strategy establish a set of criteria that purport to maintain grizzly mortality below certain thresholds with the ultimate goal of "maintain[ing] the population around the long-term average population size for 2002-2014 of 674" as determined by a population estimation methodology known as the Chao2 method. FWS_Rel_Docs_001463-64; <u>see also</u> FWS_Rel_Docs_001470-71 (regardless of cause of change in population growth rate, "the management response would be the same:  To carefully manage human-caused mortality based on scientific monitoring of the population.").

Although these thresholds may impose a ceiling on trophy hunting under state management, they do not limit the number of bears that may be killed due to conflicts with human activities.  According to the Conservation Strategy itself, "[a]ny mortality threshold will not affect the … management of conflict grizzly bears" and "[s]tate [bear management] plans provide for the take of conflict bears regardless of the current mortality quota upon consultation with all involved agencies."  FWS_Rel_Docs_002328.  Consistent with this statement, state management documents published with the Final Rule halt <u>recreational hunting</u> of grizzly bears when mortality thresholds are reached, but provide no similar limitation on <u>management removals</u> (i.e., bear killing by government agencies in

response to conflicts with humans). FWS_LIT_005472 (Idaho Fish & Game

Commission Proclamation governing grizzly bear management); 016942

(Wyoming Grizzly Bear Management Regulation); 009400 (Draft Montana

Grizzly Bear Hunting Regulations). This is not a minor omission. Management

removals accounted for 43% of human-caused bear mortalities between 2002 and

2014, FWS_Rel_Docs_001462, and 58.5% of such mortalities in 2015,

FWS_LIT_022907.

The Final Rule further touts a requirement that "[a]ny mortality that exceeds

allowable total mortality limits in any year will be subtracted from that age/sex

class allowable total mortality limit for the following year."

FWS_Rel_Docs_001465 (emphasis added). But both Wyoming and Idaho's bear

management plans state that only "hunting mortality that exceeds total mortality

limits" will count against the following year's limit. FWS_LIT_005472 (Idaho

Proclamation governing grizzly bear management), 016942 (Wyoming Grizzly

Bear Management Regulation) (emphasis added). Thus, where the majority of

grizzly bears live and human-bear conflicts occur, conflict mortality may exceed

the mortality limit without reducing allowable mortality in the following year.

The Conservation Strategy's only possible limit on management removals is

a provision that "there will be no discretionary mortality unless necessary for

human safety" if the annual bear population estimate falls below 600.

FWS_Rel_Docs_002316.  However, agency documents assert that many

management removals—including removals of bears that prey on livestock—fall

under the rubric of human safety.  See FWS_Rel_Docs_001462 ("Conflict bears

can become a threat to human safety … if they are not addressed.");

FWS_LIT_033557 (Wyoming Grizzly Bear Management Plan) ("Grizzly bears

involved in livestock depredation often times create human safety risks and may be

handled as such if the circumstances warrant.").  Such management removals will

not be curtailed even by this lower limit.  Self-defense kills by elk hunters who

encounter grizzly bears are further exempt from this lower limit because FWS does

not consider such kills "discretionary mortality."  FWS_Rel_Docs_001465

(defining "discretionary mortality" as "hunting allocation or management

removals").

At the same time, managers no longer need to address conflicts through non-

lethal means where "reasonably possible" due to withdrawn ESA management

rules.  Under the ESA regime, grizzly bears that prey on livestock could be killed

"only if … [i]t has not been reasonably possible to eliminate such threat or

depredation by live-capturing and releasing unharmed in a remote area the grizzly

bear involved."  50 C.F.R. § 17.40(b)(1)(i)(C).  By contrast, the Conservation

Strategy permits state wildlife managers to kill conflict bears at their discretion

"after considering the cause, location, and severity of the incident(s)," without any

requirement that they first attempt to address the conflict through relocation.

FWS_Rel_Docs_002369.

FWS never evaluated any of these issues. Instead, as in its last flawed delisting attempt, FWS once again failed to address an emerging threat to grizzlies—the mortality consequences of their dietary shift to meat. For this reason alone, FWS's delisting of Yellowstone grizzlies violated the ESA.

