Kristine M. Akland
Akland Law Firm, PLLC
317 E. Spruce St.
P.O. Box 7274
Missoula, MT 59807
aklandlawfirm@gmail.com
Telephone: (406) 544-9863

Nicholas M. Arrivo
The Humane Society of the United States
1255 23rd St. NW, Suite 450
narrivo@humanesociety.org
Telephone: (202) 676-2339
Admitted *pro hac vice*

Counsel for Plaintiffs in CV 17-117-M-DLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, *et al.,* <br><br>        *Plaintiffs*, <br><br> v. <br><br><br> UNITED STATES OF AMERICA, *et al*., <br><br>        *Defendants*, <br><br>   and <br><br> STATE OF WYOMING; STATE OF IDAHO; SAFARI CLUB INTERNATIONAL; and NATIONAL RIFLE ASSOCIATION OF AMERICA, <br><br>        *Defendant-Intervenors*. | CV-17-00089-DLC-JCL <br><br> [Consolidated with: CV-17-117-M-DLC; CV-17-118-M-DLC; CV-17-119-M-DLC; CV-17-123-M-DLC] <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I) INTRODUCTION ........................................................................... 1

II) STANDARD OF REVIEW ...................................................... 2

III) LEGAL BACKGROUND ........................................................ 3
    (a) The Endangered Species Act and the Delisting Process ..................... 3
    (b) Grizzly Bears and the ESA ................................................. 4

IV) ARGUMENT ............................................................................ 6
    (a) Existing Regulatory Mechanisms are Inadequate Because they are Non-Binding and Unreliable ...................................................... 6
    (b) Existing Regulatory Mechanisms are Inadequate Because They Allow a Level of Mortality that Threatens the Survival of the Population ....... 15
    (c) The Lack of any Regulation Outside the Demographic Monitoring Area is Inadequate ....................................................... 20
    (d) The Lack of a "Recalibration" Provision Renders the Strategy Inadequate and Threatens the Survival of the Population ..................... 24

V) CONCLUSION ........................................................................ 28

# TABLE OF AUTHORITIES

## Federal Cases

Alaska v. Lubchenco
        825 F.Supp.2d (D.D.C. 2011) ................................................... 15

Colo. River Cutthroat Trout v. Salazar
        898 F.Supp.2d 191 (D.D.C. 2012) ........................................... 7

Ctr. for Biological Diversity v. Zinke
        868 F.3d 1054 (9th Cir. 2017) ................................................. 3

Gardner v. U.S. Bureau of Land Mgmt.
        638 F.3d 1217 (9th Cir. 2011) ................................................. 2

Desert Survivors v. U.S. Dep't of the Interior
        2018 WL 2215741 (N.D. Cal. May 15, 2018)) ...................... 10

Envtl. Def. Ctr., Inc. v. EPA
        344 F.3d 832, 851 (9th Cir. 2003)) ......................................... 12

Greater Yellowstone Coal. v. Servheen
        665 F.3d 1015 (9th Cir. 2011) ........................................ *passim*

Greater Yellowstone Coal. v. Servheen
        672 F.Supp.2d 1105 (D. Mont. 2009) ...................................... 5

Humane Soc'y of the United States v. Zinke
        865 F.3d 585 (D.C. Cir. 2017) ......................................... 21 n.3

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.
        463 U.S. 29 (1983) ............................................................ 3, 14

N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.
        248 F.3d 1277 (10th Cir. 2001) ............................................... 3

Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.
   475 F.3d 1136 (9th Cir. 2007) ...................................... 2, 20, 28

Oregon Nat. Res. Council v. Daley
   6 F.Supp.2d 1139 (D. Or. 1998) ............................................. 6-7

Organized Vill. of Kake v. U.S. Dep't of Agric.
   795 F.3d 956 (9th Cir. 2015) ............................................. 11-12

Reyn's Pasta Bella v. Visa USA
   442 F.3d 741 (9th Cir. 2006) .............................................. 9 n.2

Rocky Mountain Wild v. Walsh
   216 F.Supp.3d 1234 (D. Colo. 2016)....................................... 12

Save Our Cabinets v. U.S. Dep't of Agric.,
   254 F.Supp.3d 1241 (D. Mont. 2017)........................................ 3

TVA v. Hill
   437 U.S. 153 (1978).................................................. 3-4

W. Watersheds Project v. FWS
   535 F.Supp.2d 1173 (D. Idaho 2007) ................................ 10, 12

State Cases
   Lay018burn v. Wyo. Game and Fish Dep't
   No. 186-086 (Wyo. First Judicial Dist. 2016) ........................ 8-9

Federal Statutes and Regulations

   Code of Federal Regulations
      50 C.F.R. § 424.11........................................3-4, 6, 20-21, 23

   United States Code
      5 U.S.C. § 706.................................................... 2, 12
      16 U.S.C. § 1531....................................................... 3

16 U.S.C. § 1533......................................................3-4, 6, 15, 20

16 U.S.C. § 1535......................................................... 14

16 U.S.C. § 1540......................................................... 2

**<u>Federal Register Entries</u>**

40 Fed. Reg. 31,734 (July 28, 1975) ........................................ 4

68 Fed. Reg. 15,100 (Mar. 28, 2003) ........................................ 7

72 Fed. Reg. 14,866 (Mar. 29, 2007) ........................................ 4

81 Fed. Reg. 13,174 (Mar. 11, 2016) ........................................ *passim*

82 Fed. Reg. 30,502 (June 30, 2017) ........................................ *passim*

# I. INTRODUCTION

In the words of the U.S. Fish and Wildlife Service's ("FWS") former Grizzly Bear Recovery Coordinator, the delisting rule challenged here represents a "major sellout of the science details necessary to assure…conservation of the Yellowstone grizzly" and "a violation of the mandate of the ESA that the Service implement adequate regulatory mechanisms prior to delisting." FWS_Emails_063366-67, 063377.

