JEFFREY H. WOOD
Acting Assistant Attorney General
COBY HOWELL, Senior Trial Attorney
MICHAEL R. EITEL, Senior Trial Attorney
DEVON L. FLANAGAN, Trial Attorney
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, Oregon 97204-2902
Tel: (503) 727-1023 | Fax: (503) 727-1117
Email: Coby.Howell@usdoj.gov
[Additional counsel listed on signature page]
*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>STATE OF WYOMING, *et al.*,<br><br>Defendant-Intervenors. | Case No. 9:17-cv-00089-DLC-JCL<br><br>Consolidated with:<br>CV 17-117-M-DLC;<br>CV 17-118-M-DLC;<br>CV 17-119-M-DLC;<br>CV 17-123-M-DLC; and<br>CV 18-016-M-DLC<br><br>**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................... 5

  I. STATUTORY BACKGROUND ........................................... 5

  II. REGULATORY BACKGROUND ...................................... 6

STANDARD OF REVIEW ....................................................... 7

ARGUMENT ....................................................................... 7

  I. THE COURT SHOULD REJECT PLAINTIFFS' CHALLENGES TO THE MECHANICS OF FWS' DECISION TO IDENTIFY AND DELIST A DISTINCT POPULATION SEGMENT. ............................. 7

    A.   Plaintiffs' *Humane Society* claims are moot............................. 10

    B.   Even if the Court has jurisdiction, the ESA authorizes FWS to identify a distinct population segment and determine its conservation status, even when dealing with a segment of a previously-listed species............................................. 15

    C.   The ESA does not require FWS to examine all other listable entities when identifying and delisting a distinct population segment. ........................................................ 20

      1. FWS did not reopen the 1975 listing or carve up the "lower-48" entity and therefore there was no reason to examine the prior "species" listing. ........................................... 21

      2. Plaintiffs wrongly conflate Section 4(c)'s distinct obligations

with FWS' authorities under Section 4(a). ................................26

    3. FWS did not alter the grizzly bears' status outside of the Greater Yellowstone Ecosystem. ................................................30

    4. Plaintiffs' interpretation works to the detriment of grizzly bear recovery. ....................................................................................34

  D. FWS nonetheless made findings and rationally addressed whether the 2017 Rule affects the "lower-48" listing. ..............38

  E. Plaintiffs' contention that FWS failed to evaluate grizzly bear's historic range lacks merit. ........................................................41

II. THE YELLOWSTONE SEGMENT IS BIOLOGICALLY RECOVERED. ......................................................................................49

III. FWS COMPLIED WITH THE ESA IN ANALYZING POTENTIAL THREATS TO THE SEGMENT. ..................................56

  A. FWS rationally considered the Conservation Strategy in issuing its decision. ..................................................................61

    1. FWS' consideration of the "inadequacy of existing regulatory mechanisms" was reasonable. ....................................................63

    2. Plaintiffs' challenges over the adequacy of public comment on the Conservation Strategy fail. .................................................68

    3. Plaintiffs' challenges over funding for the Conservation Strategy similarly fail. .............................................................75

  B. FWS rationally analyzed mortality management that applies post-delisting, and its findings are well reasoned and

supported. ......................................................................................... 78

    1. Plaintiffs misapprehend Chao2 and the multiple monitoring and evaluation methods incorporated into the Conservation Strategy. .................................................................................... 80

    2. Plaintiffs' distrust of the three sovereigns identifies no defect in the Conservation Strategy or FWS' Rule. ................................. 86

    3. Plaintiffs' speculation that new methods will be adopted in a way that threatens the species identifies no deficiency in this Rule. .......................................................................................... 90

    4. FWS rationally considered regulatory mechanisms and mortality management in unsuitable habitat outside the demographic monitoring area. .................................................. 94

    5. FWS' properly considered whether a combination of the ESA's listing factors are likely to threaten grizzly bears. ................... 98

  C. The genetic health of this grizzly bear population is secure. .... 99

  D. Grizzly bears are not threatened by food resource availability. .............................................................................. 108

III.   PLAINTIFFS' REMAINING CHALLENGES TO THE 2017 RULE LACK MERIT. ........................................................................ 116

  A. FWS' 2017 Rule is not an affirmative agency action triggering the obligation to consult under Section 7 of the ESA. ............ 116

  B. Mr. Aland's claims lack merit. ............................................... 119

CONCLUSION ..................................................................................... 123

# TABLE OF AUTHORITIES

CASES                                                                PAGE


*Alaska Oil & Gas Ass'n v. Pritzker*,
  840 F.3d 671 (9th Cir. 2016) ....................................................... 102, 104
*Alliance for Wild Rockies v. Zinke*, 16-cv-21-DLC (ECF_50:41),
  265 F. Supp. 3d 1161 (D. Mont. 2017) ................................................. 23
*Am. Mining Cong. v. EPA*,
  965 F.2d 759 (9th Cir. 1992) ............................................................ 121
*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
  126 F.3d 1118 (9th Cir. 1997) ........................................................... 11
*Asarco, Inc v. EPA*,
  616 F.2d 1153 (9th Cir. 1980) .......................................................... 44
*BASF Wyandotte Corp. v. Costle*,
  598 F.2d 637 (1st Cir. 1979) ............................................................ 69
*Bear Valley Mut. Water Co. v. Jewell*,
  790 F.3d 977 (9th Cir. 2015) ....................................................... 69, 74
*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................. 94, 98
*Butte Envtl. Council v U.S. Army Corps of Eng'rs*,
  620 F.3d 936 (9th Cir. 2010) ........................................................... 59
*Cal. Sportfishing Prot. All. v. FERC*,
  472 F.3d 593 (9th Cir. 2006) .......................................................... 117
*Center for Biological Diversity v. FWS*,
  402 F. Supp. 2d 1198 (D. Or. 2005) .............................................. passim
*Citizens to Pres. Overton Park v. Volpe*,
  401 U.S. 402 (1971) ...................................................................... 7
*Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*,
  531 F.3d 792 (9th Cir. 2008) ................................................... 16, 28, 29
*Ctr. for Biological Diversity v. EPA*,
  90 F.Supp.3d 1177 (W.D. Wash. 2015) ............................................... 60
*Ctr. for Biological Diversity v. NMFS*,
  977 F.Supp.2d 55 (D.P.R. 2013) ....................................................... 59
*Ctr. for Food Safety v. Vilsack*,

718 F.3d 829 (9th Cir. 2013) ............................................................. 118

*Defenders of Wildlife v. Corps*, 15-cv-14-BMM,
  2017 WL 1405732 (Apr. 19, 2017, D. Mt.) ............................... 11, 14, 15
*Defenders of Wildlife v. Dep't of Interior*,
  354 F.Supp.2d 1156 (D. Or. 2005) ...................................................... 34
*Defenders of Wildlife v. Norton*,
  239 F. Supp. 2d 9 (D.D.C. 2002) ........................................................ 45
*Defenders of Wildlife v. Norton*,
  258 F.3d 1136 (9th Cir. 2001) ...................................................... 44, 45
*Defenders of Wildlife v. Zinke*,
  849 F.3d 1077 (D.C. Cir. 2017) .................................. 64, 65, 84, 107
*Defs. of Wildlife v. Salazar*,
  729 F. Supp. 2d 1207 (D. Mont. 2010) ............................................. 122
*E&J Gallo Winery v. EnCana Corp.*,
  503 F.3d 1027 (9th Cir. 2007) ...................................................... 38, 39
*Envtl. Def. Ctr., Inc. v. EPA*,
  344 F.3d 832 (9th Cir. 2003) .............................................................. 68
*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
  255 F.3d 1073 (9th Cir. 2001) ......................................................... 118
*Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*,
  408 F. Supp. 2d 916 (N.D. Cal. 2006) ................................................ 12
*Friends of the Earth v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) ........................................................................... 15
*Good Samaritan Hosp. v. Mathews*,
  609 F.2d 949 (9th Cir. 1979) ............................................................. 56
*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
  691 F.3d 1008 (9th Cir. 2012) ................................................ 11, 14, 117
*Greater Yellowstone Coal. v. Servheen*,
  665 F.3d 1015 (9th Cir. 2011) ................................................... passim
*Greater Yellowstone Coal. v. Servheen*,
  672 F. Supp. 2d 1105 (D. Mont. 2009) ...................................... passim
*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ........................................................................... 87
*Hall v. EPA*,
  273 F.3d 1146 (9th Cir. 2001) ......................................................... 121
*Humane Society of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017)...................................................... passim

*Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*,
    56 F.3d 1071 (9th Cir. 1995) .............................................................. 11

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) .............................................................. 69

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir.2012) ............................................................ 116

*Kern Cty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) .................................................... passim

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................ 7

*Long Island Care at Home v. Coke*,
    551 U.S. 158 (2007) ............................................................................ 14

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................ 124

*Mt. Diablo Hosp. v. Shalala*,
    3 F.3d 1226 (9th Cir. 1993) ......................................................... 41, 46

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ..................................................................... 59, 117

*Nat'l Med. Enters. v. Sullivan*,
    916 F.2d 542 (9th Cir. 1990) ............................................................ 119

*Nat'l Wildlife Fed'n v. Norton*,
    386 F.Supp.2d 553 (D. Vt. 2005).......................................................34

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) ............................................................ 15

*Nw. Ecosystems All. v. FWS*,
    475 F.3d 1136 (9th Cir. 2007) ..................................................... 16, 30

*Oceana v. Bryson*,
    940 F.Supp.2d 1029 (N.D. Cal. 2013) ............................................... 33

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) .............................................................. 68

*P & V Enters. v. Corps*,
    516 F.3d 1021 (D.C. Cir. 2008) ......................................................... 33

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) ..................................................................... 121

*Pickern v. Pier 1 Imps. (U.S.)*,
    457 F.3d 963 (9th Cir. 2006) .............................................................. 15

*Pitts v. Terrible Herbst, Inc.*,
    653 F.3d 1081 (9th Cir. 2011) ............................................................ 11

*Princeton Univ. v. Schmid,*
455 U.S. 100 (1982) ............................................. 12
*Safari Aviation v. Garvey,*
300 F.3d 1144 (9th Cir. 2002) ........................... 121
*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) .........................86, 87
*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 971 (9th Cir. 2014) ............................. 41
*Sturgeon v. Frost,*
136 S.Ct. 1061 (2016) .......................................88
*Syverson v. Int'l Bus. Machs. Corp.,*
472 F.3d 1072 (9th Cir. 2007) ........................... 119
*Trout Unlimited v. Lohn,*
559 F.3d 946 (9th Cir. 2009) ........................... 106
*Tucson Herpetological Soc. v. Salazar,*
566 F.3d 870 (9th Cir. 2009) ..................... 47, 48, 76
*United States v. Mendoza,*
464 U.S. 154 (1984) ........................................ 119
*United States v. Ron Pair Enters.,*
489 U.S. 235 (1989) ..................................... 16, 20
*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
412 U.S. 669 (1973) ......................................... 99
*W. Watersheds Project v. Lueders,*
122 F. Supp. 3d 1039 (D. Nev. 2015) ................ 125

STATUTES

5 U.S.C. § 706 ................................................... 69
5 U.S.C. § 706(2)(A) ............................................. 7
5 U.S.C. §§ 701-706 ............................................. 7
16 U.S.C. § 1531(a)(5) .......................................... 61
16 U.S.C. § 1532(3) .............................................. 3
16 U.S.C. § 1532(16) ............................... 18, 22, 123
16 U.S.C. § 1532(20) ........................................... 43
16 U.S.C. § 1533(a) ...................................... 43, 117
16 U.S.C. § 1533(a)(1) ........................... 6, 16, 18, 27
16 U.S.C. § 1533(a)(1)(D) ....................... 77, 106, 107
16 U.S.C. § 1533(b)(1)(A) .............................. passim

16 U.S.C. § 1533(c)......................................................26

16 U.S.C. § 1533(c)(1) ...........................................17, 27

16 U.S.C. § 1533(c)(2) .................................................27

16 U.S.C. § 1533(g) .......................................................6

16 U.S.C. § 1536(a)(2) ...............................................116

16 U.S.C. §§ 1531(b) ......................................................5

16 U.S.C. §§ 1532(6) ..............................................56, 58

28 U.S.C. § 2401(a) .....................................................20

## FEDERAL REGULATIONS

47 Fed. Reg. 4204 (Jan. 28, 1982) ...............................23

50 C.F.R. §17.11(h) .................................................19, 20

50 C.F.R. § 17.11 .........................................................31

50 C.F.R. § 17.11(a) .....................................................22

50 C.F.R. § 17.40(b) .....................................................90

50 C.F.R. § 402.01(b) .....................................................5

50 C.F.R. § 402.02 .....................................................116

50 C.F.R. § 424.11(d) ..............................................6, 117

61 Fed. Reg. 4722 (1996) ...........................................29

82 Fed. Reg. 30502 (June 30, 2017) ................6, 28, 45, 49

83 Fed. Reg. 18737 (Apr. 30, 2018) .....................passim

# CITATION FORMATS

1.     Citations to pleadings in this case are formatted as ECF_XX:YY, where XX refers to the ECF-document number and YY refers to the ECF-generated page number in the upper right corner.

2.     Citations to the administrative and judicial record are formatted consistent with the U.S. Fish and Wildlife Service's Index, for example, FWS_Rel_Docs:XX, where XX refers to the bates stamp numbers generated by the Service in the lower right corner of the document.

## INTRODUCTION

For over four decades, the U.S. Fish and Wildlife Service ("FWS") has led a collaborative, expert-driven process to recover the Greater Yellowstone Ecosystem population of grizzly bears. In 1975, the population was almost entirely contained within Yellowstone National Park, and the population's status was precarious. To respond, FWS, the U.S. Forest Service, National Park Service, and U.S. Geological Survey, with the aid of the States of Montana, Idaho, Wyoming, and other entities combined efforts to make this one of the best studied and managed grizzly bear populations in the world. Today the population is thriving, and may even be at carrying capacity. Habitat is secure. Conflicts resulting in mortality are carefully monitored and managed. And no credible dispute exists that this population has far surpassed the recovery criteria developed by the experts and embodied within FWS' recovery plans issued under the Endangered Species Act ("ESA").

This, however, is not an unfamiliar situation. We found ourselves in strikingly similar circumstances when various plaintiffs challenged FWS' 2007 Final Rule identifying these bears as a distinct population segment ("Segment") and finding that the Segment was neither

endangered nor threatened.  Although this Court agreed with FWS on some aspects, it disagreed on others and vacated and remanded the 2007 Rule.  *Greater Yellowstone Coal. v. Servheen,* 672 F. Supp. 2d 1105 (D. Mont. 2009).  The Ninth Circuit similarly agreed with FWS on the validity and importance of the Conservation Strategy, a coordinated multi-agency effort for monitoring and managing these bears, but affirmed this Court's remedy, finding that FWS should study and better explain the effect of the whitebark pine food supply on these bears. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011).

Throughout all of that underlying litigation, there were dire predictions of emaciated bears and rampant mortality because of a perceived whitebark pine epidemic.  But these fears never materialized. Even so, FWS went back and performed an exhaustive review on whitebark pine and food sources generally.  It reached the same, albeit considerably more supported, conclusion as it had with the 2007 Rule: these bears are not threatened by shifting availability in food resources, habitat is secure and more than adequately protected, mortality is responsibly managed and monitored, and the population is neither endangered nor threatened as those terms are defined under the ESA.

Nevertheless, the Plaintiffs here once again raise the same dire predictions. But in doing so, Plaintiffs have not fairly contended with FWS' 130-page rule and the wealth of data and studies supporting FWS' findings. Plaintiffs instead gin up facts, cast aspersions on the States, and ask the Court to reject FWS' rule because they and their preferred public commenters can conjure scenarios and future threats to this grizzly bear population. This is not how Congress intended FWS to administer the ESA.

The ESA's purposes lie with protecting a species, including distinct populations like this Segment, up until the point where management can be returned to the States. 16 U.S.C. § 1532(3). Herein lies the difference between FWS and Plaintiffs. Plaintiffs want perpetual ESA protections because they distrust FWS, the Interagency Grizzly Bear Study Team ("Interagency Study Team"), the sovereign States and Tribes, and all of the other experts that are actually studying and protecting these bears. Plaintiffs are willing to put forth any argument that suits their objective of ensuring that responsible Federal and State agencies are not allowed to make decisions regarding

grizzly bear management or recovery. FWS, by contrast, is focused on heeding the science and implementing the Act as Congress intended.

This Court has an opportunity. It can critically examine what FWS and the other experts have accomplished since 1975 with the protection and management of this grizzly bear population. It can recognize the extraordinary efforts the Federal, State, Tribal, and local governments have made to bring this population back from the brink to one that is now thriving and secure. It can inform its judgment by looking to the law and extensive record, and acknowledge that, while there may be scientific disagreements, FWS' completion of this Court's remand is anything but arbitrary and capricious. The alternative is Plaintiffs' view—that FWS should not be allowed to implement the Act and the States should not be permitted to manage a recovered grizzly bear population. As the plain language of statute makes clear, and as confirmed by Congress' ratification of the Northern Rocky wolf delisting rule under similar circumstances to those here, this is not Congress' intent.

The Court should not entertain Plaintiffs' proposed course, as Congress entrusted these decisions to FWS. FWS' 2017 Rule is

scientifically, technically, and legally sound.  This Court should

conclude that FWS has fulfilled this Court's and the Ninth Circuit's

remand and affirm the 2017 Rule.

## BACKGROUND

## I.    STATUTORY BACKGROUND

Congress enacted the ESA "to bring any endangered species or

threatened species to the point at which the measures provided

pursuant to [the Act] are no longer necessary." 16 U.S.C. §§ 1531(b),

1532(3).  The Secretary of the Interior[1] maintains a list of threatened

and endangered species.  *Id*. § 1533(c)(1).  A "species" is "any subspecies

of fish or wildlife or plants, and any distinct population segment of any

species of vertebrate fish or wildlife which interbreeds when mature."

*Id*. § 1532(16).  An "endangered species" is "any species which is in

danger of extinction throughout all or a significant portion of its range."

*Id*. § 1532(6).  A "threatened species" is one "which is likely to become

an endangered species within the foreseeable future throughout all or a

significant portion of its range."  *Id*. § 1532(20).

---

[1] The Secretary delegated his responsibilities under the ESA to FWS.
*See* 50 C.F.R. § 402.01(b).

Section 4 charges FWS with "determin[ing] whether any species is an endangered species or threatened species" after considering five statutory factors, the best scientific and commercial data available, and States and foreign governments' efforts to protect the species. 16 U.S.C. § 1533(a)(1), (b)(1)(A). If the species recovers and warrants delisting, FWS removes the species from the ESA's protections and monitor any delisted species for at least five years. *Id*. § 1533(g); 50 C.F.R. § 424.11(d). If the monitoring reveals a significant risk to the species, FWS can relist the species using the ESA's emergency procedures. 16 U.S.C. § 1533(g).

