Adrian A. Miller
Sullivan Miller Law
3860 Avenue B
Suite C East
Billings, MT 59102
(406) 403-7066 (phone)
adrian.miller@sullivanmiller.com

Erik E. Petersen, WSB No. 7-5608
D. David DeWald, WSB No. 7-5538
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov
david.dewald@wyo.gov

*Attorneys for the State of Wyoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, CROW CREEK SIOUX TRIBE, STANDING ROCK SIOUX TRIBE, LOWER BRULE SIOUX TRIBE, PONCA TRIBE OF NEBRASKA, PIIKANI NATION, THE CRAZY DOG SOCIETY, HOPI NATIONAL BEAR CLAN, NORTHERN ARAPAHO ELDERS SOCIETY, DAVID BEARSHIELD, KENNY BOWEKATY, LLEVANDO FISHER, ELISE GROUND, ARVOL LOOKING HORSE, TRAVIS PLAITED HAIR, JIMMY ST. GODDARD, PETE STANDING ALONE, NOLAN YELLOW KIDNEY, and GARY DORR, | CV 17-89-M-DLC (Lead Case); Consolidated with Case Nos: CV 17-117-M-DLC, CV 17-118-M-DLC, CV 17-119-M-DLC, CV 17-123-M-DLC, CV 18-16-M-DLC |

Plaintiffs,

v.

UNITED STATES OF AMERICA, and
RYAN ZINKE, Secretary, United States
Department of the Interior, and the
UNITED STATES DEPARTMENT OF
INTERIOR, and GREG SHEEHAN,
Acting Director, United States Fish and
Wildlife Service, or his Successor in
Office, and the UNITED STATES FISH
AND WILDLIFE SERVICE, and
HILLARY COOLEY, Grizzly Bear
Recovery Coordinator,

Federal Defendants,

STATE OF WYOMING, STATE OF
IDAHO, STATE OF MONTANA,
SAFARI CLUB INTERNATIONAL and
NATIONAL RIFLE ASSOCIATION OF
AMERICA, SPORTSMEN'S
ALLIANCE FOUNDATION, AND
ROCKY MOUNTAIN ELK
FOUNDATION,

Defendant-Intervenors.

**DEFENDANT-INTERVENOR
STATE OF WYOMING'S
MEMORANDUM IN
SUPPORT OF CROSS-
MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................v

INTRODUCTION ...............................................................................................1

BACKGROUND ................................................................................................3

    I.    The State of Wyoming's Management of the Grizzly Bear......................3

        A.    Wyoming's Grizzly Bear Management Plan and the
Memorandum of Agreement ............................................................4

        B.    Wyoming's Cooperation with the Fish and Wildlife Service and
the State's Enforceable Grizzly Bear Regulations...........................5

        C.    Wyoming's Hunting Regulations.....................................................7

ARGUMENT ....................................................................................................8

    I.    Standard of Review ..............................................................................9

    II.    The Service complied with the requirements of the ESA when the
agency delisted the Yellowstone grizzly bear population.........................9

    III.    The Humane Society's motion for summary judgment lacks merit. .........9

        A.    The Service relied upon adequate, enforceable regulatory
mechanisms. ...................................................................................10

            1.    The existing federal regulatory mechanisms
are adequate. ....................................................................12

            2.    The Service properly relied upon Wyoming's
enforceable grizzly bear regulations....................................12

            3.    The Humane Society's "enforceability" concerns are
unfounded. .......................................................................15

            4.    The Endangered Species Act does not require
that regulatory mechanisms be "fully funded."..................19

        B.    Existing regulatory mechanisms do not threaten the
Greater Yellowstone Ecosystem grizzly bear population..............20

C.     The Endangered Species Act does not require a "recalibration" provision in the existing regulatory mechanisms...................................................................23

D.     The Service properly limited mortality limits to the Demographic Monitoring Area......................................................24

E.     Acceptance of the advocacy groups' arguments will irreparably harm State cooperation in recovery efforts and may lead to congressional action. ................................................25

CONCLUSION ...........................................................................................28

CERTIFICATE OF SERVICE ....................................................................31

CERTIFICATE OF COMPLIANCE ..........................................................32

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Salazar,*
    800 F. Supp. 2d 1123 (D. Mont. 2011)..............................................26

*Bennett v. Spear,*
    520 U.S. 154 (1997)..........................................................................23

*Defenders of Wildlife v. Zinke,*
    849 F.3d 1077 (D.C. Cir. 2017)........................................... 10, 11, 20

*Greater Yellowstone Coal., Inc. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011) .............................. 7, 12, 14, 15, 19, 25

*Laybourn v. Game and Fish Dep't,*
    No. 186-086 (Wyo. First Judicial Dist. June 27, 2017).....................18

**Statutes**

Wyo. Stat. Ann. § 16-3-114 ............................................................. 17, 18

Wyo. Stat. Ann. § 23-1-101 ...................................................................7

Wyo. Stat. Ann. § 23-1-302 ...................................................................7

**Other Authorities**

16 U.S.C. § 1531 ..................................................................................28

40 Fed. Reg. 31734 (July 28, 1975)........................................................8

82 Fed. Reg. 30502 (June 30, 2017) ............................................. *passim*

82 Fed. Reg. 50583 (Nov. 1, 2017).......................................................22

50 C.F.R. § 424.11 ......................................................................... 10, 28

May 7, 2013, Crow Tribal Legislature, JAR No. 13-09, Sections 1, 1(b)................7

*Rules Wyo. Game & Fish Comm'n,* ch. 67 (Sept. 6, 2016) .................... 6, 15-18, 24

*Rules Wyo. Game & Fish Comm'n,* ch. 68 (May 23, 2018) ....................7

**INTRODUCTION**

The United States Fish and Wildlife Service, the States of Idaho, Montana, and Wyoming, and others have worked together for over four decades to recover the Greater Yellowstone Ecosystem population of grizzly bears (hereinafter, the Greater Yellowstone population). Through their collective efforts, they restored a threatened population to thriving status. It is the crowning achievement of wildlife recovery in North America to date. Some advocacy groups disagree.

