Robert T. Bell
Reep, Bell, Laird & Jasper
PO Box 16960
2955 Stockyard Road
Missoula, MT 59808
Facsimile: 406-541-4101
Telephone: 406-541-4100
bell@westernmontanalaw.com
*Attorney for Defendant-Intervenors*
*Safari Club International and*
*National Rifle Association of America*
[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE; et al., | CV 17-89-M-DLC-JCL |
| Plaintiffs, | (Consolidated with Case Nos. CV 17-117-M-DLC, CV 17-118-M-DLC, CV 17-119-M-DLC, CV 17-123-M-DLC), and CV 18-016-M-DLC |
| vs. | |
| UNITED STATES OF AMERICA; et al., | |
| Federal-Defendants, | |
| and | |
| SAFARI CLUB INTERNATIONAL and NATIONAL RIFLE ASSOCIATION OF AMERICA, et al. | **MEMORANDUM IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT IN ALL CONSOLIDATED CASES BY DEFENDANT-INTERVENORS SAFARI CLUB INTERNATIONAL AND THE NATIONAL RIFLE ASSOCIATION OF AMERICA AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

CITATION FORMATS ...................................................................................... iv

ACRONYMS AND SHORT NAMES ..................................................................v

I.   INTRODUCTION...........................................................................................1

II.  ARGUMENT ................................................................................................3

      A.      The best available scientific and commercial data show
             that the Yellowstone Segment is recovered and does not
             face any threats from hunting. ...................................................... 3

      B.      The FWS has the authority to designate a segment for purposes
             of delisting and, to the extent *Humane Society* applies, properly
             analyzed the relevant factors. ...................................................... 11

             1.      To the extent necessary, the FWS considered the impact
                    of the delisting on the "remnant" population............................14

             2.      To the extent necessary, the FWS considered the impact
                    of loss of historical range on the Yellowstone Segment...........20

             3.      The FWS has the authority to delist the Yellowstone
                    Segment.....................................................................................23

      C.      The FWS's actions do not conflict with the 1975 Final Rule
             or grizzly bear recovery plans.....................................................25

III.   CONCLUSION ..........................................................................................288

CERTIFICATE OF SERVICE & COMPLIANCE ..................................................30

# TABLE OF AUTHORITIES

**Cases**

Defenders of Wildlife v. Salazar,
  729 F. Supp. 2d 1207 (D. Mont. 2010) ..................3

Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,
  887 F.3d 906 (9th Cir. 2018) ......................... 10, 11

Fund for Animals v. Turner,
  1991 WL 206232 (D.D.C.)...................................24

Humane Society of the U.S. v. Zinke,
  865 F.3d 585 (D.C. Cir. 2017)................... 2, 14, 19, 20, 23

**Statutes**

16 U.S.C. § 1532(3) .............................................26

16 U.S.C. § 1533(a)(1).........................................3, 8

**Regulations**

50 C.F.R. § 402.02 ................................................3

50 C.F.R. § 424.11 ................................................3

**Legislative History**

Pub. L. 93-205, § 3(11), 87 Stat. 884 (1973)..................24

Pub. L. 95-632, § 2(5), 92 Stat. 3751 (1978)................ 23-24

**Federal Register**

40 Fed. Reg. 31734 (July 28, 1975)...................... 24, 25, 26

40 Fed. Reg. 5 (Jan. 2, 1975) ..................................25

81 Fed. Reg. 13174 (Mar. 11, 2016)............... 4, 5, 6, 9, 11, 17

82 Fed. Reg. 30502 (June 30, 2017) ........ 1, 3, 8, 9, 10, 14, 15, 16, 20, 21, 22

**CITATION FORMATS**

Consistent with the Federal Defendants, Defendant-Intervenors Safari Club International and the National Rifle Association of America adopt the following approach from the Federal Defendants' cross-motion for summary judgment.

1.  Citations to pleadings in this case are formatted as ECF_XX:YY, where XX refers to the ECF-document number and YY refers to the ECF-generated page number in the upper right corner.

2.  Citations to the administrative and judicial record are formatted consistent with the U.S. Fish and Wildlife Service's Index, for example, FWS_Rel_Docs:XX, where XX refers to the bates stamp numbers generated by the Service in the lower right corner of the document.

# ACRONYMS AND SHORT NAMES

Under the Court's Order on the Briefing Schedule, ECF 178, the parties were to minimize the use of acronyms. Below are the acronyms and short names that SCI/NRA use in this brief, including those adopted by the Federal Defendants. Acronyms below marked with an * are mentioned in Court's Order on the Briefing Schedule, ECF 178.

| Acronym or Short Name | Long Name |
| --- | --- |
| 1975 Proposed Rule | Grizzly Bear Proposed "Threatened" Status in the Conterminous 48 States, 40 Fed. Reg. 5 (Jan. 2, 1975) |
| 1975 Final Rule | Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31734 (July 28, 1975) |
| 2016 Proposed Rule | Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife, 81 Fed. Reg. 13174 (Mar. 11, 2016) |
| 2017 Final Rule | Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife, Final Rule, 82 Fed. Reg. 30502 (June 30, 2017) |
| ESA* | Endangered Species Act |
| Fed. Def. Memo | Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgement, ECF_203 |
| Federal Defendants | Named defendants in six consolidated cases |
| FWS* | U.S. Fish and Wildlife Service |
| GYE (used in secondary sources) | Greater Yellowstone Ecosystem |

| Acronym or Short Name | Long Name |
| --- | --- |
| *Humane Society* | *Humane Society of the U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) |
| IGBC | Interagency Grizzly Bear Committee |
| Regulatory Review | Regulatory Review, 83 Fed. Reg. 18737 (Apr. 30, 2018) |
| SCI/NRA | Defendant-Intervenors Safari Club International and the National Rifle Association of America |
| segment or DPS (used in secondary sources) | distinct population segment |
| Yellowstone Segment or GYE DPS (used in secondary sources) | The population of grizzly bears in the Yellowstone Ecosystem that became a "distinct population segment" under the ESA |

