LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
DARRELL G. EARLY
Chief, Natural Resources Division
STEVEN W. STRACK
  *Specially Admitted*
KATHLEEN E. TREVER
  *Specially Admitted*
Deputy Attorneys General
700 W. State Street, 2nd Floor
P.O. Box 83720
Boise, Id 83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8072
E-Mail:   steve.strack@ag.idaho.gov
                kathleen.trever@idfg.idaho.gov
*Attorneys for State of Idaho*

WILLIAMS LAW FIRM, P.C.
JAMES D. JOHNSON, ESQ.
235 E. Pine, P.O. Box 9440
Missoula, Montana 59807-9440
Telephone: (406) 721-4350
Fax: (406) 721-6037
E-Mail: james@wmslaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> STATE OF WYOMING, *et al.*, <br><br> *Defendant-Intervenors*. | CV-17-89-M-DLC <br><br> (Consolidated with Case Nos. <br> CV-17-117-M-DLC, <br> CV-17-118-M-DLC, <br> CV-17-119-M-DLC, <br> CV-17-123-M-DLC, <br> and CV-18-16-M-DLC, <br><br> DEFENDANT-INTERVENOR STATE OF IDAHO'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |

<h1 align="center">TABLE OF CONTENTS</h1>

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................7

1.  The Fish and Wildlife Service did not act arbitrarily or capriciously in concluding existing regulatory mechanisms are adequate to maintain the recovered status of the Greater Yellowstone grizzly bear population ....................................................................................................7

2.  Plaintiffs err in asserting that enforceability by third parties is a prerequisite to finding that state regulatory mechanisms are adequate ........11

3.  The Idaho Fish and Game Commission approved the Tri-State Agreement in all aspects, including mortality limits ...................................16

4.  The Fish and Wildlife Service did not act arbitrarily or capriciously in determining that removal of bears for "human safety" in the event the population drops below 600 bears will ensure the bear population remains above recovery levels .....................................................................18

5.  Plaintiffs' concerns about the lack of "recalibration" in the event the States develop a less conservative method for estimating the Greater Yellowstone grizzly bear population are unfounded and unsupported by the record ...............................................................................................20

6.  The FWS correctly relied on its reasoned expectation that the States will continue to fund grizzly bear management ..................................................24

CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

CASES

*Colorado River Cutthroat Trout v. Salazar*,
    898 F. Supp. 2d 191 (D.D.C. 2012) ...................................................................12

*Ctr. for Biological Diversity v. FWS*, No. CIV.A. 05-CV-00305RP,
    2007 WL 716108 (D. Colo. Mar. 7, 2007) .......................................................11

*Ctr. for Biological Diversity v. Lubchenco*,
    758 F. Supp. 2d 945 (N.D. Cal. 2010) .............................................................23

*Defs. of Wildlife v. Kempthorne*,
    535 F. Supp. 2d 121 (D.D.C. 2008) ..........................................................12, 25

*Defs. of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017) .................................................................13, 19

*Greater Yellowstone Coalition, Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ...................................................................*passim*

*Oregon Nat. Res. Council v. Daley*,
    6 F. Supp. 2d 1139 (D. Or. 1998) ....................................................................23

*WildEarth Guardians v. Salazar*, No. 10-CV-0002-WPJ/SMV, 2014 WL
    10209231 (D.N.M. July 30, 2014) ...................................................................12

*Tucson Herpetological Soc. v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) ...........................................................................13

STATUTES

16 U.S.C. § 1532(3) ................................................................................................6

16 U.S.C. § 1533(a)(1) ...........................................................................................7

16 U.S.C. § 1533(a)(1)(D) ...........................................................................7, 11, 24

16 U.S.C. § 1533(b)(1)(A) ............................................................................12, 14

FEDERAL REGULATIONS

60 Fed. Reg. 14866 (March 29, 2007) ...................................................................3

82 Fed. Reg. 30502 (June 30, 2017) ............................................................*passim*

OTHER AUTHORITIES

Idaho Const. Art. VIII, § 1 ...................................................................................24

Idaho Code § 36-104(3) ........................................................................................17

Idaho Code § 36-104(9) ...........................................................18

Idaho Code § 36-105(2) ...........................................................17

Idaho Code § 67-2328 .............................................................18

Idaho Administrative Code 13.01.08 .......................................5

Merriam-Webster's Collegiate Dictionary (10th ed. 1996) ....................................22

# INTRODUCTION

The Court should apply Ninth Circuit precedent and uphold science-based decision-making and decades of intergovernmental and community-based efforts that have achieved and sustained recovery of the Greater Yellowstone Ecosystem Grizzly Bear Distinct Population Segment (Yellowstone grizzly population). The Yellowstone grizzly population has surpassed FWS' three demographic recovery criteria since at least 2004. *Final Rule: Endangered and Threatened Wildlife and Plants; Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife*, 82 Fed. Reg. 30502, 30514 (June 30, 2017) (hereinafter "Final Rule"). Idaho and its sister states have played a vital role in this success; for decades, these three states have invested considerable resources in actively monitoring this population, managing bear-human conflicts, and cooperating in public education and law enforcement. *E.g., id.* at 30508, 30520, 30528, 30543, 30545.

