**Tim Fox**
Attorney General of Montana
**Jeremiah Weiner**
Assistant Attorney General
PO Box 201401
Helena, MT 59620-1401
ph: (406) 444-2026
timfox@mt.gov; jweiner2@mt.gov

**Rebecca Dockter**
Chief Legal Counsel
**William Schenk**
Agency Legal Counsel
Special Assistant Attorneys General
Montana Department of Fish, Wildlife and Parks
PO Box 200701
Helena, MT 59620-0701
ph: (406) 444-4047; 444-3312
rdockter@mt.gov; bschenk@mt.gov
*Attorneys for State of Montana and*
*Montana Department of Fish, Wildlife and Parks*
*Defendant Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE; et al., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA; et al. <br><br> Federal-Defendants, <br><br> and <br><br> STATE OF WYOMING, <br><br> Defendant-Intervenor. | **CV 17-89-M-DLC** <br> (Consolidated with Case Nos. <br> CV-17-117-M-DLC, <br> CV-17-118-M-DLC, <br> CV-17-119-M-DLC, <br> and CV-17-123-M-DLC) <br><br> **MONTANA'S BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I. INTRODUCTION ..................................................................................................1

II. BACKGROUND...................................................................................................3

    A. The Endangered Species Act..........................................................................3

    B. Prior Yellowstone grizzly litigation. ..............................................................4

    C. Yellowstone grizzly conservation under the ESA............................................5

    D. Yellowstone grizzly conservation after delisting ...........................................8

        i. The 2016 Conservation Strategy. ............................................................8

        ii. State Plans. ..........................................................................................10

III. STANDARD OF REVIEW ...............................................................................12

IV. ARGUMENT.....................................................................................................14

    A. Montana's regulatory mechanisms are adequate to protect the grizzly bear in the Montana portion of the Yellowstone region............................................14

    B. Montana has planned for and is committed to connectivity between the Yellowstone region and other grizzly bear populations. ...............................18

    C. FWS rationally concluded that post-delisting mortality management will ensure that the Yellowstone region grizzly population is maintained. .........20

    D. Limited, well-regulated hunting does not diminish Montana's commitment to jeopardize the Yellowstone grizzly segment............................................23

    E. FWS' cumulative effects analysis is legally sufficient. ................................26

V. CONCLUSION ...................................................................................................27

CERTIFICATE OF COMPLIANCE ...................................................................30

CERTIFICATE OF SERVICE ..........................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009) ........................................13

*Greater Yellowstone Coalition v. Servheen, et al.*
  665 F.3d 1015 (9th Cir. 2011) ..........................................................................5, 14

*Greater Yellowstone Coalition v. Servheen, et al.*,
  672 F.Supp.2d 1105 (D. Mont. 2009) ..............................................................4, 5

*Humane Society of the U.S. v. Zinke*, 865 F.3.d 585 (D.C. Cir. 2017) ......................4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................... 13, 14

*N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ......13

*National Wildlife Federation v. Norton*, 386 F. Supp. 2d 553 (D.Vt 2005) ..............3

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...............................................................................13

*Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) .........................................1

**Statutes**

5 U.S.C. § 706 ............................................................................................................12

5 U.S.C. § 706(2)(A) ..................................................................................................12

16 U.S.C. § 1531(a) .....................................................................................................4

16 U.S.C. § 1531(b) .....................................................................................................3

16 U.S.C. § 1533(a)(1) .................................................................................................3

16 U.S.C. § 1533(b)(1)(A) ...........................................................................................4

16 U.S.C. §§ 1531-1540 .......................................................................1

16 U.S.C. §1532(20) ..........................................................................3

16 U.S.C. §1532(6) ............................................................................3

Mont. Code Ann. §2-1-101, *et seq*.................................................16

Mont. Code Ann. §2-15-3113 ...........................................................12

Mont. Code Ann. §75-1-101, *et seq*...............................................16

Mont. Code Ann. §87-1-125 .............................................................17

Mont. Code Ann. §87-1-201(1) .........................................................16

Mont. Code Ann. §87-1-201(9)(a).....................................................16

Mont. Code Ann. §87-1-301 .............................................................17

Mont. Code Ann. §87-5-302 .............................................................17

