JEFFREY H. WOOD
Acting Assistant Attorney General
COBY HOWELL, Senior Trial Attorney
MICHAEL R. EITEL, Senior Trial Attorney
DEVON L. FLANAGAN, Trial Attorney
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, Oregon 97204-2902
Tel: (503) 727-1023 | Fax: (503) 727-1117
Email: Coby.Howell@usdoj.gov
[Additional counsel on signature page]
***Attorneys for Federal Defendants***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>STATE OF WYOMING, *et al.*,<br><br>Defendant-Intervenors. | Case No. 9:17-cv-00089-M-DLC<br><br>Consolidated with Case Nos.:<br>CV 17-117-M-DLC;<br>CV 17-118-M-DLC;<br>CV 17-119-M-DLC;<br>CV 17-123-M-DLC; and<br>CV 18-016-M-DLC<br><br>**FEDERAL DEFENDANTS'<br>REPLY IN SUPPORT OF<br>CROSS MOTION FOR<br>SUMMARY JUDGMENT (ECF<br>202)** |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 5

ARGUMENT ............................................................................. 6

I.   THE ESA DOES NOT IMPOSE PLAINTIFFS' PREFERRED
     RESTRICTIONS ON FWS' AUTHORITY TO IDENTIFY A
     SEGMENT AND DETERMINE ITS LEGAL STATUS ............... 6

     A.   Plaintiffs' "remnant" theory. .................................... 8

     B.   Plaintiffs' "alternative" theories .......................... 11

     C.   Plaintiffs' historical range arguments ................ 15

II.  PLAINTIFFS' DISAGREEMENT WITH FWS' EXPERT
     ANALYSIS PROVIDES NO LEGAL BASIS TO OVERTURN THE
     2017 RULE. .................................................................. 16

     A.   FWS' analysis of grizzly bear recovery and the Yellowstone
          Segment's genetic health is sound. ...................... 17

     B.   FWS' consideration of the Conservation Strategy and State
          regulatory mechanisms is sound. ......................... 23

     C.   FWS' assessment of the States' mortality management
          framework that applies post-delisting is sound. ................ 27

     D.   FWS rationally analyzed the effects of food resource
          availability on the Yellowstone Segment. ........................ 33

CONCLUSION ....................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Auer v. Robbins*, 519 U.S. 452, 462 (1997) .............................................. 11

*Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 993 (9th Cir. 2015) ......................................................................................... 27

*Bennett v. Spear*, 520 U.S. 154, 176 (1997) .......................................... 28

*Bldg. Indus. Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) .................................................................... 28

*Chevron, U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 843 (1984) ..... 11

*City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ................................. 7

*Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 813 (9th Cir. 2008) ................................................................................................ 12

*Ctr. for Biological Diversity v. Zinke*, ---F.3d---, 2018 WL 3945543, *9 (9th Cir. 2018) .................................................................................... 10, 15

*Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1082-84 (D.C. Cir. 2017) ...................................................................................................... 25, 33

*Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105, 1120-21 (D. Mt. 2009) ...................................................................................... 23

*Greater Yellowstone Coalition v. Servheen*, 665 F.3d 1015, 1032 (9th Cir. 2011) .................................................................................................... 24

*Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) ...................................................................................................... 8

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ...................... 23

*Mobile Oil Exploration & Producing Se., Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) .................................................................... 16

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ...................................... 17

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 647 (2007) .................................................................................................... 11

*Tucson Herpetological Soc. v. Salazar*, 566 F.3d 870, 882 (9th Cir. 2009) ...................................................................................... 29, 30, 38

*United States v. Edge Broadcasting Co.*, 509 U.S. 418, 434 (1993) ....... 16

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 & n.21 (1978) .................................................. 15

*WildEarth Guardians v. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014) .... 13

**Statutes**

16 U.S.C. § 1532(16) .................................................................... 6, 8

16 U.S.C. § 1533(a)(1) ............................................................. 6, 9, 12

16 U.S.C. § 1533(b)(1)(A) ................................................................ 28

16 U.S.C. § 1533(c)(1) ............................................................. 7, 9, 13

**Legislative History**

H.R. Rep. No. 93-412 ........................................................................ 7

S. Rep. No. 93-307 ............................................................................ 7

**Regulations**

50 C.F.R. § 17.11(a) ......................................................................... 9

50 C.F.R. § 17.11(h) ......................................................................... 7

83 Fed. Reg. 18737, 18738 (Apr. 30, 2018) .................................... 10

# INTRODUCTION

The nearly half-century-long process to protect, grow, and recover grizzly bears in the Greater Yellowstone Ecosystem has been inclusive and exhaustive. The U.S. Fish and Wildlife Service's (FWS) 2017 Rule is equally exhaustive in evaluating the status of the Greater Yellowstone Ecosystem grizzly bear distinct population segment ("Yellowstone Segment"). Plaintiffs' criticisms of the 2017 Rule, many of which echo arguments raised and rejected by this Court and the Ninth Circuit in previous litigation, boil down to two flawed complaints.

First, Plaintiffs create procedural barriers to FWS' consideration of this Segment, arguing the ESA does not allow FWS to address *only* the status of a segment. But Plaintiffs' proffered procedures and limitations do not actually appear in the statute, and the Court should not re-write a statute to serve Plaintiffs' private objectives.

Second, Plaintiffs quibble with FWS' expert analysis and findings, ultimately presenting a difference of opinion on the ideal method for managing grizzly bears throughout the lower-48 States and the weight to give various regulatory mechanisms and scientific studies. Yet these conclusions fall well within FWS' scientific and technical expertise and

the discretion Congress afforded FWS in administering the ESA. That

Plaintiffs disagree with FWS is legally irrelevant. Because FWS

considered the relevant factors and arrived at reasoned decisions, the

2017 Rule warrants deference.

For these main reasons, the Court should reject Plaintiffs' claims

and grant Defendants' motion for summary judgment.

## ARGUMENT

## I.    THE ESA DOES NOT IMPOSE PLAINTIFFS' PREFERRED RESTRICTIONS ON FWS' AUTHORITY TO IDENTIFY A SEGMENT AND DETERMINE ITS LEGAL STATUS.

Plaintiffs have devoted considerable time to addressing FWS'

procedural authority to identify the Yellowstone Segment and

determine its status under the ESA. The issue is not that complicated.

The core statutory listing provision—Section 4(a), 16 U.S.C. §

1533(a)(1)—has been in place and implemented effectively for 45 years.

That provision grants FWS broad authority, by regulation, to identify

and determine whether "*any species*"[1] is an endangered species, a

threatened species, or neither. 16 U.S.C. § 1533(a)(1). The ESA then

_____

[1] "[A]ny species" explicitly includes distinct population segments ("segments"). 16 U.S.C. § 1532(16).

instructs FWS to update the ESA's List to "reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b)." *Id*. § 1533(c)(1).

