LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
DARRELL G. EARLY
Chief, Natural Resources Division
STEVEN W. STRACK
  *Specially Admitted*
KATHLEEN E. TREVER
  *Specially Admitted*
Deputy Attorneys General
700 W. State Street, 2nd Floor
P.O. Box 83720
Boise, Id 83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8072
E-Mail:   steve.strack@ag.idaho.gov
              kathleen.trever@idfg.idaho.gov
*Attorneys for State of Idaho*

WILLIAMS LAW FIRM, P.C.
JAMES D. JOHNSON, ESQ.
235 E. Pine, P.O. Box 9440
Missoula, Montana 59807-9440
Telephone: (406) 721-4350
Fax: (406) 721-6037
E-Mail: james@wmslaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> STATE OF WYOMING, *et al.*, <br><br> *Defendant-Intervenors*. | CV-17-89-M-DLC <br><br> (Consolidated with Case Nos. <br> CV-17-117-M-DLC, <br> CV-17-118-M-DLC, <br> CV-17-119-M-DLC, <br> CV-17-123-M-DLC, <br> and CV-18-16-M-DLC, <br><br> DEFENDANT-INTERVENOR STATE OF IDAHO'S REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

ARGUMENT .......................................................................................................2

1.  FWS rationally concluded that a recalibration requirement was not
    necessary to ensure maintenance of a recovered grizzly bear population.......2

    A.  All participating federal and state agencies are committed to
        manage for a stable population using Chao2 estimates as the basis
        for mortality management decisions for the foreseeable future ...........2

2.  The Ninth Circuit's decision in *Servheen* that mechanisms to regulate
    mortality were adequate in light of the enforceable commitment to the
    Conservation Strategy by federal land management agencies remains
    applicable today ..............................................................................6

3.  Plaintiffs' concern that Chao2 would fail to timely detect declines in
    the bear popualtion ignores the safeguards built into the population
    monitoring and mortality management systems..............................................8

4.  Conflict-related mortality management poses no threat to the Greater
    Yellowstone grizzly bear population...........................................................12

CONCLUSION .....................................................................................................13

# TABLE OF AUTHORITIES

## CASES

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*,
    462 U.S. 87 (1983)................................................................................9

*Defenders of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017)...........................................................8

*Greater Yellowstone Coalition, Inc. v. Servheen*,
    665 F.3d 1015 (2011)..................................................................7, 8, 11

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
    88 F.3d 754 (9th Cir. 1996) ...........................................................10, 11

*Kern Cnty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ..............................................................9

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ...........................................................1, 3

*Nat'l Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ................................................................1

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ..............................................................2

*Oregon Nat. Res. Council v. Daley*,
    6 F. Supp. 2d 1139 (D. Or. 1998) ........................................................4

*Pacific Coast Fed. of Fishermen's Ass'n, Inc. v. Nat. Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) ..............................................................1

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...................................................9, 10, 11

*Yount v. Salazar*, No. CV11-8171 PCT-DGC,
    2014 WL 4904423 (D. Ariz. Sept. 30, 2014) ......................................2

## STATUTES

16 U.S.C. § 1533(a)(1)(D) ...........................................................................4

16 U.S.C. § 1533(b)(B)(ii)............................................................................3

## FEDERAL REGULATIONS

51 Fed. Reg. 33753 (Sept. 23, 1986) .........................................................13

82 Fed. Reg. 30502 (June 30, 2017) ...............................................*passim*

# INTRODUCTION

Plaintiffs have obviously combed the administrative record to find internal and external disagreements that occurred while the U.S. Fish and Wildlife Service (FWS) was deciding whether to delist the Greater Yellowstone Ecosystem grizzly bear DPS.  It is unsurprising they found many, for such is the nature of decision-making.  The presence of disagreements or conflicting data in the record, however, is not the test for determining whether FWS' decision is arbitrary or capricious: "[s]cientific conclusions reached by the agency need not reflect the unanimous opinion of its experts."  *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 868 (9th Cir. 2017).  Accordingly, FWS' decision should be reversed only if the Court determines the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (quoting *Pacific Coast Federation of Fishermen's Ass'n, Inc. v. National Marine Fisheries Service*, 265 F.3d 1028, 1034 (9th Cir. 2001).  Here, Plaintiffs' attacks upon the Final Rule's provisions for post-delisting mortality management do

nothing more than identify differences in view.  The State's motion for summary

judgment on these issues should therefore be granted.[1]