## II. FWS FAILED TO CONSIDER THE IMPACT OF ITS YELLOWSTONE DELISTING ON THE STATUS OF THE REMNANT GRIZZLY BEAR LISTING

FWS's decision to segregate and delist the Yellowstone grizzly population also violated the ESA because FWS failed to consider the impact of its action on the previously listed grizzly bear entity—the lower-48 grizzly bear population—including by evaluating whether the remnant of that entity left behind by the Yellowstone delisting is protectable under the ESA. See Humane Soc'y of the U.S. v. Zinke, 865 F.3d 585, 600-03 (D.C. Cir. 2017).

### A. Grizzly Bear Listing Under the ESA

To achieve the ESA's goals, Section 4 of the Act requires FWS to determine whether wildlife should be listed as threatened or endangered. See 16 U.S.C. § 1533(a)(1). Listed wildlife receive strong protections, but only entities meeting the ESA's definition of a "species" qualify for such protections. See id. § 1532(6), (20) (definitions of endangered and threatened species).

A "species" under the ESA "includes any subspecies of fish or wildlife or plants." Id. § 1532(16). Since 1978, a "species" also includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id.; see Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, 92 Stat. 3,751, 3,752. FWS may list such a segment of a larger species upon finding that, in addition to being endangered or threatened, the segment is discrete—that is, "markedly separated from other populations of the same taxon"—and significant. See Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996) ("Segment Policy").

FWS listed the entire lower-48 grizzly bear population as a single entity in 1975. FWS_Rel_Docs_001441. At that time, Congress had not yet enacted the ESA provision allowing FWS to list a population segment; instead, the ESA provided for listing of species, subspecies, and "'any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature.'" Humane Soc'y, 865 F.3d at 591 n.2 (quoting Endangered Species Act of 1973, § 3, Pub. L. No. 93-205, 87 Stat. 884, 886).

Following the 1975 listing, FWS identified six ecosystems that it considered necessary to recover or reestablish healthy populations. FWS_Rel_Docs_001441-42. These were: (1) the Greater Yellowstone Ecosystem; (2) the Northern

Continental Divide Ecosystem of north-central Montana; (3) the Cabinet-Yaak area

of northwest Montana and northern Idaho; (4) the Selkirk Mountains of northern

Idaho, northeast Washington, and southeast British Columbia; (5) the North

Cascades of north-central Washington; and (6) the Bitterroot ecosystem in the

Bitterroot Mountains of western Montana and central Idaho.

FWS_Rel_Docs_001442.  The first four ecosystems contain a cumulative grizzly

bear population of approximately 1,800 bears, FWS_Rel_Docs_001442—i.e.,

about 3.6 percent of the estimated historic population in the western contiguous

United States, FWS_Rel_Docs_001441.  There is no documented grizzly bear

population within the North Cascades ecosystem, with only sporadic sightings of

lone bears since 1996, FWS_LIT_016093, and the Bitterroot ecosystem "is not

known to contain a population of grizzly bears at this time,"

FWS_Rel_Docs_001442.

**B.    The Challenged Delisting and the <u>Humane Society</u> Litigation**

FWS initiated its challenged effort to delist the Yellowstone grizzly

population on March 11, 2016, when it published a proposed rule to designate the

Yellowstone population segment and contemporaneously remove it from the list of

threatened species.  FWS_LIT_019227.  Before that, in 2014, the U.S. District

Court for the District of Columbia issued its decision in <u>Humane Society of the

United States v. Jewell</u>, 76 F. Supp. 3d 69 (D.D.C. 2014), invalidating a similar

effort by FWS to designate the Western Great Lakes population of the gray wolf as a population segment and delist it from an already-listed entity, the lower-48 wolf population. The D.C. district court rejected FWS's attempt to carve out a segment and contemporaneously delist it under the ESA for a variety of reasons, including because FWS must review the status of the listed entity from which the segment was carved before taking such action, which FWS failed to do. See id. at 124.