The record illustrates that FWS turned management of grizzly bears in the Greater Yellowstone Ecosystem ("GYE") over to Wyoming, Montana, and Idaho (the "States") ignoring fatal deficiencies in the regulatory mechanisms now governing the fate of this vulnerable population. FWS began the delisting process with a firm, science-based position on state regulations that would need to be in place before the Endangered Species Act ("ESA") would permit it to move forward. But over the course of the rulemaking, FWS allowed pressure from the States to erode both the substance and the legal force of these protections to near-impotence. As a result, GYE grizzly bears stand stripped of federal protections, exposed in their stead to looming trophy hunting seasons and a woefully inadequate management framework whose shortcomings threaten the survival of the population.

Because FWS violated its duty under the ESA to evaluate the adequacy of these regulatory mechanisms using the best available science prior to delisting, Plaintiffs respectfully move this court to vacate and set aside this rule, reestablishing federal law protecting Yellowstone's still-imperiled bears from a trophy hunting season set to begin this September.

## II. STANDARD OF REVIEW

Review of delisting decisions under the ESA, 16 U.S.C. § 1540(g), is governed by the standards for review of agency actions under the Administrative Procedure Act ("APA"), pursuant to which an agency action shall be set aside when arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706. Under the APA, a "decision is arbitrary or capricious… if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Gardner v. U.S. Bureau of Land Mgmt., 638 F.3d 1217, 1224 (9th Cir. 2011). In making this determination, the Court must determine "whether the Service, in reaching its ultimate finding, considered the relevant factors and articulated a rational connection between the facts found and the choices made." Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1145 (9th Cir. 2007). "An agency

action must be reversed when the agency has…entirely failed to consider an important aspect of the problem...." Ctr. for Biological Diversity v. Zinke, 868 F.3d 1054, 1057 (9th Cir. 2017) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm")).

Summary judgment is appropriate where, as here, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Summary judgment is particularly applicable to cases involving judicial review of final agency action." Save Our Cabinets v. U.S. Dep't of Agric., 254 F.Supp.3d 1241, 1249 (D. Mont. 2017).

## III. LEGAL BACKGROUND

### a. The Endangered Species Act and the Delisting Process

When Congress enacted the ESA, it sought "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(a-b). The Supreme Court recognizes the ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." TVA v. Hill, 437 U.S. 153, 180 (1978).

"A species may be delisted on the basis of recovery only if the best scientific and commercial data available indicate that it is no longer endangered or threatened." 50 C.F.R. § 424.11(d)(2); *see also* 16 U.S.C. § 1533(b)(1)(A); N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 248 F.3d 1277, 1284-85 (10th

Cir. 2001) (best available science standard is "intended to remove from the process of listing or delisting of species any factor not related to the biological status of the species.") (citation omitted). That determination must consider the ESA's five categories of threats to a species, the continued presence of any one of which requires continued listing. 16 U.S.C. § 1533(a)(1), (c); 50 C.F.R. § 424.11(d)(2).

### b. Grizzly Bears and the ESA

In passing the ESA, Congress expressed concern about the fate of grizzly bears in the continental U.S. *See* TVA, 437 U.S. at 183-84 ("the continental population of grizzly bears … is surely threatened" and "[o]nce [the ESA] is enacted, the appropriate Secretary … will have to take action to see that this situation is not permitted to worsen, and that these bears are not driven to extinction'") (quoting 119 CONG. REC. 42,913 (1973)) (emphasis omitted). In 1975, FWS listed grizzly bears as threatened throughout the lower-48 states. 40 Fed. Reg. 31,734 (July 28, 1975). At that time, grizzlies in the continental U.S. were reduced to under 2% of their historic range and had suffered a population decline from 50,000 to under 1,000 bears. Id.

In 2007, FWS published a rule designating the GYE population of grizzly bears as a distinct population segment ("DPS") and removing it from the ESA's threatened species list. 72 Fed. Reg. 14,866 (Mar. 29, 2007). Conservationists successfully challenged that action in this Court, which vacated the delisting in

2009. <u>Greater Yellowstone Coal. v. Servheen</u>, 672 F.Supp.2d 1105 (D. Mont. 2009). The Ninth Circuit affirmed that holding in 2011, chastising FWS for "tak[ing] a full-speed ahead, damn-the-torpedoes approach to delisting – especially given the ESA's policy of institutionalized caution... " <u>Greater Yellowstone Coal. v. Servheen</u> 665 F.3d 1015, 1030 (9th Cir. 2011) (citation omitted).