## II. REGULATORY BACKGROUND

Plaintiffs challenge FWS' 2017 Final Rule, where FWS identified a Greater Yellowstone Ecosystem distinct population segment, reviewed the Segment's status, and concluded the Segment does not constitute an endangered or threatened species. 2017 Rule, 82 Fed. Reg. 30502 (June 30, 2017), FWS_Rel_Docs:1435-15656. The 2017 Rule operates to remove the Segment from the ESA's protections, save for the post-delisting monitoring requirements that continue to apply. FWS_Rel_Docs:1561-64. The facts relevant to the 2017 Rule and

Plaintiffs' motions are set forth in the Administrative Record, this Memorandum, Federal Defendants' Statement of Undisputed Facts, and Federal Defendants' Response to Plaintiffs' Statement of Facts.

## STANDARD OF REVIEW

"[R]eview of an agency's compliance with the ESA is governed by the Administrative Procedure Act (APA)." 5 U.S.C. §§ 701-706. *Greater Yellowstone Coal.*, 665 F.3d at 1023. The APA authorizes courts to "hold unlawful and set aside" final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this narrow and highly deferential standard, a court is "not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), and courts should "be 'most deferential' when the agency is 'making predictions, within its [area of] special expertise, at the frontiers of science,'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*).

## ARGUMENT

## I. THE COURT SHOULD REJECT PLAINTIFFS' CHALLENGES TO THE MECHANICS OF FWS' DECISION

**TO IDENTIFY AND DELIST A DISTINCT POPULATION SEGMENT.**

Relying exclusively on the D.C. Circuit's decision in *Humane Society of the U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) ("*Humane Society*"), Plaintiffs attack the 2017 Rule because they believe FWS should have addressed the Segment *and* the "lower-48 States" entity FWS designated in 1975. However, Plaintiffs' claims based on the *Humane Society* decision are moot as a result of FWS' superseding Regulatory Review, 83 Fed. Reg. 18737 (Apr. 30, 2018) ("Regulatory Review").

But even if the Court has jurisdiction over these claims, the ESA unambiguously supplies FWS with the discretion to identify and delist a distinct population segment, even when the segment belongs to a previously-listed species. In creating the distinct population segment provision in the statute, Congress did not require or intend for FWS to address every other listed entity within a taxon when identifying and making a conservation status determination for a distinct population segment. Moreover, even if the law requires FWS to address the effects of delisting this Segment on a previously-listed entity, FWS provided that analysis in the 2017 Rule and its Regulatory Review. On the

merits, Plaintiffs' challenges fail.

As discussed below, as a practical, but very real, matter, Plaintiffs' interpretation of *Humane Society* would significantly slow and adversely impact FWS' regulatory ability to protect and recover grizzly populations, like the Cabinet-Yaak. Under Plaintiffs' preferred approach, every regulatory action on a distinct population segment would require re-visiting every other listable entity within the entire taxon, causing significant additional work and frustrating Congress' intent of allowing FWS to focus its resources where they are needed the most.

More importantly, Plaintiffs' interpretation would require FWS to revisit its prior lower-48 listing, which could remove ESA protections throughout large swaths of the United States. *See infra* Figure 1 & 2. The current statute does not allow FWS to list a "lower-48 species" anymore; it restricts FWS (in this instance) to listing distinct population segments. This, in turn, could mean that anywhere in the United States that lacks a distinct and significant population—like the Northern Cascades, the Bitterroot, and other areas—grizzly bears would not be protected (either now or should they recolonize those areas

in the future).  In their rush to challenge this Rule, Plaintiffs have not thought their arguments through to their logical end.  FWS has thought it through, and its actions here constitute a far more rational, and legally correct, way to proceed.

As further discussed below, the Court should reject Plaintiffs' *Humane Society* arguments.

## A.    Plaintiffs' *Humane Society* claims are moot.

On April 30, 2018, after notice and public comment, FWS issued its Regulatory Review addressing the *Humane Society* decision and affirming the 2017 Rule.  83 Fed. Reg. 18737.  With respect to the *Humane Society* claims raised by Plaintiffs,[2] the Regulatory Review supersedes the 2017 Rule.  Thus, the contentions that FWS failed to address the issues raised by *Humane Society* decision are now moot.

"The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings."  *Pitts v.*

---

[2]  *See Crow Indian Tribe,* 17-cv-89, ECF_22 ¶¶ 167-174; *Humane Society,* 17-cv-117, ECF_1 ¶¶93-94; *Northern Cheyenne Tribe*, 17-119, ECF_1 ¶¶79-81; *Wild Earth Guardians*, 17-cv-118, ECF_1 ¶¶83-93; *Aland*, 18-cv-16, ECF_1 ¶¶139-143.

*Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). "If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed." *Id.*; *Grand Canyon Trust v. U.S. Bureau of Reclamation,* 691 F.3d 1008, 1016-17 (9th Cir. 2012).

This Court and the Ninth Circuit have repeatedly held that the issuance of a superseding administrative action moots claims regarding the preceding action. *Id.* ("We have held that the issuance of a superseding BiOp moots issues on appeal relating to the preceding BiOp."); *Am. Rivers*, 126 F.3d at 1124 ("the biological opinion in the present case has been superseded by the 1995 Biological Opinion. Therefore, any challenge to the 1994–1998 Biological Opinion is moot."); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995); *Defenders of Wildlife v. Corps*, 15-cv-14-BMM, 2017 WL 1405732, at *1 (Apr. 19, 2017, D. Mt.), (ECF_118) (dismissing a challenge to an Environmental Assessment as moot because of superseding agency action). Other courts have similarly

found that withdrawing, replacing, or a superseding agency action

moots any controversy over such action. *See Princeton Univ. v. Schmid*,

455 U.S. 100, 103 (1982) (holding that a challenge to a university

regulation was moot where a new regulation had been adopted); *Forest*

*Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 408 F. Supp. 2d 916,

918-19 (N.D. Cal. 2006) (dismissing case after withdrawal of timber sale

decision because, if sale were authorized in the future, "the basis for the

decision, and the basis for a challenge to that decision, could change").

The circumstances here are no different. Plaintiffs challenge the

2017 Rule alleging that FWS failed to address the "remnant" lower-48

entity and historical habitat. As discussed below, FWS did address the

lower-48 entity and historical habitat in its 2017 Rule. But even if FWS

had not addressed these issues, it explicitly did so in its Regulatory

Review. 83 Fed. Reg. 18737 ("We believe that the 2017 decision to

remove the GYE population of grizzly bears from the List complies with

the Act, but we decided to consider issues relating to the remainder of

the grizzly bear population in the lower 48 States in light of the

*Humane Society* opinion."). More specifically, FWS' Regulatory Review

analyzes the effect of delisting the Segment on the lower-48 entity and

vice versa.  83 Fed. Reg. 18739-41.  This is precisely what Plaintiffs

claim FWS failed to do.  ECF_190:23 ("FWS violated the ESA by

delisting the [segment] without considering the status of the already-

listed lower-48 grizzly population or the impact of the Yellowstone

delisting on the remnant listed population."), *but see*, 83 Fed. Reg.

18739-41.

Similarly, FWS thoroughly evaluated the loss of historical range.

83 Fed. Reg. 18741.  Here again, this is what Plaintiffs argue is lacking.

ECF_192:11-19; *id.* at 11 (FWS "failed to properly review or consider

lost historical range of the grizzly bear."), *but see*, 83 Fed. Reg. 18741-

42.  FWS provided the analyses that Plaintiffs contend are lacking and

therefore Plaintiffs already received the relief they request.  Any

perceived harm from the alleged lack of analysis in the 2017 Rule on

these issues has been superseded and redressed by the Regulatory

Review.

Perhaps in an effort to distract, Plaintiffs label the Regulatory

Review a "post-hoc" explanation, but their characterization misses its

mark.  ECF_190:22.  Agencies can, indeed must, issue new regulatory

decisions in response to a variety of factors like changed circumstances

or new legal authorities in order to fill ambiguities in a statute. *See Long Island Care at Home v. Coke*, 551 U.S. 158, 165 (2007). The fact that FWS did so here, while in the midst of litigation, is not impermissible or even novel. *Id.* at 163 (permissibly reviewing a secondary "interpretative" regulation that explained a prior regulation in response to litigation); *Defenders of Wildlife v. Corps*, 15-cv-14-BMM, 2017 WL 1405732 (ECF 118) (plaintiffs insisting, and this Court reviewing, multiple new agency decisions issued prior to final judgment). As a jurisdictional matter, this Court must review FWS' Regulatory Review. *Grand Canyon Trust*, 691 F.3d at 1017. On the merits, the Court should examine FWS' Regulatory Review because it provides the agency's views on the D.C. Circuit's *Humane* Society decision and what effect that opinion has on the 2017 Final Rule. *Long Island Care*, 551 U.S. at 171 (not only reviewing the secondary interpretative regulation, but affording the agency's position *Auer* deference.). There is nothing *post-hoc* about the agency's considered decision following notice and comment.

To be clear, we are not arguing that Plaintiffs' cases should be dismissed as moot, but rather only the claims alleging that FWS failed

to address the D.C. Circuit's opinion in *Humane Society*. *Supra* n.2;

*Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 185 (2000)

(requiring jurisdiction "for each form of relief sought"). FWS produced a

final decision, after notice and comment, providing the precise analyses

and explanations Plaintiffs claim are lacking and therefore this Court

cannot provide any effective relief with respect to those claims.[3] As this

Court recently and succinctly stated, "Ninth Circuit case law counsels

that any claims based on the superseded [agency actions] now prove

moot." *Defenders of Wildlife v. Corps*, 15-cv-14-BMM (ECF 118 at 15),

2017 WL 1405732, at *5. Accordingly, Plaintiffs' *Humane Society*

claims should be dismissed for lack of subject matter jurisdiction.

    **B.**     **Even if the Court has jurisdiction, the ESA authorizes
FWS to identify a distinct population segment and
determine its conservation status, even when dealing
with a segment of a previously-listed species.**

We begin "where all such inquiries must begin: with the language

of the statute itself." *United States v. Ron Pair Enters.*, 489 U.S. 235,

---

[3] Plaintiffs may contend that the Regulatory Review does not
adequately address these issues. However, Plaintiffs' complaints do not
challenge the Regulatory Review, nor have Plaintiffs sought leave to
amend their complaints to challenge the Regulatory Review. *Pickern v.
Pier 1 Imps. (U.S.),* 457 F.3d 963, 968-69 (9th Cir. 2006); *Navajo Nation
v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

241 (1989). Section 4 allows FWS to identify and evaluate "any species," 16 U.S.C. § 1533(a)(1), which includes any distinct population segment, *id*. § 1532(16). Section 4(a)(1) then provides that FWS may determine a species' status after considering the five listed statutory factors. 16 U.S.C. § 1533(a)(1)(A)-(E); *Nw. Ecosystems All. v. FWS*, 475 F.3d 1136, 1138 (9th Cir. 2007) ("If a population is deemed to be a [distinct population segment], the inquiry then proceeds to whether it is endangered or threatened.").

These provisions allow FWS to determine a distinct population segment's status under the ESA. *Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 804 (9th Cir. 2008) (Section 4(a) "allows the Secretary to act on [his or] her own initiative to identify species for protection [or for regulatory action, generally]") (alterations in original). FWS acted within that authority here. It identified the Greater Yellowstone Ecosystem as a Segment. FWS_Rel_Docs:1449-52. It then considered the five statutory factors as applied to this Segment. FWS_Rel_Docs:1449-78. FWS concluded the Segment has recovered and is not a threatened or endangered species. *Id*.

The Secretary of the Interior, acting through FWS, then updated

the "List" to reflect this decision. FWS_Rel_Docs:1566; 16 U.S.C. §

1533(c)(1) (list shall "reflect recent determinations, designations, and

revisions made in accordance with subsections (a) and (b) of this

section"). FWS' regulatory action falls squarely within its broad

discretion to address "any species" under Section 4(a)(1), and it updated

the "List" in accordance with Section 4(c)(1).

*Humane Society* supports this straightforward construction of the

ESA. In *Humane Society*, FWS previously listed gray wolves as

threatened in Minnesota and endangered elsewhere in the lower 48

States. 865 F.3d at 591. In 2011, FWS issued a rule identifying a

Western Great Lakes wolf distinct population segment, determined that

the segment has recovered, and removed ESA protections for the

segment. *Id*. at 593-94. The plaintiffs argued that, given the prior

lower-48 listing, FWS lacked the authority to both identify and delist

the segment. The court disagreed, holding that the ESA plainly

authorizes FWS to identify a segment within with a previously-listed

entity and delist it. *Id*. at 595-600.

*Humane Society* grounded its holdings in the ESA's plain

language and structure: the ESA provides for listing and delisting of

distinct population segments, 16 U.S.C. § 1532(16), and "[n]othing in that [ESA] statutory language forbids the recognition of recovered distinct population segments within a listed species." *Id.* at 596 (citing and discussing 16 U.S.C. §§ 1533(a)(1), (b)(1)(A), (c)(1), (2)). *Humane Society* also held that FWS reasonably interpreted the ESA to permit the delisting action. *Id.* at 597. For one, the ESA's direction

> to evaluate the status of not just species, but subspecies and segments … signals Congress's intent to target the [ESA's] provisions where needed, rather than to require the woodenly undifferentiated treatment of all members of a taxonomic species regardless of how their actual status and condition might change over time.

*Id.* at 598. FWS' interpretation furthers this direction; it is "consonant with the purposes of the [ESA], which is to devote needed resources to the protection of endangered and threatened species, while abating the [ESA's] comprehensive protections when a species—defined to include a distinct population segment—is recovered." *Id.*; FWS_Rel_Docs:1450, 1555 (FWS' interpretation adopted in the 2017 Rule).

Plaintiffs contest FWS' interpretation and the reasoning in *Humane Society.* ECF_186:21-30. They primarily argue that, in 1975, FWS created a "*de facto*" distinct population segment and thus cannot

statutorily identify and delist a smaller Segment.[4]  *Id.* at 26.  The

fundamental problem with Plaintiffs' argument is that FWS never

listed a "lower-48 segment," *de facto* or otherwise.  Rather, in 1975 FWS

listed grizzlies in the lower-48 states as a threatened *species*, not a

segment.  FWS_LIT:18566.  This is because the ESA in 1975 did not

provide the authority to list a segment.[5]  The lower-48 entity is thus a

historical artifact.  *Id.*  And, while FWS could not today list grizzlies in

the lower-48 states as a "species," that does not mean it was

---

[4] Plaintiffs reference FWS' five-year review recommending the creation
of a "lower-48 segment."  ECF_186:26.  Plaintiffs, however, omit that
this recommendation also included removing almost all states from a
"lower-48 segment."  FWS_LIT:16170 ("[T]his review recommends that
we correct the lower 48 State listing to remove the grizzly bear from the
List of Endangered and Threatened Wildlife in areas of the
conterminous States outside of the bear's historical range.").  FWS
never acted on this recommendation through formal rulemaking and
therefore the lower-48 entity remained unchanged from 1975.  50 C.F.R.
§17.11(h).  Moreover, as Plaintiffs note, it would be difficult for FWS to
identify a "lower-48 segment" when grizzlies were never (or no longer)
present in large swaths of the lower-48 States.  ECF_190:28
(questioning, "whether the North Cascades and Bitterroot ecosystems
could be listed separately as population segments without a grizzly
population occupying them.").

[5] As originally enacted, the ESA defined "species" to include species,
subspecies, and "any other group of fish or wildlife of the same species
or smaller taxa in common spatial arrangement that interbreed when
mature." Pub. L. 93-205, §3(11), 87 Stat. 884, 886 (1973).

impermissible in 1975.[6]  More importantly, FWS never modified the lower-48 entity's "species" status, which means all grizzlies throughout the lower-48 states, save the Yellowstone Segment, remain protected as threatened.  50 C.F.R. § 17.11(h).

Because FWS never altered the lower-48 entity's threatened status, Plaintiffs' argument that the 2017 Rule impermissibly creates a "segment of a *de facto* segment" is factually and legally wrong.  As the court in *Humane Society* found, "the Endangered Species Act allows the identification of a distinct population segment within an already-listed species, and further allows the assignment of a different conservation status to that segment if the statutory criteria for uplisting, downlisting, or delisting are met."  865 F.3d at 600.

> ## C.  The ESA does not require FWS to examine all other listable entities when identifying and delisting a distinct population segment.

FWS' authority to identify and delist a distinct population segment should end the Court's inquiry.  *Ron Pair Enters.,* 489 U.S. at 241 ("where, as here, the statute's language is plain, the sole function of

---

[6] While the "lower 48" grizzlies may not constitute a "species" as defined under the *current* ESA, FWS designated the entity in 1975 and the time to challenge that decision has lapsed.  28 U.S.C. § 2401(a).

the courts is to enforce it according to its terms.").  For the D.C. Circuit, it did not.

After accepting that the ESA permits FWS' regulatory action, *Humane Society* held that FWS must make additional "findings" and provide additional explanations when exercising that authority.  It explained that FWS must "address the impact that extraction of the segment would have on the legal status of the remaining wolves in the already-listed species."  865 F.3d at 600.  Plaintiffs seize on this ruling and argue that FWS' 2017 Rule fails for the same reasons.  ECF_190:23-30.  But fundamental problems exist with the D.C. Circuit's reasoning and, by extension, Plaintiffs' arguments.

> **1.  FWS did not reopen the 1975 listing or carve up the "lower-48" entity and therefore there was no reason to examine the prior "species" listing.**

*Humane Society* started from the premise that designating a distinct population segment "extract[s]" the segment from the previously-listed entity, such that two new entities exist and FWS must address the segment and remainder.  865 F.3d at 600.  The ESA does not support this construction.

Under the ESA, a distinct population segment constitutes *part* "of

any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16); 50 C.F.R. § 17.11(a) ("The listing of a particular taxon includes all lower taxonomic units."). A segment designation therefore does not carve up a species, subspecies, or previously-listed entity into multiple separate entities. The taxonomic species or subspecies remains unchanged, and a segment designation means only that a population within the species or subspecies is now recognized as eligible for protections and recovery in its own right. 16 U.S.C. § 1532(16). It would be illogical for the identification of a segment—which was previously listed by virtue of being part of the listed taxon—to legally and out of whole cloth *also* create an entirely new entity (what the D.C. Circuit termed a "remnant") outside of the segment's boundaries. When FWS designates a segment, it only designates a segment. FWS does not *also* automatically create or subdivide higher taxonomic entities like the species or subspecies to which the population belongs. There can be no other plausible, and incidentally workable, reading of the statute. *Id.*

An example illustrates the analytical flaw in the D.C. Circuit's reasoning. FWS listed the leopard as a "species" and later designated a

segment as threatened. 47 Fed. Reg. 4204 (Jan. 28, 1982). The

segment designation did not carve up the previously-listed taxonomic

species. The "species" still exists, and FWS did not engage in a five

factor listing analysis to determine if the remainder was still

endangered – it just remained to ensure the continued protection of the

species. *Id.* FWS instead determined that the segment is protectable in

its own right, altered its status to threatened, and left the remainder as

endangered. *Id.* ("leopard populations in any area other than that

[segment] delineated above ... remain on the Endangered species list,

and continue to be subject to" the Act's protections and prohibitions).

Nothing more was needed under the statute because FWS did not

create two new entities, but rather only one, more specific segment that

was *already part of the taxon*.