After reading the advocacy groups' memoranda, one might think that Congress enacted the Endangered Species Act (ESA or Act) to perpetually protect species, when, instead, Congress passed the ESA to protect species from extinction **until the species is recovered**. Once recovered, the Act demands that the Service remove a species from the list, liberating the Service to dedicate more of its time, budget, and expertise to recovering other listed species.

That is not how the advocacy groups view the ESA, particularly when the species at issue is as majestic and charismatic as the grizzly bear. The advocacy groups will never be satisfied with a rule that delists the Greater Yellowstone population. Never. And to achieve their goal of a permanently-listed Greater Yellowstone population, they will make any argument, criticize any science, contradict themselves, and claim that the sky is falling. Just like they did following the 2007 delisting rule. Just like they do now. If this Court accepts their arguments

here, and if Congress does not step in to legislate a stop to the cycle as it did with the gray wolf in Idaho and Montana, the advocacy groups will inevitably oppose the next delisting. Nothing will ever be good enough, and the parties will find themselves fighting the same fight in Missoula once again.

The law dictates another path. This Court must review the Service's robust delisting rule to determine whether it is truly "arbitrary and capricious." This Court must assess whether the Service's decision is "so implausible" that this Court must strike it down. Once the Court applies these standards, there will be no need for a third delisting rule that diverts significant amounts of money and attention from other species in need, because the Service's 2017 delisting rule is reasonable, rather than arbitrary or implausible. As the federal Defendants said in their memorandum, this Court has an opportunity. An opportunity to apply the ESA as Congress intended. Wyoming urges this Court to grasp that opportunity and allow the Greater Yellowstone population to remain under state management as one of many wildlife populations in the western United States that are, thankfully, not threatened or endangered.

## I. The State of Wyoming's Management of the Grizzly Bear

The State of Wyoming is home to the vast majority of the Greater Yellowstone population. (ECF_27:2-3).[1] It is unsurprising, then, that Wyoming has been involved with grizzly bear recovery since before the lower 48 population was listed in 1975. The State became an inaugural member of the Interagency Grizzly Bear Study Team upon its creation in 1973. 82 Fed. Reg. 30502, 30508 (June 30, 2017). The Study Team is composed of scientists and wildlife managers from federal, tribal, and state agencies involved in grizzly bear recovery. *Id*. Over the years, this interagency group has produced "a wealth of biological information" that "has made the [Greater Yellowstone] population the most studied in the world." *Id*. Wyoming also is a member of the Interagency Grizzly Bear Committee, which "coordinate[s] management efforts and research actions across multiple Federal lands and States to recover the grizzly bear in the lower 48 States [] [with] [o]ne of the objectives of [the Committee being] to change land management practices to more effectively provide security and maintain or improve habitat conditions for the grizzly bear." *Id*. (internal references omitted). And Wyoming is a member of the Yellowstone

---

[1] For the Court's convenience, Wyoming uses the citation format adopted by the federal Defendants. (*See* ECF_203:ix).

Ecosystem Subcommittee, which was formed in 1983 "to coordinate recovery efforts specific to the [Greater Yellowstone population.]" *Id.*

For decades, Wyoming has cooperated with the federal government, the states of Idaho and Montana, and many other groups and individuals to ensure the continued viability and ultimate recovery of the Greater Yellowstone population. From 1990 to 2015, Wyoming spent more than forty million dollars to recover that population, (FWS_LIT_33560), and over two million dollars in fiscal year 2018, after the delisting, (2017 Wyoming Grizzly Bear Job Completion Report).[2] This financial and regulatory commitment exemplifies, in concrete terms, Wyoming's commitment to the continued conservation of the Greater Yellowstone population.

## A. Wyoming's Grizzly Bear Management Plan and the Memorandum of Agreement

In 2002, Wyoming's Game and Fish Commission issued a detailed Grizzly Bear Management Plan to guide the Game and Fish Department's management of the species in Wyoming. (FWS_LIT_033530). The Commission most recently updated this plan in 2016. (*Id.*) "The adaptive framework for post-delisting management [that is spelled out in the Management Plan] is designed to ensure the [Greater Yellowstone population] is managed at or above demographic recovery criteria [established by the Service]." (FWS_LIT_033534-35). The plan covers the

---

[2]    Available    at    https://wgfd.wyo.gov/WGFD/media/content/Wildlife/Large%20Carnivore/Grizzly_JCR_2017_FINAL.pdf (last visited July 25, 2018).

Service's recovery criteria, regulations, management strategies, habitat preservation, monitoring, conflict management, and funding. (FWS_LIT_033525-93).

Wyoming also entered into a Memorandum of Agreement that will guide state management of the Greater Yellowstone population. 82 Fed. Reg. at 30508. The wildlife regulatory agencies of Wyoming, Idaho and Montana entered into this agreement in 2016. (FWS_LIT_004917). It represents a commitment from the signatory States to maintain a recovered Greater Yellowstone population by limiting discretionary grizzly bear mortality if the population falls to defined levels. (FWS_LIT_004919-22). The parties committed to "employ the best science and adaptive management approaches" to protect the Greater Yellowstone population. (FWS_LIT_004919). Wyoming's Grizzly Bear Management Plan incorporates the Memorandum of Agreement. (*See, e.g.*, FWS_LIT_033534).