## I.  INTRODUCTION

For the Endangered Species Act ("ESA") to succeed, the U.S. Fish and

Wildlife Service ("FWS") must be able to delist species (whether a species,

subspecies, or distinct population segment ("segment")) when warranted, which

frees up limited resources to address other ESA needs.  Delisting also returns

primary management responsibility to the states, which have great expertise in

managing wildlife.  The FWS determined, after over four decades of studying and

managing the grizzly bear segment that populates the Greater Yellowstone

Ecosystem ("Yellowstone Segment"), that these bears no longer qualified as

threatened under the ESA.  2017 Final Rule, 82 Fed. Reg. 30502 (June 30, 2017).[1]

Instead of recognizing this recovery and that these bears no longer meet the

statutory requirements for threatened status, Plaintiffs essentially seek to keep the

Yellowstone Segment listed in perpetuity.

To challenge this delisting, Plaintiffs wrongly argue that well-regulated

hunting under state management will undermine the continued recovery of the

Yellowstone Segment.  But the FWS, its experts, and the peer reviewers all

---

[1] The 2017 Final Rule is in the Administrative Record at FWS_Rel_Docs:1435.

concluded that hunting within mortality limits poses no such threat. This conclusion, as with all the FWS determinations, is entitled to deference.

Plaintiffs also wrongly try to apply certain holdings in *Humane Society of the U.S. v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) to this case. Although the reasons for rejecting Plaintiffs' arguments are many, here, Safari Club International and the National Rifle Association of America ("SCI/NRA") will focus on explaining that if the requirements of *Humane Society* apply, the FWS fully analyzed (1) the impact of the Yellowstone Segment delisting on the so-called "remnant" grizzly bears, and (2) the impact of the loss of historical range on the Yellowstone Segment delisting determination.

Finally, contrary to Plaintiffs' arguments, the FWS acted fully within its authority and, as it has long intended, designated a segment of grizzly bears for delisting, while leaving consideration of other grizzly populations for a later time.[2]

---

[2] SCI/NRA refer the Court to the Cross-motion for Summary Judgment and Memorandum in Support filed by the Federal Defendants ("Fed. Def. Memo") and cross-motions filed by other Defendant-Intervenors for comprehensive responses to Plaintiffs' arguments not addressed in this brief.

## II.    ARGUMENT[3]

### A.    The best available scientific and commercial data show that the Yellowstone Segment is recovered and does not face any threats from hunting.

The Yellowstone Segment bears are recovered and, contrary to Plaintiffs' claims, face no threats from recreational hunting.  The best available scientific and commercial data show that hunting does not place the bears at risk of extinction from overutilization or inadequate regulatory protections under the ESA.

The FWS can delist a species when the best available scientific and commercial data show "'that it is neither endangered nor threatened,' because it … recovered."  *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1214 (D. Mont. 2010) (quoting 50 C.F.R. § 424.11)).  "A species reaches 'recovery' when there is 'improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [16 U.S.C. § 1533(a)(1)].'"  *Id.* (quoting 50 C.F.R. § 402.02) (alteration in original).  As explained in the 2017 Final Rule, these criteria do "not allow [the FWS] to factor ethical objections to hunting into [its] delisting decision."  82 Fed. Reg. at 30546.

---

[3] To avoid duplication and unnecessary briefing, SCI/NRA are addressing the facts primarily through reference to the Federal Defendants' Statement of Facts and Response to Plaintiffs' Statement of Facts.  The Defendant-Intervenors are jointly filing their own response regarding the facts.

Plaintiffs allege that grizzly bears remain threatened due in part to hunting. Specifically, they argue that hunting poses a threat of overutilization and that the existing hunting regulations are inadequate. ECF_194:20-25; ECF_186:40-41. Both arguments are false. The FWS specifically addressed these issues in the 2016 Proposed Rule and came to the opposite conclusion. 81 Fed. Reg. 13174, 13200-04 (Mar. 11, 2016) (discussing hunting and overutilization); *id.* at 13208-11 (discussing the adequacy of regulations, including hunting).[4] SCI/NRA will discuss the two criteria together.

The science supports the FWS's conclusion that well-regulated hunting is not a concern when managed under established mortality limits. The FWS began by using the Chao2 estimator to determine the bear population.[5] The Chao2 estimator is "derived from the frequency of … sightings … of unique females with cubs-of-the-year." 81 Fed. Reg. at 13226. Because bears that are never seen do not get factored into the Chao2 estimator, it underestimates the population—especially as the population increases—and only allows limited harvests. *Id.* at 13187; FWS_Rel_Docs:5171; FWS_Rel_Docs:4918. Nevertheless, the Chao2 estimator is the best available method because of its low annual variation and

---

[4] The 2016 Proposed Rule is in the Administrative Record at FWS_Rel_Docs:5785.

[5] Federal Defendants thoroughly briefed the Court on the Chao2 estimator, ECF_203:90-96. SCI/NRA only highlight some Chao2 features here.

"sensitiv[ity] … to … increasing or decreasing population trends." 81 Fed. Reg. at 13187.