Scientists from the states of Idaho, Montana and Wyoming, and three federal agencies (National Park Service, USFS and FWS) have been members of the Interagency Grizzly Bear Study Team (Interagency Study Team) studying and monitoring the Yellowstone grizzly population since the Team's creation in 1973. Final Rule, 82 Fed. Reg. at 30508. The three states, NPS, USFS, and FWS, were

also charter members of the Interagency Grizzly Bear Committee,[1] and its Yellowstone Ecosystem Subcommittee, both formed in 1983 to recover and conserve grizzly bear populations and their habitat through interagency coordination of policy, planning, management and research. *See. id.*

The history of the Yellowstone grizzly population's recovery, along with the rest of the administrative record, do not support Plaintiffs' attempts to characterize the states as latecomers to bear management with underhanded intentions. The Court should reject Plaintiffs' unfounded speculations that Idaho or its sister states will misapply regulatory mechanisms, exploit loopholes or otherwise act to subvert the states' 40-plus-year financial and management investment in achieving and sustaining this population's recovery.

After vacatur and remand of the 2007 delisting rule, the state and federal scientists of the Interagency Study Team completed their review of the single flaw in the 2007 rule identified by the Ninth Circuit, namely the FWS' failure to "rationally support[ ] its determination that potential whitebark pine declines did not threaten the Yellowstone grizzly bear" (*Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1032 (9th Cir. 2011). In 2013, the Interagency Study Team published its analysis, not only regarding whitebark pine seeds, but potential

---

[1] The three states also participated in the IGBC's predecessor, the Interagency Grizzly Bear Steering Committee.

changes in other food sources for the population: *Response of Yellowstone Grizzly Bears to Changes in Food Resources: A Synthesis. FWS_LIT_005734; see also* Final Rule, 82 Fed. Reg. at 30538 (discussing report). The Interagency Study Team's analysis and related studies found that the population was resilient in the face of changeable food resources. *See* 82 Fed. Reg. at 30538-40 (summarizing recent study evidence that the Yellowstone grizzly population may be approaching carrying capacity and that the status of the recovered population has remained unchanged over the last 15 years despite significant changes in food resources).

Compared to development of the 2007 delisting rule, the process leading up to the 2017 Delisting Rule involved more discussion of state management of discretionary mortality and the potential for the states to authorize limited hunting. *Compare, e.g.,* 60 Fed. Reg. 14866, 14892-93 (March 29, 2007) and 82 Fed. Reg. at 30530-35. This additional emphasis, however, provides no reason to change the Ninth Circuit's conclusion upholding the FWS' analysis as to regulatory mechanisms in the 2007 rule. *See Servheen,* 665 F.3d at 1032 (directing district court to enter summary judgment in favor of FWS as to its "determination that existing regulatory mechanisms are adequate to protect a recovered Yellowstone grizzly population"). Indeed, regulatory mechanisms were strengthened between the 2007 rule and the 2017 Final Rule.

In 2016, state and federal agencies updated and revised the 2007 Conservation Strategy, the interagency agreement describing the agency management and monitoring commitments that apply to the delisted population and its habitat. Final Rule, 82 Fed. Reg. at 30515. The 2016 Conservation Strategy incorporated FWS' revised demographic recovery criteria, along with updated habitat standards, monitoring programs, Interagency Study Team reviews, and management activities. *See id.* at 30515-16. The 2016 revisions to the Conservation Strategy dovetailed with Idaho, Montana and Wyoming's adoption of additional state-specific regulatory mechanisms for grizzly bear, and their approval of a Tri-State Memorandum of Agreement (Tri-State Agreement) identifying their commitments to coordinate regulation and monitoring to ensure compliance with the conservative Yellowstone grizzly population demographic criteria and discretionary mortality limits. *Id.* at 30531-32; *see also* FWS_Rel Docs_001293-001305 (Tri-State Agreement).