**Federal Regulations**

40 Fed. Reg. 3174-3176 (July 28, 1975) (FWS_Rel Docs_001437) .......................5

50 C.F.R. § 424.11(c)(d) ....................................................................3

50 C.F.R. 424.11(f) ............................................................................4

82 Fed. Reg. 30502 (June 30, 2017) (FWS_Rel Docs_001435 *et seq.*)....................1

82 Fed. Reg. 30504 (FWS_Rel Docs_001437) ......................................9

82 Fed. Reg. 30508 (FWS_Rel Docs_001441) ...................................6, 7

82 Fed. Reg. 30509 (FWS_Rel Docs_001442) ............................... 6, 7, 20

82 Fed. Reg. 30510-30515 (FWS_Rel Docs_001443-001448) ..............................21

82 Fed. Reg. 30511 (FWS_Rel Docs_001444) ..............................................7

82 Fed. Reg. 30512 (FWS_Rel Docs_001445) ..............................................9

82 Fed. Reg. 30512-30513 (FWS_Rel Docs_001445-001446) ...........................8

82 Fed. Reg. 30513 (FWS_Rel Docs_001446) .......................................8, 21

82 Fed. Reg. 30514 (FWS_Rel Docs_001447) ..............................................7

82 Fed. Reg. 30515 (FWS_Rel Docs_001448) ................................ 8, 10, 15, 21

82 Fed. Reg. 30516 (FWS_Rel Docs_001449) ........................................9, 10

82 Fed. Reg. 30521 (FWS_Rel Docs_001454) ..............................................9

82 Fed. Reg. 30527-30534 (FWS_Rel Docs_001460-001467) ...........................21

82 Fed. Reg. 30528-30529 (FWS_Rel Docs_001461-001462) ...........................21

82 Fed. Reg. 30530 (FWS_Rel Docs_001463) .............................................11

82 Fed. Reg. 30533 (FWS_Rel Docs_001466) ..............................................8

82 Fed. Reg. 30535 (FWS_Rel Docs_001468) ........................................ 15, 19

82 Fed. Reg. 30536 (FWS_Rel Docs_001469) .............................................18

82 Fed. Reg. 30543 (FWS_Rel Docs_001476) .............................................12

82 Fed. Reg. 30544 (FWS_Rel Docs_001477) .............................................12

82 Fed. Reg. 30554-30555 (FWS_Rel Docs_001477-001478) ...................... 26, 27

82 Fed. Reg. 30581 (FWS_Rel Docs_001514) .............................................19

82 Fed. Reg. 30598 (FWS_Rel Docs_001531) ........................................ 23, 26

**Montana Constitution**

Mont. Const. art. II, §§ 3, 8, and 9 ............................................................15

**Montana Administrative Rules**

Mont. Admin. R. 12.9.103(1) ..................................................................17

Mont. Admin. R. 12.9.103(1)(a) ...............................................................17

Mont. Admin. R. 12.9.103(1)(f) ...............................................................17

Defendant Intervenors State of Montana and the Montana Department of Fish, Wildlife and Parks (collectively "Montana") submit the following Brief in Support of Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motions for Summary Judgment.

## I. INTRODUCTION

Plaintiffs Crow Indian Tribe and other consolidated organizational Plaintiffs (collectively "Plaintiffs") seek judicial review of the United States Fish and Wildlife Service's ("FWS") decision to designate the Greater Yellowstone Ecosystem grizzly bear population a distinct population segment and to remove that population from the list of threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531-1540 ("ESA"). *See,* 82 Fed. Reg. 30502 (June 30, 2017) (FWS_Rel Docs_001435 *et seq.*) ("2017 Final Rule").

The ESA was enacted to halt and reverse the trend toward species extinction. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180 (1978). In the case of the grizzly bear in the Greater Yellowstone Ecosystem ("Yellowstone region"), FWS, other federal agencies, and the states of Montana, Idaho, and Wyoming have done just that. The Yellowstone region grizzly population spent almost 42 years under the wing of the ESA. The question before the Court is not whether this great animal deserves to be conserved, it is whether FWS correctly determined that listing under the ESA is no longer necessary given the efforts made by states and

federal agencies over the last four decades to recover the bear and the commitments they have made to manage the Yellowstone region grizzly population to ensure it remains healthy and robust after delisting.

Montana filed answers to four of the five cases consolidated in the above-captioned matter. In their various complaints and briefs in support of motions for summary judgment, Plaintiffs Wild Earth Guardians, Northern Cheyenne Tribe *et al.*, Alliance for the Wild Rockies, and Humane Society *et al.*, despite 40 years of effort on the part of multiple federal agencies and three states, and a strikingly successful recovery by the Yellowstone region grizzly population, find fault in FWS' delisting process, analysis and conclusions.

Federal Defendants have capably addressed all of Plaintiffs' arguments. Therefore, rather than repeating them, Montana adopts all Federal Defendants' arguments in its response brief (Doc. 203). Here, Montana demonstrates that its efforts, planning and regulatory structure bolster the FWS' conclusions reached in the 2017 Final Rule and strengthen Federal Defendants' arguments in its brief. The ESA has done its work. The Yellowstone region grizzly bear has recovered, and Montana contributed significantly to that recovery. The paradigm has shifted from recovery to management. It is the states who are best equipped to manage wildlife over the long term. Montana is committed to the conservation and sustainable management of all wildlife, including the grizzly bear.

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

2

## II. BACKGROUND

### A. The Endangered Species Act.

The ESA was enacted to "provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). ESA defines the term "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range. . ." 16 U.S.C. §1532(6). A "threatened species" is one which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. §1532(20). The ESA requires the U.S. Secretary of the Interior to determine whether any species is an endangered species or a threatened species because of any of five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). FWS must consider the same five criteria for both listing and delisting. *Id.*; 50 C.F.R. § 424.11(c)(d); *National Wildlife Federation v. Norton,* 386 F. Supp. 2d 553, 558 (D.Vt 2005). Any one of the five factors may support a listing decision. *Kern County Farm Bureau v. Allen,* 450 F.3d 1072, 1075 (9th Cir. 2006). Determinations required by subsection (a)(1) must be made

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

3

solely on the basis of the best scientific and commercial data available. 16 U.S.C. §

1533(b)(1)(A).

In furtherance of its broad conservation goal, the ESA sought to

"encourag[e] the States and other interested parties . . . to develop and maintain

conservation programs" as a "key" to "better safeguarding" fish and wildlife. 16

U.S.C. § 1531(a). Indeed, a purpose of the Act is to foster state cooperation in the

conservation of threatened or endangered species. *Humane Society of the U.S. v.

Zinke*, 865 F.3.d 585, 598 (D.C. Cir. 2017). The ESA requires that listing decisions

be made "*after taking into account those efforts, if any, being made by any State . .