That's it. Congress did not further condition or cabin FWS' authority. Indeed, by speaking in "capacious terms" in setting out FWS' listing and delisting authority in Section 4(a), Congress explicitly sought to "enlarge agency discretion" in administering the Act. *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013); *see also* H.R. Rep. No. 93-412, at 11 (1973) (Section 4 is "drawn broadly"); S. Rep. No. 93-307, at 3 (1973) (intent is for the ESA to "provide the Secretary with sufficient discretion in listing and delisting animals").

FWS' 2017 Rule applied that uncomplicated statutory framework. FWS identified a "species"—the Yellowstone Segment. FWS_Rel_Docs:1449-52. FWS considered the statutory factors, *id*:1453-78, and determined this "species" is not endangered or threatened, *id*.:1558. FWS updated the ESA's List to reflect this determination. *Id*.:1565-66; 50 C.F.R. § 17.11(h). The result: grizzly bears remain threatened in the lower-48 States through the 1975 Rule, "except" for

bears in the separate Yellowstone Segment "species," which are not threatened or endangered. *Id.*

Plaintiffs nonetheless ask the Court to complicate this straightforward statutory framework, offering several reasons why FWS' focus on the Yellowstone Segment is procedurally unlawful. But Plaintiffs' theories, constructs, and alleged requirements are conjured; they are not what Congress prescribed in the text of the statute itself.

### A. Plaintiffs' "remnant" theory

Plaintiffs' main theory—one also animating the D.C. Circuit's statements in *Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017)—is that designating a Segment "carves up" a listed entity and creates *two* "species"—the Segment and a "remnant." ECF_229:16. Under this theory, anytime FWS designates a segment, it also creates and designates a *de facto* "remnant" entity that FWS must justify as a species, subspecies, or segment and then determine its status. *Id.* This construct is pure fiction.

Congress defined a "species" to include three entities: species, subspecies, and segments. 16 U.S.C. § 1532(16). Congress provided that FWS can address each species on its own and accord it with a legal

status. *Id.* § 1533(a)(1), (c). For example, FWS can list a biological species as threatened and, five years later, list a subspecies or segment of the species as endangered. By allowing FWS to consider a subspecies or segment separate from a species, the ESA *expressly* contemplates this option. *Id.*; 50 C.F.R. § 17.11(a) (taxons may have "more than one entry"). In this example, the species exists and remains threatened everywhere "except" where the animals are part of the later identified subspecies or segment, in which case the animals are endangered.

Plaintiffs would take any subsequent, lesser designation and conclude that it: (1) vacates the prior species listing and redefines the biological species as a leftover "remnant;" and (2) automatically renders vulnerable the legal status of that remnant (as a remnant of a species is no longer a "species"). ECF_229:16-17, 21-25. This argument makes no sense for a subspecies, and it makes no sense for a segment. Designating a segment draws a line around a population and determines its legal status; it does not also concoct a completely separate "remnant" entity. One does not make two.

Nor did FWS purport to create a remnant in the 2017 Rule. FWS designated a segment and *expressly* declined to alter or reevaluate the

lower-48 entity. "This listing action is specific to the [Yellowstone] grizzly bear population …. In other words, when this regulation takes effect, grizzly bear populations occurring outside of the boundary of the [Segment] will remain listed as a threatened species under the ESA." FWS_Rel_Docs:1479; ECF_203:40-43. Plaintiffs do not respond or point to any *statutory provision* that provides for the creation of a remnant anytime FWS recognizes or addresses a segment.[2]

Plaintiffs' "remnant" theory also ignores FWS' interpretation of the ESA in the Regulatory Review—that designating a segment does not *de facto* create a second entity under the Act. 83 Fed. Reg. 18737, 18738 (Apr. 30, 2018). FWS addressed the text and purposes of the ESA, past agency practice, and other factors to reasonably conclude that Congress permitted FWS to designate and determine the status of a segment. *Id.* ("Targeted rulemaking on a [segment], without also

---

[2] Indeed, by premising their arguments on FWS' purported need to consider more than the species' *current* range, Plaintiffs' arguments conflict with Ninth Circuit law. *Ctr. for Biological Diversity v. Zinke*, --- F.3d---, 2018 WL 3945543, *9 (9th Cir. 2018) (upholding FWS' interpretation that endangerment findings are based on the species' *current* range).

reopening prior listing rules or expanding our inquiry to other species"
is permissible and "furthers the purposes and objectives of the Act").

As we previously noted, and contrary to Plaintiffs' continued
claims, courts must consider formal agency interpretations—even those
offered while litigation is pending. *Auer v. Robbins*, 519 U.S. 452, 462
(1997) (refusing to ignore agency's interpretation offered during
litigation as a *post hoc* rationalization, as the interpretation "reflect[s]
the agency's fair and considered judgment on the matter in question").
Because FWS' interpretation is reasoned, the Court should defer to that
interpretation over Plaintiffs' litigation-driven arguments. *Chevron,
U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 843 (1984).

**B.    Plaintiffs' "alternative" theories**

Plaintiffs' remaining arguments that the 2017 Rule is
procedurally defective are similarly untethered to the text of the ESA
and applicable laws.

1.    Plaintiffs argue that FWS' 1975 Rule does not state that
FWS may identify and delist a segment. ECF 224:8-9. The authority for
the 2017 Rule is the ESA, not a prior rule. FWS_Rel_Docs:1452-53; 83
Fed. Reg. at 18737-39.

2.     Plaintiffs argue that a Yellowstone Segment is a "segment" of another segment—the lower-48 bears. ECF 224:10-16. Yet the Yellowstone Segment is a segment of the grizzly bear *taxon*, ECF_203:39 n.7, which Plaintiffs do not dispute, ECF 224:10 n.3. As a proper "species," FWS may review its status notwithstanding the 1975 Rule's designation of an entity that falls outside the ESA's current definition of a "species."[3]

3.     Plaintiffs argue that FWS cannot "delist" the Yellowstone Segment because it did not previously "list" it. ECF_224:17-19. But Section 4(a) does not speak in terms of "listing" or "delisting" or condition FWS' authority to "determine whether any species is an endangered species or a threatened species" to those instances where FWS previously listed the species.  16 U.S.C. § 1533(a)(1).