## ARGUMENT

1. **FWS rationally concluded that a recalibration requirement was not necessary to ensure maintenance of a recovered grizzly bear population.**

   A. **All participating federal and state agencies are committed to manage for a stable population using Chao2 estimates as the basis for mortality management decisions for the foreseeable future.**

   In the Conservation Strategy, all signatory parties agreed to Idaho's proposal

to "make a commitment" to using Chao2 "for the foreseeable future and not

change midstream."  FWS_Emails_000705.  Such commitment includes

"safeguards to make sure once a population does move downward that there are

safeguards to bring it back up."  FWS_Emails_000705.

   As Plaintiffs point out, the FWS, prior to Idaho's proposal, had insisted on

recalibration of mortality limits in the event a population estimator other than

Chao2 was used to determine the Greater Yellowstone grizzly population.  After

receiving Idaho's proposal, the FWS changed its mind.  Contrary to Plaintiffs'

assertions, it was entitled to do so: "the Service may change its mind after internal

deliberation."  *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136,

---

[1] *See Yount v. Salazar*, No. CV11-8171 PCT-DGC, 2014 WL 4904423, at *16 (D. Ariz. Sept. 30, 2014) ("surely one internal expert's disagreement with a conclusion reached by other internal experts does not make a final agency decision arbitrary or capricious. If it did, agency actions would survive APA review only when there was complete unanimity among internal experts").

1145 (9th Cir. 2007).  Even abrupt turnabouts do not establish arbitrary or
capricious decision-making, so long as the agency, in reaching its ultimate
conclusion, "considered the relevant factors and articulated a rational connection
between the facts found and the choices made."  *Id*., (quoting *Nat'l Ass'n of Home
Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).

    Here, the Service considered all relevant factors in assessing the adequacy of
the commitment by all parties to manage a stable grizzly bear population within the
2002-2014 Chao2 confidence levels of 600-747 bears.  It found that the
commitment to use Chao2 for the foreseeable future was consistent with ESA
requirements "as this is the time horizon that we must consider as we evaluate the
species' status relative to the Act's definition of a threatened species." 82 Fed.
Reg. at 30607; *see also* 16 U.S.C. § 1533(b)(B)(ii) (FWS must consider likelihood
of extinction "within the foreseeable future").  In the delisting rule, FWS rationally
concluded that the foreseeable future is "the period over which it can make reliable
predictions."  82 Fed. Reg. 30502, 30607 (June 30, 2017).  Because "[t]he partners
managing the GYE grizzly population have . . . successfully reduced or eliminated
the negative trends that led to the listing of the bear in the first place . . . there is no
need to more precisely define a particular period as being the 'foreseeable future'
for the bear."  *Id*.  FWS' reliance on the parties' commitment to a particular
population estimator for the foreseeable future is consistent with its obligation to

3

only consider "existing" regulatory mechanisms.  16 U.S.C. § 1533(a)(1)(D); s*ee also Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1152 (D. Or. 1998) (determination of threats to species "must be based on the current regulatory structure").

Plaintiffs' concern that adoption of a more accurate population estimator will, without recalibration of mortality limits, allow "bears to be killed at a much greater rate essentially overnight," ECF 227:5-6,[2] is unfounded.  Plaintiffs ignore a fundamental limitation built into the Conservation Strategy.  The Interagency Grizzly Bear Study Team, which is responsible for making the population estimates used to set annual mortality limits, must approve adoption of a population estimator other than Chao2.  FWS_Rel Docs_002316 (Conservation Strategy).  Members of the Study Team include the U.S. Geological Survey, the National Park Service, the U.S. Forest Service, and the wildlife agencies of the States of Idaho, Montana, Wyoming, and Wind River Reservation Tribes.  82 Fed. Reg. at 30508; FWS_Rel Docs_002326.