FWS appealed the Humane Society ruling, but on June 30, 2017—before any appellate decision had been rendered—FWS published the Final Rule designating and delisting the Yellowstone grizzly distinct population segment. See FWS_Rel_Docs_001435, 001450. In the Final Rule, FWS recognized that the D.C. district court disapproved an identical use of the ESA's segment language in Humane Society, but stated that "[w]e respectfully disagree with the [D.C.] district court's interpretation of the [Segment Policy]." FWS_Rel_Docs_001450. Further, FWS explicitly—and repeatedly—declined to consider the status of the already listed grizzly bear entity, the lower-48 grizzly population, or the impact of its Yellowstone delisting decision on the status or conservation of that entity, stating that "consideration and analyses of grizzly bear populations elsewhere in the lower 48 States is outside the scope of this rulemaking." FWS_Rel_Docs_001479; accord FWS_Rel_Docs_001485, 001557. Essentially, FWS gambled that it would win its appeal of the Humane Society ruling.

## C.     FWS's Post-Hoc Maneuvering

Approximately one month after publication of the Final Rule, the D.C.

Circuit issued its decision in <u>Humane Society</u>.  <u>See</u> <u>Humane Soc'y</u>, 865 F.3d at

585.  The D.C. Circuit held that, while FWS has authority under the ESA to

identify and assign a different conservation status to a population segment carved

out of an already-listed species, it may not do so without considering the status of

that listed species and "without determining whether the remnant itself remains a

species so that its own status under the Act will continue as needed."  <u>Id.</u> at 600.

Accordingly, the D.C. Circuit affirmed the judgment of the D.C. district court.  <u>See</u>

<u>id.</u> at 615.

Despite this ruling, FWS took no action to address the <u>Humane Society</u>

issue.  Therefore, Plaintiffs filed this case on August 30, 2017, alleging in Count II

of their Complaint that here—as in <u>Humane Society</u>—FWS violated the ESA by

identifying and delisting a segment of an already-listed species without considering

the status of that species or the impact of its delisting decision on the remnant

listed entity.  <u>See</u> ECF No. 1 in No. CV 17-119-M-DLC, ¶¶ 78-81.

Faced with Plaintiffs' legal challenge, on December 7, 2017, FWS published

in the Federal Register a notice seeking public comment concerning "the potential

implications for the GYE final rule in light of the <u>Humane Society</u> ruling," 82 Fed.

Reg. 57,698, 57,698 (Dec. 7, 2017), thereby again acknowledging that the Final

Rule had not addressed the status of the remnant grizzly population. On April 30, 2018, FWS concluded this post-hoc review by publishing a determination in the Federal Register asserting that the Yellowstone delisting does not require modification in light of <u>Humane Society</u>. <u>See</u> Review of 2017 Final Rule, 83 Fed. Reg. 18,737 (Apr. 30, 2018).

### D. FWS Left Critical Questions Unexamined

FWS violated the ESA by delisting the Yellowstone grizzly population segment without considering the status of the already-listed lower-48 grizzly population or the impact of the Yellowstone delisting on the remnant listed population. FWS failed to consider whether that remnant remains a listable entity under the ESA so that conservation and recovery actions for grizzlies within the remnant may continue as needed—or whether instead the remnant may become "an orphan to the law" such that needed protections could be lost. <u>Humane Soc'y</u>, 865 F.3d at 603.

As <u>Humane Society</u> observed, the ESA's "text requires the Service, when reviewing and redetermining the status of a species, to look at the whole picture of the listed species, not just a segment of it." 865 F.3d at 601. ESA Section 4(c)(1) requires FWS to publish a list of endangered and threatened species. 16 U.S.C. § 1533(c)(1). Section 4(c)(2) then requires FWS to conduct "a review of <u>all species included in a list</u> which is published pursuant to [Section 4(c)(1)] and

which is in effect at the time of such review" and, based on this review, to determine "whether <u>any such species</u> should … be removed from such list." <u>Id.</u> § 1533(c)(2)(A), (B) (emphases added). Further, Section 4(c)(2)(B) provides that any such determination "shall be made in accordance with the provisions of" Section 4(b)(1)(A), <u>id.</u> § 1533(c)(2)(B), which independently requires FWS to "conduct[] a review of the status of <u>the species</u>" when making listing determinations, <u>id.</u> § 1533(b)(1)(A) (emphasis added). Section 4(c)(1) imposes the same requirement on list revisions. <u>See id.</u> § 1533(c)(1) (requiring list revisions to reflect determinations made "in accordance with" Section 4(b)).