The delisting rule challenged in this case represents FWS' second attempt to designate and delist Yellowstone-area grizzly bears as a DPS. 81 Fed. Reg. 13,174 ("Proposed Rule") (Mar. 11, 2016); 82 Fed. Reg. 30,502 (June 30, 2017) ("Final Rule"). With federal protections no longer in place, grizzly bears are now managed pursuant to several State and inter-state mechanisms. *See* Plaintiffs' Statement of Undisputed Facts (Doc. 144) ("Facts"), ¶¶ 134-142. These include State management plans and regulations authorizing trophy hunting of bears, <u>Id.</u>, ¶¶ 115, 117, 123, as well as two inter-agency instruments which were finalized during the course of FWS' rulemaking: the Conservation Strategy ("Strategy"), which guides all aspects of post-delisting management; and the Tri-State Memorandum of Agreement ("MOA"), intended to implement provisions of the Strategy regarding mortality (including hunting). <u>Id.</u>, ¶¶ 134-161. The Strategy and MOA apply only within the subset of the proposed DPS known as the Demographic Monitoring Area ("DMA"). <u>Id.</u>, ¶ 158.

# IV. ARGUMENT

Application of the best available science to the ESA listing factors requires that GYE grizzly bears retain ESA protection. 50 C.F.R. § 424.11(d)(2). Pursuant to this Court's order (Doc. 178), Plaintiffs have limited the scope of this brief to the adequacy of existing regulatory mechanisms and procedural claims alleged in Counts III and IV of Plaintiffs' Complaint (Doc. 1). As to Count I, alleging violations of the ESA's DPS provision[1], and Count II, alleging an improper analysis of biological threats to the survival of the population, Plaintiffs adopt and incorporate the briefing of consolidated plaintiffs *Northern Cheyenne Tribe* (17-cv-119), *WildEarth Guardians* (17-cv-118), and *Alliance for the Wild Rockies* (17-cv-123).

### a. Existing Regulatory Mechanisms are Inadequate Because they are Non-Binding and Unreliable

State regulatory mechanisms whose implementation is in doubt cannot be relied upon to support a delisting determination, since "[a]bsent some method of enforcing compliance, protection of a species can never be assured." Oregon Nat. Res. Council v. Daley, 6 F.Supp.2d 1139, 1155 (D. Or. 1998) ("Daley"). The plain language of the ESA mandates consideration of "existing," (not anticipated)

---

[1] Plaintiffs previously filed a Motion for Partial Summary Judgment on Count I, arguing that "FWS unlawfully failed to consider the impact of its delisting action on the entirety of the pre-existing ESA listing of grizzly bears, which was not limited to the GYE area; and unlawfully left a remnant population of grizzly bears on the…Threatened Species List that is not a legally cognizable entity under the ESA." (Doc. 88).

"regulatory mechanisms" (not voluntary efforts). 16 U.S.C. § 1533(a)(D) ("Factor (d)"). Federal courts – and FWS itself – interpret this language as requiring a state protection to have the binding force of law before it may be considered under Factor (d). *See, e.g.* Daley, 6 F.Supp.2d at 1155; Colo. River Cutthroat Trout v. Salazar, 898 F.Supp.2d 191, 208 (D.D.C. 2012) ("FWS cannot rely on promised and unenforceable conservation agreements in evaluating existing regulatory mechanisms") (citation omitted); 68 Fed. Reg. 15,100, 15,115 (Mar. 28, 2003) (FWS policy that "regulatory mechanisms" must be "laws, regulations, [or] ordinances").

FWS erred by basing its Factor (d) analysis on a set of state and inter-state mechanisms that do not carry the force of law and to which funding has not been committed. Even assuming that these mechanisms would substantively suffice to protect grizzly bears if implemented and enforced, FWS' failure to consider, let alone provide a satisfactory explanation of, whether they will be implemented and enforced post-delisting constitutes a violation of law.

## i. The Strategy and MOA are Non-Binding and Unenforceable

The Strategy and MOA form the backbone of the post-delisting regulatory regime relied on in the Final Rule. Yet despite their central importance to FWS' justification for delisting, their reliability – the likelihood of implementation – went almost completely unaddressed. This omission is glaring, since FWS

concluded that the faithful implementation of the Strategy and MOA provisions is essential to contain the ongoing threats posed by habitat fragmentation; oil, gas, and mineral development; poaching; excessive human-caused mortality due to "conflicts" and trophy hunting; and declining food sources. Final Rule, at 30,521-40.

Fatal flaws that undermine the MOA's efficacy as a means of implementing the Strategy's mortality limits were identified by public commenters early in the rulemaking process, including:

- Lack of any penalty for breach, leaving States without an incentive to comply;
- Allowance for any State to unilaterally withdraw from the MOA on written notice, with no penalty;
- Express disclaimer of any right of action for citizens or the federal government to enforce the terms of the MOA, leaving no outside parties with the means to vindicate its terms;
- Reservation of each State's sovereign immunity, further insulating the States from recourse in the event of breach.

FWS_Pub_CMT_002021-22; *see also* FWS_Pub_CMT_002712-13. Each of these flaws remains in the final MOA signed by the States, incorporated into the final Strategy, and relied upon in the Final Rule. FWS_Rel_Docs_001293-1301.