Another example closer to this Court involves the recent litigation

involving the Cabinet-Yaak population of grizzly bears. This Court just

vacated FWS' "not warranted" determination for this population.

*Alliance for Wild Rockies v. Zinke*, 16-cv-21-DLC (ECF_50:41), 265 F.

Supp. 3d 1161, 1182 (D. Mont. 2017). The Court also remanded to FWS

for preparation of another determination specific to that population. *Id.*

If Plaintiffs' interpretation of *Humane Society* were correct, any subsequent regulatory action or determination for this population of bears would "carve up" the pre-existing lower-48 entity, thereby requiring FWS to simultaneously make findings with respect to the remainder as it moved forward with the Cabinet-Yaak population. But FWS is not required to "carve up" the pre-existing lower-48 entity because the entity retains its protected status as a threatened species. There is no corollary obligation to revisit past rules affecting the species at the same time. 83 Fed. Reg. 18739. Nevertheless, according to Plaintiffs, FWS is required to engage in a complicated administrative exercise, examining all the listable entities within the taxon, effectively foreclosing any timely action for the Cabinet-Yaak population or other species warranting action.

To further illustrate, if Plaintiffs' theory is accepted, FWS on remand could not simply list the Cabinet-Yaak population as an endangered segment, but rather must *first* revisit the entire lower-48 entity. Plaintiffs concede this point. ECF_186:28 ("[t]he Service must first remove the lower-48 segment listing and then designate and list multiple segments consistent with its own policy."). Because FWS can

no longer list the lower-48 entity as a "species" under the current statute, this would likely involve FWS creating multiple segments in isolated areas of the western United States where the bears are located (to the extent they are valid distinct population segments, *i.e.*, "significant" to the taxon of grizzly bears), and each segment would then have its own conservation status.

The result would strip protections away from grizzlies that are located outside those specific, newly created segments. After all, it would be difficult to justify a distinct population segment in an area where bears never existed or have not been located for generations. Again, Plaintiffs agree. *See* ECF_190:28 (Plaintiffs questioning the identification of segments when "there is no documented grizzly population in the U.S. portion of the North Cascades ecosystem and no known grizzlies at all in the Bitterroot ecosystem."). These unnecessary hurdles are antithetical to Congress' intent in Section 4 of the ESA. They also lie far removed from FWS' sound approach of protecting grizzly throughout the lower-48 states *while* efforts and resources are devoted to protecting and recovering grizzly bears. Plaintiffs' arguments belie their purported support for grizzly bear recovery, not to

mention this Court's Cabinet-Yaak remand.

In sum, FWS initiated targeted rulemaking to identify a distinct population segment and review its conservation status. FWS properly focused on the Segment because it did not alter the previously-designated "protected entity"—grizzlies in the "lower 48 States." 82 Fed. Reg. at 30503 (the 2017 Rule "does not change the threatened status of the remaining grizzly bears in the lower 48 States"); *Greater Yellowstone Coal.*, 672 F.Supp.2d at 1125 ("This case deals with a distinct population segment of grizzlies, which by definition is a discrete segment of the entire species, so it would be nonsensical to require [FWS] to consider the grizzlies' historic range throughout the United States ...."). FWS thus left the 1975 listed entity unchanged and only determined, as permitted, that a population *within* that entity constitutes a "Segment" and can be addressed in its own right under Section 4(a)(1).

>    **2.  Plaintiffs wrongly conflate Section 4(c)'s distinct obligations with FWS' authorities under Section 4(a).**

In holding that FWS must address the prior "lower 48" listing, the D.C. Circuit also relied on Section 4(c), 16 U.S.C. § 1533(c). *Humane*

*Society*, 865 F.3d at 601.  The court reasoned that Section 4(c)(2) requires FWS to examine the "whole" species previously listed, such that FWS may not only examine a portion of that species.  *Id.*  Plaintiffs adopt this reasoning.  ECF_190:23-27.  *Humane Society* and Plaintiffs err by merging together Section 4(c)'s obligations with FWS' independent authority under Section 4(a)(1), which is contrary to Ninth Circuit precedent.

Section 4(a)(1) expressly authorizes FWS to identify "any species," including a segment, and determine its status.  16 U.S.C. § 1533(a)(1).  Section 4(c) addresses different issues entirely.  Section 4(c)(1), 16 U.S.C. § 1533(c)(1), "sets out *the mechanics* for listing or removing from a list." S. Rep. 93-307 at 7 (July 1, 1973); H. Conf. Rep. 93-740 at 25 (1973) (Section 4(c)(1) concerns the "physical act of maintaining the list" and, following action under Section 4(a)(1), "automatically revis[ing] the lists").  This provision in no way conditions or constrains FWS' Section 4(a)(1) authorities.  16 U.S.C. § 1533(c)(1).

Section 4(c)(2) is no different.  That provision requires FWS to "conduct, at least once every five years, a review of all species included in a list" of threatened or endangered species.  16 U.S.C. § 1533(c)(2).

FWS previously included the "lower 48" species on the ESA's list in 1975. If FWS reviewed that species, it would have to consider the whole entity. *Id*. But with the 2017 Rule, FWS conducted formal rulemaking to identify a distinct population segment under Section 4(a)(1), not a Section 4(c)(2) five-year status review. 82 Fed. Reg. 30503. There was never any five-year review involved with the 2017 rulemaking.

Plaintiffs essentially argue that the Court should graft Section 4(c)(2)'s obligations onto Section 4(a)(1), despite the fact there was never any five-year review at issue in this case. ECF_190:23-24. The problem for Plaintiffs, and notably one that the D.C. Circuit did not encounter, is that Ninth Circuit precedent refutes this argument. *Coos County Board of County Commissioners* held that Section 4(c)'s obligations are not fungible with those in Section 4(a) and 4(b), as Section "1533(c)(2) does not incorporate the deadlines (and corresponding duties) associated with the petition process" located in Section 4(b). 531 F.3d at 804. Plaintiffs here similarly "conflate[] these two different mechanisms," *id*. at 804, as Section 4(a)(1) does not incorporate Section 4(c)(2)'s obligations. In fact, Section 4(c)(2) did not exist when Congress enacted Section 4(a)(1), Pub. L. 93-205, 87 Stat. 884, and Congress did not

modify FWS' Section 4(a)(1) authorities when it later added Section

4(c)(2). Pub. L. 95-632, 92 Stat. 3751 (1978). Congress did not merge

these distinct obligations contained in separate provisions of the ESA,

and neither should the Court. *Coos County*, 531 F.3d at 808 (rejecting

attempt to create "a hybrid of the two, otherwise distinct,

decisionmaking models that the ESA sets out.").

Finally, Plaintiffs argue that Section 4(b)(1)(A)'s instruction to

"review the status of the species" means that FWS must review the

status of a previously-listed species like the "lower 48" entity.

ECF_190:24 (citing 16 U.S.C. § 1533(4)(b)(1)(A)). Plaintiffs misconstrue

that provision. Section 4(b)(1)(A) provides that FWS must review the

status of the "species" that FWS addresses under Section 4(a)(1). 16

U.S.C. § 1533(b)(1)(A). FWS here addressed a segment, and Section

4(b) thus requires FWS to "review the status of" *that segment. Id.*[7]

---

[7] *Humane Society* also supported its conclusion by reference to FWS'
Distinct Population Segment Policy ("Policy"), 61 Fed. Reg. 4722 (1996).
Specifically, *Humane Society* interpreted the Policy to require FWS to
justify a segment's "discreteness" and "significance" as compared to a
newly created "remnant." 865 F.3d at 601 (Policy requires a
"comparative analysis of a potential segment to the [lower-48]
remnant."). Plaintiffs make the same mistake in arguing that the
Segment designation here is a "segment of a segment." ECF_186:24-25.
This reasoning is flawed. The Policy requires FWS to assess the

### 3. FWS did not alter the grizzly bears' status outside of the Greater Yellowstone Ecosystem.

*Humane Society* reflects a concern that addressing a segment causally alters the legal status of species outside the segment's boundaries. *Humane Society*, 865 F.3d at 601 (missing analysis in a segment rule "would divest the extant [lower 48] listing of legal force."); *id.* at 602 (concerned with a "backdoor" or "*de facto*" delisting); *id.* ("the act of designating a segment cannot in one fell swoop make an already-listed species an unlisted and unlistable non-species."). The court thus faulted FWS for leaving "unexplained how the remaining wolves' existing endangered status would continue." *Id.* at 602. Plaintiffs wrongly adopt this concern. ECF_190:25-26.

FWS did not alter the 1975 Rule, but instead implemented more surgical rulemaking for a different entity—the Yellowstone Segment. As such, FWS did not alter grizzly protections outside the Segment

population's "discreteness" and "significance" "in relation to the remainder of the species to which it belongs"—*i.e.*, to the *taxon*, not a previously-listed entity or "remnant." 61 Fed. Reg. at 4725; 82 Fed. Reg. at 30623; *Nw. Ecosystem All.,* 475 F.3d at 1143–45 (upholding the Policy). FWS applied that direction in the 2017 Rule: "[W]e find that the [Greater Yellowstone Ecosystem] grizzly bear population is discrete from other grizzly bear populations and significant *to the remainder of the taxon*." 82 Fed. Reg. at 30519 (emphasis added).

boundaries. 82 Fed. Reg. at 30546 ("This listing action is specific to the grizzly bear population in the [Greater Yellowstone Ecosystem] and, therefore, affects only the legal status of" those grizzlies). As in 2007, grizzlies occurring "outside the [Segment] remain[] protected under the ESA because all other grizzly populations are still threatened." *Greater Yellowstone Coal.*, 672 F. Supp. 2d at1125.

There is no question, indeed even a dispute, as to the legal validity of the lower-48 entity. Bears throughout the lower-48 states, save the Yellowstone Segment, remain protected as threatened. 50 C.F.R. § 17.11. FWS could not have been clearer on this issue. FWS_Rel_Docs:1556-57 ("Grizzly bears will remain listed in the remainder of the lower 48 States outside of the [segment's boundaries], and we are committed to pursuing grizzly bear recovery in the five remaining Recovery Zones identified in the 1993 Grizzly Bear Recovery Plan.").

Plaintiffs agree. Not once do they argue that bears throughout the lower-48 states have lost their ESA protections. Despite repeated references to the D.C. Circuit's concern that the remainder was an "orphan to the law," Plaintiffs never actually contend that the grizzly

lower-48 entity is truly an "orphan" to the law. ECF_192:22. This is one of, if not the defining feature of the *Humane Society* opinion, and it is not at issue in this case.

In contrast to the situation before this Court, there was ambiguity with the legal validity of the remnant in *Humane Society*. That rule involved a more complicated fact pattern where FWS had listed the lower-48 wolves as an endangered "species," except for the State of Minnesota where it was listed as a threatened "species." 865 F.3d at 602. FWS then designated a segment that spanned both previously listed entities. *Id.* FWS initially took the position that the 2011 segment designation was a "revision" of the Minnesota threatened species listing, but geographically the segment revision extended past Minnesota. *Id.* at 603. The D.C. Circuit's concerns with the lower-48 listing (the dual-spanning remnant) were animated because FWS appeared to be delisting the remnant (the endangered listing) by issuing the 2011 segment designation. *Id.* at 602 ("the Service has announced that, with the Western Great Lakes segment carved out, the remnant is no longer a protectable 'species' and has proposed its delisting *for that reason alone*.") (emphasis added). That is, FWS itself

called the lower-48 "species" listing into doubt *because of the 2011 segment delisting. Id.*

The factual oddities present in *Humane Society* do not exist at all with the Yellowstone Segment and the 2017 Rule. Unlike wolves, there has never been any dispute that grizzlies throughout the lower-48 states, save the Yellowstone Segment, are protected as threatened, and FWS certainly has not issued a proposed rule to delist the remainder because of the 2007 or 2017 Segment Rules. *Humane Society* was a vastly different fact pattern.

Indeed, if FWS reopened the 1975 rule, it would be required to divert substantial resources to addressing previously settled matters, as well as subject settled regulations to potential legal challenge. *P & V Enters. v. Corps*, 516 F.3d 1021, 1023 (D.C. Cir. 2008) ("the reopening doctrine allows an otherwise stale challenge to proceed because the agency opened the issue up anew") (quotations omitted); *Oceana v. Bryson*, 940 F.Supp.2d 1029, 1045-46 (N.D. Cal. 2013). Plaintiffs do not articulate why reopening the 1975 Rule and subjecting it to challenge— a true "damn the torpedoes" approach—facilitates grizzly protections or recovery efforts in the lower-48 states.

### 4. Plaintiffs' interpretation works to the detriment of grizzly bear recovery.

Plaintiffs' approach threatens to eliminate protections for grizzlies in the lower-48 states and works directly against grizzly bear recovery. The "lower-48" entity is not a species or subspecies, but rather a historical artifact that is currently not subject to challenge. Courts have also found that FWS cannot include vast uninhabited areas within a segment's boundaries for the purpose of downlisting those areas. *Defenders of Wildlife v. Dep't of Interior*, 354 F.Supp.2d 1156, 1170-71 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton,* 386 F.Supp.2d 553, 563-64 (D. Vt. 2005). As Plaintiffs note, the lower-48 states include large swaths of uninhabited areas, some of which were never used by grizzlies. ECF_192:20 (noting that grizzlies no longer inhabit "98% of their historic range"). This means the entire "lower-48 States" cannot be a protectable "species." By statute, it would need to be something less, and considerably less. Nor would initiating rulemaking "to revise the lower 48-States listing" advance recovery. As FWS explained: "Such a rulemaking would provide no more information about our intentions for grizzly bear recovery than the parameters and documents already guiding our existing grizzly bear recovery program."

FWS_Rel_Docs:1556.

FWS pursued a far more sensible approach. By not altering the lower-48 entity, FWS continues its long-standing recovery strategy by focusing its efforts on individual segments (to either increase or remove protections) while allowing bears throughout the entire lower-48 States to remain protected during recovery efforts. *See* FWS_Rel_Docs:1555 ("[W]hile in some situations it may be appropriate to designate multiple [segments] simultaneously, the lack of such requirement provides useful flexibility, allowing the Service to subsequently list or delist [segments] when additional information becomes available or as the conservation status of the taxon changes"). In contrast, Plaintiffs would have FWS: (1) divert limited resources to previously settled matters; (2) engage in duplicative administrative rulemaking or multiple rulemakings; (3) significantly reduce overall protections for grizzlies; (4) subject dispersing bears to unnecessary risk; and (5) unquestionably diminish recovery efforts, all of which would lend credence to the political mantra that the ESA is broken. The following two maps graphically illustrate the difference between the two approaches:

Figure 1: Current Status of Grizzly Bears in the Lower-48 States.



Figure 2: Plaintiffs' Approach to Lower-48 Grizzly Recovery:



Unlike Plaintiffs' preferred approach, FWS' course preserves protections throughout the lower-48 States while broader recovery actions continue. FWS uses the mechanism provided by Congress to target the population that is succeeding, and allows FWS to re-focus its resources to other populations more deserving of Federal attention. This plan fulfills the intent of the ESA, is reasonable, and the Court should defer to that approach. *E&J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007) (an agency "has wide latitude to determine the most effective way to carry out its charge from Congress").

**D.      FWS nonetheless made findings and rationally addressed whether the 2017 Rule affects the "lower-48" listing.**

Even assuming the D.C. Circuit correctly found that FWS should make one or more findings or explain whether the delisting affects the previously-listed entity, and the factual oddities in that case are not distinguishable, FWS provided these findings in the 2017 Rule. It rationally addressed whether the 2017 Rule affects the grizzly bears' legal and biological status outside the Ecosystem, and three reasons confirm the soundness of FWS' analysis and why Plaintiffs' arguments

should be rejected.

First, Plaintiffs argue that FWS did not consider the bears' status in the lower-48 States.  ECF_190:26.  But FWS expressly addressed that issue, including by considering ample record-based information on populations located outside the segment's boundaries.  *See, e.g.*, 82 Fed. Reg. at 30509, 30517; FWS_LIT:14530; FWS_LIT:6060; FWS_ LIT:25065; FWS_ LIT:22494; FWS_ LIT:46; FWS_ LIT:10091; FWS_ LIT:16067; FWS_ LIT:6075; FWS_ LIT:14705; FWS_ LIT:1479; FWS_ LIT:14322.  FWS also addressed whether bears outside the segment boundaries are "listable" under the ESA.  ECF_190:30.  Because FWS did not reopen the 1975 Rule, "all grizzly bears in the lower 48 outside of the [segment's] boundaries will continue to be fully protected under the Act."  FWS_Rel_Docs:1485.

Plaintiffs ignore these explanations and instead seize on isolated statements that "the management and potential status of other grizzly bear populations is outside the scope of this final rule."  *Id.*; ECF_190:26; ECF_192:20.  Plaintiffs inexplicably omit the sentences that immediately follow, where FWS nonetheless addressed the bears' status in other ecosystems.  FWS_Rel_Docs:1485.  And Plaintiffs do not

actually dispute FWS' statement—that the 2017 Rule works no *legal* change to the bears' status outside of the Segment.

Second, Plaintiffs argue that FWS neglected the 2017 Rule's effects on recovery in the lower 48 States. ECF_190:27; ECF_186:22-23. Here again, FWS explicitly addressed this issue. FWS' recovery strategy "has always been focused around six different recovery zones," where each zone has different recovery needs, criteria, and timelines for recovery. FWS_Rel_Docs:1483. As the 1993 Recovery Plan provides, "'grizzly bear populations may be listed, recovered, and delisted separately,' and that it is the intent of the Service to delist individual populations as they achieve recovery." FWS_Rel_Docs:1450 (citing FWS_ LIT:14530-33, 14557-58). FWS also has consistently implemented this strategy by responding to petitions to reclassify the Cabinet-Yaak, Selkirk, and North Cascades populations and, here, addressing the Greater Yellowstone segment. FWS_Rel_Docs:1450; FWS_Rel_Docs:1483-84. And FWS explained why the 2017 Rule will not prospectively affect these recovery efforts. FWS_Rel_Docs:1556-57 ("Grizzly bears will remain listed in the remainder of the lower 48 States …, and we are committed to pursuing grizzly bear recovery in

the five remaining Recovery Zones…").

Finally, there can be no question that FWS addressed all of these issues in its Regulatory Review. 83 Red. Reg. 18737-43. Almost in passing, Plaintiffs briefly dispute the analysis in the Regulatory Review, but they ignore the actual text of that decision. ECF_190:30; *but see*, 83 Fed. Reg. 18738, 18740-43. Plaintiffs have, quite clearly, chosen not to challenge FWS' subsequent decision and findings.

In short, Plaintiffs apparent disagreement with FWS' analysis is not a reason to pretend FWS neglected these issues or treated them arbitrarily. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1007 (9th Cir. 2014) ("As long as the agency's decision is properly documented, as it is here, we will not overturn it."). An "agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated … and why the agency reacted to them the way it did." *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1234 (9th Cir. 1993). FWS did that here—it addressed these issues consistently with the 2017 Rule's regulatory focus on the Segment. To the extent there is any question, the Regulatory Review certainly did that as well.