### B.    Wyoming's Cooperation with the Fish and Wildlife Service and the State's Enforceable Grizzly Bear Regulations

Wyoming was a "participating state" in the Service's grizzly bear delisting effort. *Id*. at 30502. Before it issued the delisting rule, the Service worked with Wyoming to identify what enforceable state regulations the Service wanted in place before the agency would delist the Greater Yellowstone population. *See* 82 Fed. Reg. at 30602. Wyoming, through the State's Game and Fish Commission, promulgated these enforceable regulations to direct how Wyoming's Game and Fish Department will manage the delisted Greater Yellowstone population. *Rules Wyo. Game & Fish*

*Comm'n*, ch. 67 (Sept. 6, 2016).[3] Among other things, the regulations require: (1) that all discretionary mortality shall be suspended if the Chao2 population estimate falls below 600 grizzly bears; (2) that the Department will coordinate with Idaho and Montana through the Memorandum of Agreement to manage grizzly bear mortalities consistent with Wyoming's Grizzly Bear Management Plan for long-term viability of the grizzly bear; (3) that the Commission will monitor the Greater Yellowstone population to ensure viability and to demonstrate that the recovery criteria continue to be met; and (4) that discretionary mortality does not exceed the age and sex-specific mortality limits in the 2016 Conservation Strategy. *See id*.

In the final delisting rule, the Service stated that its "review of State actions [was] dependent on compliance with the regulatory mechanisms required of each State (set forth in the proposed rule)[.]" 82 Fed. Reg. at 30602. The agency found that the State regulations met this requirement: the "State regulatory mechanisms are adequate to protect the recovered population of the GYE grizzly bears and [] they do contain the general elements we required in our proposed delisting rule." *Id*. at 30601.

---

[3]    Available    at    https://wgfd.wyo.gov/regulations#Grizzly-Bear-Management-Regulation (last visited July 23, 2018).

### C. Wyoming's Hunting Regulations

As part of its strategy to manage the grizzly bear after delisting, the Wyoming Game and Fish Commission issued separate regulations that allow for limited hunting of the grizzly bear in Wyoming.[4] *Rules Wyo. Game & Fish Comm'n*, ch. 68 (May 23, 2018). The regulations recognize grizzly bears as "trophy game animals" under Wyoming law, which gives the Commission the authority to strictly control the circumstances under which they can be hunted. Wyo. Stat. Ann. §§ 23-1-101(a)(xii)(A) and 23-1-302.

The Ninth Circuit held that it was "entirely appropriate" for the Service to consider state-managed hunting as part of the post-delisting management of the Greater Yellowstone population, because it allows "the state to exercise some control over grizzly mortality." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1031-32 n.7 (9th Cir. 2011). Indeed, the rule that designated the lower-48 grizzly bear as "threatened" in the first place envisioned the use of hunting as a management tool for the post-delisted species: "If, in the future, grizzly bear populations in the Yellowstone ecosystem recover to the point where population pressures require removal of a part of the population, consideration will be given to

---

[4] It is the policy of the lead plaintiff in this case, the Crow Tribe, to "fully exercise its treaty right to hunt [] within the traditional Crow homeland," including hunting delisted grizzly bears. May 7, 2013, Crow Tribal Legislature, JAR No. 13-09, Sections 1, 1(b), available at http://www.ctlb.org/wp-content/uploads/2015/09/JAR-13-09-Excercising-Off-Reservation-Hunting-Rights.pdf (last visited July 3, 2018).

a controlled reduction by sport hunting conducted by the concerned State wildlife agencies[.]" 40 Fed. Reg. 31734, 31735 (July 28, 1975); *see also* the 1982 Grizzly Bear Recovery Plan at 43 ("Sport hunting on national forest, BLM, state and private lands is recognized as a legitimate tool for managing grizzly bear populations once recovery has been achieved[.]") (FWS_LIT_014372); 2016 Conservation Strategy at 3 ("the vision of the Conservation Strategy can be summarized as follows: [] allowing regulated hunting when and where appropriate") (FWS_Rel_Docs_000305).

In sum, a regulated grizzly bear hunting season, like Wyoming's, is consistent with the original ESA listing of the Greater Yellowstone population, consistent with both the Recovery Plan and the 2016 Conservation Strategy, and "entirely appropriate" as part of post-delisting management in the eyes of the Ninth Circuit.

## ARGUMENT

Given the word limits established by this Court, Wyoming cannot realistically address all of the arguments presented by the various Plaintiff groups. (*See* ECF_178). Accordingly, in support of its motion for summary judgment and in opposition to the motions by the advocacy groups, Wyoming adopts and incorporates by reference the arguments advanced by the federal Defendants. In addition, the State specifically responds to the arguments presented by the Humane Society and the Fund for Animals (collectively, the Humane Society) in support of

its motion for summary judgment. The Humane Society's arguments address the adequacy of existing regulatory mechanisms, one of five factors that the Service must consider prior to any delisting. Neither applicable law nor the administrative record support The Humane Society's arguments.

## I.     Standard of Review

The State of Wyoming adopts and incorporates by reference the standard of review provided by the federal Defendants.

## II.    The Service complied with the requirements of the ESA when the agency delisted the Yellowstone grizzly bear population.