The Chao2 estimator further shows that "[t]he population has basically stabilized inside the [Demographic Monitoring Area[6]] since 2002, with [an average estimate of] 674." *Id*. at 13201.  This long-term stability suggests that the bears have reached density dependence inside the Demographic Monitoring Area and are therefore recovered.  *Id*.  It also gave the FWS a starting point of 674 bears to calculate sustainable total mortality levels.  *Id*.  "Total mortality" includes "mortalities from all causes," *id*. at 13227, whereas "discretionary mortality" only includes "hunting or management removals."  *Id*. at 13226.  And with 674 bears, "the best available science shows" that "[a] total mortality limit of 7.6 percent for independent females" would "result[] in population stability."  *Id*. at 13201.  Based on this figure, the FWS determined sustainable, annual mortality rates for bears at different population levels.  *Id*.; *see also* Table 1, at 13188; Table 2, at 13202; Table 3, at 13203 (breaking down the total mortality limits by sex and percentage of total population).  Discretionary mortality is not allowed if the population falls below 600.  *Id*. at 13201.

---

[6] The Demographic Monitoring Area is defined at 81 Fed. Reg. at 13226, and is mapped at figure 2, *id*. at 13184.

The 2016 Proposed Rule further required that Idaho, Montana, and Wyoming pass comprehensive regulations to ensure that their bears would be managed according to these limits. *Id.* at 13202-03. The states agreed to manage their bears in accordance with the Chao2 estimator in a Memorandum of Agreement, FWS_Rel_Docs:4920, and adopted all the required regulations. FWS_Rel_Docs:4927-29.

The 2016 Proposed Rule is scientifically sound. It was subject to peer review by five bear biologists, four from universities and one from a state wildlife agency, in accordance with strict standards for peer review. FWS_Rel_Docs:5656; FWS_Rel_Docs:5627-29. The five reviewers collectively have 159 years of wildlife-biology experience, FWS_Rel_Docs:5629, and have been published over 850 times. FWS_Rel_Docs:5366-5473.

When reviewing the 2016 Proposed Rule, the reviewers were specifically asked: "Is the management of discretionary mortality, including hunting, scientifically sound and sufficiently detailed?" FWS_Rel_Docs:5657. They all said yes, and explained why:

- "The approach taken to manage discretionary mortality, including hunting, is based on the best available scientific information…. [I]t should pose no significant threat to the [Greater Yellowstone Ecosystem] grizzly bear population…. I am satisfied that the proposed approach is scientifically

sound, conservative, and is precautionary in approach."
FWS_Rel_Docs:5169.

- "Management of discretionary mortality, including hunting, is scientifically
  sound." FWS_Rel_Docs:5194.[7]

- "[C]arefully managed hunting is not a threat to the long-term viability of this
  population and can be highly effective at reducing concerns by local
  ranchers and other members of the public." FWS_Rel_Docs:5200.

- "The plan to maintain the GYE grizzly population within the approximate
  current population estimate appears to be based on sound wildlife science
  using established and repeatedly tested analyses used to generate these
  population parameters." FWS_Rel_Docs_005204.

- "The management of discretionary mortality is sound and reasonable."
  FWS_Rel_Docs_005209.

Moreover, three of the reviewers specifically said that sufficient measures are in
place "to ensure that no future threat emerges from discretionary mortality."
FWS_Rel_Docs:5169; FWS_Rel_Docs:5204 (commenting on the "failsafe" in the
2016 Proposed Rule); FWS_Rel_Docs:5209 (describing this as "a proactive
strategy").

---

[7] This reviewer did seek more details but, based on the evidence available, was
satisfied. FWS_Rel_Docs:5194.

The 2017 Final Rule incorporated all the 2016 Proposed Rule's scientifically-sound findings on discretionary mortality, including hunting, based on population percentages derived from the Chao2 estimator.  82 Fed. Reg. at 30527-35.  The FWS concluded that hunting in accordance with the 2016 Proposed Rule and 2017 Final Rule poses no threat to the Yellowstone Segment of grizzly bears under the five criteria listed at 16 U.S.C. § 1533(a)(1).

In addition, the FWS asked the five peer reviewers the following about a draft of the Conservation Strategy:  "is management of discretionary mortality, including hunting, scientifically sound and sufficiently clear and detailed so that managers can use this document to successfully implement mortality management in the future?"  FWS_Rel_Docs:5657; *see* the final version at FWS_Rel_Docs:2141.  Again, their responses were positive. FWS_Rel_Docs:5170 (describing the Conservation Strategy as "scientifically sound and well considered"); FWS_Rel_Docs:5196 (describing the Conservation Strategy as "scientifically sound and sufficiently clear and detailed so that managers can use this document to successfully implement mortality management in the future"); FWS_Rel_Docs:5201; FWS_Rel_Docs:5205; FWS_Rel_Docs:5210-11.  This—combined with the reviewers' conclusions that the 2016 Proposed Rule had adequate safeguards and a failsafe—further undermines Plaintiffs' claims.

Plaintiffs' challenge to this conclusion falls flat for many reasons. ECF_194:20-25; ECF_186:40-41. First, because the Chao2 estimator underestimates the population, annual total mortality, which is a percentage of the underestimated population, will necessarily be underestimated, too. 81 Fed. Reg. at 13187; FWS_Rel_Docs:5171; FWS_Rel_Docs:4918. Moreover, the Chao2 estimator has low annual variation, 81 Fed. Reg. at 13187, so it will give consistent underestimates every year.

Second, Plaintiffs' concern about "lag times" are similarly unfounded. ECF_194:23, 28. One of the peer reviewers said that he had concerns about lag time if the population fell below 600, but nevertheless concluded that "discretionary mortality, including hunting," was "based on sound wildlife science." FWS_Rel_Docs:5204. And the Chao2 estimator is sensitive to population changes, 81 Fed. Reg. at 13187, so lag time should be minimal. The FWS noted that "lag time" is not an issue because it overestimates "unknown/unreported mortalities" to "ensure[] that hunting mortality does not … exceed[] allowable mortality thresholds." 82 Fed. Reg. at 30591.