Under the Tri-State Agreement, each January the three state fish and game agencies meet to review demographic and prior-year mortality information for the population, and then collectively apply their established protocol to decide how many, if any, bears will be available for harvest in each state in the upcoming year. FWS_Rel Docs_001297. Idaho uses a regulatory mechanism called a proclamation, which has the effect of law, to set numeric, geographic, and other

limits on hunting, against a backdrop of statutes and laws that protect bears in general and establish enforceable mechanisms to ensure compliance with these limits. Final Rule, 82 Fed. Reg. at 30600; FWS_Rel Docs_001625-26. Idaho-specific mechanisms include rules in Idaho Administrative Code for harvest reporting and check-in of the skull and hide, restrictions of harvest methods, prohibitions against take of an adult accompanied by young bear(s), and young bear(s) accompanied by an adult. *See* FWS_Rel Docs_001303-04 (referencing sections of Idaho Administrative Code 13.01.08).

Key components of recovery have included public education and enactment of measures at federal, state, and local levels to reduce human-bear conflicts. *E.g.,* Final Rule, 82 Fed. Reg. at 30543. Grizzly bear recovery and population management are substantial undertakings, with Idaho and its sister states dedicating significant personnel and financial resources to the recovery effort. *E.g, id.* at 30597.

FWS published the 2017 Final Rule delisting the Yellowstone grizzly population roughly eight years after the court-ordered remand of the prior delisting rule. The States shouldered primary responsibility for day-to-day monitoring and management of the population before the 2007 listing, and continued to do so for the lengthy interval between delisting rules. In light of this history, Plaintiffs' contentions that the three states, whether collectively or individually, lack

incentives to manage mortality or intend to manage bears to the brink of de-listing are unfounded.

Between 2007 and 2017, the Yellowstone grizzly population remained unchanged; indeed it has continued in the realm of approaching carrying capacity. Final Rule, 82 Fed. Reg. at 30538-40. The Court should reject Plaintiffs' recycled speculations as to the population's impending demise and uphold the scientific analysis supporting the Final Rule.

Idaho also asks the Court to recognize that the goal of conservation is "to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). Practically speaking, Plaintiffs' various arguments, including their attempt to convince the Court that long-established recovery goalposts should be moved dramatically upward and that state regulatory mechanisms should be judged against near-impossible standards, ignores the Ninth Circuit's admonition that "delisting cannot require the imposition of legal protections commensurate with those provided in the ESA itself." *Servheen*, 665 F.3d at 1032. Plaintiffs' unrealistic push for ever-greater post-delisting protections ultimately frustrates the underlying purposes of the ESA and discourages state cooperation in recovery of the Greater Yellowstone grizzly bear population, as well as conservation of other grizzly bear populations and species. The return of a species to state management

6

upon fulfillment of the five factors in ESA § 4(a)(1) [16 U.S.C. § 1533(a)(1)] should be celebrated, not discouraged.

**ARGUMENT**

Pursuant to the Court's Order (ECF 178), Defendant-Intervenor State of Idaho has limited this brief to issues of specific concern to Idaho, and in further support of its motion for summary judgment adopts and incorporates the briefing (ECF 203), Statement of Undisputed Facts (ECF 204), and Response to Defendants' Statement of Facts (ECF 205) submitted by defendant United States of America, *et al*.

**1.    The Fish and Wildlife Service did not act arbitrarily or capriciously in concluding existing regulatory mechanisms are adequate to maintain the recovered status of the Greater Yellowstone grizzly bear population.**

Idaho adopts the arguments of the United States regarding the enduring application of the Ninth Circuit's holding in *Servheen*, 665 F.3d at 1021, 1032, that the regulatory mechanisms examined and incorporated into the 2007 rule delisting the Yellowstone grizzly population met the ESA's "adequacy" requirement (16 U.S.C. § 1533(a)(1)(D)). Idaho writes separately, however, to emphasize the extent to which the Ninth Circuit's decision approved the adequacy of discretionary mortality limits in the 2007 Rule, which were much more liberal than the mortality limits that Plaintiffs now assert threaten the continued existence of the Yellowstone grizzly population.

The 2007 delisting rule incorporated a Conservation Strategy setting forth annual limits on discretionary mortality. The 2007 Conservation Strategy also incorporated state grizzly bear management plans. *Servheen*, 665 F.3d at 1021. As here, the parties disputed "whether the Strategy or associated state plans are themselves appropriately considered 'regulatory mechanisms.'" *Id*. at 1030. The Ninth Circuit held, however, that it "need not decide whether the Strategy itself, as a whole, constitutes a 'regulatory mechanism,'" because "certain of the Strategy's standards [were incorporated] into the National Park Superintendents' Compendia and National Forest Plans (NFPs)." *Id*. at 1031. Because of this incorporation, FWS' "consideration of components of the Strategy that ha[d] been made legally binding [including, as the court noted, the Strategy's mortality limits] adequately support[ed] [FWS'] . . . determination" that existing regulatory mechanisms were adequate to conserve the delisted bear population. *Id*.