. to protect such species, whether by predator control, protection of habitat and

food supply or other conservation practices.*" 16 U.S.C. § 1533 (b)(1)(A),

emphasis added. The requirement to take state efforts into account applies to a

decision to list, reclassify or delist a species. 50 C.F.R. 424.11(f).

## B. Prior Yellowstone grizzly litigation.

Many of the issues in this litigation have already been before this Court.  On

March 29, 2007, FWS published a rule designating the Yellowstone region

population of grizzly bears a distinct population segment and removing that

segment from the list of endangered and threatened species. The delisting was

challenged in the Federal District of Montana. *Greater Yellowstone Coalition v.

Serheen, et al.*, 672 F.Supp.2d 1105 (D. Mont. 2009).  The Court upheld FWS'

determination that the grizzly population was large enough to maintain adequate genetic diversity and its interpretation of the phrase "significant portion of its range." However, the Court found that FWS was arbitrary and capricious in its evaluation of whitebark pine and that regulatory mechanisms were inadequate because they were not legally enforceable. *Id.* at 1118-1120. On appeal, the Ninth Circuit Court found only one fault with the 2007 delisting rule; that the FWS was arbitrary and capricious in its failure to evaluate the impact of the loss of whitebark pine on the grizzly bear because "the data before [the Service] and its conclusion that whitebark pine declines were not likely to threaten the Yellowstone grizzly bear." *Greater Yellowstone Coalition v. Servheen, et al.* 665 F.3d 1015, 1130 (9th Cir. 2011). The Ninth Circuit overturned the District Court with respect to the adequacy of regulatory mechanisms.

## C. Yellowstone grizzly conservation under the ESA.

In 1975, the FWS listed the grizzly bear under the ESA as threatened in the 48 conterminous states. 40 Fed. Reg. 3174-3176 (July 28, 1975). Recovery of the grizzly bear in the Yellowstone region has been a cooperative effort of multiple federal agencies and the states of Montana, Idaho, and Wyoming. In 1973, before the grizzly bear was even listed, managers created a centralized research group to provide scientific information and inform management decisions in the Yellowstone region. 82 Fed. Reg. 30508 (FWS_Rel Docs_001441). The resulting

Interagency Grizzly Bear Study Team has made the Yellowstone region the most studied grizzly bear population in the world. *Id*.

In 1983, the Interagency Grizzly Bear Committee ("IGBC") was created to coordinate management efforts and research action across multiple federal lands and states to recover the grizzly bear in the lower 48 states. *Id*. One of its objectives is to change land management practices to more effectively provide security and maintain or improve habitat conditions for the grizzly bear. *Id*. The Yellowstone Ecosystem Subcommittee, a subcommittee of the IGBC, was formed the same year to coordinate recovery efforts in the Yellowstone region. *Id*. The Montana Department of Fish, Wildlife and Parks ("MFWP"), Montana's fish and wildlife management agency, is a member of all three committees.

FWS completed a Recovery Plan for the grizzly bear in 1982, which identified the Greater Yellowstone as one of six areas within the conterminous United States thought to support grizzly bears. *Id*. The Recovery Plan was subsequently amended and supplemented. The Recovery Plan contained two key components: habitat-based recovery criteria and demographic recovery criteria. FWS developed biologically based habitat recovery criteria with the goal of maintaining or improving habitat conditions at 1998 levels. 82 Fed. Reg. 30509 (FWS_Rel Docs_001442).

In 2016, revisions were proposed to the demographic recovery criteria

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

6

concurrent with the proposed delisting rule to reflect the best available science, and the Recovery Plan Supplement was updated concurrent with the 2017 Final Rule. *Id*. The revised Recovery Plan Supplement contains three demographic recovery criteria for the Yellowstone region population: The first demographic criterion establishes that the population "maintain a minimum population size of 500 grizzlies and at least 48 females with cubs-of-the-year." The second criterion requires that 16 of the 18 bear management units within the recovery zone "must be occupied by females with young, with no two adjacent units unoccupied during a 6-year sum of observations." The third calls for maintenance of the population around the 2002-2014 population estimate average of 674 grizzly bears. These recovery criteria have all been met since 2004. 82 Fed. Reg. 30514 (FWS_Rel Docs_001447).

Under the ESA, the population of the Yellowstone region grizzly bears recovered dramatically. In the early 2000s, grizzlies occupied roughly 68 percent of the suitable habitat within the Yellowstone grizzly segment. It's estimated that grizzlies now occupy 92 percent of the suitable habitat. 82 Fed. Reg. 30511 (FWS_Rel Docs_001444). When the grizzly bear was listed in 1975, estimates of the Yellowstone region population ranged from 136 to 312 individuals. 82 Fed. Reg. 30508 (FWS_Rel Docs_001441). From 1983 to 2002, the Yellowstone region grizzly population increased approximately 4.2 to 7.6 percent annually. From 2002

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

7

to 2011, the population growth rate slowed to 0.3 to 2.2 percent annually. 82 Fed. Reg. 30512-30513 (FWS_Rel Docs_001445-001446). This leveling off is attributed to an increase in population density. 82 Fed. Reg. 30513 (FWS_Rel Docs_001446). The estimated population in what is now the Yellowstone region Distinct Population Segment ("Yellowstone grizzly segment") in 2015, was 717 bears. 82 Fed. Reg. 30533 (FWS_Rel Docs_001466).