4.     Plaintiffs argue that Section 4(c)'s ministerial provisions on updating the ESA's List and for conducting five-year status reviews

---

[3] Plaintiffs' lengthy argument that the lower-48 entity constitutes a distinct population segment is frivolous. ECF_224:11-14. The 1975 Rule designated no entity as a segment (as the segment concept did not exist in 1975), and 2006 and 2011 guidance documents cannot *legally* revise the 1975 Rule. *Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 813 (9th Cir. 2008) (five-year status reviews are "useful guidance" but not substitutes for the ESA's rulemaking processes).

contradict FWS' 2017 Rule. ECF_229:23-24 (citing 16 U.S.C. § 1533(c)). This argument characterizes FWS' 2017 Rule as addressing the "lower-48 entity." *Id.* But FWS addressed the Yellowstone Segment, and Section 4(c) does not prevent it from conducting rulemaking under Section 4(a) for this "species." 83 Fed. Reg. at 18,738; *WildEarth Guardians v. EPA*, 759 F.3d 1196, 1209 (10th Cir. 2014) ("When an agency action has clearly defined boundaries, we must respect those boundaries and not describe inaction outside those boundaries as merely a component of the agency action.").

5. Plaintiffs err in arguing that designating segments (like the Yellowstone or Cabinet-Yaak) renders the lower-48 bears "vulnerable" to delisting. ECF_224:9; ECF_229:21-22. The memo Plaintiffs cite explains that the risks to the lower-48 bears would arise not from designating a segment, but from applying FWS' 1996 distinct population segment policy to *the lower-48 entity* listed in 1975. FWS_Del_Em:151568-69. This is because the lower-48 entity is not a valid "species" under the ESA as written today, and FWS would have to correct this problem if it addressed that entity. *Id.* Plaintiffs may want this result, but the law does not require it. ECF_203:44-48.

6. Plaintiffs are wrong that addressing the Yellowstone Segment interferes with grizzly bear recovery. FWS' recovery strategy provides for recovery of individual populations with the goal that, over time, the recovery of enough populations *also* results in recovery of the lower-48 entity. FWS_LIT:14533, 14540, 14558; ECF_225:9-10. While recovery efforts occur, all bears outside the Segment also remain legally protected. ECF_229:16-27. Plaintiffs thus miss a key point—that recovery of the Yellowstone Segment and the lower-48 bears are not mutually exclusive goals or objectives.

7. Even if FWS is required to consider the legal status of animals outside the Segment's boundaries (which it is not), FWS expressly did so in the 2017 Rule and the Regulatory Review. ECF_203:48-51. Plaintiffs therefore have no basis to argue that FWS ignored that issue. ECF 229:17-18, 21, 23.

In short, the Court's function is not to "impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good;" its function is to "determine whether the agency complied with the procedures *mandated by the relevant statutes*." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council*, 435 U.S. 519, 549 & n.21 (1978) (emphasis added). The ESA expressly authorizes FWS to address segments as their own species, and FWS did that in the 2017 Rule.

## C. Plaintiffs' historical range arguments

To the extent Alliance's "lost historic range" arguments are justiciable,[4] their reply clarifies that Plaintiffs believe FWS must "apply the ESA's five-factor analysis to the 48 conterminous States grizzly bear, the species listed as threatened throughout its range by the Service in 1975." ECF_230:11-12. This argument fails for the same reason as discussed above. The lower-48 species is not the "species" under review in the 2017 Rule, and the ESA does not require FWS to expand its rulemaking for one species to address other related species. *Ctr. for Biological Diversity*, 2018 WL 3945543, *9 (holding it is "reasonable for FWS to focus on the area the species currently occupies when evaluating whether the species is endangered through 'a significant portion of its range'").

---

[4] Alliance claims that its complaint alleges that FWS must consider the lost historical range of the 1975 lower-48 species, yet it cites only allegations that address the Yellowstone Segment. ECF_230:7-8. This mismatch confirms that Alliance did not raise the claims it now presses on summary judgment. ECF_203:52.

Plaintiffs' argument contravenes the law in another important respect. Courts may not commandeer agency rulemaking to require the agency to "solve every problem before it in the same proceeding. This applies even where the initial solution to one problem has adverse consequences for another area that the agency was addressing." *Mobile Oil Expl. & Producing Se. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991); *United States v. Edge Broad. Co.*, 509 U.S. 418, 434 (1993) (the law does not "require that the Government make progress on every front before it can make progress on any front"). The Court therefore should reject Plaintiffs' argument that FWS must solve all issues relating to the lower-48 grizzly bears before it may address the Yellowstone Segment (or Cabinet-Yaak, or any other segment). *E&J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039 (9th Cir. 2007) (an agency has "wide latitude to determine the most effective way to carry out its charge from Congress"); *see also* ECF 203:52-59.

## II. PLAINTIFFS' DISAGREEMENT WITH FWS' EXPERT ANALYSIS PROVIDES NO LEGAL BASIS TO OVERTURN THE 2017 RULE.

Plaintiffs disagree with returning grizzly bear management to the States. That is a concern directed at Congress and its decision that the

ESA should preempt state jurisdiction *only* when a species is threatened or endangered. Plaintiffs' policy disagreement is not a reason to pretend that FWS' decisions are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The 2017 Rule belies that contention.

## A. FWS' analysis of grizzly bear recovery and the Yellowstone Segment's genetic health is sound.

For several decades, FWS has participated in a multi-agency recovery planning process, developing and updating criteria for a recovered Yellowstone grizzly population. FWS_Rel_Docs:1441-47. Since at least 2007, the Segment has met the habitat-based recovery criteria, which require maintaining or improving habitat conditions (1998 baseline conditions) in the primary conservation area. FWS_Rel_Docs:1443; FWS_LIT:15521-29. And all demographic recovery criteria have been met since at least 2004, showing that the Segment has achieved and maintained a stable, healthy, and recovered population. FWS_Rel_Docs:1447; FWS_LIT:16422-33.

The on-the-ground facts confirm the biological recovery of this Segment. The population increased at 4-7% through the 1980s and

1990s, increased at 0.3-2.2% through the 2000s, and now has a flat population trajectory (stability) within the demographic monitoring area. FWS_Rel_Docs:1473.[5] These trends allowed the population to increase from as low as 136 bears in 1975 to conservative population estimates in the demographic monitoring area of 718, 741, 757, 717, 695, and 718 bears from 2012 to 2017.[6] The Segment's range also expanded; grizzlies now occupy over 92% of the Ecosystem's suitable habitat, up from a mere 68% in the early 2000s. FWS_Rel_Docs:1444. And "[i]ndicators of fitness in the [Yellowstone] grizzly bear population"—litter size, disease, physical condition, etc.—"demonstrate that the current levels of genetic diversity are capable of supporting healthy reproductive and survival rates." FWS_Rel_Docs:1468.

The Yellowstone Segment is biologically robust, and extensive monitoring and site-specific analysis show that the Segment has

[5] Plaintiffs wrongly argue that FWS ignored data after 2014. *See* FWS_Rel_Docs:1498, 1501-02 (response to issue 30 and 35); FWS_LIT:19468, 19467 (effects of 2015 data on trends).