Moreover, any Study Team recommendation to alter the methods for estimating the Greater Yellowstone grizzly population would then be subject to review by the Yellowstone Grizzly Bear Coordinating Committee which is responsible for implementing the Conservation Strategy.  FWS_Rel Docs_002317;

---

[2] All references are to the page numbers generated by the ECF system.

82 Fed. Reg. at 30516.  Committee members include representatives from Yellowstone National Park, Grand Teton National Park, five National Forests, the Bureau of Land Management, the United States Geological Survey, the wildlife management agencies of Idaho, Montana, and Wyoming, one local county government representative from each State, and representatives of the Shoshone-Bannock, Northern Arapahoe, and Eastern Shoshone Tribes.  82 Fed. Reg. at 30516.

While Plaintiffs acknowledge that adoption of a population estimator other than Chao2 would require Committee approval, they wrongfully assert that "the very parties that created the initial impasse over recalibration [presumably a reference to the three States] comprise a supermajority of the Committee."  ECF 227:10.  Of the eighteen Committee members, nine represent federal agencies. Thus, any action to adopt a method other than Chao2 requires significant federal concurrence.

Plaintiffs also err in asserting that reliance on the Conservation Strategy process for adopting new population estimates is simply *post-hoc* rationalization. It is not.  The Conservation Strategy adopted these procedures precisely to ensure that post-delisting management proceeds in a scientific, rational, and measured manner, with wide agreement among affected state federal, and tribal agencies. The Final Rule acknowledges that "the YGCC [Yellowstone Grizzly Bear

5

Coordinating Committee] will coordinate management and implementation of the 2016 Conservation Strategy and work together to rectify problems and to ensure that the habitat and population standards and total mortality limits will be met and maintained." 82 Fed. Reg. at 30516. More specifically, FWS found, in response to comments about the lack of a recalibration requirement, that "[t]he implementation of a new method to estimate population size within the GYE DMA [Demographic Monitoring Area] would be evaluated by the IGBST [Interagency Grizzly Bear Study Team] and constitute a change to the Conservation Strategy, which requires approval by the YGCC [Yellowstone Grizzly Bear Coordinating Committee] and a public comment period." 82 Fed. Reg. at 30,566.

In short, not only did the parties to the Conservation Strategy agree to employ Chao2 for all mortality management decisions for the foreseeable future, they agreed to a rigorous, science-based process requiring significant agreement among federal, state, and tribal parties before any alternative population estimation methodology is adopted. Plaintiffs' assertion that there is only a "vague commitment" to use the Chao2 estimator is patently wrong.

**2.**    **The Ninth Circuit's decision in *Servheen* that mechanisms to regulate mortality were adequate in light of the enforceable commitment to the Conservation Strategy by federal land management agencies remains applicable today.**

In *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015 (2011), the Ninth Circuit, addressing the 2007 grizzly bear delisting rule, found that:

> [T]he incorporation of the Strategy's population standards into the Yellowstone and Grand Teton National Park Superintendent's Compendia gives these standards—*which include mortality limits*, see Final Conservation Strategy, supra, at 173–74, 178–81–federal regulatory force, and the Park Service must adhere to them.

*Id*. at 1031 (emphasis added).  The Ninth Circuit found that "the Forest and Park Services are legally bound to uphold key Strategy standards within the PCA."  *Id.* The court concluded that "[i]n light of these measures, we believe the Service could reasonably conclude that adequate regulatory mechanisms exist to protect the Yellowstone grizzly bear."  *Id*. at 1032.

The same reasoning holds true today.  Not only does the National Park Service continue to control human-caused mortality over a significant portion of the PCA, but federal agencies comprise half the membership of the Yellowstone Grizzly Bear Coordinating Committee, which oversees implementation of the Conservation Strategy's mortality management provisions.  It is to be expected that representatives of the federal land management agencies are legally obligated to carry out the Conservation Strategy provisions adopted into their respective land management plans.