> Thus, when a species is already listed, the Service cannot review a single segment with blinders on, ignoring the continuing status of the species' remnant. The statute requires a comprehensive review of the entire listed species and its continuing status.

<u>Humane Soc'y</u>, 865 F.3d at 601.

More fundamentally, the ESA permits FWS to delist Yellowstone grizzlies only based on agency consideration of the relevant factors. <u>Ctr. for Biological Diversity</u>, 868 F.3d at 1057. The relevance of any particular factor is assessed by "determining what the statute in question makes 'important.'" <u>Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.</u>, 138 F.3d 759, 763 (9th Cir. 1998) (citation omitted); <u>accord</u> <u>Judulang v. Holder</u>, 565 U.S. 42, 53, 55 (2011) (holding that agency decision must be based on relevant factors that are tied to purpose of underlying statute).

19

The ESA's statutory text and design establish that the impact of a distinct population segment delisting on the remnant listed entity is an important factor that FWS must consider in the delisting determination. Under the ESA, FWS may delist a species after determining that the species is no longer threatened or endangered based on an evaluation of the same factors the agency considers when listing a species. See 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(d). This is the only method the statute allows for delisting a species. See 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(d). However, where FWS fails to consider the impact of designating and carving out a population segment from a larger listed entity, the agency's disregard of this impact could bypass the statutory process, "divest[ing] the extant listing of legal force" by creating a remnant that is not itself a listable entity under the ESA. Humane Soc'y, 865 F.3d at 601-02. As the D.C. Circuit stated in Humane Society:

> [T]he Service's disregard of the remnant's status would turn that sparing segment process into a backdoor route to the de facto delisting of already-listed species, in open defiance of the Endangered Species Act's specifically enumerated requirements for delisting. See 16 U.S.C. § 1533(a)(1) (listing five mandatory criteria for altering a listing). Accordingly, as a matter of plain statutory design, the act of designating a segment cannot in one fell swoop make an already-listed species an unlisted and unlistable non-species, "sidestep[ping]" the process "Congress has plainly" prescribed for delisting.

Id. at 601-02 (citations omitted).

This requirement serves not only to honor Congress's statutory design, but also to avoid a severe practical threat to species' survival from jettisoning protections for listed species in areas previously deemed essential for their survival and recovery in the absence of any rational determination that such protections are no longer needed.  See id. at 602 (faulting FWS for delisting Western Great Lakes wolf population while leaving "entirely unexplained how the remaining wolves' existing endangered status would continue" or "mak[ing] any finding that the remnant was no longer endangered").

FWS's Final Rule defies this requirement.  FWS failed to undertake the "comprehensive review of the entire listed species and its continuing status" required by the ESA.  Id.  When FWS published the Final Rule, the listed species under ESA Section 4 was the lower-48 grizzly bear population.  See FWS_Rel_Docs_001441 (discussing lower-48 grizzly listing).  Therefore, the ESA required FWS to review the status of that listed species before revising the list.  16 U.S.C. § 1533(b)(1)(A), (c)(1), (c)(2)(B).  In addition, rational consideration of the Yellowstone delisting required FWS to consider its impact on the remnant lower-48 grizzly listing.  Humane Soc'y, 865 F.3d at 601-02.  FWS refused to do so, stating repeatedly that "consideration and analyses of grizzly bear populations elsewhere in the lower 48 States" was "outside the scope of" the Final Rule.  FWS_Rel_Docs_001479; see also FWS_Rel_Docs_001485, 001557.