Further proving this point, Wyoming expressly took the position – prior to publication of the Final Rule – that the MOA does not bind it. While defending itself from a state court challenge alleging violations of notice-and-comment requirements during the adoption of the MOA, Wyoming argued it was exempt

from those administrative procedures since the MOA has no legal effect and is not a regulation. <u>Laybourn v. Wyo. Game and Fish Dep't.</u>, No. 186-086 (Wyo. First Judicial Dist. 2016) ("<u>Laybourn</u>"). Plaintiffs put FWS on notice of that ongoing lawsuit, observing that "by the <u>state's own admission</u>, these mechanisms are not binding regulations and cannot be legally relied upon by the Service to remove federal protections for grizzly bears." FWS_Pub_CMT_001978 (emphasis in original).  Wyoming has consistently maintained that the MOA "is not independently enforceable," "does not require strict adherence to its objectives," "does not have any present-day binding effect and imposes no rights or obligations," and emphasized that as a State it is "free to terminate the agreement," "retains its discretion over future management [of grizzly bears]," and "has discretion to follow, or not follow, the statements contained in [the MOA]."[2]

The legal impotence of the MOA and Strategy was highlighted to the Service at multiple points during this rulemaking. *See* FWS_Pub_CMT_001979-80, 002021-22, 002712-13. Yet without explanation, the Service took as an article of faith that they would be followed – tautologically stating that "[t]he Service believes the Tri-State MOA will be implemented because all parties have approved it." Final Rule at 30,532. Nowhere in the record nor the Final Rule does FWS

---

[2] <u>Laybourn</u>, Respondents' Brief at 14-16 (Dec. 1, 2016) (Exhibit B). This Court may take judicial notice of Wyoming's filing. *See* <u>Reyn's Pasta Bella v. Visa USA</u>, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

address or even acknowledge the fatal defects highlighted above, any one of which suffices to render the MOA – and consequently the Strategy, which relies on the MOA to implement its mortality limits – insufficient and unreliable as a regulatory mechanism. *See* <u>Greater Yellowstone Coal.</u>, 665 F.3d at 1033-34 ("[C]ompliance with the Strategy is purely voluntary...There is not a single federal or state law or regulation that provides a means for enforcing the Strategy's mortality standards…The Service's reliance on voluntary action is contrary to law.") (Thomas, J., concurring in part and dissenting in part); *see also* <u>Desert Survivors v. U.S. Dep't of the Interior</u>, 2018 WL 2215741, at *41 (N.D. Cal. May 15, 2018) ("[T]he Service's…analysis is arbitrary and capricious because it does not offer any basis for concluding that the conservation efforts described…are sufficiently certain to be effective."). Accordingly, "FWS's failure to coherently consider the adequacy of existing regulatory mechanisms renders its decision arbitrary and capricious." <u>W. Watersheds Project v. FWS</u>, 535 F.Supp.2d 1173, 1187 (D. Idaho 2007) (vacating FWS decision based on unexplained "assumptions" about adequacy of regulatory mechanisms).

### ii. FWS Arbitrarily Abandoned its Position on Necessary Regulatory Mechanisms

Apart from unlawfully relying on legally impotent regulatory mechanisms in the Final Rule, the Service committed independent legal error by abandoning – without rationale – its firm position that it would not finalize any delisting until the

States had committed to specific, legally binding regulatory mechanisms. In the Proposed Rule, the Service underscored the critical importance of state-level protections enshrined by "law and regulation" that are "legally binding" and "enforceable" to the post-delisting protection of grizzly bears. Proposed Rule at 13,210-11. Recognizing that the States would be responsible for managing delisted grizzly bears in the vast majority of GYE grizzly bear range, FWS required them to meet a minimum of five specific commitments in the form of "enforceable regulations" that are "legally binding." Id. If these commitments were not met, FWS held that "delisting could not occur." Id. at 13,204. FWS repeated this position in the notice soliciting the final round of public comment on the proposal. 81 Fed. Reg. 61,659 (September 7, 2016).

Yet the Final Rule settled for far less. Gone, without explanation, was the unwavering language requiring "enforceable" and "legally binding" commitments by the States to the five mortality-regulating provisions identified as essential in the Proposed Rule. Proposed Rule, at 13,210-11. Instead, the Service retreated to a deferential approach that expressly disclaimed the requirement that these mechanisms be enforceable and legally binding. Final Rule, at 30,601. ("[V]arying levels of commitments and enforceability are taken into account as part of this analysis to ensure the overall conclusion is reasonable.").

This abrupt change is not explained in the Final Rule, nor supported in the record by any apparent factual reconsideration. "An agency may not simply discard prior factual findings," as the Service did here, "without a reasoned explanation" Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 968 (9th Cir. 2015); *see also* Rocky Mountain Wild v. Walsh, 216 F.Supp.3d 1234, 1253 (D. Colo. 2016) (holding FWS' withdrawal of proposed species listing rule arbitrary and capricious due to unsubstantiated change in position regarding regulatory mechanisms); W. Watersheds, 535 F.Supp.2d at 1187 (FWS "may reach different conclusions than those signaled" at prior stage of ESA rulemaking, but "must explain why.") (citation omitted). Here, the "absence of a reasoned explanation for disregarding previous factual findings violates the APA." Kake, 795 F.3d at 969.

Additionally, this shift violates the law because the public was not afforded an opportunity for notice and comment on this new position. The APA forbids adoption of final rules that contain significant changes from proposed rules unless supplemental notice and opportunity to comment is provided. 5 U.S.C. § 706; *See* Envtl. Def. Ctr., Inc. v. EPA, 344 F.3d 832, 851 (9th Cir. 2003). No such opportunity for comment was made available here, even though the Final Rule was adopted more than one year after the close of public comments on the Proposed Rule, giving FWS ample time to solicit public comment on these changes.