### E. Plaintiffs' contention that FWS failed to evaluate grizzly bear's historic range lacks merit.

For numerous reasons, Plaintiffs contention that FWS failed to analyze historic range, is factually inaccurate, legally wrong, and lacks merit.  ECF_192:11-20,

First, Alliance for Wild Rockies, 17-cv-123, were the only plaintiffs to meaningfully raise the issue of historic range in their briefing. ECF_192:11-20.  However, it appears that these plaintiffs did not bring any allegation in their complaint alleging that the 2017 Rule is arbitrary and capricious for allegedly failing to analyze historic range. *See* 17-cv-123, ECF_1.  While this Court obviously wanted coordinated briefing, the Court could not have possibly sanctioned plaintiffs bringing an argument that did not have the predicate allegation in their complaint.  Thus, as a threshold matter, Plaintiffs waived their historic range argument.

Second, this Court rejected a nearly identical challenge to the 2007 Rule.  *Greater Yellowstone Coal.*, 07-cv-134-DWM (D. Mont.) (ECF_58:23-26; ECF_85:21-24).  This Court stated:

> This case deals with a distinct population segment of grizzlies, which by definition is a discrete segment of the entire species, so it would be nonsensical to require the Service to consider the grizzlies' historic range throughout the United States as significant in relation to the

> Yellowstone grizzly bear.  Even though the grizzly bear has
> lost a large percentage of its former habitat, the habitat loss
> may not be 'biologically significant' if the Yellowstone DPS
> does not remain threatened by the losses.

*Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1125.  There has been no

material change in how FWS evaluated historic range in the 2017 Rule,

and the analysis has become even more robust.  FWS_Rel_Docs:1443-

44.  Plaintiffs fail to present any compelling reason why this Court

should directly contradict its previous holding in the face of even more

robust findings.

Third, Plaintiffs' argument finds no support in the statute or

Ninth Circuit case law.  Under the ESA, FWS is required to determine

whether a species is "threatened" or "endangered."  16 U.S.C. § 1533(a).

In order to answer this question, it engages in the five-factor analysis,

but the base question is whether the species "is likely to become an

endangered species within the foreseeable future throughout all or a

significant portion of its range."  16 U.S.C. § 1532(20).  The term

"historic range" never appears in the statute.  Moreover, the language

"significant portion of its range," which is a component of the

conservation status determination, is undefined.  FWS therefore "has a

wide degree of discretion in delineating 'a significant portion of its

range' . . . ." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

The Ninth Circuit has acknowledged that, while FWS has a wide degree of discretion in determining what terms like "significant" "portion" and "range" mean, it must explain any "conclusion that the area in which the species can no longer live is not a 'significant portion of its range." *Id.* (quoting *Asarco, Inc v. EPA*, 616 F.2d 1153, 1159 (9th Cir. 1980). The Ninth Circuit recognized that this inquiry calls for the application of an inherently ambiguous legal term to highly complex scientific analyses, and thus FWS is afforded great deference in both the application of its process and the findings it makes. But, as the court held, FWS must nevertheless *explain* its process to demonstrate that a rational decision was made. *Id.* Here, that was done.

In this case, unlike *Defenders of Wildlife*, we have a segment decision – not a species wide decision. This means the inquiry is whether the Segment is threatened throughout all or a significant portion of its range, which is necessarily limited to the area *within the segment boundaries*. As the Ninth Circuit recognized, reading the statute so broadly to require an analysis of all historic range would

likely result in an erroneous listing.  *Defenders of Wildlife*, 258 F.3d at

1143 n.9 (finding that the Secretary's  counterargument was compelling

and that plaintiffs' "interpretation could erroneously result in listing of

species that are in no danger of extinction merely because they no

longer inhabit all of their historical range.").  It is under this statutory

regime that FWS explained its process in accordance with *Defenders*.[8]

With the 2017 Rule, FWS set out a process that examined all of

the habitat within the Segment boundaries, including historic range.  In

order to clearly delineate the Segment, FWS used easily identifiable

landmarks, namely major highways, as boundaries which roughly

corresponded with grizzly habitat.  FWS_Rel_Docs:1437 (Figure 1).

This meant that the Segment designation was much larger than current

or suitable grizzly habitat – it included historic range and perhaps even

habitat that was never occupied by grizzlies.  *Id.*  FWS began with early

records, which indicated that grizzly bears historically occurred

---

[8] Plaintiffs' attempt to draw a parallel between the lynx segment case is
also unavailing.  ECF_192:18.  Unlike *Defenders of Wildlife v. Norton*,
239 F. Supp. 2d 9, 19 (D.D.C. 2002), where FWS acknowledged that
there were areas of suitable habitat that were not included as a
"significant portion of its range" and failed to explained why these areas
were excluded, FWS here did not ignore suitable habitat or fail to
explain itself.

throughout most of the Segment. FWS_Rel_Docs:1443 ("While there are records of grizzly bears in eastern Wyoming near present-day Sheridan, Casper and Wheatland, even in the early 19th century, indirect evidence suggests that grizzly bears were less common in these eastern prairie habitats than in mountainous areas to the west."). These areas, however, contained grizzlies only in riparian areas where they would feed on bison carcasses. *Id.* FWS reasonably concluded that because bison herds no longer exist in this historic range, thereby eliminating the predominant food source, these areas were no longer "capable of contributing, in a meaningful way, to the overall status of the Yellowstone [segment]." *Id.* Thus, FWS did not include this historic range as "suitable habitat" because this historical, but unoccupied, habitat could not support grizzlies due to nutritional constraints, high levels of human activity, and certain land use practices. FWS_Rel_Docs:1443-44 ("Grizzly bear recovery in these portions of the species' historical range is unnecessary, because there is more than enough suitable habitat to support a viable and recovered grizzly population . . . ."); *id.* 1484, 1505. This analysis then informed FWS' "significant portion of its range" analysis within the Segment boundary.

FWS_Rel_Docs:1561; *see Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 878 (9th Cir. 2009) (similar process). Plaintiffs make no effort to contest FWS' factual findings on historic range; in fact, they ignore them altogether. This is not sufficient.

Fourth, to the extent the Court finds the D.C. Circuit's reasoning on historic range in *Humane Society* persuasive, and is willing to directly contradict its earlier holding on the 2007 Rule, the record supporting the 2017 Rule contains ample support examining historic range outside the Segment's boundaries. Indeed, even the 2017 Rule itself looks beyond the Segment's boundaries at historic range. FWS_Rel_Docs:1443 ("Most of the short grass prairie on the east side of the Rocky Mountains has been converted into agricultural lands); *id.* ("For our analysis of suitable habitat, we considered the Middle Rockies ecoregion, within which the GYE is contained."); *id.* ("we did not include drier sagebrush prairie, or agricultural lands within our definition of suitable habitat because these lands no longer contain adequate food resources . . . ."); FWS_Rel_Docs:1444 ("Grizzly bear persistence in the contiguous United States between 1920 and 2000 was negatively associated with humans and livestock densities."). To be clear, FWS

performed its "significant portion of its range" analysis within the Segment's boundaries, FWS_Rel_Docs:1561, but in the process of performing that analysis, and in particular the suitable habitat component, it examined historic range inside and outside the Segment's boundaries. FWS_Rel_Docs:1443-45. Here again, Plaintiffs simply ignore this analysis and FWS' findings.

Similarly, Plaintiffs entirely ignore FWS' analysis of historic range within the Regulatory Review. There can be no question that FWS thoroughly examined historic range in this document. 83 Fed. Reg. 18741-43. FWS examined the loss of historic range generally. *Id.* at 18741-42 ("For the Final Rule and this review, we considered historical range of grizzly bears circa 1850. . . grizzly bears were historically distributed in one large contiguous area throughout portions of at least 17 western States (i.e., Washington, Oregon, California, Idaho, Montana, Wyoming, Nevada, Colorado, Utah, New Mexico, Arizona, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and Texas . . . ."). Following its analysis, FWS concluded that the threats posed by the loss of historic range were thoroughly examined in the 2017 Rule. *Id.* ("We considered these threats

thoroughly in the Final Rule (82 FR 30520-30535, June 30, 2017), along with other vulnerabilities caused by loss of historical range, such as changes in available food sources, carrying capacity, changes in metapopulation structure, and reductions in genetic diversity and gene flow . . . .").

FWS also examined the impact of lost historic range on the Segment specifically. *Id.* at 18742 ("Grizzly bears historically occurred throughout the area of the GYE DPS (Stebler 1972, pp. 297-298), but they were less common in prairie habitats (Rollins 1935, p. 191; Wade 1947, p. 444). Today many of these habitats are no longer biologically suitable for grizzly bears."); *id.* ("Our regulatory review therefore confirmed that the Service appropriately analyzed the historic range and current status/threats to the GYE DPS, as required under the Act."). Here too, FWS concluded that the 2017 Rule thoroughly examined the threats posed by loss of historic range within the Segment boundary. *Id.* Even though this is precisely what Plaintiffs are requesting, once again they ignore these findings altogether.

## II. THE YELLOWSTONE SEGMENT IS BIOLOGICALLY RECOVERED.

Over the past several decades, FWS collaborated with teams of

experts—including the Interagency Study Team[9]—to develop criteria

that identify a recovered Ecosystem population. FWS_Rel_Docs:1441-

42; FWS_LIT:33120.  These criteria address the key factors influencing

the Segment's recovery.

For example, "the importance of secure habitat …is indisputable,"

FWS_Rel_Docs:1507, and FWS' habitat criteria thus require that

baseline habitat conditions that supported substantial population and

range expansion are maintained or improved into the future,

FWS_LIT:15521 (2007 Habitat Criteria); *see also* FWS_Rel_Docs:1442-

43 (discussing the "1998 baseline" for motorized access, secure habitat,

developed sites, livestock allotments, and other factors that must be

maintained or improved).  FWS' demographic criteria likewise address

the factors influencing survival and reproduction, including

maintaining the population above levels associated with genetic fitness

and population viability.  FWS_LIT:16422 (2017 Demographic Criteria).

These criteria were developed by experts and are scientifically

---

[9] The Interagency Study Team is an interdisciplinary group of scientists and biologists from various Federal, State, and Tribal entities that performs substantial research and monitoring on grizzly bears. FWS_Rel_Docs:1564.

supported. *See, e.g.*, FWS_Rel_Docs:5167 (peer review: "[T]he Federal Register Proposed Rule, Conservation Strategy, and Grizzly Bear Recovery Plan Draft Supplement are all rigorous and scientifically sound documents. I could find no errors of logic or scientific method.").

The evidence also shows that the Segment has met these criteria and constitutes a healthy, recovered population. By the 1950s and continuing through the 1970s, sustained pressures on habitat and the bears substantially reduced and limited the population largely to Yellowstone National Park. FWS_Rel_Docs:1441. With coordinated efforts to recover the population, it rebounded. By the early 2000s, bears occupied about 68% of the Ecosystem's suitable habitat. *Id*.:1444. With the Forest Service and National Park Service maintaining or improving the 1998 baseline conditions, the population continued to expand. By 2014, it occupied 92% of the Ecosystem's suitable habitat. *Id*.:1443-45, 1460.

Thus, from as low as 136 bears in the 1970s, the population grew and has remained over 500 bears since 2007. FWS_Rel_Docs:1447. Independent female survival rates are high and have remained unchanged for 30 years. *Id*.:1558. Females with cubs-of-the-year

substantially increased; since at least 2001, females with young occupied at least 16 of the 18 Ecosystem bear management units. *Id.* (Table 1). And the population exhibited substantial positive growth trends, increasing at 4-7% annually through the 1990s and stabilizing at or approaching the carrying capacity of the Ecosystem in the 2000s. *Id.* The 2002-2014 annual population estimate of 674 bears provides "further evidence that the population has achieved recovery …." *Id.*:1463.

Plaintiffs avoid these facts. They instead argue that FWS' entire recovery analysis consisted of determining whether 600-700 bears exist. ECF_186:35; ECF_183:16, 30-31. FWS' recovery criteria and extensive recovery analysis belie this myopic view of FWS' analysis. Next, after disparaging an approach that equates recovery with a population threshold (like 600-700 bears), Plaintiffs ironically adopt that same approach. They assert that only a population with thousands of bears can be recovered. ECF_186:35; ECF 183:29-30. Plaintiffs' view fails to recognize that "population size alone is inadequate for evaluating long-term viability, and it would be dangerous to hang viability on numbers of bears." FWS_LIT:1309. Plaintiffs also fail to grasp the purposes and

limitations of the "population viability analyses" they rely on to disparage FWS' findings.  ECF_186:35-36; ECF_187 ¶¶ 64-68.

Population viability analyses are modelled "simplification[s] of nature to help us to better understand 'how it all works.'" FWS_LIT:1309.  These models are "inexact," as the study authors admit.  FWS_LIT:28626; c*ompare* FWS_LIT:30550 (Traill 2010) (populations with "a few hundred individuals or less" have 50% odds of success), *with* FWS_LIT:28622 (Reed 2003) (predicting for all species that populations of 550 animals have 50% odds of success).[10]  This imprecision is typical; these analyses historically "have provided wildly different estimates of the number of grizzly bears required to ensure long-term persistence in the GYE."  FWS_LIT:1310*;* FWS_LIT:26986 (these predictions "depend strongly on which simulation program is used" and not reality).

The experts therefore intended that these studies apply only

_____

[10] These studies elaborate that they *only* produce "broad generalizations" (FWS_LIT:30560; FWS_LIT:3589), "broad guidelines" (FWS_LIT:28626), "useful benchmark[s]" (FWS_LIT:30551), "rules of thumb" (FWS_LIT:30552; FWS_LIT:30549), "preliminary guide[s]" (FWS_LIT:30560), and ultimately are incapable of providing Plaintiffs' desired "magic number" for population viability (FWS_LIT:28626).

where experts are confronted with "limited information and resources" (FWS_LIT:3588-89), "insufficient data" (FWS_LIT:30559), an inability to "wait for the collection of the necessary high-quality data before making decisions" (FWS_LIT:30549), and no "time to read the extensive literature surrounding viability" (FWS_LIT:30552). In sharp contrast, this grizzly population represents "likely the most well studied group of their species worldwide and the depth of understanding of the bears and their ecosystem has reached a profound level rarely matched by other large carnivores." FWS_Rel_Docs:5167. In accord, while FWS considered Plaintiffs' preferred analyses, FWS rationally declined to adopt these generalizations and rules of thumb. *See, e.g.*, FWS_Rel_Docs:1440-41. The prior court to review these arguments agreed with FWS by rejecting Plaintiffs' generic arguments that recovery depends on a "higher" population number. *Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1120–21.

Plaintiffs' reliance on public comments to challenge FWS' recovery analysis fares no better. ECF 186:36; ECF_183:30-31. Plaintiffs cite one review that stated the Segment is isolated and small. ECF_186:36; ECF_187 ¶ 70 (citing FWS_Pub_CMT:3915). Yet that review identified

factors that agencies must *continue* to address, FWS_Pub_CMT:3916,

recognized the population meets FWS' recovery criteria, *id.*:3915, and

concluded that the agencies have implemented "one of the most

successful programs for bears world-wide," *id.*  Plaintiffs also cite two

comment letters that dispute recovery based on the authors' desire for a

lower 48 metapopulation.  FWS_Pub_CMT:6108; FWS_Pub_CMT:4192.

The authors' policy preferences for a larger lower 48 population say

nothing about *this Segment's* recovery.

      Plaintiffs' reliance on select critiques also misses the point.  While

Plaintiffs can find a scientist that may agree with them, they cannot

conceal that experts within and outside FWS do not.  *See, e.g.*,

FWS_Rel_Docs:5167 (FWS' recovery plans "provide a science-based

approach to the [Segment] grizzly bears management and

conservation"); FWS_Rel_Docs:5199 ("Generally I found the proposed

rule to be remarkably comprehensive and conservative. Clearly the

[Segment] has far exceeded recovery criteria and the probability of long-

term persistence is extremely close to one."); FWS_Rel_Docs:5211

("[T]he long-term viability of this population is secure").  Because the

relevant question concerns whether FWS rationally performed its job,

not whether consensus exists, Plaintiffs' tack of pointing to competing

viewpoints fails. *Good Samaritan Hosp. v. Mathews*, 609 F.2d 949, 955

(9th Cir. 1979) ("Even the fact that we might draw two inconsistent

conclusions from the record does not prevent the [] agency's finding

from being supported by substantial evidence."); *cf. Greater Yellowstone*

*Coal.,* 672 F.Supp.2d at 1120–21.

## III.  FWS COMPLIED WITH THE ESA IN ANALYZING POTENTIAL THREATS TO THE SEGMENT.

In addition to determining whether a species meets the recovery

criteria, FWS' delisting inquiry also includes an examination of

potential future threats to determine whether the species is likely to

become endangered in the foreseeable future.  16 U.S.C. §§ 1532(6),

(20), 1533(a)(1).  FWS begins by analyzing the best available scientific

data and state efforts to protect the Segment in order to determine

whether one or a combination of the statutory listing factors shows the

species is threatened or endangered.  16 U.S.C. § 1533(a)(1)(A)-(E),

(b)(1)(A).  FWS' collective analysis of these factors and data informs a

Segment's conservation status and, in turn, FWS' decision.

FWS_Rel_Docs:1453.

Drawing on its institutional expertise, the Interagency Study

Team's extensive research, independent peer reviews, and a wealth of scientific studies and data, FWS "did not identify any factors alone or in combination that reach a magnitude that threatens the continued existence of the species now or in the foreseeable future." FWS_Rel_Docs:1558. Human-caused mortality has been addressed through a comprehensive mortality management and monitoring framework embodied in State laws, regulations, and management plans. *Id*.:1460-66. Habitat protections are secured within National Park Service and Forest Service's land-use plans, providing substantial protections to grizzlies throughout suitable habitat. FWS_Rel_Docs:1530; 1459-60; *Greater Yellowstone Coal.*, 665 F.3d at 1030-32 (recognizing the clear import of Federal land-use protections for grizzly bear recovery). The Segment's genetic health remains high and will continue to be safeguarded. FWS_Rel_Docs:1468-69. Grizzly bears have demonstrated and are likely to continue exhibiting great adaptability and resilience to changes in food resources. *Id*.:1469-73. And all other factors, singularly or combined, are not of the magnitude or significance as to threaten this population. *Id*.:1477-78, 1558. FWS had ample evidence and "great confidence that this success story for

American conservation and the Act will be maintained and that future generations will be able to see and enjoy grizzly bears in the [Ecosystem]." FWS_Rel_Docs:1492.

Plaintiffs disagree and seek to second-guess FWS' analysis by pointing to numerous alleged deficiencies in the 2017 Rule. We address these arguments below. But first we address three false premises that are embedded within Plaintiffs' arguments.