In support of its motion for summary judgment, the State of Wyoming adopts and incorporates by reference the federal Defendants' arguments that the Service complied with the ESA by delisting the Greater Yellowstone population. (*See* ECF_203). Specifically, the Greater Yellowstone population is biologically recovered, and the Service properly considered the delisting factors. (*Id*.). The State of Wyoming respectfully requests that this Court grant its motion for summary judgment for the reasons expressed by the federal Defendants.

## III.   The Humane Society's motion for summary judgment lacks merit.

In support of its motion for summary judgment, the Humane Society relies upon four distinct "regulatory mechanism" arguments. (ECF_194). They argue that the Service violated the ESA by relying upon regulatory mechanisms that: (1) are non-binding and unreliable; (2) allow a level of mortality that threatens the Greater

Yellowstone population; (3) do not address mortality outside of the Demographic Monitoring Area; and (4) do not contain a "recalibration" provision. These arguments lack merit.

### A. The Service relied upon adequate, enforceable regulatory mechanisms.

To delist a species, the ESA requires the Service to determine that the "inadequacy of existing regulatory mechanisms" will not threaten or endanger the species in question. 50 C.F.R. § 424.11(c)(4). Put another way, before delisting, the Service must determine that existing regulatory mechanisms are "adequate" to prevent the species from being threatened or endangered. *See id*. The Humane Society argues that the regulatory mechanisms upon which the Service relied are not "adequate" because they are not legally binding. (ECF_194:6-10). As the State will discuss, this is incorrect as a factual matter. The Service relied upon adequate, legally-binding regulatory mechanisms. (ECF_203:63-68). But even if the Service had relied solely upon non-binding conservation measures, the fact that they are not legally-binding does not mean that they are inadequate under the ESA. (*Contra* ECF_194:6-10); (ECF_203:63-68).

The Court of Appeals for the District of Columbia Circuit meticulously addressed this issue last year in the context of a rule to delist gray wolves in Wyoming. *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1079-84 (D.C. Cir. 2017). In that case, the environmental plaintiffs argued that the Service violated the ESA

by relying upon Wyoming's wolf management plan because it was not legally binding. *Id*. at 1084. The D.C. Circuit rejected this argument (and the environmental plaintiffs' challenge to the delisting rule), finding that nothing in the ESA demands that regulatory mechanisms be legally binding. *Id*.

> The Service's decision to delist in the absence of legal certainty is compatible with the ESA's requirement for monitoring of the species after delisting "for at least five years" and its emergency provisions authorizing the Secretary to take immediate action to ensure the delisted species does not become threatened or endangered again. So understood, the Service could reasonably conclude that Wyoming's efforts set forth in its management plan were sufficiently certain to be implemented based on the strength of the State's incentives.

*Id*. This alone refutes the Humane Society's "legally-binding" argument.[5] But this Court need not engage in the "legally-binding" debate, because the Service relied upon existing, legally-binding regulatory mechanisms that are more than "adequate" under the ESA.

The Humane Society disagrees. (ECF_194:6-15). Its argument rests on three legs: (1) the Service did not rely upon **any** enforceable State regulatory mechanisms; (2) the Memorandum of Agreement and the 2016 Conservation Strategy are inadequate because they are non-binding; and (3) the Memorandum of Agreement

---

[5] The Humane Society cites to a 2012 D.C. district court opinion in support of its "legally-binding" argument, but they do not discuss the D.C. Circuit's 2017 opinion in *Defenders of Wildlife v. Zinke* that casts the continued validity of the 2012 district court opinion into serious doubt. (ECF_194:7).

and the 2016 Conservation Strategy are inadequate because they are not fully funded and, therefore, are unreliable. *Id*. The Humane Society is incorrect.

### 1. The existing federal regulatory mechanisms are adequate.

In making its regulatory mechanisms argument, the Humane Society immediately jumps to criticize some, but not all, of the state and inter-state regulatory mechanisms that the Service considered before delisting. (ECF_194:6-15). In so doing, it skipped a step in the analysis. If the existing **federal** regulatory mechanisms are adequate on their own, the adequacy of the state and inter-state regulatory mechanisms is irrelevant. The Ninth Circuit made this clear in the prior grizzly bear delisting litigation. *Greater Yellowstone Coal.*, 665 F.3d at 1032 ("we need not, and do not, consider [the adequacy of state] measures, some or all of which may not be binding, because we hold that the clearly binding [federal] regulatory mechanisms [] suffice"). And, as the federal Defendants have already shown, the existing federal regulatory mechanisms are sufficient to comply with the requirements of the ESA. (ECF_203:66-67). Accordingly, the Humane Society's regulatory mechanism argument cannot stand.

### 2. The Service properly relied upon Wyoming's enforceable grizzly bear regulations.

If this Court finds, unlike the Ninth Circuit in 2011, that the existing federal regulatory mechanisms are inadequate on their own, the enforceable regulations

promulgated by the wildlife authorities in Wyoming, Idaho and Montana before the delisting are more than enough to make up the difference. The Humane Society disagrees, arguing that the Service improperly relied upon state regulatory mechanisms "that do not carry the force of law[.]" (ECF_194:6-15). In so doing, the Humane Society does not challenge the adequacy of the States' grizzly bear regulations. (*Id.*). The Humane Society does not even mention the existence of Wyoming's enforceable grizzly bear regulations in its memorandum in support of its motion. (ECF_194). This failure to mention these regulations cannot be explained by the Humane Society's ignorance of their existence because the Humane Society commented on them when Wyoming promulgated them.[6] (Ex. A). Instead, the Humane Society asserts that the Service did not rely upon the States' enforceable grizzly bear regulations **at all** prior to delisting. (ECF_194:10-12).