Finally, Plaintiffs' claim that there is a 50% chance that the population will decline below 500 bears and trigger emergency relisting, ECF_194:23-24, does not undermine the 2017 Final Rule. The FWS pointed out that there is only a 50% chance that the population will decline below 500 bears if total mortality limits are

reached every year.  82 Fed. Reg. at 30591.  Furthermore, mortality limits are

largely policy decisions, not scientific decisions, *id*.; they therefore do not

undermine the science.  Moreover, total mortality limits decrease as the population

levels decrease, *id*. at 30515, which diminishes the possibility of the population

falling below 500.  And the FWS concluded that eliminating discretionary

mortality if the population falls below 600—the minimum number of bears that the

states agreed to maintain, FWS_Rel_Docs:4920—serves as an adequate safeguard

to keep the population above 500.  82 Fed. Reg. at 30591.

Overall, the FWS's findings are based on the best available scientific and

commercial data.  Just three months ago, the Ninth Circuit affirmed that courts "are

to be 'most deferential' when the agency is 'making predictions, within its [area

of] special expertise, at the frontiers of science.'"  *Friends of Santa Clara River v.*

*U.S. Army Corps of Eng'rs*, 887 F.3d 906, 921 (9th Cir. 2018) (citation omitted)

(alteration in original).  This includes the best-available-scientific-and-commercial-

data standard under the ESA, which "'merely prohibits [the agency] from

disregarding available scientific evidence that is in some way better than the

evidence it relies on.'"  *Id*. at 924 (citations omitted).  Furthermore, courts cannot

"'substitute [their] judgment for the agency's in determining which scientific data

to credit, so long as the conclusion is supported by adequate and reliable data.'"

*Id*. at 921 (citation omitted).

The conclusions of the experts at the FWS (who have been studying and managing the Yellowstone area grizzly bears for at least 40 years), *see, e.g.,* 81 Fed. Reg. at 13175, and the five wildlife biologists who reviewed the 2016 Proposed Rule and Conservation Strategy (159 years of experience) meet that standard here. The Court should defer to this expertise—especially since Plaintiffs have not shown the existence of any "better" scientific evidence. *Friends of Santa Clara River,* 887 F.3d at 924. The Court should find that hunting does not undermine the Yellowstone Segment delisting.

**B.    The FWS has the authority to designate a segment for purposes of delisting and, to the extent *Humane Society* applies, properly analyzed the relevant factors.**

Federal Defendants have thoroughly explained both that the FWS has the authority to designate a segment for purposes of desisting that segment and properly did so here. ECF_203:25-59. Specifically, the Federal Defendants:

- explained that the plain language of the ESA and *Humane Society* support the FWS's delisting of the Yellowstone Segment, *id.* at 25-28;

- refuted the Plaintiffs' argument that the FWS created a "*de facto*" segment and cannot statutorily identify and delist a smaller segment, *id.* at 28-30;

- argued persuasively that the D.C. Circuit (which does not issue precedent that is binding here) incorrectly required the FWS, when delisting a newly

created segment, to analyze the delisting's impact on the so-called "remnant" population, *id.* at 30-36;

- explained that, contrary to Ninth Circuit precedent, *Humane Society* and Plaintiffs wrongly merge together ESA Section 4(c)'s obligations with the FWS's independent authority under ESA Section 4(a)(1), *id.* at 36-39;

- described the significant factual and legal differences between (1) the wolf segment delisting at issue in *Humane Society* and (2) the delisting of the Yellowstone Segment, including that no one questions that the grizzly populations outside of the Yellowstone Segment remain listed as threatened and the FWS is not proposing to delist all those populations, both concerns with the wolf segment, *id.* at 40-43;

- noted that the Plaintiffs' interpretation would be detrimental to grizzly bear protections and recovery, *id.* at 44-48;

- provided three strong reasons why, even if the FWS was required to consider the previously listed entity, that is, the so-called "remnant" population, the FWS comprehensively addressed this issue, including in the 2017 Final Rule, other documents in the administrative record, and its Regulatory Review, *id.* at 48-51; and

- explained that:

- the historical range argument was waived by the only plaintiff group to raise it in summary judgment briefing here;

- the issue was largely resolved by this Court in the 2007 delisting litigation;

- the FWS examined the impact of the loss of historical range and, under Ninth Circuit precedent, this finding is entitled to deference;

- the FWS properly, but not exclusively, focused on range within the Yellowstone Segment's boundaries; and

- the FWS examined historical range outside the Yellowstone Segment's boundaries, including in the 2017 Final Rule and the Regulatory Review, *id.* at 51-59.

SCI/NRA support and here supplement these arguments, focusing on the points that the FWS conducted any required analysis on the "remnant" population and loss of historical range, and that the FWS has authority to delist the Yellowstone Segment.[8]

---

[8] Although these issues do not directly involve hunting, SCI/NRA address them here for several reasons. First, SCI/NRA were parties to *Humane Society* and extensively briefed the segment authority issue in the D.C. Circuit courts. Second, the FWS's ability to designate a segment for purposes of delisting affects hunting. Without this authority, species listed on a nationwide basis, such as the grizzly bear, would remain listed longer, which would prevent the states from authorizing sustainable hunts of the population even though it was fully recovered. Third, in January 2018, SCI submitted comments in January 2018 to the FWS explaining

**1. To the extent necessary, the FWS considered the impact of the delisting on the "remnant" population.**

The FWS repeatedly stated that the remaining grizzly bears in the lower-48 states, i.e.*,* those outside of the Yellowstone Ecosystem, remain listed and protected by the ESA. Fed. Def. Memo at 48-51.[9] The Yellowstone Segment delisting does not suffer from the shortcomings the D.C. Circuit perceived in the Western Great Lakes wolf delisting. Mainly, the delisting of the Yellowstone Segment did not "in one fell swoop make an already-listed species an unlisted and unlistable non-species …." *Humane Society*, 865 F.3d at 602.