The Ninth Circuit's findings in *Servheen* still apply. Now, as then, 98% of the Primary Conservation Area (PCA) is controlled by the National Park Service and USFS. *Cf. Servheen*, 665 F.3d at 1031, and Final Rule, 82 Fed. Reg. at 30516 ("USFS and NPS collectively manage approximately 98 percent of lands inside the PCA"). Now, as then, "most grizzly bears (approximately 75 percent of females with cubs-of-the-year) are within the PCA for most or part of each year." Final Rule, 82 Fed. Reg. at 30512. Now, as then, the PCA is "buffered by the legal

protections afforded by the Wilderness Act on a significant portion of grizzly habitat outside the PCA." *Servheen*, 665 F.3d at 1032; *cf*. Final Rule, 82 Fed. Reg. at 30524 (80% "of suitable habitat outside of the PCA" is designated Wilderness).

While the Ninth Circuit did not find it necessary in *Servheen* to address those portions of the Conservation Strategy beyond those incorporated into national park compendia and national forest plans, it nonetheless noted the conservation benefits of the Strategy considered as a whole:

> The Rule also cites to a wide range of other rules, regulations, and laws, both state and federal, which could facilitate the protection of the grizzly bear and the implementation of the Strategy. The breadth of these measures is a tribute to the comprehensive multi-jurisdictional cooperative effort between federal and state agencies, as well as private interest groups. The multi-state commitment to implement the Strategy represents a substantial wildlife conservation planning achievement—and one that, we have no doubt, ultimately improves the lot of the Yellowstone grizzly bear. For purposes of the Factor D determination, however, we need not, and do not, consider those measures, some or all of which may not be binding, because we hold that the clearly binding regulatory mechanisms discussed above suffice.

665 F.3d at 1031-32 (footnote omitted).

Significant to this case, the mortality limits that the Ninth Circuit found to be sufficient, *id*. at 1031, were <u>less</u> protective of grizzly bears than the more conservative mortality limits incorporated into the present-day Conservation Strategy and Final Rule. The 2007 Conservation Strategy anticipated hunting so long as the population was within "annual mortality limits of 9% of adult females

(not exceeded in two consecutive years), 15% of adult males (not exceeded in three consecutive years), and 9% of cubs under two years old (not exceeded in three consecutive years)." *Id*. at 1021 (citing 2007 Conservation Strategy). The 2007 Rule and Conservation Strategy applied such mortality limits to an estimated population of 546 bears. FWS_LIT_16860.

Today, similar, but more conservative, mortality limits (7.6% of adult females, 15% of adult males, and 7.6% of cubs under two years old) apply when the Yellowstone grizzly population is between 600 bears and 674 bears. Final Rule, 82 Fed. Reg. at 30515. And if the population were to drop below 600 (still substantially larger than the 2007 population of 546), the States would cease hunting and all lethal bear removals, except where necessary to address human safety concerns. *Id*.[2]

In sum, *Servheen* established that the mortality limits in the 2007 delisting rule, as given "federal regulatory force" through incorporation into national park compendia and national forest plans, were sufficient as a matter of law, to support the FWS' determination that existing regulatory mechanisms were adequate to conserve the delisted bear population. The reasoning in *Servheen* applies with

---

[2]  Allowable total mortality rates for females and dependent young do not exceed those in the 2007 rule unless the bear population in the demographic monitoring area exceeds 747 bears, at which population the allowable mortality for females and dependent young raises to 10%.  For male bears, total allowable mortality is 20% for a population between 675 and 747 bears, and 22% if the population exceeds 747 bears. 82 Fed. Reg. at 30515.

equal, if not greater force, to the more protective mortality limits in the 2017 Final Rule. The *Servheen* decision binds this Court to uphold the adequacy of the Final Rule's conservative mortality limits.

2. **Plaintiffs err in asserting that enforceability by third parties is a prerequisite to finding that state regulatory mechanisms are adequate.**

The Ninth Circuit's *Servheen* decision confirms the adequacy of the regulatory mechanisms employed by the States of Idaho, Montana, and Wyoming to manage grizzly bear mortality. Even if the *Servheen* holding were to be ignored, the record still establishes that the FWS rationally concluded that existing regulatory mechanisms are collectively sufficient to maintain the Yellowstone grizzly population at or above recovery levels. FWS' analysis properly considered individual state regulatory mechanisms, along with state commitments in the Conservation Strategy and the Tri-State Agreement, in light of a long record of state commitment to achieving and sustaining a recovered Yellowstone grizzly population.