**D. Yellowstone grizzly conservation after delisting.**

  **i. The 2016 Conservation Strategy.**

The Final Conservation Strategy (FWS_Rel Docs_002274 *et seq.*), released by the Yellowstone Ecosystem Subcommittee in December 2016, will guide the management and monitoring of the Yellowstone region grizzly bear population and its habitat after delisting. 82 Fed. Reg. 30515 (FWS_Rel Docs_001448). It specifies and implements the population/mortality management, habitat, and conflict bear standards to maintain a recovered grizzly bear population for the future. *Id.* The Conservation Strategy contains objective, measurable habitat and population standards, and specifies clear State and Federal management responses if deviations occur. *Id.* All the state and federal agencies which are party to the Conservation Strategy have signed a memorandum of understanding through which they have agreed to implement the Conservation Strategy. *Id.*; FWS_Rel Docs_002160-2161.

The habitat component of the Conservation Strategy focuses on sustaining the recovered population within a Primary Conservation Area. The Primary Conservation Area ("conservation area") is comprised of the former Recovery Zone. It is a core secure area for grizzly bears, where human impacts on habitat conditions will be maintained at or below levels that existed in 1998. 82 Fed. Reg. 30521 (FWS_Rel Docs_001454). The year 1998 was chosen as a baseline because habitat conditions had been relatively constant for the previous decade and the population had been increasing from 4 to 7 percent per year. *Id*. The conservation area is 9210 square miles (almost 6 million acres), approximately 98 percent of which is managed by either the National Park Service or the U.S. Forest Service ("USFS"). 82 Fed. Reg. 30516 (FWS_Rel Docs_001449).

The Conservation Strategy sets out three population standards that are similar to those in the revised Recovery Plan. Mortality (whether natural or human-caused, including hunting) must be limited to that level that would enable the population standards to be met. The population is annually surveyed and estimated, and mortality limits are applied within a Demographic Monitoring Area which includes the conservation area plus most of the remaining suitable habitat in the Yellowstone region. 82 Fed. Reg. 30504, 30512 (FWS_Rel Docs_001437, 001445). Maintenance of grizzly populations in accordance with the population standards is a state obligation under the Conservation Strategy. Wyoming, Idaho

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

9

and Montana have entered a Tri-State Memorandum of Agreement ("Tri-State MOA") in which they have agreed to implement the mortality criteria in the Conservation Strategy and allocate discretionary mortality amongst the states. FWS_Rel Docs_001292-001305.

Along with habitat and population standards, the Conservation Strategy also includes habitat and monitoring protocols, provisions for management and monitoring of grizzly bear/human conflicts, provisions for information and education programs and guidelines for implementation. *See*, FWS_Rel Docs_002274 *et seq*. With the delisting, the Yellowstone Grizzly Coordinating Committee has replaced the Yellowstone Ecosystem Subcommittee. The new committee will coordinate implementation of the Conservation Strategy. 82 Fed. Reg. 30516 (FWS_Rel Docs_001449).

### ii. State Plans.

Montana, Idaho, and Wyoming have adopted state grizzly bear management plans. The state plans are incorporated into the Conservation Strategy as appendices. 82 Fed. Reg. 30515 (FWS_Rel Docs_001448). Together, the Conservation Strategy and the state plans describe and summarize the coordinated efforts required to manage the Yellowstone region grizzly bear population and its habitat such that its continued conservation is ensured.

Montana's Grizzly Bear Management Plan for Southwestern Montana

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

10

("Montana Plan") "works from the standards and commitments within the strategy providing state specific information or guidance where appropriate." FWS_LIT_033308. It sets out the goals of managing for a recovered grizzly bear population in southwestern Montana, much of which is outside the monitoring area, and the continued expansion of that population into areas that are biologically suitable and socially acceptable. FWS_LIT_033309.

The Montana Plan contains specific provisions for population monitoring, response to livestock and human conflict, information and education, food storage regulations, use of bear repellents and deterrents, aversive conditioning and management control. *See*, FWS_LIT_033304 *et seq*. The Montana Plan also has additional requirements for population and habitat monitoring and nuisance bear guidelines including bear-human interaction risk management protocols, rapid response protocols and guidelines for nuisance bear determination and control. *Id*.

FWS recognized that since 1993, MFWP has implemented countless public outreach efforts to minimize bear-human conflicts. 82 Fed. Reg. 30530 (FWS_Rel Docs_001463). For example, MFWP requires that all black bear hunters pass a bear identification test before receiving a black bear hunting license. *Id*. MFWP also includes grizzly bear encounter management as a core subject in basic hunter education courses. *Id*. The Montana Livestock Loss Board which is attached to the Montana Department of Livestock, compensates producers for direct livestock

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

11

losses caused by grizzly bears. Mont. Code Ann. §2-15-3113; *see also,* 82 Fed. Reg. 30544 (FWS_Rel Docs_001477). All three states have been actively involved in information and education outreach for over a decade, and their respective management plans contain chapters detailing efforts to continue current programs and expand them when possible. 82 Fed. Reg. 30543 (FWS_Rel Docs_001476).

In the process of developing its grizzly management and conservation program, Montana learned that biological recovery is not enough, there must be a significant degree of understanding and support for grizzlies by citizens and local communities where bears occur. It is critical that the states take their obligations under state law and their commitments under the Conservation Strategy and state plans seriously. The record clearly shows that Montana has done so. Montana's statutes are enforceable, and its programs are not mere aspirations. Montana has been and will continue to actively conserve the grizzly bear in the Montana portion of the Yellowstone region.