[6] FWS_LIT:23365; FWS_LIT:22514; FWS_LIT:23468; FWS_LIT:22895; FWS_LIT:23598; 2017 Annual Report, p.17 (2017:718), https://prd-wret.s3-us-west-2.amazonaws.com/assets/palladium/production/s3fs-public/atoms/files/2017_AnnualReport_Final_tagged_Secured_v2.pdf.

recovered. Plaintiffs, though, continue to dispute FWS' and the other experts' analysis of recovery, focusing on reply on the 500-bear criterion in FWS' recovery plan. Plaintiffs' complaints with the criterion are largely academic, as the population is now and will be managed at levels far exceeding 500 bears (by the criterion providing for management around the 2002-2014 average Chao2 estimate of 674 bears, FWS_Rel_Docs:1447-48). But, in any event, FWS' analysis of the 500-bear criterion and the genetic health of the population is sound.

In developing the demographic criteria, FWS considered the best available science to set a minimum population size of 500 bears. FWS_LIT:16423. FWS reasonably determined this Segment was not in danger of extinction in the foreseeable future because it would remain genetically healthy on its own for several decades and, over the long term, would maintain genetic diversity through translocation of bears or natural connectivity. FWS_Rel_Docs:1469; ECF_203:109-18.

Plaintiffs first allege that FWS should have relied on Plaintiffs' preferred population viability analyses. ECF_224:24. These generic studies do not provide minimum population sizes for grizzly bears or adjust their recommendations to account for grizzly bear specific

demographic, life-history, or management factors. Indeed, Plaintiffs rely on Traill (2007), but the authors there stated that a species' minimum viable population "is context-specific, and there are no simple short-cuts to its derivation." FWS_LIT:30554. Thus, while relying on these generic population estimates might be advisable if no context-specific information were available, FWS reasonably considered studies that analyzed grizzly bears, and the Yellowstone population in particular.

FWS considered Miller and Waits (2003), which estimated that the Ecosystem had a total population size of 400 and an effective population size of 100 in the 1990s. FWS_LIT:9423. Based on that size, the study found it was "unlikely that genetic factors will have a substantial effect on the viability of the Yellowstone grizzly over the next several decades." *Id.* FWS also considered Kamath et al. (2015), a study that used data through 2010 and estimated an effective population size of the Yellowstone grizzly population of approximately 469 animals—a *fourfold increase* from the effective population size reported by Miller and Waits (2003). FWS_LIT:5975, 5979.

This increase effective population size far exceeds the effective population size (100) that Miller and Waits found sufficient to maintain

short-term genetic viability. FWS_Rel_Docs:1469; FWS_LIT:5979. And, notably, the grizzly bear population's genetic diversity has improved since the 1990s, even without the introduction of one Northern Continental Divide grizzly bear into the Ecosystem every ten years as suggested by the 1993 Recovery Plan. FWS_LIT:14595.

FWS also considered Boyce (2001), a population viability analysis that found the Yellowstone grizzly population to have less than a 1% chance of going extinct in the next 100 years, based on population trends from 1983-1997. FWS_Rel_Docs:1506; FWS_LIT:1308. Plaintiffs dismiss Boyce (2001) because the study noted that its analysis should be updated to consider future changes in habitat. *See* ECF_224:29-30; ECF_230:16-17. Yet none of Plaintiffs' preferred studies incorporated habitat information—or any grizzly bear-specific information—in their minimum viable population estimates for species in general. In any event, FWS considered future habitat management and security in its recovery plans (promulgated after 2001) and throughout the 2017 Rule. FWS_Rel_Docs:1506. And the Segment has continued to expand since Boyce (2001), revealing that its conclusions were conservative. *Id.*

Plaintiffs' choice of studies also reflects their disagreement on the appropriate timeframe over which to assess recovery and whether FWS may consider connectivity or translocation. Plaintiffs argue that a population cannot be recovered if it requires connectivity with other populations or the translocation to maintain genetic diversity over the long term. ECF_224:23-24. This contravenes the ESA's definition of "to conserve," which provides that active management is compatible with biological recovery. 16 U.S.C. § 1532(3); ECF_203:115-18.

Plaintiffs respond with conclusory statements but no legal support for their claim that FWS must review the Segment's status in a vacuum. ECF_224:23-24. FWS reasonably considered that the population's genetic diversity will be preserved through either natural connectivity or translocation. As a result, Plaintiffs err in arguing FWS must presume that management efforts will not occur and that the ESA requires a species' genetic status be guaranteed naturally in perpetuity. *See* ECF_224:18; ECF_186:36-37; FWS_LIT:3588 (Frankham (2014) article relied on by Plaintiffs, assessing effective population size to retain "evolutionary potential for fitness in perpetuity," not for the foreseeable future or considering management actions).

As this Court held, FWS' reliance on grizzly bear studies like

Miller and Waits (2003) was reasonable and within its discretion.

*Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105, 1120-21

(D. Mont. 2009). While Plaintiffs may prefer different studies, that does

not render the agency's decision arbitrary. *Marsh v. Or. Nat. Res.*

*Council*, 490 U.S. 360, 378 (1989) ("agency must have discretion to rely

on the reasonable opinions of its own qualified experts").

**B.    FWS' consideration of the Conservation Strategy and existing regulatory mechanisms is sound.**

FWS reasonably considered the regulatory mechanisms in place to

protect the Segment after delisting, including binding commitments by

the National Park Service and U.S. Forest Service, federal statutory

and regulatory provisions, State regulations and proclamations with the

force of law, and the Conservation Strategy and accompanying state

agreements. FWS_Rel_Docs:1468. Now that the Segment is delisted,

numerous measures are in place that ensure the Segment's habitat is

protected, mortality is responsibly managed, and biological monitoring,

evaluation, and study will continue. The Ninth Circuit held that the

2007 Rule's reliance on similar regulatory mechanisms was rational

and that "[t]he breadth of these measures is a tribute to the

comprehensive multi-jurisdictional cooperative effort between federal and state agencies, as well as private interest groups." *Greater Yellowstone Coal.*, 665 F.3d at 1032. This case is no different.

Contrary to Plaintiffs' assertions, issues about the Conservation Strategy, mortality measures, and the potential hunting of delisted grizzly bears were raised and at issue in that litigation. *Greater Yellowstone Coal.*, 665 F.3d at 1031 (FWS' "consideration of components of the Strategy that have been made legally binding adequately supports its Factor D determination"). For example, the Ninth Circuit majority criticized the dissent's argument that state regulations did not protect grizzlies because they authorized hunting, pointing out those regulations enabled the States to "exercise some control over grizzly mortality" and finding it "entirely appropriate that [FWS] considered them in its discussion of laws that facilitate the implementation of the Strategy." *Id.* at 1032 n.7; *id.* at 1035 (Thomas, J., dissenting).[7]

---

[7] Plaintiffs' belief that Wyoming has exceeded discretionary mortality limits is legally irrelevant (as post-decisional). ECF_227:16-17. But if the Court considers the issue, Plaintiffs are wrong—the States' combined hunting quotas do not exceed the discretionary allocations for 2018. *See* FWS_LIT:16962-63; Attachment 1.