Plaintiffs err when they assert that the "federal land managers' commitment to the Strategy is insufficient" because their authorities only relate to "habitat

protection," and do not address Plaintiffs' concerns about "excessive mortality."
ECF 227:22.  Federal representatives on the Yellowstone Grizzly Bear
Coordinating Committee are responsible for implementing *both* habitat and
demographic provisions of the Conservation Strategy, including compliance with
demographic monitoring protocols, and direction of demographic reviews.  FWS
Rel Docs_002314, 002326 (Conservation Strategy).  In short, incorporation of the
Conservation Strategy into federal and management plans, and federal agency
participation in the Coordinating Committee's implementation of the Conservation
Strategy, is more than equivalent to the regulatory mechanisms that the *Servheen*
court found adequate to "maintain a recovered Yellowstone grizzly population
without the ESA's staunch protections," *Servheen*, 665 F.3d at 1020, and provides
the requisite "certainty that the conservation effort will be implemented."
*Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1084 (D.C. Cir. 2017).

3.     **Plaintiffs' concern that Chao2 would fail to timely detect declines in the bear population ignores the safeguards built into the population monitoring and mortality management systems.**

        Plaintiffs seek to have the Court interject itself into complex scientific
decisions regarding allowable rates of grizzly bear mortality, the effects of such
mortality on the overall population, and the best methodology for determining such
effects.

8

"The determination of what constitutes the 'best scientific data available' belongs to the agency's 'special expertise . . . . When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 103 (1983).

Here, Plaintiffs assert that in light of higher mortality limits for male grizzly bears, the current 1:1 ratio of adult males to adult females, as used in Chao2, may change, resulting in population losses that go undetected for some time. This is exactly the type of science-based determination that is best left to agency deference absent a showing that the agency simply ignored better science. "The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" *Id*. (quoting *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006)).

Plaintiffs fail to show any "disregard" of scientific evidence. FWS examined the risk that Chao2 may not immediately detect changes in the population due to changes in male:female ratios and due to the model's use of trailing data from the last ten years—but the fact that a scientific methodology has known flaws does not foreclose it being the best available science. Indeed, all

population estimators have flaws: for example, the most likely alternative to

Chao2, Mark-Resight, provides unbiased population estimates but lacks sufficient

"power to detect changes in population trend." 82 Fed. Reg. at 30566.  "The fact

that FWS chose one flawed model over another flawed model is the kind of

judgment to which we must defer."  *San Luis & Delta-Mendota Water Auth.*, 747

F.3d at 620.

Nor did FWS ignore flaws in the Chao2 methodology.  It rationally

addressed possible shortcomings in the Chao2 methodology by requiring the use of

three additional population estimators.  FWS_Rel Docs_002330; *see also* 82 Fed.

Reg. at 30566 ("[t]he IGBST frequently reviews their protocols and techniques for

population estimation and population trend analysis. They currently use four

different techniques for inference").  FWS additionally addressed possible

shortcomings in the Chao2 model by providing, in the Conservation Strategy, that

"[m]ortality standards and grizzly bear vital rates [including male:female ratios]

will be reviewed and reported by the IGBST every 5 years."  FWS_Rel

Docs_002328.

Plaintiffs take issue with the length of time between demographic reviews,

but the number of years of data necessary to detect a permanent change in vital

rates is a question of scientific methodology best left to the agency's judgment.

*See Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th

Cir. 1996) (upholding district court's determination that "Plaintiffs were quibbling over the choice of scientific methodologies, a decision to which a reviewing court should defer"). Here, FWS established a rational basis for the span between demographic reviews: "[t]he 5- to 10-year time interval was selected based on life-history characteristics of bears and methodologies in order to obtain estimates with acceptable levels of uncertainty and statistical rigor." 82 Fed. Reg. at 30533. The determination of demographic review frequency likely to render the best scientific data available is a matter of agency expertise entitled to the "greatest" deference. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 609; *see also Servheen,* 665 F.3d at 1019-20 ("[w]e, as judges, do not purport to resolve scientific uncertainties or ascertain policy preferences").