As a result, FWS left critical questions unexamined. FWS's own recovery strategy for grizzly bears in the lower-48 United States focuses on conserving and restoring bear populations in specified ecosystems that extend well beyond Yellowstone. See FWS_LIT_014556-57 (1993 Grizzly Bear Recovery Plan). Yet FWS never recognized "lower-48 grizzlies outside Yellowstone" as a listable species or subspecies under the ESA. Indeed, lower-48 grizzly bears, including Yellowstone grizzlies, are all members of Ursus arctos horribilis, a brown bear subspecies that extends north through Canada and Alaska. FWS_Rel_Docs_001438. Nor has FWS considered whether the lower-48 grizzly bear population minus the Yellowstone subpopulation would satisfy the ESA's and FWS's own requirements for listing as a distinct population segment. See 16 U.S.C. § 1532(16) (segment provision); Segment Policy, 61 Fed. Reg. at 4,725. To the contrary, in FWS's August 2011 Five-Year Review of the lower-48 grizzly listing prepared under ESA Section 4(c)(2)—which appears to mark FWS's only formal consideration whether the pre-1978 lower-48 grizzly listing would satisfy distinct population segment requirements—FWS found the lower-48 listing to satisfy the Segment Policy's "significance criterion" largely because Yellowstone "does represent an unusual and unique ecological setting for the taxon" and Yellowstone bears "are genetically divergent from nearby adjacent populations." FWS_LIT_016075, 016077. Yet now FWS has carved the Yellowstone grizzly

population from the lower-48 listing without even considering whether the remnant is still listable under distinct population segment requirements.

Moreover, although FWS suggested that multiple lower-48 grizzly bear ecosystems might be designated and listed as separate population segments under the ESA, FWS_LIT_016080, this potential path also presents important, unexamined issues. There are, at a minimum, substantial questions whether the listings of the North Cascades and Bitterroot grizzly bear ecosystems could be sustained on this basis given that there is no documented grizzly population in the U.S. portion of the North Cascades ecosystem and no known grizzlies at all in the Bitterroot ecosystem. FWS has not wrestled with the question whether the North Cascades and Bitterroot ecosystems could be listed separately as population segments without a grizzly population occupying them.

FWS's effort to salvage its ESA compliance with a post-hoc Federal Register "determination" fails. At the outset, where, as here, an agency's post-decisional determination constitutes a post-hoc rationalization for challenged action, a reviewing court may not rely upon it "to cure the deficiencies" in agency analysis. W. Watersheds Project v. U.S. Bureau of Land Mgmt., 181 F. Supp. 3d 673, 680 (D. Ariz. 2016). Courts may consider an agency's post-hoc submission only where it is "explanatory in nature, rather than a new rationalization of the agency's decision, and [is] sustained by the record." Kunaknana v. Clark, 742

F.2d 1145, 1149 (9th Cir. 1984); see also Sacks v. Office of Foreign Assets Control, 466 F.3d 764, 779-80 (9th Cir. 2006) (rejecting agency reliance on post-hoc Federal Register publication to justify challenged action). Given that FWS repeatedly declined to consider the status of any grizzly population other than Yellowstone in the Final Rule, FWS's post-hoc "determination" regarding Humane Society should be disregarded for this reason alone.

Even if the Court were to consider FWS's post-hoc "determination," it does not patch the unlawful gap in FWS's analysis. FWS asserts that, once it determined the Yellowstone grizzly population segment was not threatened or endangered, it "was required to modify the list to reflect" this determination under ESA Section 4(c), but faced "no corresponding requirement to modify the original listed entity or to separately assess its status." 83 Fed. Reg. at 18,738 (emphasis in original). This post-hoc analysis ignores the point that ESA Section 4(c) mandates list modifications only to reflect determinations "made in accordance with" ESA Section 4(b)(1)(A), which requires FWS to review "the status of the species" before making a listing determination. 16 U.S.C. § 1533(c)(1), (b)(1)(A). "[T]hat review can reasonably be read to include any and all of the composite segments or subspecies that might be included within a taxonomically listed species"—not just a newly identified segment. Humane Soc'y, 865 F.3d at 601. Further, nowhere in FWS's post-hoc "determination" did the agency address the critical question

whether the lower-48 grizzly population minus the Yellowstone population segment remains a listable entity, or whether all identified grizzly recovery areas in the lower-48 might be independently listable as population segments. Although the "determination" contains a section titled "Impact of GYE Delisting on the Lower-48-States Entity," it addresses biological factors and ignores the threshold legal issue of listability. 83 Fed. Reg. at 18,739-41. Thus, even in its post-hoc analysis, FWS failed to consider whether it was "riving an existing listing into a recovered sub-group and a leftover group that becomes an orphan to the law." Humane Soc'y, 865 F.3d at 603.