### iii.    The Strategy is Inadequate Because It Lacks Funding

FWS irrationally glossed over an additional deficiency that will undermine the efficacy of the Strategy: the availability of funding. By its own terms, the Strategy will cost an estimated $5.5 million dollars per year to implement. FWS_Emails_055308-9.  The States are responsible for most of these funds, without which core post-delisting monitoring and management activities, (including population estimates, mortality monitoring, and food source surveys) cannot occur. Id. FWS recognizes that the consistent availability of these funds on an annual basis is essential to the Strategy's adequacy as a regulatory mechanism. *See* FWS_Emails_027046 (peer reviewer noting success of Strategy "assumes sufficient Federal and State funds will be available into the foreseeable future..."); FWS_Emails_002556 ("The adequacy of the regulatory mechanisms demonstrated by this [Strategy] are dependent upon funding being available to fully implement the management and monitoring actions detailed in this document."); FWS_Pub_CMT_002858.

Yet FWS ignored information that casts doubt on the availability of these funds for even the short term. Both the Strategy and MOA expressly state that they do not constitute an obligation of funds on behalf of the States.

FWS_Rel_Docs_001299; FWS_LIT_017081. This is especially troubling because the States' share of grizzly bear management funding has increased post-delisting – yet they are no longer eligible for federal grants to support grizzly bear management through Section 6 of the ESA. 16 U.S.C. § 1535(d)(1); FWS_Pub_CMT_002280 ("[A]fter delisting, ESA…funding to the states will disappear, reducing available funds to the three states by hundreds of thousands of dollars per year."). Yet "nowhere in the Proposed Rule…[was] there any substantiation that increased funds will be allocated by state or federal governments to support post-delisting management of grizzly bears." FWS_Pub_CMT_002281. And demonstrating an intent to avoid accountability for their share of post-delisting management funds, the States requested that language pertaining to their funding commitments – and the status review that would be "triggered" should those commitments fall through – be removed from the Final Rule. FWS_Pub_CMT_004123.

Despite these red flags, FWS failed to assess the likelihood that the Strategy would be funded. Instead, the Final Rule dismisses concerns about funding by noting that "the States have been funding and performing [bear management] for decades." Final Rule at 30,603. But this retrospective statement refers to a time when bears retained federal protections and the States were not charged with implementing a specific management regime to keep the population off the brink

of extinction. The Service "entirely fail[ed] to consider an important aspect of the problem," State Farm, 463 U.S. at 43, by neglecting to assess the capacity of the States to fund the Strategy and address legitimate concerns that they would not. See Alaska v. Lubchenco, 825 F.Supp.2d 209, 219 (D.D.C. 2011) ("The Service…noted that many of the Plan's recommendations were unfunded, and it was therefore uncertain whether they would ever be implemented."). Because "the adequacy of the regulatory mechanisms demonstrated by [the Strategy] are dependent upon funding being available to fully implement [its] management and monitoring actions," this oversight requires vacatur of the Final Rule. FWS_Emails_002556.

b. **Existing Regulatory Mechanisms are Inadequate Because They Allow a Level of Mortality that Threatens the Survival of the Population**

Even if the States were to fully and faithfully implement the MOA and Strategy, the best available science shows that the number of hunting kills and lethal removals allowed would still constitute a threat to the survival of the GYE grizzly bear population. By the Service's own admission, flaws in the Strategy have a significant chance of causing a catastrophic population decline that will be undetectable using current monitoring methods. The delisting must be vacated because even under the Service's rosy vision of State management, the threat of overutilization for recreational purposes due to inadequate existing regulatory mechanisms will remain. 16 U.S.C. § 1533(a)(1)(B), (D).

The Strategy's protocol for establishing total allowable mortality within the Demographic Monitoring Area ("DMA") recognizes that the death of a female bear has a more significant impact on the population than the death of a male bear, due to the species' reproductive biology. FWS_LIT_016312; Facts, ¶ 163. Under the Strategy, a significantly higher percentage of the GYE population of adult male bears may accordingly die in any given year than adult female bears. Id. "Discretionary mortality" quotas (intentional recreational or management kills) are derived from this total allowable mortality limit, and are also separated by demographic cohort. Id., ¶ 154. For instance, Wyoming has approved hunting quotas of one female and ten male bears within the DMA for fall 2018, and Idaho has done the same, approving a 2018 hunt quota of one male bear. Id., ¶ 124-25.

Although the Strategy recognizes the need for greater protection of adult females for the health of the population, this interacts with the Strategy's population estimates in a pernicious way. Specifically, the annual estimate of how many bears exist in the population is based *entirely* on observations of females with cubs-of-the-year, extrapolating from that count the estimated total population. Facts, ¶ 156. Because it does not actually count male bears, instead assuming a fixed 1:1 male-to-female ratio, this methodology will not account for differential levels of mortality between males and females – even though the Strategy expressly contemplates significantly higher male mortality. Id.;

FWS_LIT_016312. The result will be a vicious cycle in which the consistently high annual adult male mortality allowed by the Strategy is reached, annual population estimates based entirely on observations of *female* bears do not detect or account for those male deaths, the next year's mortality limit is then set based on that inaccurate population estimate, an unsustainably high number of male bears die as a result, and the cycle continues undetected for years. The Interagency Grizzly Bear Study Team ("IGBST") summarized the issue as raised in public comments:

> [G]iven allowable mortality rates for the entire GYE of up to 7.6% for independent females and 15% for independent males when the population estimate is above 600, and assuming both males and females inside Parks will continue to die at a rate of approximately 5% per year…the number of independent males outside the Parks will decline dramatically with continued harvest subsidized by independent males that emigrate from the Parks, which will also experience some declines as a consequence. In contrast, the ecosystem-wide cohort of reproductive females remains relatively intact, thus continuing to produce relatively robust estimates of total population size (based on the Chao2 technique that is derived from counts of females with cubs-of-the-year), but with no direct measure of changes in the number of independent males. As the decline in the subpopulation of independent males occurs over a number of years, at no point are population or mortality limits surpassed, thus not triggering a review that would lead to more conservative management, entirely as an artifact of the proposed monitoring system. This is a major, unacknowledged deficiency of the proposed post-delisting monitoring and management and constitutes a methodological threat to the Yellowstone grizzly bear population.