First, Plaintiffs interpret the ESA and listing inquiry as requiring perpetual Federal protections whenever a factor might possibly impact the species in the future. Plaintiffs' interpretation conflicts with the ESA. Congress did not intend for FWS to preempt State management with the ESA anytime a possible future threat may exist. Quite the opposite. Congress understood that "the states are far better equipped to handle the problems of day-to-day management and enforcement of laws and regulations for the protection of endangered species than is the Federal government." H.Rep. No. 93-412, 93d Cong., 1st Sess. 7 (1973). Congress thus instructed FWS to preempt State laws only where the *evidence* shows that the species is endangered or threatened. 16 U.S.C. § 1533(b)(1)(A); *id.* § 1532(6), (20); S. Rep. No. 93-307 (1973)

("While the Federal government should protect such species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs.").

Second, Plaintiffs equate debate and disagreement between FWS staff with a flawed regulatory process. *See, e.g.*, ECF_187 ¶¶ 79, 132, 151, 157. "But debates—particularly in the recently evolving science at play here—are a good thing. Human experience dictates that debates invite scrutiny. This goes hand in hand with ESA's requirement that agency decision-making be scrutinized to insure that listed species are being properly protected." *Ctr. for Biological Diversity v. NMFS*, 977 F.Supp.2d 55, 75 (D.P.R. 2013). Indeed, "[i]nternal agency disagreement and debate are expected with a delisting rule for a controversial species like grizzly bears." FWS_Rel_Docs:1483. Ultimately, "the delisting recommendation came from staff biologists," *id.*, and the process "worked just as it should," *Butte Envtl. Council v U.S. Army Corps of Eng'rs*, 620 F.3d 936, 946 (9th Cir. 2010). And that final decision, which FWS fully explained and supported in the 2017 Rule, is the subject of this Court's review. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("fact that a preliminary

determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious").

Third, Plaintiffs cite select studies, snippets of peer reviews, and certain individual viewpoints that agree with Plaintiffs' objectives in preventing delisting. They argue, repeatedly, that FWS "ignored" or "disregarded" issues. But for each issue FWS allegedly "ignored," the record shows FWS addressed the issue. Likewise, experts within and outside FWS—including preeminent grizzly bear experts—applied their expertise and concluded that FWS' analysis is sound. A well-qualified independent expert concluded, for example, that this rulemaking involves "a robust and well-considered approach that meets the highest standards of science-based management and conservation." FWS_Rel_Docs:5167. This comment itself does not carry the day, but Plaintiffs pretend this other side does not exist, which neither fairly addresses the record nor applies the law. *Ctr. for Biological Diversity v. EPA*, 90 F.Supp.3d 1177, 1208 (W.D. Wash. 2015) (APA requires courts to uphold an agency's decision where it "has cited multiple peer reviewed scientific sources to justify its decision" and where the

agency's "position is not so implausible that [it] cannot be ascribed to the product of agency expertise or a difference in view").

## A. FWS rationally considered the Conservation Strategy in issuing its decision.

A key component of this regulatory process centered on work by FWS and interagency science and management teams "to develop and maintain conservation programs" for the Segment. 16 U.S.C. § 1531(a)(5). For the last 40 years, Federal, State, Tribal, and other institutions have worked to establish a coordinated, science-based strategy for the management and protection of grizzly bears in the Ecosystem. These efforts culminated in the 2007 Conservation Strategy, which describes a coordinated, multi-agency effort for monitoring and managing the Segment. FWS_Rel_Docs:1448. Due to the scientific, collaborative, and binding nature of these commitments, the Ninth Circuit affirmed FWS' reliance on this strategy in evaluating the future status of the Segment. *Greater Yellowstone Coal.*, 665 F.3d at 1032.

On remand, those same Federal, State, and other entities did not rest on this favorable ruling. They revised the Conservation Strategy's mortality management framework to reflect the best available scientific

data on the demographic rates and trends of the grizzly bear population, to ensure maintenance of a stable grizzly bear population into the foreseeable future. FWS_Rel_Docs:1448. As before, Federal and State land- and wildlife-management agencies signed a final Conservation Strategy. FWS_LIT:16978-017110); 16997-98. Importantly, the National Park Service and Forest Service again incorporated the Conservation Strategy into their Compendia and Forest Plans, a key attribute that led to the Ninth Circuit's affirmance of the predecessor strategy. FWS_Rel_Docs:1449.

The Conservation Strategy culminates and incorporates more than 20 years of collaborative, interagency efforts to protect and recover bears. FWS_Rel_Docs:1448. This framework has a proven record of protecting habitat and monitoring and managing the grizzly bear population. *Id.* It thus provides a solid foundation for the continued protection of grizzly bears into the foreseeable future. As a testament to its strength and the collaborative efforts behind its development, numerous independent peer reviewers concluded that the Conservation Strategy is a science-based, professional, and protective management regime that will provide for the long-term recovery of this grizzly bear

population.  *See e.g.,* FWS_Rel_Docs:5171; FWS_Rel_Docs:5197;

FWS_Rel_Docs:5201; FWS_Rel_Docs:5211.  As FWS summarized, the

Conservation Strategy and other protections in place represent a

"comprehensive approach to recovery [that] has led to reduced

mortality, increased population numbers, and significant increases in

range, and has allowed grizzly bears to reoccupy habitat they have been

absent from for decades while ensuring demographic and habitat

security into the foreseeable future."  FWS_Rel_Docs:1491.

### 1. FWS' consideration of the "inadequacy of existing regulatory mechanisms" was reasonable.

Plaintiffs' argument that FWS' consideration of the adequacy of

existing regulatory mechanisms, in particular the Conservation

Strategy, is arbitrary because these mechanisms are not binding and

enforceable is meritless.  ECF_194:12 (a regulatory mechanism must

have "the binding force of law before it may be considered under Factor

(d).").

This same argument was the centerpiece of plaintiffs' challenge to

the 2007 Rule.  *Greater Yellowstone Coal.*, 07-cv-134-DWM (D. Mont.)

(ECF_58:10-19; ECF_85:8-16).  This Court agreed with the plaintiffs

that "regulatory mechanisms" must be binding and enforceable before

FWS may consider those actions in its statutory five-factor analysis. *Greater Yellowstone Coal.,* 672 F. Supp. 2d at 1116 ("Because the Service admits that the Conservation Strategy is unenforceable, the Strategy was not properly considered in the Service's evaluation of existing regulatory mechanisms.").  The Ninth Circuit reversed. *Greater Yellowstone Coal.,* 665 F.3d at 1030 ("The district court held that the Service relied on too many measures that were not legally binding and failed to explain adequately how the legally binding measures would protect the grizzlies.  Because we find adequate support in the Rule for the Service's conclusion, we reverse the district court on this ground.").

Since the Ninth Circuit's decision, the D.C. Circuit has also agreed that "[n]othing in the ESA demands that level of certainty . . ." *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1084 (D.C. Cir. 2017). That court continued: "The Service's decision to delist in the absence of legal certainty is compatible with the ESA's requirement for monitoring of the species after delisting 'for at least five years' and its emergency provisions authorizing the Secretary to take immediate action to ensure the delisted species does not become threatened or endangered again."

*Id.* at 1084.  Considering the Ninth Circuit's controlling opinion in the present remand, and the unlikelihood of any potential Circuit split, Plaintiffs' recycled argument borders on frivolous.  Indeed, Plaintiffs entirely fail to address *Defenders of Wildlife v. Zinke*, and the only meaningful reference to *Greater Yellowstone Coalition* is, tellingly, to the *dissent.*  ECF_194:15.

What Plaintiffs fail to grasp, *see* ECF_194:12-15, is that consideration of "regulatory measures" is just that – consideration of one factor, among four others, that informs the overall conservation status determination, *i.e.,* whether the Segment is threatened.  16 U.S.C. § 1533(a)(1)(A)-(E).  Although consideration of that one factor could be dispositive depending on the severity of the inadequacy, what the Circuit courts have uniformly held is that FWS' evaluation of *all five factors* is held to a reasonableness standard, rather than some singular, legal litmus test based on notions of enforceability.  In fact, it may even be inconsistent with the ESA to ignore State efforts, regardless of enforceability.  *Defenders of Wildlife v. Zinke*, 849 F.3d at 1083 ("Given Congress's direction that state conservation efforts must be considered, 16 U.S.C. § 1533(b)(1)(A), their consideration as part of

the State's 'regulatory mechanisms' is hardly contrary to congressional intent.").

Here, with the strength of the Conservation Strategy, many aspects of which have remained identical or substantially similar, and that were endorsed and upheld by the Ninth Circuit, there can be no question that FWS' evaluation of this factor is reasonable. *Greater Yellowstone Coal.*, 665 F.3d at 1031 ("Even assuming that the Service's consideration of the Strategy's voluntary or unenforceable components was error, its consideration of components of the Strategy that have been made legally binding adequately supports its Factor D determination.").

The Ninth Circuit specifically pointed to the incorporation of the Conservation Strategy into the National Park Service's Compendia and the Forest Service's Forest Plans as sufficient to support FWS' regulatory mechanism analysis. *Id.* Like its predecessor, the Conservation Strategy and its criteria were again incorporated into the Compendia and Forest Plans. FWS_Rel_Docs:1449 ("Affected National Forests and National Parks have incorporated the habitat standards and criteria into their Forest Plans and National Park management

plans and/or Superintendent's Compendia via appropriate amendment processes so that they are legally applied to these public lands within the GYE."); FWS_Rel_Docs:1454 (incorporating the 1998 habitat standards). Plaintiffs fail to address the Ninth Circuit's conclusion that incorporation of the Conservation Strategy into the federal agency planning documentd – alone – is more than sufficient to find that FWS' consideration of Factor D is reasonable. *Greater Yellowstone Coal.,* 665 F.3d at 1032 ("The multi-state commitment to implement the Strategy represents a substantial wildlife conservation planning achievement -- and one that, we have no doubt, ultimately improves the lot of the Yellowstone grizzly bear . . . we need not, and do not, consider those measures, some or all of which may not be binding because we hold that the clearly binding regulatory mechanisms discussed above suffice.").[11]

---

[11] Plaintiffs also assert that FWS altered its position between the Proposed Rule and the 2017 Rule regarding the need for legally-binding commitments from the States on certain mortality-related provisions. ECF_194:15-17. FWS did not "discard prior factual findings" or significantly alter the final rule, as Plaintiffs claim, ECF_194:17, but instead updated the *rationale* for the rule to account for factual developments that occurred between the Proposed Rule and 2017 Rule. In the Proposed Rule, FWS stated its anticipated conclusion based on hypothetical regulatory mechanisms that could be enacted. In the 2017 Rule, FWS was legally obligated to evaluate the actual regulatory mechanisms and State conservation efforts at the time it issued the

## 2. Plaintiffs' challenges over the adequacy of public comment on the Conservation Strategy fail.

Plaintiffs assert that FWS violated the APA by failing to provide a new public comment period on certain changes between the draft and final Conservation Strategy. ECF_190:30-34. However, the changes that Plaintiffs point to were relatively minor and not critical to FWS' decision to delist the Segment in the 2017 Rule. Therefore, a new public comment period was not required and the inability to comment on these changes did not prejudice Plaintiffs.

While an agency generally must "identify and make available technical studies and data" relied upon in its decision to propose particular rules, "the public is not entitled to review and comment on every piece of information utilized during rule making." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). "After

_____

rule. *See* 16 U.S.C. § 1533(b)(1)(A); FWS_Rel_Docs:1534; *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015). To the extent that this rationale could be considered a substantial change between the Proposed Rule and 2017 Rule, the APA's requirement that a final rule be "in character with the original proposal and a logical outgrowth of the notice and comments" was plainly satisfied here. ECF_194:12; *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 851 (9th Cir. 2003); FWS_Rel_Docs:1530, 1534.

publishing a proposed rule, agencies often receive new information, which in turn improves the accuracy of agency action." *Id.* Agencies "should be encouraged to use such information . . . without thereby risking the requirement of a new comment period." *Id.* (quoting *BASF Wyandotte Corp. v. Castle*, 598 F.2d 637, 644-45 (1st Cir. 1979)). The Ninth Circuit has made clear that new information only requires a new comment period when it is *critical* or *vital* to the agency's ultimate decision. *See id.* at 1080; *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1403 (9th Cir. 1995). If an agency errs by failing to reopen public comment on new information vital to its decision, courts will only reverse the decision if Plaintiff demonstrates that the error prejudiced them. 5 U.S.C. § 706; *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 993 (9th Cir. 2015) (affirming a judgment against plaintiffs where FWS cited new studies in its final rule that were not available for public comment); *Kern*, 450 F.3d at 1076.

Plaintiffs highlight three changes in the Conservation Strategy they allege warranted a new comment period. ECF_190:32-33. None of these changes were critical to the agency's ultimate decision.

First, Plaintiffs assert that the final Conservation Strategy

abandoned provisions requiring management agencies to attempt to resolve grizzly conflicts through at least one relocation before killing the offending bear. ECF_190:32. Plaintiffs mischaracterize and exaggerate this change. The draft Conservation Strategy did not include a blanket rule that all bears had to be relocated at least once prior to removal. The "one relocation" provision applied *only* to bears preying on lawfully present livestock on public lands within the Primary Conservation Area, a fairly narrow category of removals. *Id*. The responsible agencies could remove a bear for any other offense without a prior relocation if the agencies "document[ed] the reason in writing." FWS_LIT:016367. The final Conservation Strategy did not include these provisions, which together would likely have had no more than a modest impact on overall management removals. FWS_LIT:017073.

Any increase in management removals due to this change in the Conservation Strategy was not significant to the 2017 Rule's analysis and ultimate conclusion. The 2017 Rule notes that FWS "do[es] not consider management removals a threat to the GYE grizzly bear population now, or in the foreseeable future" and that all responsible parties have committed to maintaining removals at sustainable levels.

FWS_Rel_Docs:1462. Any management removals will be counted against annual mortality limits. *See* FWS_LIT:17073 ("Removal of conflict bears will be carefully considered and counted against the mortality limits for the GYE."); FWS_Rel_Docs:1528 (same). Overall, the fact that the final Conservation Strategy eliminated the requirement that a small subset of conflict bears had to be relocated once before removal did not materially change the threat to grizzly bears from management removals and was irrelevant to FWS' ultimate decision in the 2017 Rule.

The second change identified by Plaintiffs is similarly exaggerated. Plaintiffs misleadingly assert that the final Conservation Strategy "[a]bandon[s] a commitment to maintain secure grizzly bear habitat" within the Primary Conservation Area "at or above levels that existed in 1998." ECF_190:32-33. This is not true. The final Conservation Strategy made "[n]o substantive changes in the content of habitat standards," which had long been in place to ensure no net loss of secure habitat with respect to 1998 conditions. FWS_LIT:17038-17039; *see also* FWS_LIT:17040 (explaining that secure habitat on federal lands inside the Primary Conservation Area will be maintained at or

improve upon the 1998 conditions).  The final Conservation Strategy does note that a multi-agency planning group is being convened to address ways to maintain habitat for grizzly bears while taking into account the significant increase in visitor use at the National Parks and increased grizzly bear populations in the area.  FWS_LIT:17039; FWS_Rel_Docs:1519.  This planning group will consider how to accommodate necessary changes to administrative infrastructure—for instance, adding enough bathrooms for the greater number of visitors— while "minimiz[ing] deviations to the 1998 baseline." *Id.*  If the planning group concludes that modifications to the habitat standards are necessary, it will issue a draft document that will be available for public comment.  FWS_LIT:17039-17040.  Any final revision will be approved by the Yellowstone Grizzly Bear Coordinating Committee, including FWS and other affected federal agencies.  *Id.*:17040.

Thus, the planning group may *propose* modest changes to the 1998 habitat baseline in the future, but will do so as minimally as possible and only as necessary to account for the realities of increased visitation and grizzly bear populations.  And a proposal is just that – it does not mean there will be a change.  FWS_Rel_Docs:1519.  The existence of

this planning group, of which FWS is a member, is unlikely to

significantly alter the protection of habitat in the Primary Conservation

Area and therefore was not critical to FWS' decision to delist the

Segment.  Additionally, Plaintiffs and other interested members of the

public will have a full opportunity to weigh in on any proposed changes

during a future public comment period, if there is a proposed change,

and therefore they are not harmed or prejudiced by the inability to

comment during the 2017 rulemaking process.

The third alleged change Plaintiffs identify is the addition of a line

in the final Conservation Strategy that the Chao2 method of estimating

grizzly bear populations will be used "for the foreseeable future."

ECF_190:33 (citing FWS_LIT:17030).  This did not represent a material

change from the information available to Plaintiffs prior to the public

comment period.  The Proposed Rule recognized some weaknesses in

the Chao2 method and stated that Chao2 "will continue to be the

method [for population estimates] until a new population estimator is

approved.  If new methods become available, these will be considered

for application in the [Greater Yellowstone Ecosystem] as long as they

represent the best available science."  FWS_Rel_Docs:005772-005773.

Therefore, Plaintiffs had the opportunity to comment on the fact that Chao2 will be used for the foreseeable future but could be replaced if the best available science indicates that a different method is more reliable. And, in fact, numerous commenters addressed this issue. *See* FWS_Rel_Docs:001498-001499. Therefore, FWS had no reason to reopen the public comment period after the addition of the "foreseeable future" language, and Plaintiffs were not prejudiced by FWS's decision.

Overall, the changes between the draft and final Conservation Strategies were minimal, foreseeable given the public feedback on the draft Conservation Strategy, and did not warrant a new public comment period. *See* FWS_Rel_Docs:1535 (explaining that the final Conservation Strategy and 2017 Rule were logical outgrowths of the draft Conservation Strategy). The minor changes identified by Plaintiffs "were not vital to FWS' decision as they were not used to introduce a new premise, to justify independently the final decision, or to reach a different conclusion." *Kern*, 450 F.3d at 1080.

Finally, even if FWS somehow erred by not reopening the comment period after the final Conservation Strategy was released, Plaintiffs "fail to demonstrate how this error prejudiced them." *Bear*

*Valley*, 790 F.3d at 993.  Plaintiffs had the opportunity to comment on the draft Conservation Strategy, both through the public comment period on the Proposed Rule and the separate comment period on an earlier draft of the Conservation Strategy itself.  *See* FWS_LIT:17003. Plaintiffs also had the opportunity to raise comments regarding allegedly excessive conflict mortalities, maintaining grizzly habitat, the use of Chao2, and FWS's reliance on the Conservation Strategy in general—the same topics as the alleged changes in the final version. *See, e.g.*, FWS_Rel_Docs:1498-1499 (Chao2), 1508-1509 (modifications to 1998 baseline secure habitat), 1526-1528 (managing conflict mortality), 1535 (Conservation Strategy).  Plaintiffs do not assert or demonstrate that they were prejudiced by the inability to comment on these modest revisions to the final Conservation Strategy.  *See* ECF_190:25-29.