In support of this argument, the Humane Society implies that, because the Service considered both binding and non-binding conservation measures as part of its regulatory mechanism analysis, the Service "abandoned" its statement in the proposed delisting rule that the States must promulgate enforceable grizzly bear regulations before delisting. (*Id.*). This is as deliberately obtuse as it is incorrect. The

---

[6] The Humane Society made a strategic decision not to dispute the adequacy of Wyoming's enforceable grizzly bear regulations. (*See* ECF_194). As a result, it waived this potential argument in support of its motion.

mere fact that the Service looked at the entire universe of conservation measures does not support the Humane Society's "abandonment" argument. (*Contra id.*).

For example, in the prior grizzly bear delisting, the Service reviewed a suite of conservation measures, some of which were legally-binding and some that were not. *Greater Yellowstone Coal.*, 665 F.3d at 1032. The Ninth Circuit declined to weigh in on the "legally-binding" debate, at least in part because the court found that a subset of the legally-binding regulatory mechanisms that the Service considered were sufficient on their own. *Id.* In so doing, the Ninth Circuit's ruling shows that merely because the Service considered both binding and non-binding conservation measures in the final rule does not mean that the agency abandoned its statement that it would require enforceable state regulations before delisting. *Id.*

As the Service clearly stated in the delisting rule, the agency considered the entire suite of conservation measures, **including** the enforceable state regulations envisioned in the proposed rule. 82 Fed. Reg. at 30601-02. And the Service found that the enforceable state regulations met both what the agency described in the proposed rule and what the ESA requires. *Supra* at 5-6. Moreover, nothing impeded the Service from relying, as it said it did, on enforceable state regulations because these supposedly-abandoned state regulations have been in full force since well before the Service's issuance of the delisting rule. *See, e.g.*, *Rules Wyo. Game &*

*Fish Comm'n*, ch. 67 (Sept. 6, 2016). The Humane Society's "abandonment" argument lacks merit as a result.

### 3. The Humane Society's "enforceability" concerns are unfounded.

Instead of addressing Wyoming's enforceable regulations head on, the Humane Society attacks the 2016 Conservation Strategy and the Memorandum of Agreement. (ECF_194:6-10). Specifically, the Humane Society argues that the Service did not consider whether Wyoming would faithfully implement and comply with the 2016 Conservation Strategy and the Memorandum of Agreement. (*Id.*). In support, the Humane Society asserts that the Memorandum of Agreement does not successfully implement the mortality limits in the 2016 Conservation Strategy because: (1) there is no penalty for breach of the Memorandum of Agreement; (2) Wyoming can withdraw from the Memorandum of Agreement without penalty; (3) private parties cannot enforce the terms of the Memorandum of Agreement; and (4) Wyoming retains its sovereign immunity in the Memorandum of Agreement. (*Id*. at 8).

As an initial matter, the Humane Society's attack on the 2016 Conservation Strategy flies directly in the face of the Ninth Circuit's ruling in the prior delisting litigation. There, the Ninth Circuit found the prior version of the Conservation Strategy to be sufficient under the ESA. *Greater Yellowstone Coal.*, 665 F.3d at 1031. And, as the federal Defendants point out, the prior Conservation Strategy is

more or less equivalent to the 2016 Conservation Strategy at issue here. (ECF_203:66). Indeed, it is updated and more robust. (*See* ECF_203:61-63). This alone should lead the Court to reject the Humane Society's argument.

In any event, while the Humane Society's four assertions about the Memorandum of Agreement are generally correct, the conclusion that the Humane Society draws from them is not. As already discussed, the Service can rely upon regulatory mechanisms that are not legally binding. Regardless, Wyoming's Game and Fish Commission promulgated enforceable regulations that address the Humane Society's concerns. *See Rules Wyo. Game & Fish Comm'n*, ch. 67, § 4 (Sept. 6, 2016). And, although the federal regulatory mechanisms suffice on their own, the Service took a conservative approach and would not have issued the delisting rule without these state regulations in place. 82 Fed. Reg. at 30602. The four assertions about the Memorandum of Agreement put forth by the Humane Society ring hollow as a result.

With regard to the Humane Society's first assertion, Wyoming's regulations require that the State's Game and Fish Department "shall" manage the grizzly bear in a manner consistent with the Memorandum of Agreement. *Rules Wyo. Game & Fish Comm'n*, ch. 67, § 4(k) (Sept. 6, 2016). Specifically, among other things, the regulations require the Department to "manage grizzly bear mortalities within the age and sex specific mortality limits identified in [Wyoming's Grizzly Bear]

Management Plan." *Id*. The management plan incorporates the mortality limits described in the 2016 Conservation Strategy. (FWS_LIT_033537). So, if Wyoming's Game and Fish Department fails to abide by these limits, the Department will have breached Wyoming's enforceable regulations. *See Rules Wyo. Game & Fish Comm'n*, ch. 67, § 4(k) (Sept. 6, 2016). Similarly, with regard to the Humane Society's second assertion, if Wyoming's Game and Fish Department withdrew from the Memorandum of Agreement, the agency could not comply with the Commission's enforceable regulations. *See id*. Thus, there is a real-world penalty for withdrawal.