The following passages from the 2017 Final Rule, not specifically provided or not provided in full by the Fed. Def. Memo, help further demonstrate that the FWS comprehensively analyzed the impact of delisting on the remnant population.

| Federal Register | Language |
|---|---|
| 82 Fed. Reg. at 30503, col. 2 | "Identifying the GYE grizzly bear DPS and removing that DPS from the List of Endangered and Threatened Wildlife ***does not change the threatened status of the remaining grizzly bears in the lower 48 States***, which remain protected by the Act." (All emphasis added.) |

that the FWS had extensively analyzed, in the 2017 Final Rule, the remnant population and historical range issues.

[9] Although SCI/NRA focus on the fact the FWS satisfied the *Humane Society's* remnant population analysis, SCI/NRA also support the Federal Defendants' other arguments.

| Federal Register | Language |
|---|---|
| *Id.* at 30546, col. 2 | "In other words, when this regulation takes effect, ***grizzly bear populations occurring outside of the boundary of the GYE DPS will remain listed as a threatened species under the ESA.***" |
| *Id.* at 30623, col. 2; *see also id.* at 30623-24, col. 3–col. 1 (same). | "Grizzly bears will remain listed in the remainder of the lower 48 States outside of the GYE DPS, and ***we are committed to pursuing grizzly bear recovery in the five remaining Recovery Zones*** identified in the 1993 Grizzly Bear Recovery Plan." |
| *Id.* at 30558-59, col. 3–col. 1 | "Our recognition that the GYE grizzly bear population qualifies as a DPS and its separate listing or delisting ***is also consistent with the 1993 Recovery Plan's (which predates the Service's 1996 DPS policy) stated intention to delist each of the remaining populations as they achieve their recovery targets*** and an associated five factor analysis under section 4 of the Act indicates that they no longer meet the definition of a threatened or endangered species (USFWS 1993, p. ii)." |
| *Id* at 30551-52, col. 3–col. 1. | "*Issue 13*—Many commenters, including some with differing viewpoints on the status of the Northern Continental Divide Ecosystem (NCDE) grizzly bear population, ***wanted clarification on what delisting for the GYE would mean for other grizzly bear populations.*** One commenter requested clarification on how this rule would distinguish grizzly bears that are a part of the GYE population from those who might be part of a different population located in Idaho, Montana or Wyoming.

*Response*—Upon delisting of the GYE grizzly bear population, ***all grizzly bears in the lower 48 outside of the GYE DPS boundaries will*** |

| Federal Register | Language |
|---|---|
| | ***continue to be fully protected under the Act.*** …. As stated in Issue 2, the management and potential status of other grizzly bear populations is outside the scope of this final rule. That said, ***a draft Environmental Impact Statement (EIS) that examines recovery options for grizzly bears in the North Cascades was published in the Federal Register*** on January 13, 2017 (82 FR 4336). Between 1993 and 1999, we issued warranted but precluded findings to reclassify grizzly bears as endangered in the ***Cabinet-Yaak*** (58 FR 8250–8251, February 12, 1993; 64 FR 26725–26733, May 17, 1999), and the ***Selkirk Ecosystems*** (64 FR 26725–26733, May 17, 1999). However, as of 2014, both the ***Selkirk and Cabinet-Yaak*** populations were reclassified as threatened (79 FR 72440, December 5, 2014) because of improving population trends (79 FR 72488). … The ***NCDE grizzly bear population is likely biologically recovered***; the IGBC NCDE subcommittee drafted a Conservation Strategy in 2013 that was published by the Service in the Federal Register for public comment and peer review." |
| *Id.* at 30508-09, col. 3– col. 1. | "***The Recovery Plan identified six recovery ecosystems within the conterminous United States thought to support grizzly bears. Today, current grizzly bear distribution is primarily within and around the areas identified as Recovery Zones*** (USFWS 1993, pp. 10–13, 17–18), including: (1) The GYE …; (2) the ***Northern Continental Divide Ecosystem*** (NCDE) of north-central Montana …; (3) the ***North Cascades*** area of north-central Washington …; (4) the ***Selkirk Mountains*** area of northern Idaho, northeastern Washington, |

| Federal Register | Language |
|---|---|
| | and southeastern British Columbia …; and (5) the ***Cabinet-Yaak*** area of northwestern Montana and northern Idaho …. The ***Bitterroot Ecosystem*** in the Bitterroot Mountains of central Idaho and western Montana (14,500 km2 (5,600 mi2)) is not known to contain a population of grizzly bears at this time ….”[10] |

The FWS addressed these same points in other documents in the administrative record. In several letters, the FWS reiterated its conclusion that grizzly bears and their habitat outside the Yellowstone Ecosystem “retain[] the full protections of the ESA.” FWS_Rel_Docs:1680; FWS_Rel_Docs:2425. In a “Questions and Answers” document published around the time of the 2017 Final Rule, the FWS explained that “[t]his delisting only impacts the Yellowstone grizzly bear population; all other grizzly bears in the lower 48 states remain listed.” FWS_Rel_Docs:5826; *see also* 2017 Informational Memo, FWS_Del_Docs:9684 (same); Director’s Memo to File, FWS_Del_Docs:9693 (“It is the policy of the USFWS that recovery and delisting of any of the populations identified in the Grizzly Bear Recovery Plan will not impact the listed status of any of the

---

[10] The 2016 Proposed Rule contains similar statements. *See, e,g.,* 81 Fed. Reg. at 13175 (following delisting of the Yellowstone Segment, “there would be no change to the threatened status of the remaining grizzly bears in the lower 48 States, which would remain protected by the Act.”), 13181-82 (discussion of the remaining populations).

remaining population units in the Plan."). As all these references demonstrate, whatever analysis the *Humane Society* court thought failed to occur with the Western Great Lakes wolves delisting did in fact occur as part of the Yellowstone Segment delisting.