In making a delisting decision, Section 4(a) of the ESA requires FWS to consider, among other factors, whether the species is endangered or threatened because of "the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). Section 4(b) provides further direction in applying this factor:

> The Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial

> data available to him after conducting a review of the status of the species _and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas._

16 U.S.C. § 1533(b)(1)(A) (emphasis added). Giving effect to every word in the statute, FWS, in assessing the adequacy of state regulatory mechanisms, _must_ consider those mechanisms in the context of state conservation efforts and practices. There is no requirement that a conservation plan be enforceable for FWS to consider it "as part of its overall assessment of ongoing management practices." _Colorado River Cutthroat Trout v. Salazar_, 898 F. Supp. 2d 191, 208 (D.D.C. 2012).

It is appropriate for FWS to consider state plans that include "tangible steps" to conserve a species and a "proven track record" of a state's implementation of conservation efforts. _Defs. of Wildlife v. Kempthorne_, 535 F. Supp. 2d 121, 131-32 (D.D.C. 2008); _see, e.g., Ctr. for Biological Diversity v. FWS_, No. CIV.A. 05-CV-00305RP, 2007 WL 716108, at \*3 (D. Colo. Mar. 7, 2007) (rejecting plaintiff's assertion that "voluntary efforts must be rejected when they are not enforceable through a regulatory mechanism" because FWS was "relying on a history of conservation efforts and not on prospects for the future"); _WildEarth Guardians v. Salazar_, No. 10-CV-0002-WPJ/SMV, 2014 WL 10209231, at \*3-4 (D.N.M. July 30, 2014) ("nothing in the ESA requires that a regulatory mechanism must be

binding and enforceable before FWS may consider it," particularly when accompanied by a history of successful implementation by government participants).

The Ninth Circuit has also upheld the consideration of conservation agreements in assessing the adequacy of regulatory mechanisms, even if "not yet fully implemented," if past experience supported FWS' determination of the adequacy of the agreement measures going forward. *Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 881 (9th Cir. 2009). In its consideration of the 2007 Rule delisting the Greater Yellowstone Ecosystem Grizzly Bear Distinct Population Segment, the Ninth Circuit, citing *Tucson Herpetological Society*, left undetermined the issue of whether the 2007 Conservation Strategy "itself, as a whole, constitutes a 'regulatory mechanism,'" since its legally binding component parts were, standing alone, sufficient to conserve grizzly bears. *Servheen*, 665 F.3d at 1030-31. But the court noted that "we have no doubt [the Conservation Strategy] ultimately improves the life of the Yellowstone grizzly bear." *Id*. at 1032.

Most recently, the D.C. Circuit upheld FWS' consideration of Wyoming's wolf management plan in the context of a delisting decision. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1083 (D.C. Cir. 2017). The plan at issue "explains how the State intends to carry out its day-to-day implementation of its legal obligations." *Id*. The D.C. Circuit held that reliance on a management plan in considering the

adequacy of Wyoming's regulatory mechanisms was "a quintessential judgment call that Congress left to the Secretary, and by delegation to the Service, which has years of experience in evaluating what is reasonably likely to be implemented and effective." *Id*. The court found FWS' discretion to consider the plan was well founded in the text of ESA § 4(a), which "provides no definition of 'regulatory mechanisms" and in § 4(b)(1)(A), which "direct[s] that state conservation efforts must be considered." *Id*. Because FWS "had seen [similar management plans] in operation and was reasonably certain [it] would be fulfilled, the court upheld FWS' determination "that Wyoming's management plan is a reliable indicator of how the State plans to implement its statutes and regulations." *Id*.

Here, the administrative record documents ten additional years of state conservation efforts beyond the record before the Ninth Circuit in *Servheen. E.g.,* Final Rule, 82 Fed. Reg 30599 ("agencies responsible for managing the GYE grizzly bear population upon delisting came together to develop the 2016 Conservation Strategy and have been effectively cooperating and communicating with each other about grizzly bear management decisions for the last 35 years"). Since the 2007 delisting rule, scientists from Idaho, Montana, Wyoming Fish and Game agencies, along with scientists from U.S. Geological Survey, National Park Service, FWS, and universities have continued to actively participate in Interagency Study Team research, analyses, and monitoring. *E.g.,*

FWS_LIT_005682 (2009 *Yellowstone Mortality and Conflicts Reduction Report)*;

FWS_LIT_005735 (2013 *Response of Yellowstone Grizzly Bears to Changes in*

*Food Resources: A Synthesis*); FWS_Rel Docs_006733 (2015 Annual Report

Summary describing population and food source monitoring, and mortality data,

including Wind River Tribes' data).

For ten additional years since the 2007 delisting rule, Idaho and its sister

states have shouldered responsibility for public education and managing bear-

human conflicts. *E.g.,* FWS_Lit_023352, 023405-10 (2012 Interagency Study

Team Annual Report summary of Idaho/Montana/Wyoming state agency response

to conflicts); FWS_Lit_023455, 023510-8 (similar information in Interagency

Study Team 2014 Annual Report); FWS_Lit_023583, 023644-54 (similar

information in Interagency Study Team 2016 Annual Report). Even while the

Yellowstone grizzly population has been part of the ESA lower-48 grizzly bear

listing, Idaho has enforced state protections for grizzly bear, including the

successful prosecution of an unlawful take of grizzly bear under state law in 2014,

with a conviction following jury trial. FWS_Rel Docs_001625.