## III. STANDARD OF REVIEW

Review of the Plaintiffs' claims is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under this standard, a court may only set aside final agency action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A final agency action is considered to be arbitrary and capricious:

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

12

> if the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43

(1983). Conversely, a final agency action should be upheld where a reasonable

basis exists for the FWS' decision. *See, Kern Co. Farm Bureau v. Allen*, 450 F.3d

1072, 1076 (9th Cir. 2006). In examining FWS' decision, the Court must "consider

whether the decision was based on a consideration of the relevant factors and

whether that has been a clear error of judgment." *San Luis & Delta-Mendota Water*

*Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The standard of review is

"highly deferential," and, where supported by substantial evidence, the FWS'

findings must be upheld, even if that evidence is susceptible to more than one

rational interpretation. *Id.*

    Deference to the FWS is highest "when reviewing scientific judgments and

technical analyses within the agency's expertise." *N. Plains Res. Council v.*

*Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011); *see also, Ecology Ctr. v.*

*Castaneda*, 574 F.3d 652, 658-59 (9th Cir. 2009) ("We grant considerable

discretion to agencies on matters requiring a high level of technical expertise.").

Courts may uphold decisions of the FWS even if they are of "less than ideal

clarity," as long as the FWS' "path may be reasonably discerned." *Motor Vehicle*

*Mfrs. Assn.*, 463 U.S. at 44.

## IV. ARGUMENT

As noted above, Montana adopts the arguments of Federal Defendant (Doc.

203). In addition, Montana is entitled to summary judgment in its favor for the

following reasons.

### A. Montana's regulatory mechanisms are adequate to protect the grizzly bear in the Montana portion of the Yellowstone region.

In the 2017 Final Rule, FWS rationally found that existing regulatory

mechanisms are adequate to justify delisting the Yellowstone region grizzly. Just

as in *Greater Yellowstone Coalition,* Plaintiffs allege that regulatory mechanisms

are inadequate because they are nonbinding and unenforceable. Doc. 194 at 7-10.

Remarkably, Plaintiffs cite a dissenting opinion in the Ninth Circuit case, while

ignoring the majority opinion and the holding in the case. The Ninth Circuit Court

stated: "We need not decide whether the [Conservation] Strategy itself, as a whole,

constitutes a 'regulatory mechanism.' Even assuming that the Service's

consideration of the Strategy's voluntary or unenforceable components was error,

its consideration of components of the Strategy that have been made legally

binding adequately supports its Factor D determination." *Greater Yellowstone*

*Coalition,* 665 F.3d at 1030-31. The Court concentrated on the enforceability and

binding nature of United States Forest Service plans and National Park Service

compendia. State regulatory mechanisms are equally binding.

Plaintiffs brush aside Montana's commitment to the Conservation Strategy and Tri-State MOA and existing regulatory mechanisms. MFWP and Montana's Fish and Wildlife Commission ("Commission") implemented the statutory duty to protect, conserve, and manage grizzly bears as a rare species and the administrative duty to protect the grizzly bear in the Yellowstone region, by readopting the Montana Plan in 2013 (originally adopted in 2002) and signing the Conservation Strategy, thereby committing MFWP to carry out its duties under both documents. *See*, FWS_LIT_033304 and FWS_Rel Docs_002274-75. The Commission adopted the Tri-State MOA on July 13, 2016 through a process that binds MFWP and the Commission to apply the terms contained within it. FWS_LIT_009590; 82 Fed. Reg. 30535 (FWS_Rel Docs_001468). Moreover, Montana has multiple layers of regulation, beginning with its constitution and becoming more specific with statutes, administrative rules and finally, a binding obligation as signatory to a Tri-State MOA committing MFWP to implementing the Conservation Strategy, which includes the Montana Plan. 82 Fed. Reg. 30515 (FWS_Rel Docs_001448).

Montana's Constitution contains provisions for a right to a clean and healthful environment, the right of participation, and the right to know. Mont. Const. art. II, §§ 3, 8, and 9. Montana has a state environmental policy act and right to know statutes that require the eyes and the ears of government be open to

the public. *See*, Mont. Code Ann. §75-1-101, *et seq*. and Mont. Code Ann. §2-1-101, *et seq*. Thus, MFWP developed its grizzly management and conservation policies and Montana Plan in an open and collaborative fashion. FWP_LIT_033308. In the process, MFWP learned that a critical component of cultivating tolerance for grizzly bears is the understanding that once truly recovered, Montana would be able to manage and conserve them as a valuable part the state's wildlife heritage. Montana's people are invested in the recovery and continued conservation of the Yellowstone region grizzly.

MFWP is bound by Montana statute to implement programs that manage wildlife and game species in a manner that prevents the need for listing under the state's endangered species act (Mont. Code Ann. § 87-5-107) or under the ESA, and that assists in the maintenance or recovery of listed or candidate species. Mont. Code Ann. § 87-1-201(9)(a). Under the mantel of this statute, MFWP has the authority to contractually commit to the Conservation Strategy, which it has done. Montana law also defines bears as game animals (Mont. Code Ann. § 87-2-101(6)), and MFWP must enforce all the laws of the state respecting the protection, preservation, management, and propagation of game animals. Mont. Code Ann. § 87-1-201(1). These statutes and commitments obligate MFWP and the Commission to adhere to the Conservation Strategy.