Although the Ninth Circuit did not need to determine whether the non-binding aspects of the Conservation Strategy qualified as "existing regulatory mechanisms" under the ESA, most of the Conservation Strategy and Memorandum of Agreement have been incorporated into binding Federal land-use plans and state regulations or proclamations. FWS_Rel_Docs:1464-65, 4398-99. And the D.C. Circuit confirmed that the ESA does not require legally binding "regulatory mechanisms." *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1082-84 (D.C. Cir. 2017).

As in *Defenders of Wildlife*, FWS "reasonably and adequately responded to concerns about the reliability" of the States' agreements. *Id.* at 1083-84. *See* FWS_Rel_Docs:1464-65 (summarizing State actions and incentives to comply with Conservation Strategy); FWS_Rel_Docs:1530 (States' history, resources, and expertise in managing big game species); ECF_204:¶85. FWS' analysis of the Conservation Strategy and regulatory mechanisms is sound.

Plaintiffs' secondary argument—that FWS failed to reopen public comment on the 2017 Rule after release of the final Conservation Strategy—fares no better. ECF_203:78-85.

First, Plaintiffs complain that the parties to the Conservation Strategy eliminated a provision applying to relocation of grizzlies that prey on livestock in the primary conservation area (a subset of bear removals). ECF_203:80; FWS_LIT:16367. Yet they misleadingly rely on *overall* numbers of conflict removals in 2002-2014. ECF_229:28. The alteration to the Conservation Strategy was more targeted and far less consequential than Plaintiffs assert. FWS_Rel_Docs:1462 (finding *all* management removals are not a threat, much less a portion of them).

Second, Plaintiffs allege that FWS should have reopened public comment because a multi-agency planning group will meet and determine whether any changes to the 1998 habitat baseline are necessary to accommodate updating administrative infrastructure for National Park visitors. ECF_229:28. The planning group has a limited mission and is committed to "minimize deviations to the 1998 baseline." FWS_LIT:17039-40; ECF_205:¶161. Plaintiffs provide no evidence that a potential, limited future proposal will materially alter the 1998 habitat baseline conditions. ECF_229:28. They also fail to establish how they were harmed by the inability to comment on hypothetical future

changes to the habitat baseline, which will be subject to a future public comment period. ECF_229:29.

Third, Plaintiffs allege that FWS should have reopened comment to address a line added to the final Conservation Strategy—that Chao2 would be used "for the foreseeable future." ECF_190:33. Yet Plaintiffs provide no response to the fact that the proposed rule provided Plaintiffs with notice that Chao2 would be used only "until a new population estimator is approved." ECF_203:83-84 (quoting FWS_Rel_Docs:5772-73). Plaintiffs had a full opportunity to, and did, comment on the prospect of Chao2's eventual replacement. ECF_203:85.

Plaintiffs have not pointed to any change in the Conservation Strategy that was vital to FWS' decision in the 2017 Rule and yet unavailable for public comment. Even if they had, Plaintiffs' conclusory allegations do not "demonstrate how this error prejudiced them." *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 993 (9th Cir. 2015); ECF_229:29-30.

C. **FWS' assessment of the States' mortality management framework that applies post-delisting is sound.**

Under the Conservation Strategy and the State regulatory mechanisms, the States have committed to managing the population at

levels associated with a stable population—the 2002-2014 average population estimate of 674 bears. FWS_LIT:17030, 17556. Combined with the habitat protections in place, FWS determined that the State regulatory mechanisms are adequate to maintain a recovered population into the foreseeable future. FWS_Rel_Docs:1468, 1558. Independent experts agreed. ECF_204:29-31.

Plaintiffs do not seriously contend that maintaining the existing habitat protections and managing a population around the 2002-2014 average estimate will endanger the Segment. Instead, they argue that the federal and State agencies failed to provide "assurances" that various scenarios will not occur. ECF_227:4. Plaintiffs misconstrue the ESA's inquiry.

Under the ESA's best available data mandate, 16 U.S.C. § 1533(b)(1)(A), FWS makes a listing decision based on evidence and likely threats; it does not usurp State jurisdiction over resident species based "on speculation or surmise." *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001). And where Plaintiffs disagree with FWS' assessment, Plaintiffs must "present [] conclusive evidence to rebut the Secretary's determination that such threats … are

not likely" to occur. *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 882 (9th Cir. 2009). Plaintiffs have not met that burden; they cite theories, not evidence of likely threats endangering bears.

Mainly, Plaintiffs continue their speculation that sustained male mortality will alter male-to-female sex ratios and go undetected, driving the population below 600 bears. ECF_227:12-14. Yet Plaintiffs fail to explain why the States will likely authorize sustained harvest at the highest rates every year, to the States' detriment. ECF_203:94. Plaintiffs are also silent on why the Interagency Study Team cannot identify changed sex ratios, when they *already* successfully (and timely) detected such changes. *Id.*:92; FWS_Rel_Docs:1524. Plaintiffs quibble that the reviews may occur every 5-10 years, ECF_227:14-15, yet ignore the experts' conclusions that this review period is adequate, FWS_Emails:8975, and conservative, FWS_Rel_Docs:1538 (responding to this same complaint about the 5-10 year review period, finding it conservative given the 14-year generation time of bears). And Plaintiffs disregard other key protections, such that vital rate reviews occur where the Chao2-modeled associations change, FWS_LIT:17132

(No.20), and whenever indications of changed population dynamics exist (such as sustained high male harvest), FWS_Rel_Docs:1538.[8]

Even if Plaintiffs' feared scenario occurs—a population dropping below a conservative Chao2 estimate of 600 bears—they cannot overcome FWS' finding that this scenario will not threaten the bears.

First, Plaintiffs produce no evidence to rebut the finding that Chao2 produces conservative estimates; at high bear densities, it underestimates the population by as much as 50%. FWS_Rel_Docs:1488; FWS_LIT:11519-20. Thus, a population dropping just below a Chao2 estimate of 600 bears—which is well above minimum population estimates to maintain recovery (500 bears)—does not automatically threaten the species.