Finally, Plaintiffs' arguments about Chao2's inability to detect population decline fail to mention FWS' determination that the Chao2 methodology, which undercounts the number of bears, provides an additional buffer that prevents against the possibility of the bear population dropping below recovery levels. 82 Fed. Reg. at 30555. Such a buffer, in combination with halts on most human-caused mortality when the population, as measured by Chao 2, drops below 600 bears, offers additional rational support for FWS' conclusion that state and tribal

11

wildlife agencies "will manage total mortality to ensure all recovery criteria will continue to be met."  82 Fed. Reg. at 30531.

**4.      Conflict-related mortality management poses no threat to the Greater Yellowstone grizzly bear population.**

Plaintiffs continue to assert, without justification, that conflict-related mortality poses a threat to the Greater Yellowstone grizzly bear population, and that the FWS and the States ignored such threat.  Plaintiffs take great effort to demonstrate an upward "trend" in grizzly bears killed because of conflicts with hunters and livestock.  ECF 231:10.  The actual numbers of bears removed for conflicts, however, remains well within the annual mortality limits that are consistent with maintenance of a stable bear population.  *See* ECF 231:10 (indicating 2015 removals of 12 bears in hunter conflicts and 9 bears for livestock depredation); *cf*. 82 Fed. Reg. at 30515 (establishing allowable total mortality rate of 15% for adult male grizzlies and 7.6% for adult females and dependent young when population is between 600 and 674 bears).

Moreover, in the unlikely event that removal of bears to resolve conflicts results in mortality in excess of established limits, the excess mortality will be subtracted from the following year's mortality available for hunting. FWS_LIT_017559 (Conservation Strategy Appendix O).  Plaintiffs' continued assertion that the States will only subtract *hunting* mortality that exceeds total

mortality limits is simply wrong, for the reasons explained in Idaho's opening brief (ECF 216:22-22).

Finally, Plaintiffs assert, wrongfully, that ESA regulations were "much more protective of conflict bears than post-delisting measures." ECF 231:15. During recovery, FWS allowed removal of bears for livestock depredations, even at population levels well below 600 bears. *See, e.g.*, 51 Fed. Reg. 33753, 33759 (Sept. 23, 1986) (adopting regulation authorizing removal of bears for livestock depredation if threat not eliminated by relocation). In the unlikely event that the Greater Yellowstone grizzly population drops below 600 bears (as measured by Chao2), the States have agreed to stop discretionary mortality other than removals necessary to address human safety. FWS_LIT_017558. Thus post-delisting mortality management of conflict removals is as at least as protective as that in place during recovery.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the briefing of the United States, which is incorporated herein by this reference, the Court should grant the State of Idaho's motion for summary judgment.

Respectfully submitted this 22nd day of August 2018.

/s/ James D. Johnson
James D. Johnson
WILLIAMS LAW FIRM, P.C.

13

LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO
Steven W. Strack
  *Specially Admitted*
Kathleen Trever
  *Specially Admitted*
Deputy Attorneys General
Natural Resources Division

*Attorneys for State of Idaho*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum complies with the 3,250 word limit of this Court's Order of May 14, 2018 (ECF 178), in that it consists of 2,862 words excluding the caption, tables of contents and authorities, and certificates of service and compliance, as calculated by the word count function of the word processor used to prepare the memorandum; and further certify the foregoing memorandum complies with Local Rule 1.5(a)(2) in that it is double spaced in a 14-pt font typeface.

/s/ James D. Johnson, Esq.
James D. Johnson, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of August, 2018, I caused the foregoing to be electronically filed with the Court using the CM/ECF system, which caused all attorneys of record to be served by electronic means.

/s/ James D. Johnson
James D. Johnson
WILLIAMS LAW FIRM, P.C.

14