In sum, FWS carved out and delisted a distinct population segment from a larger listed entity but "left entirely unexplained how the remaining [members of the species'] existing [listed] status would continue." Id. at 602. Because FWS failed entirely to consider this important issue, its Final Rule violated the ESA. See id. at 602-03.

## III. FWS VIOLATED THE ESA AND APA BY REFUSING TO ALLOW PUBLIC COMMENT ON MAJOR CHANGES IN THE FINAL CONSERVATION STRATEGY

Finally, FWS violated the ESA and the APA by refusing to allow any opportunity for public comment on significant changes made to weaken the post-delisting grizzly management framework in the final Conservation Strategy.

The ESA generally provides for the APA's notice-and-comment rulemaking requirements, 5 U.S.C. § 553, to "apply to any regulation promulgated to carry out the purposes of [the ESA]." 16 U.S.C. § 1533(b)(4). The APA requires an agency to publish a notice of proposed rulemaking in the Federal Register, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and, "after consideration of the relevant matter presented," "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(b)-(c).

While this framework allows an agency to "add material to the administrative record after the close of a public comment period," an agency must allow public comment on such additions unless the material merely "supplement[s] or confirm[s] existing data." Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1402 (9th Cir. 1995); accord Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072, 1076-80 (9th Cir. 2006). Where additional material introduces new information that is "critical" to the agency's decision, and the agency "relie[s] largely" on the new information to support its decision, "meaningful public participation in the rule-making process" requires an opportunity for public comment on the new material. Idaho Farm Bureau Fed'n, 58 F.3d at 1403-04; see Ober v. EPA, 84 F.3d 304, 312-15 (9th Cir. 1996) (holding agency violated APA by failing to provide

comment opportunity after state submitted new justifications that agency relied upon to reject pollution controls).

FWS violated these principles by denying public comment on the final Conservation Strategy, which is central to the delisting scheme. FWS repeatedly relied on the Conservation Strategy throughout the Final Rule to offset threats to the Yellowstone grizzly bear population, including human-caused mortality, FWS_Rel_Docs_001459, 001461-63, habitat destruction, FWS_Rel_Docs_001454-57, and genetic isolation, FWS_Rel_Docs_001512-13. FWS allowed public comment on a draft Conservation Strategy issued with the proposed Yellowstone delisting rule in March 2016. See generally FWS_LIT_019227. FWS refused, however, to allow any public comment informed by the final Conservation Strategy itself. See FWS_Rel_Docs_001480.

This was a significant failure. The parties to the final Conservation Strategy adopted changes to its management framework that weakened grizzly protections, and that the public could not reasonably have anticipated. These include:

- Abandoning provisions of the draft Conservation Strategy that generally required management agencies to attempt to resolve grizzly conflicts, including livestock conflicts, through at least one relocation before killing the offending bear—a particularly threatening change given the recent spike in conflict mortalities. Compare FWS_LIT_016367 (draft) with FWS_LIT_017073-74 (final); see also Point I, supra.

- Abandoning a commitment to maintain secure grizzly bear habitat within a designated 9,210-square-mile Primary Conservation Area at

27

or above levels that existed in 1998, which were believed to correlate with an increasing bear population. FWS_LIT_016298, 016332, 016336-37. Instead of solidifying this commitment, the final Conservation Strategy announced formation of a planning group to propose unspecified "revisions to the 1998 habitat standards" based on an asserted need for, among other things, "more administrative infrastructure." FWS_LIT_017039-40.