FWS_Emails_008488-89.

This defect is so severe that, in models constructed by two experts, it presented a greater than 50% chance of the GYE population declining, undetected by population estimates, below 500 bears (the level triggering an emergency status review). FWS_Pub CMT_004300 (Dr. Lee Broberg); FWS_Emails_008597-60 (Dr. David Mattson).

FWS acknowledged this flaw in the Final Rule, admitting the likelihood of the Strategy's mortality limits being "unsustainable" and "the potential to overshoot the population objective" in a way that is not detectable due to "a lag time" in population monitoring. Final Rule at 30,591; *see also* FWS_Emails_009005-06 (IGBST lead biologist: "There is indeed a lag time and the potential to exceed the threshold is real" and the "50% chance that mortality limits are unsustainable… is correct if mortality thresholds are reached every year."). But its response was alarmingly inadequate, claiming only that the problem is under further study and could be accounted for through future "adaptive management":

> Whereas IGBST is currently investigating the power of the Chao2 technique to assess how soon we can detect a change in population trend…and how far the population may already be below the objective of 674 when this is detected, the premise for this adaptive management approach is well established in the literature.

Final Rule at 30,591; *see also* FWS_Emails_008027 ("[I]t is worth considering the broader issue of the monitoring system based on Chao2 possibly not detecting

declines in the male subpopulation, outside and inside the Parks");
FWS_Emails_009005 ("IGBST is currently investigating the power to detect when
a population threshold…has been reached and by the time it is detected, the degree
to which population thresholds may be exceeded in terms of time and population
size.").

During FWS' previous attempted delisting, the Ninth Circuit rejected a
similar invocation of the magic words "adaptive management" to justify delisting
GYE bears despite serious, population-threatening, uncertainty. The court rebuked
FWS for failing to "rationally explain why the uncertainty regarding the impact of
whitebark pine loss on the grizzly counsels in favor of delisting now, rather than,
for example, more study." <u>Greater Yellowstone Coal.</u>, 665 F.3d at 1028. Rejecting
the "Service rel[ying] heavily on 'adaptive management' to justify its decision to
delist the grizzly despite the scientific uncertainty" through further, post-delisting
IGBST study of the threat, the Court held that "the ESA's policy of
institutionalized caution" instead demanded vacatur. <u>Id.</u>, at 1028-30 (citations
omitted).

As was the case then, FWS' vague promise of further study – <u>while GYE
grizzly bears remain delisted, subject to trophy hunts and other sources of
excessive mortality</u> – is not a satisfactory response to a present population-level
threat. FWS gambled with the future of GYE grizzly bears by knowingly delisting

them into a management regime that runs a greater than 50% chance of causing catastrophic population decline. But this Court has no obligation to "defer[] to a coin flip." Id., at 1028. It should vacate the Final Rule on the grounds that the Service failed to "articulate[] a rational connection between the facts found and the choices made," Nw. Ecosystem All., 475 F.3d at 1145, and violated their obligation under the ESA to consider the "adequacy of existing regulatory mechanisms" in light of the best available science. 16 U.S.C. 1533 § (a)(1)(D); 50 C.F.R. § 424.11(d)(2).

### c. The Lack of any Regulation Outside the Demographic Monitoring Area is Inadequate

Even though the Strategy and MOA's mortality limits within the DMA are excessive, they at least contemplate some cap (however difficult to monitor and enforce) on the number of bears that can be killed in any given year. But in the roughly 76% of the proposed DPS that lies outside the DMA, this is not the case. The mortality restrictions and other protective provisions of the Strategy and MOA cease applying to bears the moment they leave the DMA - however close to its boundary they may range. There are no limits on the number, sex, or age of bears killed outside the DMA boundary – nor the the methods used to kill them. Facts, ¶ 158. The States could erect an electrified barrier on the perimeter of the DMA that instantaneously killed any grizzly bear that crossed the boundary, and it would not have altered FWS' Factor (d) assessment at all.

This conclusion is arbitrary and unlawful for three reasons. First, by entirely neglecting to assess the adequacy of regulatory mechanisms outside the DMA despite the documented presence of bears there, FWS failed to conduct the entity-wide threats assessment required for delisting. 50 C.F.R. § 424.11(d)(2).[3] Second, FWS arbitrarily designated the DMA boundary based in part on unsubstantiated social factors rather than the "best available science," excluding some areas from the DMA (and thus the reach of the Strategy and MOA) due solely to human attitudes and activities rendering them "unsuitable." *See* FWS_Rel_Docs_006969-70 (presence of livestock allotments and human population density render habitat "unsuitable" for bears). Third, even accepting the Final Rule's tortured position that only bears inside the DMA matter, FWS failed to consider that – because they are members of the same population, and in many cases the very same bears – the fate of bears outside the DMA boundary affects bears within the DMA boundary.