### 3. Plaintiffs' challenges over funding for the Conservation Strategy similarly fail.

Contrary to Plaintiffs' allegations, ECF_194:18-20,[12] FWS did

---

[12] The plaintiffs challenging the 2007 Rule raised the same argument. *Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1116, (ECF_43:9-10). However, the Ninth Circuit found that the 2007 Rule's analysis of regulatory mechanisms was sufficient to support its delisting decision,

"assess the likelihood that the Strategy would be funded" and provided a rational connection between the relevant facts and its conclusion that the States' agreement to fund the Conservation Strategy was reliable. *See* ECF_194:19. The signatories to the Conservation Strategy agreed that "[e]ach agency is responsible for seeking the necessary funding to carry out the tasks agreed to in this Conservation Strategy." FWS_LIT:17081. The 2017 Rule found no reason to question this commitment given the signatories "demonstrated track record of funding measures to ensure recovery of this grizzly bear population for more than 3 decades." FWS_Rel_Docs:1449; FWS_Rel_Docs:1465, 1535-1536. In fact, "[t]he States have been funding and performing the majority of grizzly bear recovery, management, monitoring, and enforcement efforts within their jurisdictions for decades." FWS_Rel_Docs:1536. Given the States' longstanding commitment to the recovery and delisting effort, FWS concluded that "[t]here is not a reasonable basis to believe the States will not adequately fund grizzly

---

and noted previous rulings established that "multi-agency, multi-state conservation agreement[s]" could be considered in analyzing the threats facing a species. 665 F.3d at 1030-31 (citing *Tucson Herpetological Soc'y,* 566 F.3d at 879).

bear management of a delisted population." FWS_Rel_Docs:1536.

Moreover, if adequate funds were unavailable in the future, it could

trigger a status review for the possible relisting of the species.

FWS_Rel_Docs:1536.

In contrast to this well-supported explanation, Plaintiffs do not

raise any factual basis for questioning the funding of the Conservation

Strategy, except for the mere fact that funding will occur in the future

and cannot be guaranteed. FWS readily acknowledged that long-term

funding for grizzly bear conservation cannot be guaranteed as those

funds must come from appropriations (both State and Federal).

Appropriations, by their very nature, are subject to a future political

process. Although the potential for changes in future government

funding or priorities is "a fact of life," this alone does not call into

question FWS' reliance on an agency's commitment to fund future

conservation efforts.

Suggesting that appropriations must be "guaranteed" sets an

impossible hurdle, one that Plaintiffs know full well no government

would ever be able to attain. However, Section 4 of the ESA does not

require an absolute guarantee. 16 U.S.C. § 1533(a)(1)(D); *Center for*

*Biological Diversity v. FWS*, 402 F. Supp. 2d 1198, 1209 (D. Or. 2005)

(The Service is not required to find under Factor D that the existing

regulatory mechanisms would "fully protect or remove all risks" to a

species.).  It requires FWS to critically evaluate this factor (one of five)

in its decisionmaking process and rationally support its conclusion.  *Id.*

FWS has evaluated the Conservation Strategy, considered its reliance

on future appropriations, and reached a reasonable conclusion.

## B. FWS rationally analyzed mortality management that applies post-delisting, and its findings are well reasoned and supported.

FWS focused on examining the potential impact of human-caused

mortality on grizzly bears.  FWS_Rel_Docs:1460.  FWS' demographic

recovery criteria require over 500 bears and well-distributed occupancy

in the Ecosystem. FWS_LIT:16423-26.  The criteria also require

managing the segment around the 2002-2014 average population

estimate of 674 bears (range: 600-747 bears).  *Id.*:16426-27;

FWS_Rel_Docs:1447-48.  This population range corresponds with the

time period (2002-2014) where the grizzly population stabilized at or

near the carrying capacity—*i.e.*, when bear densities and not human-

caused mortality, food resource availability, habitat conditions, or other

factors influenced population dynamics and trends. *Id*.;

FWS_LIT:16430; *see also* FWS_LIT:33117; FWS_LIT:16502;

FWS_LIT:893.

Under the Recovery Plan and Conservation Strategy, the 2002-

2014 population range is maintained by adhering to variable mortality

limits for independent males, independent females, and dependent

young.  FWS_LIT:16427.  When the population remains above the

modeled estimate of 674 bears, higher mortality limits apply (which if

authorized yearly would be expected to reduce the population size).

FWS_Rel_Docs:1488; FWS_Emails:9005.  Should the population

fluctuate to 674 bears or below, the mortality limits decrease to allow

the population to stabilize or grow.  FWS_Rel_Docs:1488, 1523-24; *see*

*also* FWS_LIT:16430-31; FWS_LIT:33117.  Should the population drop

below 600 bears, all discretionary mortality ceases except that required

for human safety.  FWS_Rel_Docs:1447.  This approach—"more liberal

mortality rates above 674, and more restrictive mortality rates below

that"—is well-tailored to ensuring population viability.

FWS_Rel_Docs:1489.

Plaintiffs disagree by largely focusing on the Interagency Study

Team's population estimation method (Chao2). ECF 190:20-25, 29-33;

ECF 194:14-18. Chao2 uses observations of females with cubs-of-the-

year, rule sets, and statistical analyses to produce an annual population

estimate within the demographic monitoring area.

FWS_Rel_Docs:1446, 1463. The Interagency Study Team calculates

mortality limits based on the population estimate and then subtracts

mortalities from the prior year to determine the State's allocation of

discretionary mortality in the primary conservation area. *Id*.;

FWS_LIT:33124-29. As addressed below, this method, combined with

continual monitoring and oversight by the Interagency Study Team,

ensures that human-caused mortality does not endanger this

population. FWS_Rel_Docs:1460-66.

> **1. Plaintiffs misapprehend Chao2 and the multiple monitoring and evaluation methods incorporated into the Conservation Strategy.**

Plaintiffs dispute the States' mortality management based on

hypotheticals. They string together a series of speculative

contingencies: the States *could* authorize adult male mortality at the

highest levels for sustained periods, which *could* alter male-to-female

sex ratios, which *could* lead to population declines, which *could* go

undetected. ECF 194:22-23. Plaintiffs fail to appreciate that "multiple techniques for monitoring" guard against this exact scenario. FWS_Emails:8027 (Interagency Study Team expert).

The Interagency Study Team uses multiple methods and indices to monitor bears and facilitate the mortality management framework contained in the Conservation Strategy and the Recovery Plan. FWS_Rel_Docs:1498 (discussing the Team's four monitoring and evaluation methods, including Chao2); *id.*:1510 (same). The Study Team, for instance, performs known-fate analyses of radio-collared bears, which allows it to update sex ratios and vital rates that then feed into the Chao2 population estimator. *Id.*:1508, 1522. In the unlikely scenario that "male survival declines," these altered relationships and updates to Chao2's inputs "would lead to lower estimates of total population size through changes in the sex ratio, which would eventually change mortality thresholds as specified in the Rule and [Conservation Strategy]." FWS_Emails:8027.[13]

---

[13] Plaintiffs attempt to cast doubt on the Interagency Study Team's abilities by misleadingly attributing a public comment summary to the Study Team itself. ECF_194:23-24 (discussing FWS_Emails:4888-89); *but see* FWS_Emails:8027 (Study Team disagreeing with the commenter's and Plaintiffs' arguments). Plaintiffs also rely heavily on

Notably, the Team's ability to detect altered sex ratios or trends is not hypothetical. In 2012, "the current monitoring system effectively identified that a change in the population trajectory had occurred, which triggered the [Study Team] to conduct a comprehensive biological and monitoring review." FWS_Rel_Docs:1502. This review led to updated sex ratios used in Chao2 (from 0.635 to 1:1), updated vital rate assessments, and altered population trends (from 4-7% annually to 0.3-2.2% annually). *Id.*:1495, 1502; FWS_LIT:16428; *see also* FWS_LIT:33110 (Study Team's report). The Interagency Study Team's multiple monitoring and evaluation methods are an integral component of the Conservation Strategy and will continue at least every 5-10 years, and more often whenever indications of altered sex ratios or trends arise. FWS_Rel_Docs:1464 (Table 3, Item 7).[14]

---

Dr. Mattson's comments. ECF_194:23 (citing FWS_Emails:8597-600). Yet experts expressed well-founded disagreement with Dr. Mattson's views because, *inter alia*, "the peer reviewed research does not support [his] ideas," FWS_Rel_Docs:1493, and experts "have no way to verify the validity of these analyses (the graphs show some extreme patterns that seem unrealistic)," FWS_Emails:8027.

[14] The Interagency Study Team explained the appropriateness of this 5-10 year review interval. FWS_Emails:8975 (review interval based on the generation time and trends of grizzly populations); FWS_LIT:5162-63 (Harris et al 2011). The Study Team further intends to perform these vital rate reviews annually, thereby further guarding against

Plaintiffs also argue the Interagency Study Team's monitoring and evaluations will not identify changes around a specific threshold (*e.g.*, 674 bears) quickly enough. ECF_194:23. This is not new. The uncertainty in immediately detecting changes around a specific threshold is "a common situation with large vertebrate populations." FWS_Rel_Docs:1497-98; FWS_Emails:9005. The experts explored this uncertainty and rationally concluded that it does not present a risk to this population's recovery.

First, Chao2 is highly conservative. At higher population numbers, it underestimates the population by as much as 50%. FWS_Rel_Docs:1488; FWS_LIT:11519-20. Chao2 is conservative in other respects. After a population reaches stability (as here), Chao2 is likely to show a declining trend even where the population continues to grow. FWS_LIT:33137. This means that mortality limits derived from Chao2's estimates are also conservative, *i.e.*, mortality limits are reduced even as the population continues to grow. "Given that the Chao2 estimator underestimates population size, particularly at higher densities …, the concern that mortality limits should be more

Plaintiffs' proposed scenarios. FWS_Emails:8027; FWS_Rel_Docs:1499.

conservative to account for bias associated with the population size and trend is unfounded."  FWS_Rel_Docs:1524; *id.* ("With a highly conservative population estimation technique due to documented underestimation bias of the model-averaged Chao2 method …, management decisions will also be conservative.").

Second, the 2002-2014 population objectives are conservative, requiring management around a long-term average associated with stability.  FWS_Rel_Docs:1488, 1490.  Fluctuations around the long-term 2002-2014 average, as well as fluctuations in discretionary mortality, are contemplated and consistent with recovery.  *Id.*; FWS_Rel_Docs:1522, 1524 (explaining why sustained mortality at the higher levels, which could correspond to a 50% chance of decline, is not tethered to reality).  Indeed, given the decreased management flexibility attendant with sustained population reductions, the States have strong incentives to manage discretionary mortality to maintain the population within the 2002-2014 average range.  *Id.*:1488; *Defs. of Wildlife v. Zinke*, 849 F.3d at 1084 (FWS "could reasonably conclude that Wyoming's efforts set forth in its management plan were sufficiently certain to be implemented based on the strength of the

State's incentives").

Third, the Conservation Strategy's management framework includes numerous safeguards, including triggers for Interagency Study Team reviews and cessation of discretionary mortality except for human safety. FWS_Rel_Docs:1488, 1490. These latter protections are as protective as the ESA protections previously in place, which allowed for significant and sustained population growth and range expansion. *Id.*:1511. These safeguards likewise belie Plaintiffs' presumption that this population is threatened by any lag in detecting altered trends around a specific point estimate. ECF_194:24-25.

Collectively, these factors show that the population is not managed at the razor's edge, the Interagency Study Team will continue to detect any changes in sex ratios and population trends, and any delay in immediately picking up altered trends or sex ratios will not endanger the population. As the Interagency Study Team expert explained: "I am confident that we would detect the patterns that" Plaintiffs and their preferred public commenters "predict[] in a timely manner." FWS_Emails:8027. FWS and other experts agreed. FWS_Rel_Docs:1702 (the monitoring and estimation methods "allow[]

timely detection of a sustained increasing or decreasing trend").  And

this approach of using monitoring and estimation methods, combined

with addressing uncertainty through precautionary and conservative

assumptions, is not vague and uncertain "adaptive management."

ECF_194:24-25.  It is responsible and sound management of a wildlife

population.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d

581, 620 (9th Cir. 2014) (agency justified in picking a model where it

rationally identifies modeling limitations and makes conservative

assumptions).

### 2. Plaintiffs' distrust of the three sovereigns identifies no defect in the Conservation Strategy or FWS' Rule.

Plaintiffs' next suggestion that the States can (and will) game the

system by accounting only for hunting mortality in establishing

mortality limits is similarly unsupported.  ECF_190:14-18.  Under the

Recovery Plan, Conservation Strategy, and Memorandum of Agreement

between the States, all discretionary and human-caused mortality is

accounted for in establishing the next years' mortality limits.

FWS_Rel_Docs:1465 & Table 4.  Where exceedances of the prior years'

mortality limits occur, the exceedances are subtracted from the next

years' mortality limits. *Id*.:1465, 1552, 1525, 1531-32. This approach works to ensure that the mortality rates and limits maintain the grizzly population around the 2002-2014 average population levels, which the evidence shows correspond with a healthy, viable population. *Id*.

Plaintiffs nonetheless argue that the States' regulations deviated from this process by only accounting for hunting mortality in establishing next years' mortality limits. ECF_190:15-16. Plaintiffs omit how the mortality limits are calculated. Hunting "is a discretionary mortality source that will occur only if mortality limits from all other causes have not been exceeded." FWS_Rel_Docs:1521. Hunting mortality is the last source authorized, and the first source eliminated with any exceedances. *Id*.; FWS_LIT:16942 (§ 4(g)); FWS_Rel_Docs:1296-97.

Additionally, documents like state regulations "should not be read as a series of unrelated and isolated provisions." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). The States agreed to account for all mortality in managing to the mortality limits in the Memorandum of Agreement, FWS_Rel_Docs:1294, and they incorporated that agreement into the regulations and operative regulatory documents, *see*

FWS_LIT:16942 (§ 4(l)); FWS_LIT:5472 ("Any grizzly bear hunting mortality that exceeds total mortality limits …, determined as set forth in the Tri-State [Agreement]"); FWS_Rel_Docs:1465. This, too, belies Plaintiffs' attempt to create a conflict within the State's regulations. *Sturgeon v. Frost*, 136 S.Ct. 1061, 1070 (2016) (improper to construe provisions "in the abstract" and without regard to whether the construction "is ultimately inconsistent with both the text and context of the [document] as a whole").

Plaintiffs' suggestion that the States will disregard their commitments also asks FWS to presume the States will act in bad faith. We dispute that FWS can or should use such untenable assumptions. *Greater Yellowstone Coal.*, 665 F.3d at 1032 n.7 ("We simply point out that these laws 'allow the killing of bears' only under state regulation— such as with hunting licenses that are subject to annual limits – and thus enable the states to exercise some control over grizzly mortality.") But even were that not the case, the States cannot manipulate the numbers in the way Plaintiffs suggest. The Interagency Study Team identifies the population estimates and yearly accounts for mortality in the Ecosystem. FWS_Rel_Docs:1463, 1562 (discussing the Study

Team's continued analysis and monitoring of mortality); *id.*:1464 (Table 3, Item 4); FWS_LIT:17032 (Conservation Strategy providing that the Study Team will "update and report ongoing mortalities within the [demographic monitoring area] to all agencies so that the states may adjust management actions under their purview if a mortality limit is approached or exceeded. The [Study Team] will annually summarize all mortality information as to location, type, date, sex, and age for the [Ecosystem] and produce this information in their annual reports.").[15] The States then take those calculations and allocate any discretionary mortality. FWS_Rel_Docs:1464 (Table 3, Item 5). Plaintiffs' criticisms disregard the Conservation Strategy's multi-faceted, interlocking protections for grizzly bears, such as the Interagency Study Team's critical role in monitoring and estimating population numbers,

---

[15] Plaintiffs claim that FWS "never evaluated" conflict removals. ECF_190:18. But FWS expressly evaluated all sources of mortality, including discretionary conflict and management removals. FWS_Rel_Docs:146; *id.*:1461-62. And Plaintiffs' disregard the Ninth Circuit's response to similar arguments—that it is "reasonable to conceive of 'adequate' regulatory mechanisms as offering a recovered species something less than the stalwart protections of the ESA, but considerably more than no special protection at all." *Greater Yellowstone Coal.*, 665 F.3d at 1032.

mortalities, and trends.[16]

### 3. Plaintiffs' speculation that new methods will be adopted in a way that threatens the species identifies no deficiency in this Rule.

During the rulemaking processes, FWS and other experts acknowledged that Chao2 is highly conservative and, as with any model, has its limitations. FWS_Rel_Docs:1496-97. The experts also acknowledged that new methods are being examined and will continue to be explored, which could (someday) result in the use of a new estimation approach. *Id.* Plaintiffs believe that FWS cannot allow for scientific advancements unless it prospectively dictates how unidentified models and methods can be used. Specifically, Plaintiffs draw on a debate that occurred on whether or how to "recalibrate" a new model or method (should one be adopted in the future).

---

[16] Plaintiffs similarly contend that protecting human safety is some new "loop-hole." ECF_190:14-15. But mortality associated with protecting human safety is not new. In fact, mortality associated with human safety occurs regularly under the ESA. 50 C.F.R. § 17.40(b); FWS_Rel_Docs:1461; FWS_LIT:18479. Moreover, Plaintiffs are simply wrong. Mortality associated with human safety counts against the States when determining the annual discretionary mortality. FWS_Rel_Docs:1445 ("total mortality limits apply" within the demographic monitoring area); *id.*: 1565 (definition of "total mortality").

ECF_194:29-33.[17]  Besides the bald speculation, Plaintiffs cite a debate

but overlook its resolution.

First, the experts rightfully left open the possibility that scientific

advances may occur and be incorporated into the Conservation

Strategy.  "The statement that new estimators may be used, should an

improved method become available, is a meaningfully and scientifically

sound approach."  FWS_Rel_Docs:5171 (peer reviewer).  But Plaintiffs

misunderstand that neither FWS nor the Interagency Study Team has

identified or adopted a new estimation method.  *Compare* ECF_194:30-

31 (contending a new "Mark-Resight" approach may be adopted), *with*

FWS_Rel_Docs:1499 (explaining the Study Team determined not to

adopt this approach).

Second, the experts cannot "recalibrate" estimates without

---

[17] "Recalibration" refers to calibrating a new model's estimates for a given year (*e.g.*, 1000 bears in 2020) to the Chao2 population estimates generated for the 2002-2014 time period (average of 674 bears).  This concern was identified because: (1) the recovery plan's objective is to manage the population around the 2002-2014 average population size; and (2) the sliding scale mortality rates and limits are currently tailored to Chao2's estimates for the 2002-2014 period.  Thus, to meet the recovery plan's objective, any new method must either produce an estimate and population range for the 2002-2014 time period or in some manner be calibrated to Chao2's estimates for that time period. FWS_Rel_Docs:3725.

knowing what method may be adopted. FWS_Rel_Docs:1499. If the new method uses data that researchers did not collect in 2002-2014, the new method cannot generate estimates for that time period. *Id.* ("It is likely that any new method would require data that are not currently collected, and, therefore, retroactive estimation using the new method would not be possible."). These two points alone show that FWS rationally did not "require" recalibration based on a method that the Interagency Study Team has neither identified nor adopted.