With regard to the third assertion, Wyoming's Administrative Procedure Act provides private parties with the ability to bring suit if they believe the Game and Fish Department violated the State's regulations. *See* Wyo. Stat. Ann. § 16-3-114. The Humane Society already sued Wyoming's Game and Fish Department over grizzlies by relying upon this provision of Wyoming's Administrative Procedure Act. (ECF_194:9). Because the regulations require the Department to manage grizzly bears in accordance with the Memorandum of Agreement, *Rules Wyo. Game & Fish Comm'n*, ch. 67, § 4 (Sept. 6, 2016), and because the Humane Society can bring suit for failure to abide by the regulations under Wyoming Statute § 16-3-114, the Humane Society's third assertion lacks traction.

With regard to the fourth assertion, Wyoming's Administrative Procedure Act provides for a limited waiver of its sovereign immunity to suit. Wyo. Stat. Ann. § 16-3-114. That waiver allows private parties to bring suit regarding alleged violations of the regulations, as just discussed. *Id*. So, that assertion falls flat as well. In sum, the existence of Wyoming's enforceable regulations directly refutes the Humane Society's "enforceability" arguments.

The Humane Society makes much of the fact that, in a 2016 state court procedural challenge by the Humane Society to Wyoming's signing of the Memorandum of Agreement, Wyoming acknowledged that the Memorandum of Agreement is, by itself, not binding on the State. (ECF_194:8-9). Wyoming stands by that statement. But it is irrelevant here, because **after** that statement was made, Wyoming promulgated the regulations discussed above that **do** make the critical aspects of the Memorandum of Agreement binding on the State. *Rules Wyo. Game & Fish Comm'n*, ch. 67 § 4 (Sept. 6, 2016). In its opinion rejecting the Humane Society's procedural challenge, the Wyoming court recognized the State's position that the Memorandum of Agreement "contemplate[s] future rulemaking" and that said rulemaking culminated on September 6, 2016, with regulations. *Laybourn v. Game and Fish Dep't*, No. 186-086 (Wyo. First Jud. Dist. June 27, 2017) (Ex. B). Accordingly, Wyoming's statements in the state court litigation undermine rather than buttress the Humane Society's arguments here.

### 4. The Endangered Species Act does not require that regulatory mechanisms be "fully funded."

The Humane Society next argues that the 2016 Conservation Strategy is inadequate as a regulatory mechanism because "it lacks funding." (ECF_194:13-15). The implication of this argument is that, for regulatory mechanisms to be adequate under the ESA, they must be funded in perpetuity. As the Humane Society well knows, such a requirement would be totally unworkable, as state agencies do not have guaranteed, perpetual funding. Given that reality, it is unsurprising that the Humane Society's "funding" argument is untethered to legal support.

The Humane Society provides no citations that support its "fully funded" argument. (*See* ECF_194:13-15). The quote from *Alaska v. Lubchenco* is pure *dicta*. (*See id*. at 15) (citation omitted). By contrast, many decisions find regulatory mechanisms to be "adequate" under the ESA without evidence of fully-guaranteed funding. Take, for example, the Forest Service plans that the Ninth Circuit found to be sufficient in the prior grizzly bear delisting litigation. Like most federal agencies, the Forest Service requests funding from Congress at regular intervals with no guarantee of what the next budget will look like. Yet the uncertainty of future funding did not stop the Ninth Circuit from finding the Forest Service's plans to be adequate under the ESA. *See Greater Yellowstone Coal.*, 665 F.3d at 1032. The same is true here. This Court should summarily reject the Humane Society's unsupported "funding" argument on this basis alone.

In addition, the federal Defendants have shown that the Service adequately considered the issue of future funding. (ECF_203:75-78). And there is no reason to believe that Wyoming will not dedicate sufficient funding to support the management of grizzly bears as it has for many years, despite not being required to do so. *Supra* at 4 (two million dollars already expended post-delisting); *see, e.g.*, 82 Fed. Reg. at 30602 ("The States have an incentive to manage bears based upon recovery criteria[.]"); *id.* ("the Service has not encountered any situation or data that evidences an intent [by the States] to deviate from these established wildlife management practices."); *Defenders*, 849 F.3d at 1084 (finding that the ESA allows the Service to conclude that non-binding state measures are adequate based on the State's incentive to comply with said measures). For these reasons, the Humane Society's "funding" argument lacks merit.

## B. Existing regulatory mechanisms do not threaten the GYE grizzly bear population.

The Humane Society next asserts that the level of discretionary mortality allowed by the Memorandum of Agreement and the 2016 Conservation Strategy threatens the very survival of the Greater Yellowstone population. (ECF_194:15-20). Specifically, it argues that the grizzly population faces a "catastrophic population decline" that is "undetectable" by the monitoring required by the final rule and incorporated into the Memorandum of Agreement and the 2016

Conservation Strategy. (*Id.* at 15-20). These hyperbolic arguments and the now-familiar assertions of impending doom lack support in the administrative record.

The Humane Society's "catastrophic decline" argument rests on two separate but related assertions. First, the Humane Society argues that, because the conservative Chao2 model estimates the grizzly bear population based on the number of females with cubs-of-the-year, the model will overestimate the population of male grizzlies to the point that "an unsustainably high number of male bears [will] die as a result." (ECF_194:15-17). Second, the Humane Society argues that this alleged overestimation creates a 50-percent chance that the mortality limits in the final rule will be unsustainable.[7] (*Id.* at 18-20).