As demonstrated by the Federal Defendants' Response to Plaintiffs' Statement of Facts, the FWS has a long history—at least since the 1975 listing—of considering the status of the various grizzly bear populations in relation to each other. ECF_205:¶¶25-45. The Yellowstone Segment delisting is simply another chapter in this history.

Thus, Plaintiffs ignore a key distinction between the delisting of the Western Great Lakes wolves and the Yellowstone Segment—that with grizzly bears, several other populations of grizzly bears remain protected post-delisting of the Segment and no so-called remnant population is caused by the Yellowstone Segment delisting. ECF_190:21-26; ECF_191-1:20-23. *Humane Society* explained a concern at issue in that case that is not a concern with the Yellowstone Segment delisting:

> Yet the Service's disregard of the remnant's status would turn that sparing segment process into a ***backdoor route to the de facto delisting of already-listed species***, in open defiance of the Endangered Species Act's specifically enumerated requirements for delisting. … Accordingly, as a matter of plain statutory design, the act of designating a segment cannot in one fell swoop make an already-listed species an unlisted and unlistable non-species, "sidestep[ping]" the process "Congress has plainly" prescribed for delisting.

*Humane Society,* 865 F.3d at 601-02 (emphasis added).

When the Western Great Lakes wolves were delisted, essentially no wolf populations remained within the range outside the Western Great Lakes and the Northern Rocky Mountains, where the population of wolves was already delisted. This accounted for all the on-the-ground wolf populations and none existed anywhere in what the *Humane Society* court referred to as the "remnant." With grizzly bears, the FWS knew other populations with significant numbers of bears existed, so the delisting of the Yellowstone Segment did not create a "legal orphan." The whole of the grizzly populations remaining on-the-ground after the Yellowstone Segment delisting was similar to what was in place before the delisting—a nationwide listing with a few existing populations and at least one area where reintroduction was possible.

According to *Humane Society*, "the Service must make it part and parcel of its segment analysis to ensure that the remnant, if still endangered or threatened, remains protectable under the Endangered Species Act." 865 F.3d at 602. As explained above and by the Federal Defendants, based on the on-the-ground situation with grizzly bears, the FWS concluded that the "remnant" population of bears, anchored by the Northern Continental Divide population (and the Selkirk and Cabinet Yaak populations), would remain listed and listable as a threatened species. Thus, the FWS took "the second step of determining whether both the

segment and the remainder of the already-listed [species] would have mutually independent statuses as species." *Id.*

The ESA continues to protect the grizzly bears outside the Yellowstone Ecosystem. Where populations exist on the ground (and potentially could be reintroduced), they remain the subject of ongoing recovery efforts by the FWS. *See, e.g.,* 82 Fed. Reg. at 30517; FWS_Del_Docs:52870-71 (Draft Director's Memo, Sept. 2, 2014). To the extent required, the FWS comprehensively analyzed the impact of delisting on these grizzly bears.

> **2.** **To the extent necessary, the FWS considered the impact of loss of historical range on the Yellowstone Segment.**

The FWS also focused on the impact of the loss of historical range on the Yellowstone Segment of grizzly bears. In contrast to what the D.C. Circuit found regarding the Western Great Lakes wolf delisting, the FWS did not "categorically exclude[] the effects of loss of historical range from its analysis." *Humane Society*, 865 F.3d at 603. Instead, the FWS discussed the issue in detail.

> We do not separately consider whether lost historical range is an SPR because ***we already evaluate the effects of lost historical range on the species when we evaluate the status of the species in its current range***. Specifically, in our evaluation of current status, we are considering whether, without that portion ***(i.e., lost historical range)***, the species is in danger of extinction or likely to become so in the foreseeable future. … [I]t is the Service's ***standard practice to consider the effects of lost historical range on the species*** when we evaluate the status of the species in its current range.

82 Fed. Reg. at 30624, col. 1–col. 3.  The FWS recognized the importance of the

Yellowstone Segment to the species as a whole and acknowledged the loss of

grizzly bears in much of its historical range.

> ***Given the grizzly bear's historic occupancy of the conterminous
> United States and the portion of the taxon's historic range the
> conterminous United States represent, recovery in the lower 48
> States where the grizzly bear existed in 1975 when it was listed has
> long been viewed as important to the taxon*** (40 FR 31734, July 28,
> 1975). The GYE grizzly bear population is significant in achieving the
> Recovery Plan objectives, as it is one of only five known occupied
> areas and one unoccupied area and constitutes approximately half of
> the estimated number of grizzly bears remaining in the conterminous
> 48 States.

*Id.* at 30519, col. 2.  The FWS acknowledged that the original listing of the grizzly

bear was due in part to loss of historical range.  *Id.* at 30520, col. 2 ("Both the

dramatic decreases in historical range and land management practices in formerly

secure grizzly bear habitat led to the 1975 listing.").  To address these issues and

guide the management and recovery of the grizzly bear, the FWS set up the

Interagency Grizzly Bear Study Team in 1973 and the Interagency Grizzly Bear

Committee ("IGBC") in 1983.  *Id.,* col. 2–col. 3.  Because a mission of the IGBC

was to "achieve recovery of the grizzly bear in the lower 48 States," its input on

the Yellowstone Segment delisting necessarily included consideration of both the

other recovery areas and the loss of historical habitat.

> While grizzly bears currently occupy only a fraction of historical
> habitat in the lower 48 States, ***the Service concludes that restoration
> of grizzly bears to all historical habitats (particularly those no longer***

*capable of supporting grizzly bear populations) within the DPS boundaries or within the lower 48 States is not necessary or possible.* The information presented in this rule supports the conclusion that the GYE grizzly bear population has recovered and no longer meets the definition of endangered or threatened under the Act.