The 2017 Final Rule thus rationally relies on decades of "reliable indicators"

of how states will manage the Yellowstone Grizzly Population and the adequacy of

the collective regulatory mechanisms for managing a delisted population.

**3.   The Idaho Fish and Game Commission approved the Tri-State Agreement in All Aspects, Including Mortality Limits.**

The Tri-State Agreement was executed by the States of Wyoming, Montana, and Idaho, by and through the Directors of their Fish and Game/Wildlife agencies and the presiding officials of their Fish and Game/Wildlife Commissions; it delineates how the states will coordinate and allocate discretionary mortality. FWS_Rel Docs_001293. The Tri-State Agreement identifies quantifiable actions the States will take to manage for a population of 600-747 bears (representing the 95% confidence intervals of the 2002-2014 Chao2 modeled average of 674 bears). FWS_Rel Docs_001296. The States agreed to achieve this criterion by meeting annually to establish discretionary mortality limits. FWS_Rel Docs_001297. One of the steps in determining annual discretionary mortality (allowed only if the population remains above 600 bears, with the exception of removals to address human safety), is to determine if total allowable independent male or female mortality was exceeded the previous year. *Id*. If exceeded, the number exceeding the total allowable mortality will be subtracted from the next year's discretionary mortality available for harvest for that gender. *Id*. Total allowable mortality includes discretionary mortality (hunting and management removals) and non-discretionary mortality (natural deaths and human-caused mortality such as illegal shootings, defense of human life shootings, and vehicle collision). FWS_Rel_Docs_001295.

Plaintiff Center for Biological Diversity (ECF 190), without foundation, asserts that the Idaho Fish and Game Commission conspired to subvert the Tri-State Agreement by only approving the subtraction of grizzly bear hunting mortality that exceeds total mortality limits when it approved the Tri-State Agreement by proclamation (FWS_LIT_005471-72). Under Idaho law, the Commission, in addition to issuing rules and orders, may issue "proclamations" that "have full force and effect as law." Idaho Code § 36-105(2). The Center asserts that the Commission's proclamation was a deliberate attempt to alter the Tri-State Agreement so that "conflict mortality may exceed the mortality limit without reducing allowable mortality in the following year." ECF 190 at 11.

The proclamation language reflects a mundane matter of procedure. Idaho Fish and Game proclamations are the administrative vehicle used to "impose such restrictions and conditions upon hunting, angling or trapping as said commission shall find to be necessary." Idaho Code § 36-104(3). Thus, in adopting the proclamation, the Commission addressed the substance of the Tri-State Agreement as it applied to restrictions or conditions imposed upon hunting. Nothing in the proclamation, however, rejects or amends any portion of the Tri-State Agreement, a fact verified by the fact that on the same day that the Commission issued the proclamation (August 8, 2016) (FWS_LIT_005472), the Commission also approved the Tri-State Agreement unconditionally, and the Director of the Idaho

Department of Fish and Game and the Chairman of the Idaho Fish and Game

Commission both signed the Agreement, binding both entities to comply with its

terms. *See* Idaho Code § 67-2328 (Idaho agencies may enter into agreements to

exercise their "powers, privileges and authority jointly with the United States, any

other state, or public agency of any of them"); Idaho Code § 36-104(9) (Fish and

Game Commission may "[e]nter into cooperative agreements with state and federal

agencies … for the development of wildlife rearing, propagating, management,

protection and demonstration projects").

4. **The Fish and Wildlife Service did not act arbitrarily or capriciously in determining that removal of bears for "human safety" in the event the population drops below 600 bears will ensure the bear population remains above recovery levels.**

Plaintiff Center for Biological Diversity (ECF 190), suggests the

Conservation Strategy will not adequately arrest a hypothetical decline in the

population because it allows the management removal of bears where "necessary

for human safety" if the annual bear population estimate falls below 600. ECF 190

at 11.

To the contrary, the States' agreement to halt all discretionary mortality if

the bear population drops below 600, other than that necessary to address human

safety concerns, applies comparable or greater protections for that population size

than those previously effective under the ESA (and, as discussed *supra*, more

protective than the 2007 mortality limits found sufficient in *Servheen*). ESA-protected bears may be, and have been, removed to address livestock depredations. *See* Final Rule, 82 Fed. Reg. at 30522 ("[a]pproximately 14 percent (45 of 311) of all human-caused grizzly bear mortalities in the GYE between 2002 and 2014 were due to management removal actions associated with livestock depredations").