The Commission is statutorily obligated to set policies for the protection,

preservation, and propagation of wildlife in Montana, including game species, and for the "fulfillment of all other responsibilities of the department as provided by law." Mont. Code Ann. § 87-1-301. Therefore, the Commission is legally bound to set policies within the framework of the Conservation Strategy and the Montana Plan; implementation of which are MFWP's responsibility. The Commission also has the authority to provide open and closed seasons, means of taking, shooting hours, tagging requirements for carcasses, skulls, and hides, possession limits, and requirements for transportation, exportation, and importation of grizzly bears. Mont. Code Ann. § 87-5-302. The same laws that protect any other game animal further protect the grizzly bear. It is a crime to take any game animal without a license. Mont. Code Ann. § 87-1-125. Violators are prosecuted and penalized.

The Administrative Rules of Montana also declare that the Commission "is dedicated to the preservation of grizzly bear populations within the state of Montana." Mont. Admin. R. 12.9.103(1). The rule directs MFWP to work to perpetuate and manage grizzly bears in suitable habitats of the state. Mont. Admin. R. 12.9.103(1)(a). The rule contains further guidance on research, hunting and recreational use, and depredation management. Finally, the rule requires MFWP to consult with appropriate federal agencies and comply with applicable federal rules and regulations in implementation of the policy. Mont. Admin. R. 12.9.103(1)(f).

Coupled with Montana's regulatory mechanisms described above,

Montana's commitments are more than adequate to protect and even enhance the Yellowstone region grizzly population in the state and qualify as adequate under the law. FWS considered multiple regulatory mechanisms including various components of the Conservation Strategy, and state laws and regulations throughout the 2017 Final Rule. It's treatment of the issue was comprehensive, rational and far from arbitrary.

## B. Montana has planned for and is committed to connectivity between the Yellowstone region and other grizzly bear populations.

FWS found that genetic concerns are not currently a threat the to Yellowstone segment. 82 Fed. Reg. 30536 (FWS_Rel Docs_001469). FWS' conclusion was not arbitrary. FWS found that current levels of genetic diversity in the population are capable of supporting healthy reproductive and survival rates. *Id*. As reasons for genetic health, FWS cites normal litter size, no evidence of disease, high survivorship, an equal sex ratio, normal body size and characteristics and a relatively constant population size within the monitoring area. *Id*. In fact, genetic heterozygosity values in the Yellowstone segment have increased slightly over the last few decades. Thus, FWS concluded that there is no immediate need for new genetic material. *Id*. Moreover, the current effective population is more than four times the minimum effective population size suggested in scientific literature. *Id*. FWS clearly articulated a reasonable basis for its conclusion. That is all that is required. *See Kern Co. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th

Cir. 2006).

Plaintiffs insist that FWS' conclusion that the Yellowstone grizzly segment is biologically recovered is arbitrary because the population is not linked to other grizzly populations. Doc. 186 at 26-27. Because declines in genetic diversity are expected in isolated populations, when the bear was listed FWS identified isolation of the Yellowstone region grizzly population as a potential threat. 82 Fed. Reg. 30535 (FWS_Rel Docs_001468). While FWS rationally concluded, based on the best available science, that genetic diversity does not constitute a threat to the Yellowstone region grizzly bear population now, nor is it anticipated to in the foreseeable future, it clearly recognized that introduction of outside genetic material would benefit the Yellowstone region grizzly population in the long term. *Id*.

The Montana Plan provides for the connectivity that it anticipates will someday provide that genetic infusion. The Montana Plan clearly expresses the state's commitment to connectivity between the Yellowstone region and (primarily) the Northern Continental Divide Ecosystem. One of the plan's long-term goals is "to allow the grizzly bear populations in southwest and western Montana to reconnect through the maintenance of non-conflict grizzly bears in areas between the ecosystems." FWS_LIT_033352, 82 Fed. Reg. 30581 (FWS_Rel Docs_001514). The Montana Plan recognizes that impacts from climate change

are best mitigated through well-connected populations of grizzly bears.

FWS_LIT_033352. Connectivity among grizzly populations also mitigates genetic

erosion and increases resiliency to demographic and environmental variation.

FWS_LIT_033344. Connected populations is important enough that in formulating

the Montana Plan, MFWP did not even consider an alternative to limit grizzly bear

distribution to just the recovery area because such an approach would be

"logistically impossible and biologically undesirable." FWS_LIT_033352.

The Yellowstone region grizzly population is now over 700 bears. 82 Fed.

Reg. 30509 (FWS_Rel Docs_001442). It has reached its recovery target and is

healthy and robust. The Conservation Strategy and Montana Plan are designed to

ensure that this recovery will be maintained.  That is sufficient to satisfy the

delisting criteria. *See,* Doc. 203, *supra.* But the Conservation Strategy and

Montana Plan go further by setting the stage for improvements to the population's

genetic health by providing a path for future connectivity between the Yellowstone

segment and the Northern Continental Divide.

## C. FWS rationally concluded that post-delisting mortality management will ensure that the Yellowstone region grizzly population is maintained.

Management of human-caused mortality has been a major focus of both

grizzly bear recovery and planning for post-delisting management. One of the

purposes of the Conservation Strategy is to specify and implement the

population/mortality management standards to maintain a recovered grizzly bear

population for the future. 82 Fed. Reg. 30515 (FWS_Rel Docs_001448). Along with identifying post-delisting monitoring to maintain a healthy Yellowstone region grizzly bear population, it establishes a comprehensive framework to manage mortality inside the monitoring area. 82 Fed. Reg. 30510-30515 (FWS_Rel Docs_001443-001448). FWS thoroughly explained the mortality management framework, and openly discussed sources of human-caused mortality and how those sources are dealt with under the Conservation Strategy and state law. 82 Fed. Reg. 30527-30534 (FWS_Rel Docs_001460-001467).