Second, Plaintiffs do not contest that, if the population drops below 600 bears, the only discretionary mortality allowed is for human safety. ECF_229:15. They argue this is not protective enough. Plaintiffs

---

[8] Plaintiffs' other scenario—that mortality outside the demographic monitoring area will cause the population inside the area to decline—fails for the same reasons. If pressures outside the monitoring area affect population numbers or dynamics inside the area, the extensive, multi-faceted monitoring and modeling by the Interagency Study Team will detect such changes. FWS_Rel_Docs:1525; ECF_203:106-07.

are wrong. When listed, removals occurred for far more reasons than just human safety. FWS_Rel_Docs:1462 (removals caused by conflicts with livestock accounted for nearly 33% of the removals while listed); ECF_204:6 (regulations while listed allowed for removals for human safety, but *also* for bears damaging livestock, crops, or beehives). This means that, were the population to fall below 600 bears, the resultant protections are equivalent to when the species was listed and the population rapidly grew and expanded.

Unable to poke holes in the comprehensive mortality management framework, Plaintiffs argue that conflict mortality is not part of mortality limits. ECF_229:13. But they misrepresent the Conservation Strategy, quoting it as saying: "'[a]ny mortality threshold will not affect the … management of conflict grizzly bears.'" ECF_229:13 (quoting FWS_Rel_Docs:2328). Plaintiffs used ellipsis to omit the word "immediate"; with that word re-inserted, the Strategy rationally provides that the States may protect humans in a year, even though mortality limits are reached *that year*. FWS_Rel_Docs:2328. This does *not* mean that conflict mortalities are ignored in calculating the next year's mortality limits. FWS_LIT:17070-17075; *id*.:17073 ("Removal of

conflict bears will be carefully considered and counted against the mortality limits for the [Segment] as described in the Conservation Strategy.").

Similarly misleading is Plaintiffs' argument that the States do not account for conflict mortalities that exceed the year's total annual mortality limits in setting the next year's limits. ECF_229:13. As we explained, Plaintiffs cherry-pick regulatory language governing hunting exceedances to support a negative inference—because hunting exceedances are subtracted, conflict exceedances are not. *Id*. Yet the regulatory provision Plaintiffs cite does not discuss conflict exceedances or negate provisions requiring the States to account for any exceedances to mortality limits in establishing the next year's limits. FWS_LIT:17096; ECF_203:97-98.[9]

Finally, Plaintiffs insist that the rule is flawed because, if an unidentified model replaces Chao2, FWS did not require that mortality limits be recalibrated. ECF_227:5-11. Despite their continued

---

[9] Nor do Plaintiffs respond to the fact that the Interagency Study Team estimates the population size and sets mortality limits. FWS_LIT:17129-33 ("The [Study Team] will … annually estimate population size … and then set mortality limits").

protestations, Plaintiffs avoid three facts that show their claims center on purely speculative future action: (1) all responsible parties will use Chao2 into the foreseeable future, even if other models are explored; (2) no alternative model has been identified, much less adopted; and (3) no party has committed that recalibration, if appropriate, will not occur. ECF_203:100-104. As Plaintiffs note elsewhere, ignoring these facts and basing listing decisions on such future speculative modeling actions would be improper. ECF_224:23-24.

The States have provided for a robust system of managing grizzly bear mortality into the foreseeable future. This framework is set forth in the Conservation Strategy, and Plaintiffs' arguments hinge on misconstruing the Strategy or pretending it will not be implemented. These are not valid critiques. *Defs. of Wildlife*, 849 F.3d at 1083 ("Given Congress's direction that state conservation efforts must be considered, …, their consideration as part of the State's 'regulatory mechanisms' is hardly contrary to congressional intent.").

### D. FWS rationally analyzed the effects of food resource availability on the Yellowstone Segment.

Plaintiffs argue that FWS "failed to consider" how food resource availability affects grizzly bears. ECF_229:12. This is an incredible

assertion, given this topic played a central role in the experts' scientific study and FWS' analysis on remand. ECF_203:118-25. More accurately, Plaintiffs agree with Dr. Mattson, ECF_229:10, who argues that all the peer-reviewed studies on this issue are "meaningless if not downright wrong." FWS_Pub_CMT:5990. Yet Plaintiffs cannot show that all the experts and peer-reviewed studies are wrong, and their wholesale reliance on a dissenting viewpoint contravenes Ninth Circuit law. *Tucson Herpetological Soc'y*, 566 F.3d at 881-82 (holding the "merits of the conflicting studies is not a proper subject for this court to resolve").

First, Plaintiffs continue to over-generalize the importance of whitebark pine seeds to the grizzly bear population. ECF229:6-11. Only a portion of the Yellowstone Segment overlaps with whitebark pine and "a considerable number of bears feed almost exclusively on other foods during fall, even during years of good [whitebark pine] production." FWS_LIT:2302. Grizzlies also are generalists that display great diet plasticity, contradicting Plaintiffs' assertions that bears are hypersensitive to shifts in food resource availability. FWS_LIT:5772 (Yellowstone Segment "has shown notable resilience in the face of

decline of whitebark pine and natural stochasticity of other food resources within the" Ecosystem").

Second, some grizzlies supplemented their diet in the fall with other food resources, like meat, in poor seed production years. FWS_Rel_Docs:1471. But they did not increase their range in search of food (thereby increasing potential for conflicts). FWS_LIT:2302. Nor, as Plaintiffs now argue (ECF_228:7-8), did grizzlies select for high-conflict areas within their range, like open hunting areas. FWS_LIT:5759 (study "did not detect a spatial effect due to areas open to hunting, suggesting the increased rate of carcass use was not restricted to multiple-use lands where bears would find hunter-killed ungulate remains"). Plaintiffs thus miss a central point—that secure habitat, not a bear's diet in a particular year, is key to grizzly bear survival. FWS_Rel_Docs:1472 ("[I]n both good and poor whitebark pine seed years, survival is determined primarily by levels of secure habitat" and "the mechanism driving the increased mortality risk is secure habitat, not the presence or absence of whitebark pine"); FWS_LIT:2303.

Third, Plaintiffs argue shifting food resource availability caused changes to cub and yearling survival. ECF_229:9. They neglect to

mention that cub and yearling survival began to change in the late 1990s and early 2000s—*before* the whitebark pine decline. FWS_Rel_Docs:1440, 1470-72, 1544; FWS_LIT:16510 (study finding the "[d]ecline in cub survival was evident beginning in the early 2000s and was associated more strongly with increasing grizzly bear density than reduced availability of whitebark pine").

Fourth, Plaintiffs "interpret" conflict mortalities between 2008 and 2016 as constituting an "urgent threat" to bears. ECF_229:10-12. They theorize that the population has stayed static since 2002, meaning bear densities and population dynamics are not influencing mortality numbers from 2008 to 2016. *Id*. The facts do not support this claim.