- Responding to the threat that a future change in grizzly population estimation methodology could open the door to a dramatic increase in allowable grizzly bear mortality under the Conservation Strategy management framework by offering only a vague assurance that the current Chao2 estimation methodology will be used "for the foreseeable future." FWS_LIT_017030; see also Humane Soc'y Br., Point IV.d (discussing estimation methodology issue).

Despite denying any opportunity for public input on these weakened measures, FWS relied on them in the Final Rule to determine that the Yellowstone grizzly population was not threatened—often with little or no effort to grapple with the import of last-minute changes. See FWS_Rel_Docs_001454-56, 001459-60, 001478 (1998 habitat conditions); 001462 (conflict removal provisions); 001498-99 (reliance on Chao2 for "foreseeable future"). For example, FWS extensively relied on the Conservation Strategy's purported maintenance of 1998 habitat security conditions to address the threat of grizzly habitat destruction notwithstanding the final Conservation Strategy's explicit announcement that this requirement would soon be revised. See FWS_Rel_Docs_001454-56, 001459-60.

FWS's conduct violated the ESA and the APA. The final Conservation Strategy was "central" to FWS's decision to delist the Yellowstone grizzly

population and FWS "relied largely" on the provisions at issue to justify its decision.  Idaho Farm Bureau Fed'n, 58 F.3d at 1403.  Further, the changes to these provisions "did not merely expand on prior information and address alleged deficiencies."  Ober, 84 F.3d at 314.  Rather, they introduced entirely new substantive concepts into the Conservation Strategy—abandonment of a relocation requirement for conflict bears, imminent erosion of baseline 1998 habitat security conditions, and a vague, "foreseeable-future" safeguard against the potential for dramatically expanded grizzly mortality.  Most importantly, FWS relied on these provisions to determine "compliance with a critical statutory provision," id.—the ESA's provision for assessing the threatened status of a species, 16 U.S.C. § 1533(a)(1).  Accordingly, the Final Rule was unlawful because "[t]he public needed the opportunity to comment" on these new provisions.  Idaho Farm Bureau Fed'n, 58 F.3d at 1404.

## CONCLUSION

For the foregoing reasons, Plaintiffs Northern Cheyenne Tribe, Sierra Club, Center for Biological Diversity, and National Parks Conservation Association respectfully request that this Court grant their motion for summary judgment. Plaintiffs also ask the Court to remedy FWS's ESA and APA violations by vacating and remanding the Final Rule and reinstating the prior listing of Yellowstone grizzly bears as a threatened species under the ESA.  See 5 U.S.C.

§ 706 ("reviewing court shall … set aside agency action, findings, and conclusions found to be" unlawful); <u>Alsea Valley All. v. Dep't of Commerce</u>, 358 F.3d 1181, 1185 (9th Cir. 2004) (vacatur of unlawful agency action "normally accompanies a remand"); <u>Defs. of Wildlife v. Salazar</u>, 776 F. Supp. 2d 1178, 1187 (D. Mont. 2011) (holding that policy underlying ESA counsels in favor of vacating agency action that violated statute); <u>see also</u> <u>Paulsen v. Daniels</u>, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.").

Respectfully submitted this 13th day of June, 2018.

<u>/s/ Timothy J. Preso</u>
Timothy J. Preso
Joshua R. Purtle
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
tpreso@earthjustice.org
jpurtle@earthjustice.org

*Counsel for Plaintiffs Sierra Club, Center for Biological Diversity, and National Parks Conservation Association and Local Counsel for Plaintiff Northern Cheyenne Tribe*

Joshua Osborne-Klein
Ziontz Chestnut
2101 Fourth Avenue, Suite 1230
Seattle, WA 98121
(206) 448-1230 | Phone
(206) 448-0962 | Fax
joshok@ziontzchestnut.com

*Counsel for Plaintiff Northern Cheyenne Tribe*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that the foregoing brief contains 6487 words, as determined by the word count function of Microsoft Word.

/s/ Timothy J. Preso
Timothy J. Preso

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served on all counsel of record via the Court's CM/ECF system.

/s/ Timothy J. Preso
Timothy J. Preso