The best available science indicates that allowing unmitigated hunting mortality and management removals outside the DMA will cause population-wide problems. A peer review of the amended recovery criteria addressed this problem as early as 2013: "Biologically, it may not always make sense to exclude mortalities that occur outside the [DMA]. For example, a bear killed while making a short-term

---

[3] This failure is related to, but distinct from, FWS' failure to assess the legal status of the "remnant" population of grizzlies out of which the proposed DPS has been carved. *See* Humane Soc'y v. Zinke, 865 F.3d 585, 601-02 (D.C. Cir. 2017); Complaint ¶ 94.

foray outside the monitoring area and outside its normal home range, would not be counted against the mortality threshold when it probably should be….More rationale and justification is needed to explain the implications of this major change." FWS_Rel_Docs_000201.

A peer review of the Proposed Rule three years later identified the same flaw, observing mortality could be "misinterpreted by limiting monitoring to the DMA" because "[b]ears killed outside of the DMA could also spend time inside of the DMA if they have a home-range that overlaps the boundary" and highlighting that bear deaths "outside the DMA still influence[] the entire GYE population." FWS_Emails_027038. The impact of mortality outside the DMA on "trans-boundary" bears and the population as a whole was echoed in multiple substantive public comments. *See, e.g.*, FWS_Pub_CMT_006039, 002710, 002009, 003320.

The impact of this management scheme is already apparent. Wyoming has approved quotas of up to 10 bears within the DMA (where Strategy and MOA mortality limits apply) and 12 bears outside the DMA (where mortality is at the complete discretion of Wyoming) for its inaugural trophy hunt – abusing FWS's indifference toward bears outside the DMA to more than double its inaugural hunting quota. Facts, ¶ 124. Those additional 12 bears will be shot in a zone that immediately abuts the DMA, and will in all likelihood include bears whose "home-range…overlaps the boundary." FWS_Emails_028038. And outside the DMA, no

sex-based quotas apply, amplifying the population-threatening effect of this excessive hunt. Wyoming hunters will legally be allowed to kill up to 12 breeding-age female bears (<u>more than six times the combined 2018 allocation of adult female mortality for all States</u>) on periphery of the DMA this fall.

Wyoming's approved hunting regulation illustrates that the blinders FWS has willfully donned will allow unregulated mortality outside the DMA in quantities that will unravel the entire post-delisting mortality regime. As the range of GYE bears continues to trend nearer to and beyond the DMA boundary (*see* FWS_Emails_000516-17), this structural flaw will only grow in importance. Yet FWS' only response was that "population monitoring protocols that are in place will detect if the level of mortality outside the DMA reaches a point where population size inside the DMA declines." Final Rule at 30,592. This is insufficient for two reasons. First, the "lag time" issue identified in subsection (b) above – which FWS concedes exists – would prevent monitoring from detecting adverse population-level consequences until far too late. Second, relying on monitoring to observe the fallout of a present, known threat does not rebut the existence of that threat, and the consequent need for continued protection. 50 C.F.R. § 424.11(d)(2). For the same reason that monitoring would not excuse delisting bears if Wyoming intended on immediately killing half of the adult females in the DMA, it does not do so here. Rather, "the ESA's policy of institutionalized caution" requires that the

Final Rule be vacated and the Service address this threat *before* delisting. <u>Greater Yellowstone Coal.</u>. 665 F.3d at 1028-30 (citations omitted).

### d. The Lack of a "Recalibration" Provision Renders the Strategy Inadequate and Threatens the Survival of the Population

The Final Rule relies on the Strategy as the centerpiece of post-delisting grizzly bear management. Yet the record shows that the Service knew of a loophole in the Strategy so significant that the former FWS Director personally – and unsuccessfully – intervened to prevent what the he deemed a "show-stopper" from making its way into the final version. FWS_Emails_008087, 8319, 8546-47, 8455-56. The loophole, now enshrined in the final Strategy, allows for the States to radically inflate the annual population estimate by adopting a different methodology, without "recalibrating" the underlying population targets to match this new method. Facts, ¶ 148-51. As a result, State managers can effectively double the population estimate at the flip of a switch without any change in the conditions of bears on the ground, granting themselves permission to kill *hundreds* of additional grizzly bears through an accounting trick. FWS recognized and opposed the omission of this key "recalibration" provision, but – impermissibly prioritizing expedience over the best available science – proceeded to deem the Strategy adequate and delist the population anyway.

The annual population estimate is the key to the entire Strategy. Core regulatory components including allowable total and discretionary mortality levels,

emergency hunting season closures, and mandatory status review "triggers" all depend on the yearly population estimate. The methodology used to derive this population estimate is therefore vitally important. The Proposed Rule and Draft Strategy released for public comment provided that the "conservative" chao2 population estimator, which IGBST has been using since 2002, would continue to be used for monitoring post-delisting unless and until the best available science recommended an updated protocol. FWS_Rel_Docs_005889-90.