Third, Plaintiffs erroneously discount the Conservation Strategy's firm commitment to use Chao2 into the foreseeable future, even if the Interagency Study Team adopts a new method. FWS_LIT:17023 (Study Team "may continue to investigate new methods for population estimation as appropriate; however, the model-averaged Chao2 method will continue to be used for the foreseeable future"). The Conservation Strategy further commits to using Chao2 in setting mortality limits prospectively, as the relevant commitment concerns managing "for a stable population within the" demographic monitoring area "around the

2002-2014 modeled-average chao2 estimate." *Id*.:16988.[18]

Fourth, the Conservation Strategy must be amended to adopt a new method, which requires approval by the signatories and public comment. FWS_Rel_Docs:1486, 1499. That is, no one party has a veto or may unilaterally alter the estimation methods, mortality limits, or the population management objectives. *Id*. This protection showed why the agencies that were strongly in favor of specific recalibration language ultimately supported the Conservation Strategy; the Strategy's process and procedures require that any changes accord with the Interagency Study Team's expertise and that of the Strategy's signatories. *See, e.g.*, FWS_Rel_Docs:2411-12.

In the end, Chao2 applies for the foreseeable future, experts cannot "recalibrate" numbers based on an estimation method that has not been identified, and appropriate safeguards exist to ensure that any future changes accord with the science and grizzly bear recovery. FWS_Rel_Docs:2411-12. By arguing otherwise, Plaintiffs seek little

_____

[18] This commitment, in particular, addresses the majority of Federal concerns articulated during the process—*i.e.*, the need for a clear commitment to manage to stability (the 2002-2014 time frame). *See* FWS_Emails:33514; FWS_Rel_Docs:3719; FWS_Rel_Docs:2411.

more than to transform the ESA into an academic exercise that "guards against" theoretical future scenarios. FWS_Pub_CMT:6038 (cited at ECF_194:30). The Supreme Court has already rejected this view—that the ESA should be "implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176 (1997).

> **4. FWS rationally considered regulatory mechanisms and mortality management in unsuitable habitat outside the demographic monitoring area.**

Searching for a different way to create a violation, Plaintiffs argue that FWS neglected to consider mortality management and regulatory mechanisms that apply outside the primary conservation area and demographic monitoring area. ECF_194:25-28. The 2017 Rule refutes this accusation.

FWS extensively analyzed the quality and availability of suitable habitat in the Ecosystem. *See, e.g.*, FWS_Rel_Docs:1443-44, 1505. FWS explained, in depth, why suitable habitat inside the demographic monitoring area provides "ecological resiliency to the population through the availability of widely distributed, high-quality habitat that will allow the population to respond to environmental changes." *Id.*:1444. FWS also addressed, in depth, why mortality management

and limits and secure habitat inside suitable habitat provide for a secure grizzly bear population in the Ecosystem. *Id.*:1444-45; *id.*:1510 (primary conservation area "contains approximately 75 percent of the females with cubs (the population's most important age and sex group) … and will continue to serve as a source area for the rest of the [Ecosystem]"). Thus, while "approximately 23 percent of the current range occurs outside the [demographic monitoring area]," FWS explained why suitable habitat inside the core management areas "contains adequate habitat quality and quantity to support a recovered grizzly bear population." *Id.*:1508.[19]

In addition, FWS extensively addressed mortality management and State regulatory protections outside the core suitable habitat and primary management areas. FWS addressed Federal management and protections in unsuitable habitat, including Forest Service land-use protections. FWS_Rel_Docs:1469; FWS_LIT:16433. And FWS

---

[19] Plaintiffs err in arguing that FWS identified unsuitable habitat based only on "social" factors. ECF_194:26. FWS appropriately accounted for numerous factors, including evaluating areas marked by high levels of human activity and presence, lack natural food resources, contained land use practices that alter the suitability of the habitat for grizzly bears, and other factors. FWS_Rel_Docs:1484, 1505.

considered state land use practices and regulations in unsuitable habitat, FWS_Rel_Docs:1458-59, including the effects of these regulations on grizzly bears, *see, e.g.*, FWS_LIT:16431 ("Grizzly bear occupancy will not be actively discouraged outside the [suitable habitat areas] and grizzly bears will not be persecuted just because they are present there."); FWS_LIT:16433 (evaluating state management in unsuitable habitat on connectivity with Northern Continental Divide Ecosystem bears); FWS_Rel_Docs:1466.

In view of this analysis, Plaintiffs cannot sustain the dramatic claims that FWS failed to examine any potential impact or regulatory mechanisms outside the demographic monitoring area. ECF_194:25-26. Plaintiffs' related argument that mortality outside the demographic mortality area threatens the source population within the boundaries fares no better. *Id*.:26-27. If, as Plaintiffs' speculate, bear mortality outside the demographic monitoring area affects population numbers, vital rates, or trends, the Interagency Study Team's comprehensive monitoring will identify these impacts, which will then feed into the population estimates and mortality limits that apply. *See* FWS_Rel_Docs:1525 ("Bears that die outside the [demographic

monitoring area] may have dispersed from within or simply have home ranges on the periphery; regardless, the population monitoring protocols that are in place would detect if the level of mortality outside the [area] reaches a point where population size inside the [area] declines."). Other experts agreed. FWS_Emails:9006 ("[I]f the level of mortality outside the Demographic Monitoring Area reaches a point where population size inside the … Area would decline, the population monitoring protocols that are in place would detect this.").

In the end, Plaintiffs merely dispute FWS' finding that a viable, recovered grizzly population can be maintained by the strong habitat and other protections in place in the demographic monitoring area. And they attempt to justify that dispute by alleging, without support, that FWS ignored the effects to grizzly bears occurring or moving outside the core suitable habitat areas. While Plaintiffs may desire that bears occupy cities, farm and range lands, and other areas incompatible with bear occupancy and persistence, their desires do not show that FWS ignored a "relevant" issue or arrived at unfounded conclusions.

### 5. FWS' properly considered whether a combination of the ESA's listing factors are likely to threaten grizzly bears.

Plaintiffs also argue that FWS failed to analyze the cumulative effects of various impacts on grizzly bears. ECF_186 at 40-44. In Plaintiffs' view, FWS looked at mortality management in isolation and neglected to consider how other factors cumulatively or synergistically may affect bears. *Id*. But Plaintiffs merely toss aside the entire 130-page rule, where FWS repeatedly examined how multiple factors— including mortalities, changes to habitat quality, changes to food distribution, altered mortality rates, and many other factors—can potentially interact to affect grizzly bears. FWS considered metrics, like population trends, that explicitly account for "total mortality, changes in habitat quality, changes in population density, change in current range, displacement effects, and so forth." FWS_Rel_Docs:1478.

Because this 2017 Rule addresses all of the relevant issues, Plaintiffs ultimately are unable to produce any evidence of a real threat to grizzly bears. They instead predicate their challenges on speculation, assertions that the States will act in bad faith, and anything else that abstractly casts doubt on whether the bears should be delisted. Like

standing, the ESA's listing process is not an "ingenious academic exercise in the conceivable," *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973), and the Court should reject Plaintiffs' generic challenge to FWS' comprehensive, well-supported, and well-reasoned evaluation of the multitude of factors that potentially influence grizzly bear recovery.

### C. The genetic health of this grizzly bear population is secure.

As the 2017 Rule explains, the Segment is currently genetically healthy and expected to remain so for at least several decades. In the long-term, genetic diversity may be maintained through natural connectivity between the Segment and other grizzly bear populations or translocation of bears from other populations. FWS therefore reasonably concluded, based upon peer-reviewed scientific studies, that "genetic diversity does not constitute a threat to the [Segment] now, nor is it anticipated to in the foreseeable future." FWS_Rel_Docs:1469.

This Court held that the 2007 Rule reasonably determined that genetic health was not a significant threat to the Yellowstone grizzly bear population because the 2007 Rule provided for a total population above 500 grizzly bears. *Greater Yellowstone Coal.*, 672 F. Supp. 2d at

1120–22.  FWS relied upon the same studies and the same basic population requirements, with added support from newer scientific studies, to assess the Segment's genetic health risks in the 2017 Rule. Once again, FWS "provided a reasonable explanation for its conclusions about genetic diversity and population size" and Plaintiffs' contrary claims should be dismissed.  ECF_186:24-28; ECF_192:17-21.

As cited in both the 2007 and 2017 Rules, Miller and Waits (2003) proposed a minimum "effective population size"—meaning the number of bears available to reproduce at any given time—of 100 grizzly bears and estimated that a total population size of 400 grizzly bears would achieve this effective population minimum.  FWS_Rel_Docs:1468; *Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1120-21.  A more recent study concluded that the Greater Yellowstone Ecosystem has a current effective population size of 469 animals, more than four times the minimum effective population size recommended by the literature. FWS_Rel_Docs:1469 (citing Kamath et al. (2015)).  This indicates that the Miller and Waits recommendation of 400 total individuals is likely a conservative recommendation to maintain genetic fitness for this

particular population.[20] To provide even greater insurance of genetic

fitness, the Conservation Strategy established a standard to maintain

the total population above 500 animals. FWS_Rel_Docs:1468. With an

effective population size well above the recommended minimum, the

best available science indicates that the Segment's viability will be

unaffected by genetic health threats for at least the next several

decades. *See* FWS_LIT:9419 (Miller and Waits (2003)); *Greater*

*Yellowstone Coal.*, 672 F. Supp. 2d at 1121 (deferring to FWS's expertise

in relying on Miller and Waits and reaching the same conclusion);

FWS_LIT:5974 (Kamath et al. (2015) confirming no significant

reduction in genetic diversity since Miller and Waits).

Even in the long-term, genetic diversity is not a threat to the

Segment because individuals from other grizzly bear populations could

---

[20] Miller and Waits (2003) estimated that effective population size
would be about 25 to 27 percent of total population.
FWS_Rel_Docs:1468. The Kamath study indicates that a much greater
proportion of the current total population (based upon the Chao2
estimation method) is part of the effective population. *Id.* As discussed
in the 2017 Rule, reported ratios of effective population size to census
size for grizzly bear populations vary widely from 4 to 60 percent. *Id.*
FWS determined that the Kamath study's results on the high end of
this ratio range "most likely reflects the underestimation bias of the
Chao2 population estimator." *Id.*

naturally migrate in the Yellowstone area or be translocated by FWS if genetic diversity becomes a concern. FWS_Rel_Docs:1469.[21] Based on several scientific studies, FWS concluded that one to two effective migrants from other grizzly bear populations every 10 years would ensure the Segment's long-term genetic health. FWS_Rel_Docs:1469.

Commitments from the States and FWS will encourage natural connectivity between the Segment and the Northern Continental Divide Ecosystem grizzly bear population, located in the northwest corner of Montana. FWS_LIT:33347. As of 2014, the two populations were only 71 miles apart, and there have been multiple confirmed grizzly bear sightings between the two ecosystems. FWS_Rel_Docs:1513. The

---

[21] Plaintiffs erroneously claim that FWS did not look beyond "several decades" when assessing the genetic threats. ECF_186:36. FWS examined genetic health in the long-term and provided mechanisms to ensure that genetic diversity is maintained, either through natural migration or translocation of bears by FWS. Further, Plaintiffs' outrageous assertion that FWS must analyze genetic health over a 400-year time scale far exceeds any definition of the "foreseeable future" used to assess ESA protections for other species. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016) (deferring to FWS's analysis of a species' viability over 50 and 100 years). FWS reasonably relied upon data finding a 99.2 percent probability of grizzly bears in the Segment persisting for 100 years, FWS_Rel_Docs:1512-13, and concluded that genetic health in particular was not a threat over the "long-term," extending well past several decades. FWS_Rel_Docs:1469.

Conservation Strategy and state management plans provide several provisions to increase the likelihood of future genetic exchange between these two populations. The demographic monitoring area boundary extends all the way to the Segment boundary in the north to facilitate connectivity. FWS_Rel_Docs:1513. Federal and State agencies will consider connectivity when planning future highway and road construction. FWS_LIT:17067. Additionally, there are already attractant storage rules on public lands between the Segment and both the Northern Continental Divide and Bitterroot recovery zones, to reduce the likelihood of conflicts in those areas. FWS_Rel_Docs:1469; FWS_LIT:17068.

Plus, despite Plaintiffs' allegations to the contrary, the State of Montana has committed to facilitating connectivity by managing discretionary mortality—including hunting mortalities—between these populations. *See* ECF_192:24; FWS_Rel_Docs:1469, 1513. In its management plan, Montana stated its long-term goal "to allow the grizzly bear populations in southwest and western Montana to reconnect through the maintenance of non-conflict grizzly bears in areas between the ecosystems." FWS_LIT:33352. Specifically,

Montana committed to manage non-conflict bears between the Segment

and the Northern Continental Divide Ecosystem in a manner

"compatible with maintaining some grizzly occupancy," for instance by

maintaining presence of non-conflict bears in the Tobacco Root and

Highland Mountains.  *Id.*; FWS_LIT:17036.  Montana's hunting

regulations reflect this commitment by closing all grizzly bear hunting

in the Highland-Ruby grizzly bear management unit, an area northwest

of the Segment that could provide connectivity opportunities, and

setting quotas for other hunting districts.  FWS_LIT:9400-01;

FWS_Rel_Docs:1514.  Montana also will consider connectivity when

addressing "land-use patterns that promote or hinder bear movement"

and when relocating grizzly bears.  FWS_LIT:33352;

FWS_Rel_Docs:1513.[22]

---

[22] Montana's commitments and regulations are consistent with FWS'
stated goal in the Proposed Rule for Montana to manage discretionary
mortality in the area between the Segment and the Northern
Continental Divide Ecosystem.  FWS_Rel_Docs:5789.  Therefore, there
was no significant change between the Proposed Rule and 2017 Rule
regarding Montana's management of mortality in areas of potential
connectivity that would have necessitated reopening the public
comment period.  *See* ECF_192:27.  Plus, FWS *did* reopen public
comment after Montana had issued its 2016 regulations, allowing the
public to review and comment on the actual regulations and FWS'

FWS and State agencies will continue monitoring and genetic

testing to detect and document possible gene flow between the Segment

and the Northern Continental Divide Ecosystem. FWS_Rel_Docs:1469.

If natural connectivity does not occur and monitoring indicates a

reduction in genetic diversity, FWS will translocate individuals from

other populations to the Segment to enhance genetic health.

FWS_Rel_Docs:1469, 1543.

FWS' plan to translocate grizzly bears as a safeguard to ensure

long-term genetic health is compatible with the finding that the

population has recovered and should be delisted. *Contra* ECF_186:38-

39. FWS never required that this population of grizzlies must be

naturally connected to other populations prior to delisting.[23] The 1993

Recovery Plan explicitly states "[l]inkage zones are desirable for

---

conclusion that these regulations and commitments satisfied the key
provisions in the Proposed Rule. FWS_Rel_Docs:4397-4400.
[23] Plaintiffs cite various emails and documents establishing that
connectivity between grizzly bear populations is important and
desirable. ECF_186:37. FWS does not contest that fact. However,
Plaintiffs do not cite any final document issued by FWS stating that
natural connectivity is *essential* before any grizzly bear population could
be delisted. Nor do any of the documents cited by Plaintiffs undermine
FWS' sound, science-based conclusion that genetic health concerns do
not put the Segment not in danger of extinction now or in the
foreseeable future.

recovery, but are not essential for delisting," FWS_LIT:14566, and expressly contemplated that bears may need to be translocated from other populations to Yellowstone as a precautionary measure, FWS_LIT:14569. Additionally, the Recovery Plan contemplated the delisting of individual grizzly bear populations as they achieved viability and met the demographic recovery goals, as the Segment indisputably has. FWS_LIT:14574; FWS_Rel_Docs:1514.

Plaintiffs resurrect a failed argument from the challenge to the 2007 Rule, asserting that the potential need for translocation at some point in the future means that the Segment is not truly recovered. ECF_186:39. This Court rejected this argument, and its reliance on *Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009), in upholding FWS's plan for translocation (if necessary) as part of the 2007 Rule. *Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1121-22. Nothing in the ESA or case law precludes FWS from relying on future management such as this. 16 U.S.C. § 1533(a)(1)(D); *Trout Unlimited*, 559 F.3d at 957-58 (concluding FWS properly considered hatchery fish, in addition to the natural population, when downlisting). Indeed, the statute mandates that FWS analyze whether there are sufficient "regulatory

measures" in place before a delisting decision is made, clearly evidencing congressional intent that future human interference would be desirable, if not required. 16 U.S.C. § 1533(a)(1)(D). As the D.C. Circuit concluded in analogous circumstances, "the ESA did not prohibit the Service from delisting [a species] where translocation could eventually be necessary as a stopgap measure after many generations of insufficient natural connectivity." *Defs. of Wildlife v. Zinke*, 849 F.3d at 1091-92. While Plaintiffs may wish that genetic diversity is achieved through natural connectivity—a desire FWS shares—FWS has allowed for the possibility that this may not occur, and that is entirely permissible under the ESA. FWS_Rel_Docs:001469.

In sum, FWS exercised its biological expertise and determined that genetic diversity does not constitute a threat to the Segment now or in the foreseeable future. FWS_Rel_Docs:1469. Like in the 2007 Rule, FWS provided a "reasonable explanation" for concluding that the Segment does not face threats from genetic health in the next several decades, and that any long-term threats will be mitigated by measures to encourage and monitor for natural connectivity or, if necessary, occasional translocation of grizzly bears from other populations.

*Greater Yellowstone Coal.*, 672 F. Supp. 2d at 1122.  This multi-pronged, proactive approach ensures the long-term genetic health of the Segment.

### D.   **Grizzly bears are not threatened by food resource availability.**

Whitebark pine is a high-elevation species located within 14% of the habitat occupied by grizzly bears and overlaps with only about two-thirds of the Ecosystem population. FWS_Rel_Docs:1472; FWS_LIT:5744; FWS_LIT:2302.  Whitebark pine also produces good cone (or seed) productions only periodically. FWS_Rel_Docs:1470; FWS_LIT:5744.  But when available to bears, whitebark pine seeds can provide a high-calorie food resource.  *Id.*  Due to declines in whitebark pine numbers beginning in the early 2000s, FWS_Rel_Docs:1470, the courts determined that FWS' prior rule did not do enough in evaluating this "potential threat." *Greater Yellowstone Coal.*, 665 F.3d at 1024, 1029.

FWS and the Interagency Study Team did not replicate that shortcoming.  On remand, they studied, evaluated, and scrutinized every facet of the bears' interaction with different food resources, including whitebark pine. FWS_Rel_Docs:1469.  They developed

"substantial knowledge about [whitebark pine's] ecological role for grizzly bears in the [Ecosystem]." FWS_LIT:5771. And they generated substantial evidence showing that the "whitebark pine decline has had no profound negative effects on grizzly bears at the individual or population level." FWS_LIT:5772. Nor did they find that other changes in food resources have threatened or are likely to threaten grizzly bears in the future. *See generally* FWS_LIT:5734 (Interagency Study Team's synthesis of the extensive research on grizzly bears' food resources).

Unconcerned with the evidence, Plaintiffs allege that researchers and FWS missed a key impact—whitebark pine declines caused the bears to eat more meat, which led to "record" mortalities in 2015 and 2016, which caused the population to "decline," which will endanger bears. ECF_190:9-14. This argument is just as ill-conceived now as when Plaintiffs raised it to the experts during the remand and rulemaking process. FWS_Rel_Docs:1501.