As an initial matter, the federal Defendants have already explained why the Humane Society's cherry-picking of comments and preferred science does not carry the day. (ECF_194:60). Moreover, in the final delisting rule, the Service explained why these concerns are unfounded. First, the Humane Society's argument that the Chao2 model will overestimate the population of male grizzlies provides less than the whole picture. (*See* ECF_194:16-18). Specifically, in responding to this concern, the Service made clear that the Interagency Grizzly Bear Study Team "uses multiple techniques for monitoring, including Chao2." 82 Fed. Reg. at 30591.

---

[7] If this Court vacates the final rule and puts the Greater Yellowstone population back on the list, the Service will continue to use the Chao2 model, with all of its alleged flaws, because it is the best available science.

> Although the model-averaged Chao2 technique would not detect changes in the male subpopulation, the rates and ratios we use to derive a total population estimate are based on our known-fate analyses. The sample of radio-monitored bears (females and males) will allow [the Study Team] to update these rates and ratios if they change, which would be reflected in the total population estimate. If male survival declines, this would lead to lower estimates of a total population size through changes in the sex ratio, which would eventually change mortality thresholds as specified in this final rule and the 2016 Conservation Strategy.

*Id*.; *see also id*. at 30629 (noting that the Study Team will monitor both male and female radio-collared grizzly bears to track population trends). In other words, the Service already debunked the Humane Society's "male mortality" argument. Contrary to the impression provided by the Humane Society, the Service and the Interagency Grizzly Bear Study Team do not view the grizzly population solely through the Chao2 lens. (ECF_203:78-86). The Humane Society's "male grizzly" argument fails as a result.

With regard to the "50 percent" argument, the federal Defendants have shown that the Humane Society relies on a number of speculative assumptions, something the ESA disfavors. *Bennett v. Spear*, 520 U.S. 154, 176 (1997). Moreover, "the number of bears available for discretionary mortality, including for harvest, will be conservative because the Chao2 estimates are very conservative." 82 Fed. Reg. 50583, 50592 (Nov. 1, 2017). And, of course, "if any population estimate falls below 600 [bears], there will be **no** discretionary mortality, except as necessary for human

safety." *Id*. at 30591 (emphasis added). Accordingly, the Humane Society's "catastrophic decline" argument lacks merit.

### C. The Endangered Species Act does not require a "recalibration" provision in the existing regulatory mechanisms.

The Humane Society next argues that the Service acted arbitrarily by not specifically addressing how and whether recalibration will occur if the best available science advances to the point where a new population estimator is required. (ECF_194:24-28). Specifically, it purportedly is concerned that the States will use a population estimator other than Chao2 at some point in the future and not make adjustments to fit the new estimator.[8] (*Id*.). The federal Defendants have already shown that the Service rationally decided not to speculate as to what may or may not become the best available science in the future. (ECF_203:90-94) (citing *Bennett*, 520 U.S. at 176 (concluding that the ESA should not be "implemented haphazardly, on the basis of speculation or surmise")). Accordingly, a recalibration provision is unnecessary and imprudent.

The Humane Society's "recalibration" argument also fails due to Wyoming's enforceable grizzly bear regulations. Specifically, Wyoming's enforceable

---

[8] The Chao2 estimator that the Humane Society worries the States will replace at some point in the future is the same estimator that the Humane Society argues will lead to a "catastrophic population decline" in the Greater Yellowstone population. (ECF_194:15-20).

regulations require the Wyoming Game and Fish Department to use the Chao2 model. *Rules Wyo. Game & Fish Comm'n* , ch. 67, § 4(c) (Sept. 6, 2016). If another model emerges that is the best available science, and if that model is adopted, Wyoming's Game and Fish Commission will need to revise its regulations to recognize the new model. *See id*. In turn, if Wyoming alters its regulations, the Service has committed to promptly conduct an evaluation of the new regulations to see if the new regulations represent a threat to the Greater Yellowstone population. 82 Fed. Reg. at 30630. If the regulations pose such a threat, the Service will pursue listing the species, which could include an emergency listing. *See id*. This structure provides more than enough protection for the grizzly population from an as-yet-developed population model. The Interest Groups' "recalibration" argument lacks merit as a result.

### D. The Service properly limited mortality limits to the Demographic Monitoring Area.

The Humane Society argues that the Service violated the ESA by not considering the adequacy of regulatory mechanisms outside the Demographic Monitoring Area. (ECF_194:20-24). The federal Defendants refuted this assertion by explaining how the Service did, in fact, consider the adequacy of regulatory mechanisms outside the Demographic Monitoring Area. (ECF_203:94-97).

When weighing this argument, this Court should keep two things in mind. First, the area inside the Demographic Monitoring Area contains enough suitable

habitat for the Greater Yellowstone population to remain recovered and secure. (FWS_Rel_Docs:1508) (the Demographic Monitoring Area "contains adequate habitat quality and quantity to support a recovered grizzly bear population"). Second, the Chao2 population estimate does **not** include bears outside the Demographic Recovery Area. *See, e.g.*, 82 Fed. Reg. at 30512-514, 30554. In other words, any bears outside the Demographic Recovery Area are in addition to the recovered Greater Yellowstone population as measured by the Service in the Demographic Monitoring Area. Both of these factors put the Humane Society's argument into context.

### E.  Acceptance of the advocacy groups' arguments will irreparably harm State cooperation in recovery efforts and may lead to congressional action.

More than ten years ago, the Service determined that the Greater Yellowstone population had achieved recovery. 82 Fed. Reg. at 30505. Obeying its statutory mandate, the Service delisted the grizzly bear population. *See id*. Advocacy groups challenged the delisting rule, asserting all manner of alleged failings by the Service. Ultimately, the Ninth Circuit found that **one** of the alleged failings had merit. *Greater Yellowstone Coal.*, 665 F.3d at 1032. That finding resulted in the recovered grizzly population remaining on the list for another decade, siphoning time and money away from other species recovery efforts, despite the fact that the

environmental community's prediction of a whitebark pine seed-related disaster was unfounded.