*Id.* at 30557-58, col. 3–col. 1.

The FWS also considered the impact of the loss of historical habitat in its analysis of "resiliency" and "redundancy" related to the population within the Yellowstone Ecosystem.  Although the loss of historical range would have an impact on these factors, the FWS addressed any concerns.  "Suitable habitat outside the [Primary Conservation Area] provides additional ecological resiliency and habitat redundancy to allow the population to respond to environmental changes."  *Id.* at 30527, col. 1; *id.* at 30545, col. 1 (same).

Despite this evidence and relying primarily on *Humane Society*, Plaintiffs broadly suggest that the FWS was obligated to but failed to consider the impact of lost historical range, using a threats analysis under the listing factors, on grizzly bears throughout the lower-48 states.  ECF_191-1:12-20.  *Humane Society* did not mandate a "threats analysis" in the entire historical or listed range, but instead required that the FWS determine, in its analysis of threats *within the segment,* the impact of the loss of all historical range.

Under Plaintiffs' theory, the FWS would have to conduct a delisting-factors analysis for the entire range, even though the FWS was only determining whether

to delist the Yellowstone Segment.  Applying the factors to a segment considering the loss of historical range is different than applying the factors analysis throughout the historical range.  *Humane Society* found that the FWS's focus on the factors analysis of the current range within the segment was appropriate, but FWS had to do so in light of the loss of historical range.  *Humane Society*, 865 F.3d at 606 ("The only obligation at issue here is for the Service to contend with the implications of massive range loss for the species' endangered or threatened status ***within its current environment.***") (emphasis added).

In the end, Plaintiffs conflate the remnant and historical range arguments "Yet, the Service fails to properly consider the impact of this severe loss of historic range on the survival and recovery of both the Greater Yellowstone grizzly bear and the remnant population of grizzly bears in the lower 48 States."  ECF_191-1:20.  But *Humane Society* and Ninth Circuit precedent discussed by the Federal Defendants (ECF_203:54-55) only call for an analysis of how the loss of historical range outside the segment impacts the species within the segment.

### 3.    The FWS has the authority to delist the Yellowstone Segment.

The 1975 lower-48 listing did not constitute a segment because the FWS did not have authority to list segments in 1975 and the FWS's intent was not to list the bears as a segment.  The 1975 Final Rule predated the 1978 ESA amendments that added the ability to list and delist segments.  *See* Pub. L. 95-632, § 2(5), 92 Stat.

3751, 3752 (1978).  Although listing as a segment was not an option in 1975,

Plaintiffs incorrectly argue that the listing "had to be" a "*de facto*" segment listing

because the lower-48 bears were not an entire species or subspecies.  ECF_186:26.

Plaintiffs ignore the third listing possibility available to the FWS in 1975.  Prior to

the 1978 amendments, the definition for "species" (*i.e.,* what the FWS can list or

delist) included a third option:  "any other group of fish or wildlife of the same

species or smaller taxa in common spatial arrangement that interbreed when

mature."  Pub. L. 93-205, § 3(11), 87 Stat. 884, 886 (1973).  As Federal

Defendants correctly state, the 1975 lower-48 listing is a "historical artifact."

ECF_203:29.

The 1975 Final Rule indicates that the FWS did not intend to treat the lower-

48 bears as a single *de facto* segment.  The original listing rule treated three

different populations, or ecosystems, of bears differently—from each other and

from bears outside the three ecosystems.  40 Fed. Reg. 31734, 31735 (July 28,

1975).[11]  For example, the FWS treated the bears in the Bob Marshall ecosystem

differently than the bears in the other two ecosystems.  The rule allowed hunting

pursuant to Montana's hunting laws.  *Id.*[12]  The FWS also indicated that it would

---

[11] The 1975 Final Rule is in the Administrative Record at FWS_Lit_18564.

[12] Although a court later struck down this aspect of the 1975 Final Rule, *Fund for Animals v. Turner*, 1991 WL 206232 (D.D.C.), the FWS's intent to treat different populations differently remains.

manage the Yellowstone Ecosystem bears independently of all other bears, if circumstances warranted. *See id.* and *infra Section* II.C. The 1975 Final Rule also stated, "[t]he regulations of this rulemaking are designed to insure the species' conservation in all three of these ecosystems, and to protect any members of the species occurring elsewhere in the 48 conterminous States." *Id*. at 31735. In other words, the FWS was focusing on the ecosystems—actively managing, studying, and conserving the bears in those areas—and simply prohibiting the take of all bears in the rest of the lower 48.

The entire lower-48 listing was not an individual segment as Plaintiffs suggest. Accordingly, Plaintiffs' argument regarding the FWS's allegedly unauthorized delisting of the Yellowstone Segment crumbles. For the reasons further explained in Fed. Def. Memo, the FWS has the authority under the ESA to delist the Yellowstone Segment. ECF_203:25-30 (discussing *Humane Society*).

## C. The FWS's actions do not conflict with the 1975 Final Rule or grizzly bear recovery plans.

The FWS's successful recovery and delisting of the Yellowstone Segment are consistent with the 1975 Final Rule and the recovery plans. Neither the 1975 Proposed Rule nor the 1975 Final Rule contradict the FWS's population-by-population approach to grizzly-bear recovery. 40 Fed. Reg. 5 (Jan. 2, 1975); 40 Fed. Reg. 31734 (July 28, 1975). Plaintiffs attempt to read into the rule an all-or-nothing delisting requirement that does not exist. *See* ECF_186:21-24.