There is no indication, however, that the States will interpret all livestock depredations to jeopardize human safety. The Idaho Grizzly Bear Management Plan interprets "human safety" to mean "human/grizzly encounters [that] may jeopardize the safety of humans." FWS_LIT_033006. Under Idaho's plan, human safety removals include "[g]rizzly bears displaying unnatural aggression or considered a threat to human safety" and grizzly bears "displaying food conditioned or habituated behaviors." FWS_LIT_033008.

Moreover, if the Yellowstone grizzly population were to drop below 600, the States are incentivized to limit mortality to return the population to a point where discretionary hunting mortality is allowed. FWS may consider "the strength of the participating state's incentives" in assessing the likelihood that management commitments will be carried out. *Def. of Wildlife*, 849 F.3d. at 1984. In light of such factors, there is no basis for the Plaintiffs' assertion that the States will exploit the "human safety" exemption to remove bears that do not pose actual threats to humans.

**5. Plaintiffs' concerns about the lack of "recalibration" in the event the States develop a less conservative method for estimating the Yellowstone grizzly bear population are unfounded and unsupported by the record.**

In the Tri-State Agreement, the three States agree to undertake tangible, quantifiable actions to maintain a population of 600-747 bears (representing the 95% confidence intervals of the 2002-2014 Chao2 modeled average of 674 bears). FWS_Rel Docs_001296. Population estimates made with the Chao2 method are generally agreed to be conservative as the population has increased—i.e., they substantially underestimate the actual number of grizzly bears in the Greater Yellowstone Ecosystem. *See* Final Rule, 82 Fed. Reg. at 30555 ("at the model-averaged Chao2 estimate of approximately 700 bears, there are likely 350 other bears that remain uncounted"). As a result, the States' commitment to manage for a population of 600-747 bears as estimated by Chao2 likely results in a population closer to 1,000 bears, well in excess of the established recovery level of 500 bears, where 500 bears is an absolute number, not tied to Chao2 or any other specific counting method. Final Rule, 82 Fed. Reg. at 30512.

Plaintiff Humane Society asserts that in the event the States develop a more accurate method of estimating the Yellowstone grizzly population, the States must "recalibrate" their commitment to manage for a target population of 600-747 bears—i.e., the target population should increase by the same increment as the estimated population, to avoid, in Plaintiff's words, the taking of "hundreds of

additional grizzly bears through an accounting trick." ECF 194 at 24. Plaintiff, by selective use of the administrative record, asserts that FWS shares its concern.

As Plaintiff Humane Society notes, FWS Director Dan Ashe called a lack of provision for recalibration if the method for estimating the population were to change in the future "an absolute show-stopper" on October 28, 2016. FWS_Emails_008319. It does not appear, however, that Director Ashe's concerns were grounded solely in the best available science. Rather, in the words of a National Park representative, "the core of the issue is a *public demand* to know what will happen if the population estimate becomes much higher based on a new model." FWS_Emails_016317-18 (emphasis added).

The question of the need for recalibration in the Final Rule is ultimately a moot one, as the States resolved Director Ashe's concerns. At a meeting of the Yellowstone Ecosystem Subcommittee on November 16, 2016, Idaho Department of Fish and Game Wildlife Bureau Chief Jeff Gould described the States' solution to potential public concerns about recalibration:

> One of the key changes we made because of an issue with the longevity of our commitment, we made a change that says foreseeable future. New edits were based on best available science. We had a conversation on recalibration and decided that Chao2 is based on best available science. We wanted to make a commitment to use that for the foreseeable future and not change midstream. We dropped the notion of recalibration and inserted the notion of using Chao2 for the foreseeable future. It doesn't preclude best available science in future. The second topic was stability where we talked about population standards and managing for a stable population. We're not precluding

the use of finding better science in the future. In Chapter 2 [of the Conservation Strategy], the population standard section there's a phrase, "The goal of the strategy used to be 'to maintain 500 grizzly bears.['"] We went well beyond that to reflect what this group wanted to have commitment for, and that is for this period of time when population trajectory was relatively flat from 2002-2014. We have commit[ted]to continue to manage that range to at least within the confidence interval of the 2002-2014 Chao2 estimate. It also relates to demographic criteria 3. This wording "at least" gives frame for the lower end. We have solid commitment about safeguards to make sure once a population does move downward that there are safeguards to bring it back up. We wanted to make sure we were consistent with the recovery plan, use best available science, and a conservative management approach.