Plaintiffs acknowledge that under the state plans, recreational hunting would be halted when mortality thresholds are reached but complain that there is no similar limitation on management removals and that state plans provide for take of conflict bears regardless of current mortality quota. Doc. 190 at 10. But mortality is a fact. Some is unavoidable. 82 Fed. Reg. 30513 (FWS_Rel Docs_001446). Regulations authorized by §4(d) of the ESA allowed for management removals and self-defense mortalities when the Yellowstone segment was listed. 82 Fed. Reg. 30528-30529 (FWS_Rel Docs_001461-001462). Mortality will continue to occur now that it is delisted. Obviously, there will be natural mortality. There will also be mortality due to management removals, self-defense, defense of livestock, vehicle accidents and other sources.

Plaintiffs also criticize state hunting regulations that they acknowledge

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

21

curtail hunting but not management removals when discretionary mortality limits are reached. On its face, the argument is nonsensical; hunting regulations regulate hunting. Other management actions will be regulated elsewhere, like the Tri-State MOA wherein Montana, Idaho and Wyoming have agreed to maintain the population within the three criteria by using an adaptive management framework that will include, but not be limited to, the following:

- If the population is less than 600, the Parties will not allow discretionary mortality unless necessary to address human safety issues.
- At any population level greater than 600, if total allowable independent male or female mortality is exceeded, the number exceeding the total allowable mortality will be subtracted from the next year's discretionary mortality available for harvest for that gender.
- If a state meets any of its allocated regulated harvest limits at any time of the year, the respective state will cease hunting within the [monitoring area].
- If the total mortality limit for independent males, independent females, or dependent young is exceeded for three consecutive years and the annual population estimate falls below 612 (the lower bounds of the 90% confidence interval), the Parties will evaluate alternatives to reduce discretionary mortality and request IGBST biology and monitoring review. The Parties will consider the results of the IGBST review in determining appropriate changes to the management framework.
- If the distribution of reproductive females does not meet the criterion for Bear Management Unit occupancy, the Parties will request IGBST biology and monitoring review. The parties will consider the results of the IGBST review in determining appropriate changes to the management framework.

FWS_Rel Docs_001296-001297.

The Conservation Strategy and Tri-State MOA, coupled with state statutory duties, are more than adequate to regulate discretionary mortality. FWS' thorough analysis of discretionary mortality is well-reasoned and rational. Its conclusion that human-caused mortality does not constitute threats to the Yellowstone grizzly segment now and is not anticipated to constitute a threat in the future is based on the best available science. There is nothing arbitrary about it.

### D. Limited, well-regulated hunting does not diminish Montana's commitment to jeopardize the Yellowstone grizzly segment.

In the 2017 Final Rule, FWS recognizes that State fish and wildlife agencies have significant expertise in managing hunting sustainably. Therefore, it chose not to micromanage how states would implement hunting regulations. 82 Fed. Reg. 30598 (FWS_Rel Docs_001531). In response to public comment, FWS stated, "We do not consider the hunting regulations in Montana, Wyoming and Idaho to be too liberal, but rather the States have agreed to strict mortality limits, with the additional safeguard of subtracting any excess mortality in subsequent years, which would ensure the GYE grizzly bear population remains at healthy levels." *Id.*

In Montana, no grizzly bear hunting will take place in 2018. However, the Commission did adopt Montana Grizzly Bear Hunting Regulations on February 11, 2016. *See,* FWS_LIT_009397-009408. While not currently in effect, the regulations establish a framework for hunting grizzly bears in Montana post-delisting. They include a fee schedule and delineate seven hunting districts in the

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

23

Montana portion of the Yellowstone region. They include a provision that licenses will be issued only after completion of the required hunt orientation class; that a license holder may take only one bear, that the number of licenses issued will not exceed the number of bears available to hunt (based on mortality thresholds and allocation between the three states) and that a sportsperson may take only one Montana grizzly bear their life. *Id*.

Plaintiffs' incorrectly suggest that any regulatory commitments to provide and manage for connectivity, including no hunting zones, is unacceptable to the states. Doc. 186 at 27. Plaintiffs cite a memo from the states to the FWS which states "Montana may address [connectivity] through ongoing management planning. However, any declaration of "no hunting zones" as part of the federal delisting rule is unacceptable." FWS-Del-Em-00144669. While this memo does express Montana's position that a prohibition on hunting should not be in the delisting rule, it doesn't preclude Montana from disallowing hunting in critical areas where a population would benefit. Indeed, Montana has embraced this approach. The Montana Plan states:

> FWP would likely not institute hunting seasons in areas where bear density is low and harvest mortality is not sustainable. In addition, FWP would likely not institute hunting seasons in areas where bear density is low and removal of bears would negatively impact the potential for movement of grizzlies between ecosystems when desired and acceptable.

FWS_LIT_033364. Montana's Yellowstone region grizzly bear hunting

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

24

regulations follow the Montana Plan. For example, the Tobacco Root and Highland mountains were identified in the Montana Plan as potentially important for migration. FWS_LIT_033347 ("Maintaining presence of non-conflict grizzly bears in areas between the NCDE management area and the demographic monitoring area of the GYA, such as the Tobacco Root and Highland Mountains, would likely facilitate periodic grizzly movements between the NCDE and GYA.").