The grizzly bear population expanded its range by as much as 60% since the early 2000s. FWS_LIT:884 (2004 estimate of 36,364 km²); FWS_LIT:19349 (2014 estimate of 58,314 km²). Within the demographic monitoring area where the population estimates are obtained, bears increased their occupancy of suitable habitat between the early 2000s (68%) and 2014 (over 92%). FWS_Rel_Docs:1444. This population expansion was not associated with larger home range sizes (as would be required under Plaintiffs' theory of a static population occurring co-

extensively with range expansion). Home range sizes for females declined, and home range sizes for males were unchanged. *Id.*:1471 (citing findings of several peer-reviewed studies).

The grizzlies' range expansion instead occurred with a population expansion, and this is consistent with Chao2's estimates. The model increasingly *underestimates* population size, by as much as 50%, as bear densities increase. FWS_Rel_Docs:1488; FWS_LIT:11519-20. With increasing densities, a roughly static Chao2 estimate therefore does *not* equate to a static grizzly bear population. *Id.* Plaintiffs' claims that only food resources can be affecting mortality levels are thus wrong. *See*, *e.g.*, FWS_Rel_Docs:1471 (explaining that conflict mortalities increased as population expanded outside primary conservation area, in part due to the bears' exposure to more livestock allotments).

Fifth, Plaintiffs' myopic focus on mortality numbers disregards the influence of mortalities on population dynamics and trends. The experts analyzed population trends from 2002 to 2015, finding no decline. FWS_Rel_Docs:1473, 1498; FWS_LIT:33142-44. In litigation, Plaintiffs seize on the 2016 estimate (695) to argue for a decline. ECF_229:12. Yet even on reply, and despite citing 2017 data elsewhere (*id.*:12 n.3),

Plaintiffs incredibly fail to acknowledge the 2017 estimate of 718, which is greater than either the 2015 or 2016 estimates. *See* n.9, above.[10] For good reason: it eviscerates their *story* that conflict mortalities have caused a population decline and thus an "urgent" threat to bears.

In short, FWS analyzed and rationally found that shifts in whitebark pine or other foods present no threat to the grizzly bear population. FWS_Rel_Docs:1473. A wealth of scientific data supports this finding. ECF_203:125 (citing studies). Plaintiffs' alternative theories identify no defect in this rule, as "inferences from indeterminate scientific data" do not render the agency's determination arbitrary. *Tucson Herpetological Soc'y*, 566 F.3d at 881-82.

## CONCLUSION

The completion of the Ninth Circuit's remand in *Greater Yellowstone Coalition v. Servheen* was a significant achievement, but it pales in comparison to the sustained, on-the-ground efforts directed towards the Yellowstone population of grizzly bears. For over half a

---

[10] Plaintiffs emphasize that the mortality limit was exceeded once in 2015. ECF_229:12. But the overall management approach is conservative, ECF_203:93-95, which is why exceeding a limit in *one* year for one category of the population does not threaten the species, FWS_LIT:17019 (mortality limits measured over three years).

century, the region has worked tirelessly to protect this population. And these efforts worked.

The Yellowstone Segment's grizzly bears have survived widespread hunting, poisoning, dump closures, a massive forest fire in the 1980s, a recent whitebark pine epidemic, and many more obstacles over the last century. They are resilient. Looking forward, enormous tracts of suitable habitat—the most salient factor for long-term grizzly viability—are unquestionably protected. Two National Parks, wilderness areas, and binding commitments to maintain baseline conditions across 98% of the key suitable habitat more than dispel any doubt as to how the species or its habitat will be managed. And the States are committed to managing this population conservatively, just as they do with all of the other wildlife within their borders.

With an iconic species, there is an admitted tendency to leave well enough alone. But perpetual ESA protection would negate the incentive for co-managers, like the States and Tribes here, to work for the benefit of any listed species. That is why Congress was remarkably clear with the ESA. If a species has recovered and if FWS finds, based on an analysis of five enumerated statutory factors, that future threats are

sufficiently minimized, the species, subspecies, or even a segment should come off the list. That is how the ESA works.

Plaintiffs have failed to establish that the facts and law justify usurping FWS' expertise and overturning this 2017 Rule. As such, the Court should grant Federal Defendants' motion for summary judgment.

DATED: August 22, 2018.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Section Chief

*/s/ Coby Howell*
COBY HOWELL, Senior Trial Attorney
U.S. Department of Justice
c/o U.S. Attorney's Office
1000 SW Third Avenue
Portland, Oregon 97204-2902
Tel: (503) 727-1023 | Fax: (503) 727-1117
Email: Coby.Howell@usdoj.gov

/s/ *Michael R. Eitel*
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370

Denver, Colorado 80202
Tel: (303) 844-1479 | Fax: (303) 844-1350
Email: Michael.Eitel@usdoj.gov

/s/ *Devon Lea Flanagan*
DEVON LEA FLANAGAN, Trial Attorney
D.C. Bar No. 1022195
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
601 D St. NW
Washington, D.C. 20004
Tel: (202) 305-0201 | Fax: (202) 305-0275
Email: Devon.Flanagan@usdoj.gov

OF COUNSEL:
Tyson Powell
Office of the Solicitor
Department of the Interior

## CERTIFICATE OF COMPLIANCE

The attached brief is proportionately spaced, has a typeface of 14 points and contains 6498 words, excluding the caption, tables, and certificates of service and compliance.

*/s/ Michael R. Eitel*
MICHAEL R. EITEL
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I certify that on August 22, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the attorneys of record.

*/s/ Michael R. Eitel*
MICHAEL R. EITEL
U.S. Department of Justice

ATTACHMENT 1

**Grizzly Bear Tri-state meeting notes – 1/11/2018**

*Attendees: Frank van Manen-USGS via phone, Mark Haroldson-USGS via phone, Ed Schriever-IDFG, Ken McDonald-MTFWP, Delissa Minnick-BLM WY, Dan Tyers-USFS, Kerry Gunther-YNP, Kate Wilmot-GTNP, Sue Consolo-Murphy-GTNP, Dan Thompson-WGFD, Toby Boudreau-IDFG, Kathleen Trever-IDFG, Casey McQuiston-Shoshone NF, Lisa Timchak-Shoshone NF, Sue Stresser-Shoshone NF, Andy Pils-Shoshone NF, Brian Nesvik-WGFD*

- Brian Nesvik opened with introduction and background on the intent of the meeting
    - Will outline the population estimate and allocation process
    - Seeking input from federal land management agencies