While finalizing the Strategy, FWS proposed language clarifying that population objectives and mortality thresholds would be "recalibrated" to match if a new population estimator were adopted post-delisting. Facts, ¶ 151. This common sense adjustment was necessary to ensure that the Strategy's population targets were not rendered meaningless and ineffective if a new estimator were used. For example, if the most likely alternative to the chao2 estimator ("mark-resight") were adopted *without* recalibrating the underlying population targets, "[a] population that the Service currently represents as numbering around 675 could suddenly be inflated to over 925, thereby allowing for a [67% increase in] sport harvest." FWS_Pub_CMT_006038. FWS' former grizzly bear recovery coordinator echoed this concern, explaining that changing the estimator without recalibration "is biologically and legally indefensible" as illustrated by past population data: "[t]he 2007 population estimate using Chao2 was 683, but there

were actually over 1200 bears in the population in 2007 if we used mark-resight," such that *without* recalibration "the states could reduce 1200 bears to 683." FWS_Del_Emails_00144611; *see also* FWS_Rel_Doc_003725 (Forest Service stating recalibration, States "could potentially manage a decline from 1,000 to 600 [bears]" putting "[g]enetic issues…back on the table"); FWS_Emails_016837-8 (NPS and FWS leadership expressing need for recalibration: "Some current estimates place as many as 1,100 bears in the DMA. This would [without recalibration] trigger the much higher mortality rates and drive the population down over a relatively short period of time."); FWS_Emails_027007 (peer review: "need to calibrate any new estimation method with the previous approaches to ensure long-term comparability of data.").

Yet the States resisted this change to the Strategy, offering competing language that did not include the recalibration provision. This set off alarms at FWS, with senior staff correctly regarding the lack of a recalibration provision as a "show-stopper" (FWS_Emails_008087) without which delisting could not lawfully proceed:

> For several weeks, we have been trying to reach a compromise on key language to the [Strategy]. It regards the issue of "recalibration" of the demographic standards (population goals, mortality limits and rates, etc.) if the population estimator is changed post-delisting. We believe this is a key commitment that must be clear in the strategy in order to ensure that the states are committed to the basic goal of maintaining the delisted population of bears….

> …It is much clearer, and frankly scientifically warranted, to just state clearly if the population estimator is changed we will recalibrate. Why the states are unwilling to make this commitment, frankly, is quite concerning.

FWS_Emails_008546-47, 8455-56 (FWS Director correspondence with FS and NPS leaders) (emphasis added);

> We believe that the language the states suggest is too ambiguous in regards to what will happen if a new population estimator is adopted…We and our legal counsel do not believe that such an approach would be defensible. The language proposed by the Service is written to state clearly that if the population estimator is changed, we will recalibrate the associated metrics to maintain stability of the population…

FWS_Emails_007744 (FWS Field Supervisor comments).

Nevertheless, after Governors intervened and spoke with the FWS Director (FWS_Emails_063383) the States prevailed, securing language in the Final Strategy that not only failed to provide for recalibration if the population estimator is changed, but also removed the "best available science" standard for changing the estimator at all. FWS' former grizzly bear coordinator scathingly reviewed the approved language, observing that it "Removed wording from Appdx. C about a change in these methods requiring the best available science. Why? **Can drive a truck through this!,"** "Ignores what will happen if a new estimator becomes available. It is obvious what the states plan is," and finally characterizing it as "a major sellout of the science details necessary to assure to conservation of the Yellowstone grizzly." FWS_Emails_063366 (emphasis in original).

FWS proceeded to delist even though the Final Strategy lacked the recalibration

provision it correctly considered "key…to the basic goal of maintaining the delisted population." FWS_Emails_008546-47. As FWS' former grizzly coordinator observed, this constituted "a violation of the mandate of the ESA that the Service implement adequate regulatory mechanisms prior to delisting. There cannot be a vote by other agencies to determine if the Service follows the ESA any more than the USFS can allow other agencies to vote whether the USFS will follow NFMA." FWS_Emails_063377. FWS may have lacked the voting power to ensure that calibration language was included in the Final Strategy (just as it lacks the voting power to force Wyoming to pass a statute). But that is not an excuse. FWS – and only FWS – remained legally obligated to evaluate and find the Strategy adequate as an "existing regulatory mechanisms" prior to delisting. The record makes clear that FWS – from long-tenured biologists to D.C. leadership – found the final Strategy inadequate because it lacked this provision. Moving forward with delisting anyway was an unlawful abdication of FWS' ESA obligation; the Final Rule must be set aside because FWS failed to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made.'" Nw. Ecosystem All. 475 F.3d at 1145.

## V. CONCLUSION

For the reasons above, Plaintiffs respectfully request this Court grant summary judgment on all counts of their Complaint and vacate the Final Rule.

Date: June 13, 2018

*/s/ Nicholas Arrivo*
Nicholas Arrivo
The Humane Society of the United States

Kristine Akland
Akland Law Firm, PLLC

**Attorneys for Plaintiffs**

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2018, I filed a copy of this document

electronically through the CM/ECF system, which caused all ECF registered

counsel to be served by electronic means, as more fully reflected on the Notice of

Electronic Filing.


/s/ Kristine M. Akland
Kristine Akland
Akland Law Firm, PLLC

Nicholas Arrivo
The Humane Society of the United States

Attorneys for Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 6,500 words, in accordance with the case management plan, excluding the caption, table of authorities, table of contents, signature blocks, and certificate of compliance. Under Local Rule 7.1(d), a table of contents and table of authorities are provided for this brief.

*/s/ Nicholas Arrivo*
Nicholas Arrivo
The Humane Society of the United States

Kristine Akland
Akland Law Firm, PLLC

Attorneys for Plaintiffs