Plaintiffs falsely presume that bears are traveling further for food and end up feeding on livestock or hunter-produced carcasses or gut piles. ECF_190:10-11. Yet bear movements did not change during the period of whitebark pine decline, and female home range sizes

*decreased.* FWS_LIT:5760, 5763, 5764; FWS_LIT_891-93; FWS_LIT:11532. This indicates that "most bears had ample opportunities to use secure habitats, even in the absence of [whitebark pine] foraging." FWS_LIT:2303. Further, bears have always eaten meat, and no evidence suggests they supplement their diet in poor whitebark pine years (or any other year) with hunter-killed carrion or gut piles, thereby disregarding the other complement of meat resources available to them—*i.e.*, killing prey (bison or elk), usurping wolf kills, scavenging on winter-killed carrion, and feeding on colonial insects (ants and wasps). FWS_LIT:5741, 5758-59; FWS_Rel_Docs:1451-52, 1469-71; *see also* FWS_LIT:4485 (examining the dietary breadth of grizzly bears).

Plaintiffs next argue that whitebark pine declines and attendant increases in feeding on meat affected females and caused reduced cub and yearling survival. ECF_190:11. Here again, researchers found "no evidence of a decline in percent body fat during the period of whitebark decline." FWS_LIT:16511; FWS_LIT:5756-57. And the "survival of independent-aged females was high and did not change during" the period of whitebark decline. FWS_LIT:16510; FWS_LIT:5770. Indeed,

the highest counts of females with cubs occurred in 2013 and 2014, nearly a decade after the whitebark pine decline began. FWS_Rel_Docs:1545. Finally, numerous peer-reviewed studies found substantial evidence that decreases in dependent young survival through the 2000s were *not* attributable to whitebark pine declines or other shifts in food resource availability. FWS_LIT:16502 ("The results of our study support the interpretation that slowing of population growth [and dependent survival] during the last decade was associated more with increasing grizzly bear density than with the decline in whitebark pine."); *id*.:16510, 16511-12 ("no evidence of a longer term downward trend in survival of independent bears with the decline of this food."); *see also* FWS_LIT:5765-68.

Finally, Plaintiffs argue that declines in whitebark pine and alleged shifts to a more meat-based diet directly caused "record" high mortalities in 2015 and 2016. ECF_190:11-14. This argument confirms that science should be left to the scientists.

First, Plaintiffs' reference to mortality numbers disregards important context. "Although the total number of human-caused mortalities has increased since the early 1990s, so has the grizzly bear's

population size." FWS_Rel_Docs:1501. The grizzly population also continued to expand into unsuitable habitat, where human-bear conflicts are higher. *Id.* Plaintiffs neglect that the mortality percentages in 2015 and 2016 were neither unprecedented nor above the Recovery Plan's sustainable mortality limits. FWS_LIT:22907-08; FWS_LIT:23609-10. *See* Fig., below.

| | DMA Mortality[1] | ≤674 | 675-747 | >747 |
|---|---|---|---|---|
| Independent Female % Total Mortality Limit[2] | | <7.6% | 9% | 10% |
| 2015: Chao2 modeled average 717 (639-794)[3] | n=25 | | 10.1% | |
| 2016: Chao2 modeled average 695 (620-770)[4] | n=12 | | 5.0% | |
| Independent Male % Total Mortality Limit | | 15% | 20% | 22% |
| 2015: Chao2 modeled average 717 (639-794) | n=32 | | 13% | |
| 2016: Chao2 modeled average 695 (620-770) | n=37 | | 15.6% | |
| Dependent Young % Total Mortality Limit | | <7.6% | 9% | 10% |
| 2015: Chao2 modeled average 717 (639-794) | n=13 | | 5.8% | |
| 2016: Chao2 modeled average 695 (620-770) | n=9 | | 4.2% | |

[1]Total mortality for independent males and females includes known and probable mortalities from all causes plus an estimate for unreported loss. Only human-caused mortality is included for dependent young. FWS_Rel_Docs:1464.
[2]Bold values from the 2017 Recovery Plan, as reproduced in the 2017 Rule. FWS_Rel_Docs:1464.
[3]2015 values from FWS_LIT:22907-08.
[4]2016 values from FWS_LIT:23609-10.

Second, Plaintiffs argue that whitebark pine declines caused the population to decline, pointing to the Chao2 population estimate for 2016. ECF_190:12. They forget their own admission that one or two years does not equal a "trend." ECF_187 ¶ 11; *see also* FWS_Rel_Docs:1498 ("In response to comments that there was a 6 percent population decline between 2014 and 2015, for a long-lived vertebrate, such as grizzly bears, inference of trend based on model-averaged Chao2 estimates from one year to the next is inappropriate.

Trends should be investigated over longer time periods.").  And the next year's population estimate shows that Plaintiffs hoped for "decline" did not materialize: the 2016 Chao2 estimate was 695 (range:620-770), and the 2017 Chao2 estimate was 718 (range:640-796).[24]

Third, Plaintiffs illogically attribute 2015 and 2016 mortalities to declining food sources such as whitebark pine.  ECF_190:12-14.  Yet the whitebark pine decline began in the early 2000s and peaked in 2009. FWS_LIT:31858 (Fig.3).  Cone production in 2015 and 2016—which



**Figure 3.  Number of live whitebark pine (WBP) trees on cone production transects among 190 individual trees monitored since 2002 in the Greater Yellowstone Ecosystem, 2002–2017.**

---

[24] *See* FWS_LIT:22907-08; *see also* https://prd-wret.s3-us-west-2.amazonaws.com/assets/palladium/production/s3fs-public/atoms/files/IGBST%20Summary%20Report%202017_final%20%281%29.pdf (2017 estimates).

Plaintiffs speculate caused bears to eat more meat and be exposed to additional mortalities—was at or above average levels. *Id.* (Fig.2).



**Figure 2. Annual mean number of cones/tree observed along whitebark pine cone production transects, Greater Yellowstone Ecosystem, 1980–2017. The overall average of 16 cones/tree is shown as a solid horizontal line.**

It is bald conjecture to suggest that the whitebark pine decline starting nearly a decade ago suddenly caused extensive mortalities in 2015 and 2016. Plaintiffs' conjecture also fails to account for the wealth of evidence that "bears experiencing loss of whitebark pine in their home ranges are not necessarily exposed to greater risk of conflict or mortality associated with anthropogenic areas." FWS_LIT:5763; FWS_LIT:5761 (based on the evidence, "attributing the observed

increase in fall human-caused mortalities solely to whitebark pine decline does not seem warranted" based on the evidence). "This is an important distinction and addresses one of the more salient questions regarding potentially indirect impacts of whitebark pine decline," FWS_LIT:5763, and it is a distinction Plaintiffs flout in the hopes of derailing a successful 40-year effort to recover grizzly bears.

In short, "changes in food resources are not likely to become substantial impediments to the long-term persistence of the [Greater Yellowstone Ecosystem] grizzly bear population." FWS_Rel_Docs:1473. FWS' analysis and findings here are supported by a wealth of actual data, studies, and analysis, including FWS_LIT:5734; FWS_LIT:888; FWS_LIT:2293; FWS_LIT:3422; FWS_LIT:4485; FWS_LIT:11549; FWS_LIT:16502. FWS' findings properly accounted for the continued monitoring of "multiple indices including production and availability of four high-caloric foods; and monitoring of grizzly bear vital rates including survival, age at first reproduction, reproductive rate, cub survival, mortality cause and location, dispersal, and human bear conflicts." FWS_Rel_Docs:1545. FWS' findings are reasoned.

## III.  PLAINTIFFS' REMAINING CHALLENGES TO THE 2017 RULE LACK MERIT.

### A.  FWS' 2017 Rule is not an affirmative agency action triggering the obligation to consult under Section 7 of the ESA.

Plaintiffs raise a novel claim—that FWS violated Section 7(a)(2), 16 U.S.C. § 1536(a)(2), by failing to consult and ensure the 2017 Rule is not likely to jeopardize the continued existence of *other* ESA-listed species.  ECF_186:30-33.  Supreme Court and Circuit precedent foreclose this claim.

Section 7(a)(2)'s requirements are triggered only with (1) affirmative agency action as that term is defined under the Act, and (2) where the agency has "some discretion" to take action for the benefit of a protected species.  *Karuk Tribe of Cal. v. U.S. Forest Serv.,* 681 F.3d 1006, 1024 (9th Cir.2012) (*en banc*).  As to the first requirement, an "action" under Section 7 means an activity or program that is "authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02.

The 2017 Rule identifying and delisting the Segment does not authorize, fund, or carry out any activities.  Rather, the 2017 Rule merely changes the legal status of the Segment and transfers

jurisdiction from FWS to the States.  The Ninth Circuit made this distinction, noting that the "triggering mechanism for consultation is an agency action, not the listing of a species." *Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593, 596 (9th Cir. 2006); *Grand Canyon Trust*, 691 F.3d at 1020 (noting that in *Cal. Sportfishing*, the Ninth Circuit "decided that the relevant 'agency action' was the granting of the permit in 1980," not the listing of the Chinook Salmon as a threatened species in 1999 or the continued operation of the hydroelectric project pursuant to the 1980 permit).  In other words, the listing decision itself is not an affirmative agency action that triggers consultation.   And the statute does not differentiate between listing and delisting.  16 U.S.C. § 1533(a).

Plaintiffs' arguments also fail as to the second prong because Section 7(a)(2) "does not attach to actions … that an agency is required by statute to undertake once certain specified triggering events have occurred." *Homebuilders*, 551 U.S. at 669.  That is the case here.  The ESA specifies an exclusive list of five factors FWS shall consider in listing or delisting; if the factors are satisfied, FWS must either list or delist the species. 16 U.S.C. §§ 1533(a)(1)(A)-(E); *see also* 50 C.F.R. §

424.11(d) (factors FWS may consider in delisting a species). Congress

did not authorize FWS to modify or withhold a listing or delisting action

due to impacts to other ESA-listed species. 16 U.S.C. § 1533(b)(1)(a)(A)

("The Secretary shall make determinations required by subsection

(a)(1) *solely* on the basis of the best scientific and commercial data

available to him after conducting a review of the status of the species"

based on the five-factors listed in (a)(1) and taking into account efforts

being made by relevant States) (emphasis added). Because FWS lacks

discretion to take actions that inure to the benefit of *other* ESA-listed

species when listing or delisting species, Section 7(a)(2) is not triggered

and the delisting decision cannot be vacated for failure to consult.[25] *See*

*Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 831, 841-42 (9th Cir. 2013)

(no consultation required because, once the agency determined that the

statutory criteria were met, it had a nondiscretionary duty to act);

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir.

---

[25] Plaintiffs cite two cases, neither of which involve a required ESA
Section 4 determination. ECF_186:33. In fact, in *National Parks
Conservation Association v. Jewell*, the court found that the
requirement to consult was triggered "[w]hen a federal agency's
proposed *discretionary* action 'may affect listed species or critical
habitat.'" 62 F. Supp. 3d 7, 12 (D.D.C. 2014) (emphasis added).

2001) (agency lacked the required discretion because of limitations on agency authority present).  Accordingly, Plaintiffs' claim under Section 7(a)(2) fails as a matter of law.

### B.    Mr. Aland's claims lack merit.

*Pro se* Plaintiff, Mr. Aland, claims that the Ninth Circuit's decision regarding the 2007 Rule collaterally estops the United States from legally defending any future effort to delist grizzly bears in the Yellowstone area, including the 2017 Rule challenged in this case. ECF_183:20-24.  Collateral estoppel is patently inapplicable to this situation.

First, nonmutual collateral estoppel cannot be used against the United States government.  *United States v. Mendoza*, 464 U.S. 154, 159-61 (1984); *Nat'l Med. Enters. v. Sullivan*, 916 F.2d 542, 545 (9th Cir. 1990); *see* ECF_183:22 (admitting that Plaintiff invokes "non-mutual offensive collateral estoppel" to preclude the United States from litigating this case).

Second, collateral estoppel does not apply because the issues in this case regarding the 2017 Rule were not actually litigated in any prior litigation.  *See Syverson v. Int'l Bus. Machs. Corp.*, 472 F.3d 1072,

1078 (9th Cir. 2007).  In *Greater Yellowstone Coal.*, the Ninth Circuit

affirmed the order vacating the 2007 Rule solely on the grounds that

the 2007 Rule did not adequately support its conclusions regarding the

impact of declining whitebark pine on the grizzly bear population.  665

F.3d at 1032.  The 2007 Rule was vacated and *remanded* to FWS,

allowing FWS the discretion to undertake new rulemaking to address

the deficiencies identified by the court.  *Greater Yellowstone Coal.*, 672

F. Supp. 2d at 1127.  This remand was not illusory.  FWS issued the

2017 Rule and no court has ruled on the validity of the 2017 Rule.  Mr.

Aland's motion for summary judgment on Count 1 of his Complaint

should be denied.

Mr. Aland also asserts that FWS violated the APA by disregarding

public sentiment when delisting the Segment, failing to compile

statistics summarizing public comments, and not adequately

responding to certain scientific comments.  ECF_183:25-30.  Mr. Aland's

criticisms lack any legal or factual basis.

The APA's notice-and-comment rulemaking procedures require

the agency to (1) publish a notice of proposed rulemaking; (2) allow

interested parties the opportunity to submit "data, views, and

arguments" regarding the proposal, and (3) "adopt a rule after consideration of the relevant matter presented." *See Safari Aviation v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002) (quoting *Hall v. EPA,* 273 F.3d 1146, 1163 (9th Cir. 2001)). "An agency must consider and respond to *significant* comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (emphasis added). Significant comments are "those which 'raise relevant points, and which, if adopted, would require a change in the agency's proposed rule.'" *Safari Aviation*, 300 F.3d at 1151 (quoting *Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992)).

Here, FWS received and reviewed over 665,000 public comments on the Proposed Rule. FWS_Rel_Docs:1480; FWS_Pub_CMT:000001. FWS considered, summarized, and responded to all substantive, relevant comments. FWS_Rel_Docs:1479-01558 (Final Rule response to public comments); FWS_Pub_CMT:000002-001261 (summarizing public comments). FWS therefore thoroughly addressed and appropriately responded to the comments received.

FWS had no additional obligation to compile statistics regarding the percentage of public comments opposing or supporting the rule, and

Mr. Aland cites no statutory provision or case law imposing such an obligation. Nor, for that matter, would public sentiment for or against the 2017 Rule be a relevant factor that FWS permissibly can consider in implementing the Act. 16 U.S.C. § 1533(b)(1)(A) (requiring listing decisions be made "solely on the basis of the best scientific and commercial data available"); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1214 (D. Mont. 2010) (delisting "cannot be based on emotion or sentiment.")

Finally, FWS adequately responded to public comments, including those from Dr. Mattson. *See* ECF_183:28. Dr. Mattson commented on numerous topics discussed in the Proposed Rule, including whitebark pine, genetic health, and the calculation of discretionary mortality. *See* FWS_Pub_CMT:1629-1647, 005966-006100. FWS addressed each of these substantive issues in the analysis for the 2017 Rule or its response to comments. *See, e.g.*, FWS_Rel_Docs:1468-1469 (discussing genetic health), 1469-1473 (changes in food resources, including whitebark pine), 1523-1525 (calculating mortality). FWS thus considered the contentions of Dr. Mattson and exercised its scientific expertise to determine that the best available science did not align with

his conclusions.  *See, e.g.*, FWS_Rel_Docs:1493.  And Mr. Aland's conclusory allegations do not identify any particular issue raised by Dr. Mattson that FWS failed to address or adequately consider.

## CONCLUSION

It is evident that all of Plaintiffs' contentions are designed with the singular purpose of achieving grizzly bear recovery throughout the entirety of the western United States.  FWS wholeheartedly shares in this goal.  But our differences lie in how to achieve that goal.

Plaintiffs demand that every population of grizzly bears throughout the United States must be recovered before FWS can delist even one of them.  The problem with this approach is that Congress does not share this vision.  The statutory language in the ESA contemplates a distinct population segment; it does not contemplate a "lower-48 remnant" or even a "lower-48 species."  16 U.S.C. § 1532(16). Congress intended FWS to employ the distinct population segment as a targeted mechanism for listing and delisting, and in this circumstance that mechanism advances grizzly bear recovery by allowing FWS to re-focus its resources on other populations, namely the Northern Continental Divide Ecosystem, Cabinet-Yaak, and Selkirk populations.

To obfuscate, Plaintiffs fundamentally reject the use of Congress'

distinct population segment mechanism, asking this Court to require

FWS to look at every other listable entity within the taxon, before it can

turn its attention to Yellowstone.  Plaintiffs likewise raise a host of

other scientific disagreements and voice differing lay opinions, most of

which are recycled arguments from the challenge to the 2007 Rule.

While it is true there is a difference of opinion on many issues, just as

there are with any biological or scientific issue, that does not mean

FWS' considered judgment developed over decades and based on

compelling data, is "so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle*

*Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29

(1983).  If this Court critically examines the Yellowstone Segment, and

all of the protections under the Conservation Strategy that ensure its

continued viability, FWS' determination is eminently reasonable.  And

looking forward, the other Federal agencies, States, and Tribes can be

trusted to manage this population of bears, just as they competently do

with all of the other wildlife within their borders.  The completion of

this Court's 2007 Rule remand is anything but "implausible."  *Id.*

This Court should resist Plaintiffs' invitation to a briar patch, a thicket from which we can only emerge based on further congressional action. Instead, Federal Defendants respectfully request that this Court allow biology and implementation of the ESA to remain in the hands of FWS. Because FWS considered relevant issues and articulated a rational connection between the facts and decisions made, the Court should grant summary judgment in favor of Federal Defendants[26], deny Plaintiffs' motions for summary judgment, and enter judgment in favor of Federal Defendants on those claims.

DATED: July 11, 2018.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SETH M. BARSKY, Chief
MEREDITH L. FLAX, Ass't Section Chief

---

[26] The Court should enter judgment in favor of Federal Defendants on every claim in the six consolidated cases except those that are currently stayed under this Court's order. ECF_178:4-5; *W. Watersheds Project v. Lueders*, 122 F. Supp. 3d 1039, 1055 (D. Nev. 2015) (granting judgment in favor of defendants on abandoned claims), *aff'd*, 701 F. App'x 651 (9th Cir. 2017).

*/s/ Coby Howell*
COBY HOWELL, Senior Trial Attorney
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, Oregon 97204-2902
Tel: (503) 727-1023 | Fax: (503) 727-1117
Email:  Coby.Howell@usdoj.gov

*/s/ Michael R. Eitel*
MICHAEL R. EITEL, Sr. Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1479 | Fax: (303) 844-1350
Email: Michael.Eitel@usdoj.gov;


*/s/ Devon L. Flanagan*
DEVON LEA FLANAGAN, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
601 D St. NW
Washington, D.C. 20004
Tel: (202) 305-0201 | Fax: (202) 305-0275
Email: Devon.Flanagan@usdoj.gov


Of Counsel:
Tyson Powell
Office of the Solicitor
Department of the Interior

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE & COMPLIANCE

I hereby certify that on July 11, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the attorneys of record. I certify that this brief is 22,972 words in accordance with the Court's order, ECF_198.

*/s/ Coby Howell*
COBY HOWELL
Senior Trial Attorney
U.S. Department of Justice