Here we are again. The grizzly bear population remains recovered. 82 Fed. Reg. at 30502. The advocacy groups are again predicting catastrophe. (*See, e.g.*, ECF_194). And once again it is in the hands of this Court to determine whether the Service acted in an arbitrary and capricious manner in removing the Greater Yellowstone population from the agency's list of threatened and endangered species.

The federal Defendants rightly point out that, if this Court finds legal error where the Ninth Circuit did not in 2011, Congress may choose to legislatively delist the grizzly bear. (*See* ECF_203:125) ("further congressional action"). That is not rhetoric, as the gray wolf litigation and subsequent legislation show. *See All. for the Wild Rockies v. Salazar*, 800 F. Supp. 2d 1123, 1127 (D. Mont. 2011). Every time Congress needs to legislate a fix to a recovery effort, the ESA becomes more fragile because it shows that the statute, with its goal of recovery, is not functioning as Congress intended.

But there is an additional policy-based risk posed by overturning the 2017 delisting rule. Another refusal by this Court to delist the recovered grizzly bear population leaves the States with little hope of a successful delisting in the future. The last rule had **one** supposed failing. Yet here we are arguing everything all over again. Why would litigation before this Court in 2028 be any different?

If the States no longer believe a delisting is possible, the incentive to help assist a species to achieve and maintain recovery is greatly diminished. The citizens of Wyoming have no desire to pay millions of dollars in state funds for grizzly bear management if the grizzly bear will remain forever under federal control. With little incentive for the States to participate, the Service may be left to its own devices, despite the fact that the States are the ones with the expertise in managing grizzly bears on the ground. This presents a very real risk to future federal-state partnerships under the ESA.

As the Service recognized in the final rule, "[r]ecovery of the Greater Yellowstone Ecosystem Distinct Population Segment would not have occurred without the active participation, support, and leadership of Idaho, Montana, and Wyoming." 82 Fed. Reg. at 30602. By removing the incentive to participate, this Court could threaten the continued recovery of the Greater Yellowstone population, not to mention future recovery efforts for other species. And for what? A paperwork exercise for a population that has been recovered for over a decade?

The question here is whether the United States Fish and Wildlife Service acted in an arbitrary and capricious manner when it delisted the Greater Yellowstone population. By the very nature of that standard, it is not this Court's role to let the perfect be the enemy of the good. And doing so can have long-lasting consequences.

## CONCLUSION

The goal of the ESA is to achieve recovery. 16 U.S.C. §§ 1531, 1532(3); 50 C.F.R. § 424.11(d)(2). If this Court invalidates the Service's 2017 delisting rule, after an exhaustive remand of a nearly-perfect 2007 rule, and despite the fact that the grizzly bear population is fully recovered, the message will be clear – inevitable litigation in the District of Montana makes it impossible to delist the Greater Yellowstone population of grizzly bears. That is not what Congress intended when it enacted the ESA.

The Greater Yellowstone recovery effort is a tremendous success story. It should be a case study of how the ESA works well. It should not be an example to Congress and the States that the ESA is broken. The States are already successfully managing grizzly bears just as they do other wildlife, such as the black bear, within their borders. Congress did not intend for species to remain listed forever. There must be a finish line. And the Greater Yellowstone population crossed that line.

The Service should now be dedicating its limited time and funds to other species. The Northern long-eared bat in Montana. The Banbury Springs limpet in Idaho. The Wyoming toad. These animals have little in common with the Greater Yellowstone grizzly bear. They are not charismatic megafauna. They do not drive member donations. They are not getting anywhere near the same amount of the Service's time and money that goes to the Greater Yellowstone grizzly bear. And

they have one other critical characteristic that they do not share with the Greater Yellowstone grizzly bear. These animals, and hundreds of others, are endangered and at risk of extinction. Unlike the Greater Yellowstone grizzly bear.

The Greater Yellowstone population is recovered. This Court should uphold the Service's robust delisting rule.

Dated this 25th day of July, 2018.

FOR DEFENDANT-INTERVENOR
STATE OF WYOMING

/s/ Adrian A. Miller
Adrian A. Miller
Sullivan Miller Law PLLC
3860 Avenue B
Suite C East
Billings, Montana  59102
(406) 403-7066 (phone)
(406) 294-5702 (fax)
adrian.miller@sullivanmiller.com

Erik E. Petersen, WSB No. 7-5608
D. David DeWald, WSB No. 7-5538
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY  82002
(307) 777-6946 (phone)
(307) 777-3542 (fax)
erik.petersen@wyo.gov
david.dewald@wyo.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 25th, 2018, the foregoing was served by the Clerk of the U.S. District Court of Montana, Missoula Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.


/s/ Adrian A. Miller
Adrian A. Miller

**CERTIFICATE OF COMPLIANCE**

1.     In accordance with Local Rule 7.1(d)(2)(E) of the United States District Court for the District of Montana Local Civil Rules, the State of Wyoming files this Certificate of Complaince.

2.     This document complies with Local Rule 7.1(d)(2)(A) and (E), since, exluding caption, the certificates of service and complaince, table of contents and authorities, and exhibit index, the document contains 6,391 words in 14-point Times New Roman font.

Dated this 25th day of July, 2018.


/s/ Adrian A. Miller
Adrian A. Miller