Nothing in the 1975 Proposed or Final Rules create an obligation that the FWS must recover all lower-48 grizzly bear populations, or even multiple populations, before delisting the Yellowstone Segment. Plaintiffs wrongly argue that the 1975 Final Rule requires that healthy populations "remain threatened but subject to regulatory modifications . . . ," *id*. at 23-24, instead of allowing population-by-population delistings. The language in the 1975 Final Rule on which the Plaintiffs try to rely means something else. The FWS determined that if circumstances in the Yellowstone Ecosystem became such that some bears needed to be hunted to alleviate population pressures, the FWS would have considered modifying the grizzly bear regulation to allow for a hunt, as was the case for the Bob Marshall bears. 40 Fed. Reg. at 31735. At the time, the FWS believed a regulated hunt to alleviate population pressures was one of the conservation tools that the FWS is permitted to utilize in its efforts to recover a species. 16 U.S.C. § 1532(3). In the rule, the FWS was simply stating that it would consider using that conservation method if circumstances warranted it. The rule did not suggest that a grizzly bear segment must remain listed under the ESA after it is fully recovered.

Likewise, the 1982 grizzly bear recovery plan does not mandate an all-or-nothing delisting approach. A full reading of the plan betrays Plaintiffs' selective quotations. *See* ECF_186:22. The plan explains that one of the recovery objectives for the entire lower 48 was to recover at least three "grizzly bear

ecosystems in order to delist the species in the conterminous 48 states."
FWS_Lit_014330. Later in the plan, when explaining Yellowstone-specific
criteria, the FWS stated that "[t]he population will be judged recovered (***eligible
for delisting***) when it is determined to be viable at [a certain population size]." *Id.*
at 014365 (emphasis added). The FWS's approach all along has been to recover
individual populations, such that each population could be delisted independently.
In the original plan, when three of those populations were recovered and delisted,
then the entire lower-48 listing would be deemed ready for delisting. This
determination does not prevent the delisting of segments leading up to a potential
delisting of the entire lower-48 listing.

Additionally, the 1982 recovery plan is not determinative because the FWS
has revised and supplemented it several times and made clear its intent to delist
population by population.[13] Each time it modified the plan, the FWS modernized
the recovery objectives to reflect new available scientific information and best
management practices. If the 1982 recovery plan was not clear about the FWS's
population-by-population approach, the 1993 recovery plan was. The 1993 plan
states that the recovery objective is "[d]elisting of each of the remaining
populations by population as they achieve the recovery targets," and further states

---

[13] Plaintiffs' Statement of Facts recognizes that the FWS revised and supplemented
the plan several times since 1982. ECF_187:¶¶25, 34-36.

that "[e]ach individual population will remain listed until its specific recovery criteria are met." FWS_Lit_14533; *see also* ECF_203:50 (Federal Defendants explaining continued recovery strategy, including delisting populations as they are recovered). The subsequent supplements to the 1993 recovery plan do not modify the FWS's general approach of delisting individual populations as they are recovered. *See* FWS_Lit_015486 (2007), FWS_Lit_015521 (2007), FWS_Lit_019025 (2013 draft), FWS_Lit_016405 (2016 draft), FWS_Lit_016422 (2017).

The FWS has not given up on its efforts to recover the entire lower-48 grizzly listing. *See supra* Part II(B)(1) (citing FWS statements of commitment). It is simply approaching recovery and delisting in a different manner than Plaintiffs would like.[14] Plaintiffs' suggested all-or-nothing delisting approach was never the FWS's intent when it committed to recovering grizzly bears in the lower-48.

## III.    CONCLUSION

For the reasons explained above, in the Fed. Def. Memo, and in the other Defendant-Intervenors' briefs, SCI/NRA request that the Court grant this cross-

---

[14] The Court should defer to the FWS's interpretation of the ESA and need not agree with the view of so-called "leading scientific experts" that the ESA "obligates" the FWS to manage the lower-48 grizzlies in an all-or-nothing approach. *See* ECF_186:22-23 (citing FWS_Pub_Cmt_004192).

motion for summary judgment and deny the Plaintiffs' motions for summary

judgment.

DATED this 25th day of July, 2018.

Respectfully submitted,
/s/Robert T. Bell
Robert T. Bell
Reep, Bell, Laird & Jasper
PO Box 16960
2955 Stockyard Road
Missoula, MT 59808
Facsimile: 406-541-4101
Telephone: 406-541-4100
bell@westernmontanalaw.com
*Attorney for Defendant-Intervenors Safari
Club International and National Rifle
Association of America*

/s/ Douglas S. Burdin
Douglas S. Burdin (D.C. Bar. No. 434107)*
501 Second Street NE
Washington, D.C. 20002
Facsimile: 202-543-1505
Telephone: 202-543-8733
Email: dburdin@safariclub.org
*Attorney for Defendant-Intervenor Safari
Club International*

/s/ Michael T. Jean
Michael T. Jean (MI Bar No. P76010)*
11250 Waples Mill Road
Fairfax, VA 22030
Facsimile: 703-267-1164
Telephone: 703-267-1158
Email: mjean@nrahq.org
*Attorney for Defendant-Intervenor National
Rifle Association of America*
* Pro Hac Vice granted.

**CERTIFICATE OF SERVICE & COMPLIANCE**

I hereby certify that on July 25, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System, which will send

notification of such filing to the attorneys of record.  I certify that this brief is

6,312 words (counted using Microsoft Word's counting function) and in

accordance with the word limits in the Court's order, ECF_198.

/s/ Douglas S. Burdin
Douglas S. Burdin (D.C. Bar. No. 434107)*
501 Second Street NE
Washington, D.C.  20002
Facsimile: 202-543-1505
Telephone: 202-543-8733
Email:  dburdin@safariclub.org
*Attorney for Defendant-Intervenor Safari
Club International*


* Pro Hac Vice granted.