FWS_Emails_00705. The subcommittee voted to adopt the States' proposed language. FWS_Emails_00706. When informed of the decision to use the Chao2 estimator for the foreseeable future, Director Ashe stated:

> [T]he states['] reluctance to discuss "recalibration" is really to the bears' advantage. Chao2 is a very conservative estimator, so locking it in as the estimate actually will under-allocate harvest. And if/when the population grows, the harvest targets will become proportionally smaller. It's not a big effect, but it works in favor of the bears.

FWS_Emails_006926.

FWS' reliance on the States' commitment to use Chao2 for population estimates for the "foreseeable future" was neither arbitrary nor capricious. "Foreseeable," in this context, means that there is no reasonable anticipation of using any method other than Chao2 "within the range for which forecasts are possible." *Merriam-Webster's Collegiate Dictionary* 457 (10th ed. 1996). The standard also dovetails with the standard for assessing future threats to the Greater

Yellowstone Distinct Population Segment—the ESA defines a "threatened species" to be one that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). In short, for the foreseeable future, the States will manage bears to maintain a population of 600-747 bears, as measured by Chao2, and such estimation likely results in an on-the-ground population of over 1,000 bears, double the recovery level. Such a management regime goes far beyond that necessary to ensure that there is no likelihood of the bear becoming endangered at any foreseeable future date.

Moreover, once the States committed to employing the Chao2 estimator as a regulatory mechanism for the foreseeable future, the ESA's plain language foreclosed FWS from considering the effects of a possible future regulatory change. "The ESA requires agency decisions to be made based on consideration of '*existing* regulatory measures.'" *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 965 (N.D. Cal. 2010) (quoting 16 U.S.C. § 1533(a)(1)(D) (emphasis added). The ESA precludes FWS from concluding a threat exists to a species based on the mere possibility of a future regulatory change. *See Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1152 (D. Or. 1998) (determination of threats to species "must be based on the current regulatory structure").

**6.     The FWS correctly relied on its reasoned expectation that the States will continue to fund grizzly bear management.**

Plaintiff Humane Society asserts that FWS' analysis of the adequacy of state regulatory mechanisms is fatally flawed because the States have not "committed" to funding the Conservation Strategy, and points specifically to the fact that the States requested that references to funding commitments be omitted from the Final Rule. ECF 194 at 18.

Such assertions can only be based on ignorance of state funding mechanisms and the rule of law. The States are constitutionally barred from contractually committing to the expenditure of funds that have not yet been appropriated. *See, e.g.*, Idaho Const. art. VIII, § 1 (prohibiting creation of any debt or liability "except in case of war, to repel an invasion, or suppress an insurrection"). Congress was certainly aware of this limitation in most state constitutions when it enacted ESA § 4(a)(1)(D), and did not require that States amend their constitutions for their regulatory commitments to be deemed adequate.

This technical limitation on the States' ability to commit to future expenditures, however, does not lessen state commitment to adequately fund grizzly bear management; there is "a demonstrated track record of funding measures to ensure recovery of this grizzly bear population for more than 3 decades." Final Rule, 82 Fed. Reg. at 30516. The Memorandum of Understanding Detailing Agency Agreement to Implement [the 2016 Conservation Strategy], as

signed by the state and federal agencies, also states that "All agencies will take appropriate steps to seek funding to implement this document." FWS_Rel Docs_002293-4. When States have a "proven track record" of implementing past conservation efforts, it is not "speculative" to rely on the States to carry out conservation plans in existence at the time of delisting. *Defs. of Wildlife v. Kempthorne*, 535 F. Supp. 2d 121, 131-32 (D.D.C. 2008). Simply put, Humane Society's funding criticisms are completely impractical and would create a threshold for delisting that could never be achieved.

## CONCLUSION

For the foregoing reasons, the Court should grant the State of Idaho's motion for summary judgment and deny Plaintiffs' motions for summary judgment.

Respectfully submitted this 25th day of July 2018.

/s/ James D. Johnson
James D. Johnson
WILLIAMS LAW FIRM, P.C.

LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
Steven W. Strack
  *Specially Admitted*
Kathleen Trever
  *Specially Admitted*
Deputy Attorneys General
Natural Resources Division
    *Attorneys for State of Idaho*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum complies with the 6,500 word limit of this Court's Order of May 14, 2018 (ECF 178), in that it consists of 5,710 words, excluding the caption, tables of contents and authorities, and certificates of service and compliance, as calculated by the word count function of the word processor used to prepare the memorandum; and further certify the foregoing memorandum complies with Local Rule 1.5(a)(2) in that it is double spaced in a 14-pt font typeface.

/s/ James D. Johnson, Esq.
James D. Johnson, Esq.


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2018, I caused the foregoing to be electronically filed with the Court using the CM/ECF system, which caused the all attorneys of record to be served by electronic means.

/s/ James D. Johnson
James D. Johnson
WILLIAMS LAW FIRM, P.C.