The hunting regulations delineate seven hunting districts. While five of those hunting districts noted that the number of licenses available was to be determined, two districts, the Stillwater-Bighorn and Highland-Ruby, which contains the Tobaccos and Highlands, are marked "CLOSED." FWS_LIT_009400. Clearly, in formulating and adopting the hunting regulations, MFWP and the Commission adhered to the Montana Plan.

The Montana Plan thoroughly examines the role of hunting. There, MFWP recommends that a regulated hunting season be a part of the overall grizzly bear management program for nine specific reasons and discusses twelve specific statutes, regulations, and considerations that will affect any proposed hunt. FWS_LIT_033347-033348. FWS rationally relied on the Montana Plan and other Montana regulatory mechanisms to reach its conclusion that, even with hunting, the Yellowstone region grizzly bear population will remain at healthy levels. 82

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

25

Fed. Reg. 30598 (FWS_Rel Docs_001531).

**E. FWS' cumulative effects analysis is legally sufficient.**

Plaintiffs allege that FWS failed to analyze whether any one or a combination of the five threat factors causes the Yellowstone grizzly segment to remain threatened under the ESA. Doc. 186 at 29. In support, they cite *WildEarth Guardians v. Salazar,* 741 F.Supp.2d 89 (D.D.C., 2009. There, FWS had declined to list the Utah prairie dog. FWS pointed to a conclusion of its analysis of the listing factors' individual impacts. The Court found that FWS had failed to cite to anything in the administrative record that evidenced, in a non-conclusory fashion, that FWS considered the listing factor's cumulative effect. *WildEarth Guardians*, 741 F.Supp.2d at 102-103.

Here, FWS does provide an analysis of the cumulative impacts of various threats to the Yellowstone grizzly segment. *See*, 82 Fed. Reg. 30554-30555 (FWS_Rel Docs_001477-001478). It acknowledges that the principle threats, which it had thoroughly assessed, may cumulatively impact the Yellowstone grizzly segment beyond the scope of each individual threat. Using the effects of the loss of whitebark pine, increasing human populations, and climate change as examples, FWS concluded that today these stressors have been adequately minimized and ameliorated and do not impact the Yellowstone grizzly segment with the same intensity. *Id*.

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

26

FWS further relied on the "relatively constant" population trend: "We consider estimates of population trend to be the ultimate metric to assess cumulative impacts to the population." *Id*. It's use of population stability as a proxy for the impact of multiple stressors was explained as including total mortality, changes in habitat quality, changes in population density, change in current range, displacement effects. *Id*. Plaintiffs quibble that the use of a proxy is only acceptable if the results mirror reality. Doc. 186 at 32. FWS is aware of the reality faced by grizzly bears. The 2017 Final Rule provides an exhaustive discussion of various threats, some of which are analyzed in combination with others and concludes "there will always be stressors acting on the GYE grizzly bear population that lead to human-caused mortality or displacement, but if these are not causing the population to decline, we cannot consider them substantial." 82 Fed. Reg. 30554-30555 (FWS_Rel Docs_001477-001478). FWS evaluated the cumulative impacts of various stressors and rationally concluded that they were not a threat. That is all that is required.

## V. CONCLUSION

The Yellowstone grizzly segment has recovered thanks to the efforts of multiple federal and state agencies and many other conservation partners. These efforts and the resulting population recovery are laudable. But ESA has done its job, and the paradigm has shifted from protection and recovery to management. It

is time for FWS to focus on the recovery of other species and for the states to take the lead on long-term management and conservation of the grizzly bear.

Disposition of this case in favor of Plaintiffs would not add substantially more protection for grizzlies in the Yellowstone region, but would cast doubt on FWS' ability to remove a population from the endangered species list in spite of the successful efforts of states and other partners to recover that species. Thus, Montana fears that public support for grizzly bear recovery could be jeopardized. Montana's vision is to manage and conserve grizzlies in a way that carefully balances human tolerance of grizzlies with the ecological needs of the species and facilitate the potential for genetic connection between the Yellowstone segment and other populations. Delisting the fully-recovered Yellowstone grizzly segment is a critical step toward Montana fulfilling that vision.

For the reasons stated herein, Montana respectfully requests that the Court deny Plaintiffs' motions for summary judgment and grant Defendant Interveners' Cross Motion for Summary Judgment.

Dated this 25th day of July 2018.

/s/ William Schenk
**William Schenk**
Agency Legal Counsel

**Rebecca Dockter**
Chief Legal Counsel

**Tim Fox**
Attorney General of Montana

**Jeremiah Weiner**
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rules 7.1 and 24.1 of the Rules of Procedure of the United States District Court for the District of Montana, I certify the following concerning the State of Montana and Montana Department of Fish, Wildlife and Parks' Brief in Support of Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motions for Summary Judgment:

1. the document is double spaced except for footnotes and quoted and indented material;

2. the document is proportionally spaced, using Times New Roman, 14 point font; and

3. the document contains 6228 words as calculated by Microsoft Word.


/s/ William Schenk
**William Schenk**
Agency Legal Counsel


## CERTIFICATE OF SERVICE

I hereby certify that, this 25th day of July, 2018, I electronically filed the foregoing documents with the Clerk of the Court via CM/ECF system, which will send notification to the attorneys of record.


/s/ William A. Schenk
**William A. Schenk**
Agency Legal Counsel

Montana's Brief in Support of Cross Motion for Summary Judgment and
Opposition to Plaintiffs' Motions for Summary Judgment

30