- Frank van Manen went over population estimate and calculations of mortality rates
    - Count of females with cubs
        - 57 unique
        - 64 annual Chao2 estimate
        - 57 model-averaged Chao2 for 2017
    - Total estimate is 718; 250 independent males, 250 independent females, 217 dependent young (rounding of individual categories is reason why total is greater)
    - 50 known and probable mortalities in DMA
        - 39 human caused
        - 7 natural
        - 4 undetermined
    - 5 known and probable outside DMA
        - 3 human caused
        - 1 natural
        - 1 undetermined
    - DMA morts - documented
        - 11 females
        - 20 Males
        - 12 dependent young
    - Mortality rates in range of 675-747 population
        - 20% independent males
        - 9% indep females
        - 9% dep young
    - Total estimated mortality
        - 20 independent females – (includes 9 unk/unreported) – 8.0%
        - 33 independent males – (includes 13 unk/unreported) – 13.2%
        - 12 human-caused dependent young – 5.5%

- Dan Thompson outlined the MOA process for allocation of mortality

- 5 step process through MOA
    - 1) calculate 2017 DMA population estimate: 718
    - 2) Determine maximum allowable mortality limits
        - For population between 675-747, mortality limits: 9% for independent females and 20% for independent males
    - 3) Calculate 2017 total estimated mortality for DMA for independent aged bears
        - 20 females, 33 males
    - 4) Compare 2017 DMA total mortality to 2017 mortality limits
        - Male limit (50) – total mortality (33) = 17 males below limit
        - Female limit (22.5) – total mortality (20) = 2.5 females below limit
    - 5) Allocate potential harvest mortality available in 2018 by state based on % of DMA
        - Total allowable for potential harvest in DMA for 2018 = 17 independent males; 2.5 independent females
        - WY (58%) – 9.86 males, 1.45 females
        - MT (34%) – 5.78 males, 0.85 females
        - ID (8%) – 1.36 males, 0.2 females

        Potential harvest mortality will use whole numbers that collectively do not exceed the total allowable

- State updates
    - Wyoming-Nesvik
        - Revised state management plan and received Commission approval in May 2016
        - Public scoping meetings in fall 2017
            - No hunting proposals presented to the public. Meetings focused on soliciting feedback on 5 areas from the Commission Grizzly Bear Management Plan
                - Research
                - Monitoring
                - Conflict Management
                - Information and Education
                - Hunting
            - Compiled public input
            - Targeted group engagement; sportsman groups, stock growers, environmental groups, outfitters
            - Facebook Live session-presented information on Management Plan and solicited additional feedback

- Will present summary to commission Jan 18
  - Will seek direction from commission on proceeding with hunting season at January commission meeting
  - Dan Tyers asked about takeaways from public meetings

    Wyoming's takeways:

    - Citizen science interest
    - Support for research; predator/prey, harvest impacts
    - Continued high level of monitoring
    - Support for I&E/outreach
    - Conflict relocation
    - Better population estimate
    - Support for hunting season
  - Andy Pils: What would process be for establishing season structure

    Wyoming's process is:

    - Put regulation together
    - Proposal out for public comment through Wyoming Administrative Procedure Act
    - Final regulation by late spring/early summer
    - No possibility for spring season 2018
  - Ed Schriever: Was there more interest in hunting outside the DMA?

- Idaho-Schriever
  - No spring season
  - Fall 2018 at earliest
  - Similar timeline and process to Wyoming
  - Commission has not indicated position yet
  - General regulations in place

- Montana-McDonald
  - Montana has season structure already laid out
  - Only numbers not in place
  - BMUs, season dates, structure already set up
  - BMUs include areas both in and out of DMA
  - Total number of licenses wouldn't exceed number of adult male bears available
  - Future seasons would be early spring and late fall to target males
  - Take numbers to commission

- Probably no hunt in 2018
- Small numbers
- Conservative approach
- Structure to support connectivity between NCDE/GYE
  - Outreach in corridor areas
- New bear person in Red Lodge
- Butte/Helena corridor is a priority area with more bears found in that area
- Conflict management is priority
- Delissa Minnick: Hunt areas quotas based on?
  - Connectivity and conflicts for MT.

Qs for all states

- Sue Stresser: What about numbers for outside DMA
  - Montana: total would be the DMA number for MT regardless of where hunt areas are located
  - Idaho: only have bears in DMA for most part, but boundary would be close to but not necessarily exactly DMA
    - Probably not going to have mortality allocation outside DMA, but could do that if seen necessary
  - Wyoming: 3 tiered approach
    - PCA conservative
    - In DMA and outside PCA more liberal
    - Outside DMA most liberal
- Andy Pils: If one state exceeds will others coordinate?
  - Each state closes its season when respective mortality limits reached.
  - All states would close seasons if female mortality for GYE is reached; otherwise each state would manage in-season independently.
- Dan Tyers: Any mechanism for resolving differences between states?
  - Allocation percentages are default, but could negotiate
  - If can't agree then 58%, 34%, 8% would stand as allocation.
- Sue Consolo-Murphy: What happens to number if only 1 or 2 states decide to hunt?
  - Three State Memorandum of Agreement is about coordination so the states may adjust some mortality depending on year and total availability.

- Input from federal agencies
  - YNP –
    - Most interested in hunt area boundaries and how hunting may affect public grizzly bear viewing in YNP.
    - concern that non-hunting use will not be prioritized
    - Areas near parks taken into consideration
  - GTNP –
    - Would like to see no hunting in JDR
    - 3 tier approach makes sense
    - Appreciate public meeting approach
    - Will states have consistent approach to hunting?
  - Nesvik: Wyoming will be available to meet with parks after commission meeting to go over potential regs
  - USFS, Tyers (5 forest supervisors provided input to Tyers prior to the meeting)
    - Focus hunting in areas of known conflicts
    - Focus hunting away from areas of high public use
    - Avoid hunting bears in connectivity corridors
  - Nesvik: Wyoming can meet to discuss Commission hunting regulation
  - Schriever: It's in states' interest to resolve conflict since management removal takes bears away from hunting the next year. However, conflict areas can be the same as areas of high public use; hunting is not always effective tool to address conflicts.
  - Nesvik: Try to utilize hunting for conflict removal to greatest extent possible.
  - BLM WY –
    - Concentrate areas of conflict
    - Most BLM outside DMA
    - Could WGFD share commission meeting outcome and regulation with BLM?
  - Nesvik: Wyoming can meet with BLM with FS or separately to discuss Commission hunting regulation.
- BLM: Would states round up or down on decimals?
    - States will round down on total numbers to prevent exceedance of overall limit; states may discuss how to allocate by bears based on round numbers.
- GTNP: What is Idaho timeline?
  - Idaho's Commission meets next week.
  - Given timing, the earliest hunt the Commission may practically consider is a fall 2018 hunt.

Nesvik reviewed the agenda, summarized the meeting and asked for any additional topics or discussion.

Nesvik committed to providing meeting minutes to the attendees in the near future.