IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CROW INDIAN TRIBE; et al., | CV 17–89–M–DLC |
| Plaintiffs, | |
| vs. | (Consolidated with Case Nos. |
| | CV 17–117–M–DLC, |
| UNITED STATES OF AMERICA; et al., | CV 17–118–M–DLC, |
| | CV 17–119–M–DLC, |
| | CV 17–123–M–DLC |
| Federal Defendants. | and CV 18–16–M–DLC) |
| and | ORDER |
| STATE OF WYOMING; et al., | |
| Defendant-Intervenors. | |

Before the Court are Plaintiffs WildEarth Guardians ("Guardians") Motion for Attorneys' Fees and Costs (Doc. 341) and Northern Cheyenne et al.'s ("Northern Cheyenne") Updated and Revised Motion of Plaintiffs for an Award of Attorneys' Fees and Costs (Doc. 343).  Guardians requests $515,740 in fees and costs and Northern Cheyenne requests $356,034.50 in fees and costs.  (Docs. 342 at 30; 344 at 26.)  Federal Defendants oppose the motions.  (Doc. 355 at 3.)  For the reasons explained, the Court awards Plaintiffs' requests in full.

1

## BACKGROUND

In 1975, the Fish and Wildlife Service ("FWS") listed the grizzly bear in the lower 48 states as "threatened" under the Endangered Species Act ("ESA") in response to the grizzly's dwindling numbers across the western United States. Final Rule, Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife, 82 Fed. Reg. 30,502, 30,508 (June 30, 2017) ("Final Rule").  At that time, researchers estimated that grizzly bears inhabited only two percent of their once-vast historical range.  *Id.* The FWS designated six grizzly bear recovery areas, one of which was the Greater Yellowstone Ecosystem ("GYE").  *Id.* at 30,508–09.  Among other protections, the ESA barred hunting and shooting grizzly bears in the lower 48, subject to strictly limited exceptions.  16 U.S.C. §§ 1532(19), 1538(a).  From 1975 to 2016, the GYE grizzly population rebounded to approximately 718 bears, prompting the FWS to isolate the GYE grizzly bear and delist those bears as a distinct population segment.[1]  82 Fed. Reg. at 30,509.

The effect of this decision was that efforts to monitor and protect the species were transferred to the States of Wyoming, Idaho, and Montana and tribal

---

[1] This was actually the agency's second attempt to delist the GYE grizzly bear.  In 2007, the FWS first identified the GYE as a distinct population segment and delisted that segment.  72 Fed. Reg. 14,866 (Mar. 29, 2007).  An environmental organization challenged the 2007 delisting rule and prevailed in their case before Judge Molloy.  *Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009).  That decision was largely affirmed on appeal.  *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011).

authorities.  82 Fed. Reg. at 30,628.  On September 1, 2018, Wyoming and Idaho were set to issue a total of 23 recreational hunting licenses for GYE grizzlies. (Doc. 190 at 7.)

Plaintiffs, the Crow Indian Tribe et al. ("Crow Tribe") filed suit challenging the Final Rule, followed by the Humane Society of the United States ("Humane Society"), Guardians, Northern Cheyenne, and Alliance for the Wild Rockies ("Alliance").[2]  The States of Wyoming, Idaho, and Montana intervened, joined by the National Rifle Association, the Safari Club International, and other industry entities.  (Docs. 26; 35; 42; 108).

On December 5, 2017, the Court consolidated the cases after concluding that all cases involved "common questions of law and fact."  (Doc. 40 at 2.)  Less than a month into litigation, Federal Defendants moved to stay the case while the agency took additional public comment on its Final Rule in light of the D.C. Circuit's then-newly released opinion in *Humane Society v. Zinke*, 865 F.3d 585, 614–15 (D.C. Cir. 2017), which affirmed the district court's vacatur of the delisting rule for the Western Great Lakes gray wolf as a distinct population segment.  (Doc. 61.)  There, the court held the FWS could not carve out and delist

---

[2] For purposes of this order, the Court will refer to Guardians and Northern Cheyenne jointly as "Plaintiffs."  The Court will refer to the Crow Tribe, Human Society, and Alliance jointly as "co-Plaintiffs."  The Court will refer to all five entities collectively as "Organizational Plaintiffs." Plaintiff Robert Aland's contributions to the case are not relevant to the fee dispute and will not be discussed.

a distinct population segment of an already-listed species without first considering the status of that species and "without determining whether the remnant itself remains a species so that its own status under the Act will continue as needed." *Humane Society*, 865 F.3d at 600.  In light of this holding, the FWS sought public comment on whether its Final Rule remained valid.  Request for Comments, Possible Effects of Court Decision on Grizzly Bear Recovery in the Conterminous United States, 82 Fed. Reg. 57,698 (Dec. 7, 2017).  Organizational Plaintiffs opposed Federal Defendants' request to stay litigation because the FWS had not issued any withdrawal or corresponding stay that would protect the GYE grizzly bear in the interim; the GYE grizzly bear had already been delisted by the issuance of the Final Rule and Wyoming and Idaho were planning a fall grizzly bear hunt. (Docs. 81 at 3; 82 at 6.)

Simultaneously, Northern Cheyenne moved for partial summary judgment arguing that the FWS's request for comment constituted a tacit acknowledgement that its Final Rule violated the ESA because, here as in *Humane Society*, the agency failed to consider the effect of delisting the GYE grizzly bear on the remnant species.  (Doc. 76 at 7.)  Federal Defendants moved to stay briefing on that motion as premature, contending that the Court's scheduling order had not yet required the agency to produce an administrative record.  (Doc. 79 at 2.)

On March 13, 2018, the Court held a hearing on Federal Defendants' motion to stay. (Doc. 130.) Ruling from the bench, the Court denied the motion, however, it stayed briefing on Northern Cheyenne's pending motion for partial summary judgment. (*Id.*) On May 14, 2021, the Court entered a briefing schedule and set a hearing so that the case could be "argued prior to a potential fall hunting season." (Doc. 178 at 2.) Organizational Plaintiffs each filed separate motions for summary judgment. (Docs. 185; 188; 189; 191; 193.) After requesting leave to file excess pages—which Northern Cheyenne opposed as unnecessary—Federal Defendants filed a response and cross-motion for summary judgment. (Docs. 195; 196; 202.)

On August 30, 2018, the Court held a hearing on the summary judgment motions. (Doc. 250.) The Court declined to rule from the bench notwithstanding the fact that hunting season was set to begin in two days. After the hearing, Northern Cheyenne (on behalf of all Organizational Plaintiffs) filed a temporary restraining order ("TRO") to enjoin Wyoming and Idaho from issuing hunting licenses prior to the Court's ruling. (Doc. 252.) Northern Cheyenne requested expedited ruling on its TRO by the following day at noon to allow them to seek an emergency appellate ruling if necessary. (*Id.* at 2.) That same day, the Court granted the motion and entered a 14-day TRO. (Doc. 254.) The day the TRO was set to expire, the Court extended it for an additional 14 days. (Doc. 258.) Then, on

September 24, 2018, the Court granted summary judgment to Plaintiffs and vacated and remanded the Final Rule.  (Doc. 266.)

The Court found for Organizational Plaintiffs on two issues.  It concluded "(1) the Service erred in delisting the Greater Yellowstone Ecosystem grizzly bear without further consideration of the impact on other members of the lower-48 grizzly designation; and (2) the Service acted arbitrarily and capriciously in its application of the five-factor threats analysis demanded by the ESA."  (Doc. 266 at 2–3.)  Finding these issues dispositive, the Court did not address the remaining arguments raised by the Plaintiffs.  (*Id.* at 2 n.2.)

Federal Defendants appealed the portion of the Court's decision that required FWS to study the effects of delisting on the remnant population and to "further consider[] . . . the threat of delisting to long term genetic diversity of the Yellowstone grizzly" whereas some of the Intervenors challenged the Court's entire decision.  *Crow Indian Tribe v. United States*, 965 F.3d 662, 670 (9th Cir. 2020).  On appeal, Organizational Plaintiffs were primarily represented by Guardians and Northern Cheyenne who addressed all issues raised by Federal Defendants and the Intervenors.

The Ninth Circuit largely affirmed this Court, holding that the FWS's delisting of the GYE grizzly violated the ESA as it failed to (1) appropriately

6

protect GYE grizzlies' lasting genetic diversity and (2) commit to a recalibrated GYE grizzly population estimator. *Crow Indian Tribe*, 965 F.3d at 680–81.

On September 10, 2020, the Ninth Circuit granted Plaintiffs' unopposed motion to transfer consideration of Plaintiffs' attorneys' fees motions to this Court. (Doc. 307 at 12.)  Plaintiffs argue that their victories before the district and appellate courts entitle them to attorneys' fees and costs under the ESA.  The Crow Tribe, Humane Society, and Alliance settled their fee requests for between $132,804 and $175,000 each.  Federal Defendants were unable to settle attorneys' fees with Plaintiffs and those motions are presently before the Court.

## LEGAL STANDARD

Under the ESA's citizen-suit provision, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  16 U.S.C. § 1540(g)(4).  This fee shifting provision was intended to "expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties—parties achieving some success, even if not major success." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 (1983).  Such an award is appropriate where the fee-seeking party had "some degree of success on the merits," *id*. at. 680, and substantially contributed to the goals of the ESA, *Carson-Truckee Water Conservancy Dist. v. Sec'y of the Interior*, 748 F.2d 523, 525 (9th Cir. 1984)

*abrogated on other grounds by Marbled Murrelet v. Babbit*, 182 F.3d 1091, 1094–95 (9th Cir. 1999).

To determine an appropriate award, a court starts with the lodestar figure, which is determined by multiplying a reasonable hourly rate by the number of hours expended on the litigation. *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001). The fee-seeking party bears the initial burden of demonstrating that counsel's requested fees are reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). However, ultimately, when "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Id.* at 435. Furthermore, a court "should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). "[T]he standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed." *Greenpeace v. Stewart*, 2020 WL 2465321, at *8 (9th Cir. 2020) (citing *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982)).

Once the moving party meets their burden to establish that the requested fees are reasonable, the burden shifts to the opposing party to demonstrate that the requested fees are unreasonable. *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98 (9th Cir. 1992). A court may reduce a fee request by conducting an hourly audit or a holistic percentage reduction. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1200–03 (9th Cir. 2013). Principally though, the purpose of fee shifting policies is to effectuate justice and "not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

## DISCUSSION

Under the ESA,[3] Guardians seeks $515,740 and Northern Cheyenne seeks $388,559.50 in attorneys' fees and costs. (Docs. 359 at 16; 360 at 15.) Federal Defendants primarily object to the number of hours billed.[4] The Court will begin its analysis there. It will then address Plaintiffs' hourly rates and whether Plaintiffs are entitled to costs.

---

[3] Plaintiffs alternatively argue their fees motions under the Equal Access to Justice Act. Federal Defendants do not dispute that the ESA governs their award and that Plaintiffs are entitled to fees, they simply dispute the amount requested. (Doc. 355 at 15–17.)

[4] At numerous places throughout their brief, Federal Defendants assert that they are not challenging Plaintiffs' hourly rates which are in line with rates awarded by the District of Montana in the past. Yet they seem to imply that if the Court determines the hours are reasonable, it should reduce their hourly rate—although this argument is not well developed. (*See* Doc. 355 at 34 ("But here, either Plaintiffs' hourly rates are too high, or they spent too much time. Both cannot be true.").) The Court will therefore briefly address the reasonableness of Plaintiffs' attorneys' rates below.

## I.    Reasonable Hours

Plaintiffs argue they are entitled to the hours reflected on their timesheets as their attorneys efficiently achieved success in a complicated multi-stage, multiparty case that lasted over four years.  (Docs. 342 at 21–27; 344 at 21–24.) Notwithstanding the fact that counsel for Guardians and Northern Cheyenne expended more hours than counsel for the Crow Tribe, the Humane Society, and Alliance alike, Plaintiffs contend their billed hours are reasonable because they took a more active and central role in the litigation.  (*See* Docs. 359 at 10; 360 at 5–10.)

Northern Cheyenne supports its fee request with affidavits from two Montana practitioners.  James Goetz[5] found that the billed hours were reasonable given the necessity that counsel review a "voluminous" administrative record, oppose Federal Defendants' request to stay, and litigate its motion for summary judgment and a temporary restraining order.  (Doc. 344-2.)  Roger Sullivan[6] agrees the requested hours are reasonable.  Additionally, Northern Cheyenne voluntarily cut 687.4 hours to "eliminate redundant or unnecessary time entries."  (Doc. 344 at 21.)

---

[5] James Goetz has been a member of the Montana Bar for over 50 years and has a background in environmental litigation.  (Doc. 344-2).
[6] Roger Sullivan has been a member of the Montana Bar for over 35 year and has an "extensive" background in environmental litigation.  (Doc. 344-3).

Guardians supports its request with affidavits from L. Randall Bishop[7] and Matthew Hayhurst,[8] both of whom agree that the hours billed are reasonable for the type of work performed.  (Docs. 342-6; 342-5.)  Mr. Hayhurst specifically notes the exceptionally large administrative record—which was approximately 350,000 pages—speaks to the case's complexity and accounts for a significant expenditure of counsel's time.  (Doc 342-5 at 3.)

Having conducted an initial review of Plaintiffs' timesheets, the Court agrees that, at first glance, the requested fees are reasonable.  Thus, having met their initial burden to demonstrate the reasonableness of the request, the burden now shifts to Federal Defendants to oppose it.

Federal Defendants believe that Plaintiffs are entitled to no more than $175,000 each, as this figure is consistent with the amount accepted by Alliance and the Humane Society after settlement negotiations.  (Doc. 355 at 3.)  Federal Defendants raise six primary arguments in support of their belief that Plaintiffs claim excessive hours.  First, they assert that Plaintiffs' hours are excessive when compared with the hours billed by attorneys for their co-Plaintiffs.  (Doc. 355 at 25–35.)  They next contend that Plaintiffs' fee experts' testimony is unreliable

---

[7] L. Randall Bishop—not to be confused with Guardians' lead counsel Matthew Bishop—is an attorney with 34 years of experience in Montana and a former professor at the University of Montana School of Law.  (Doc. 342-6.)

[8] Matthew Hayhurst is a former federal circuit court law clerk and a Montana bar certified lawyer with over 20 years' experience including a background in litigating complex civil cases on appeal.  (Doc. 342-5.)

11

because their experts did not consider the timesheets of co-Plaintiffs' attorneys. (*Id.* at 35–40.)  Third, they argue that Organizational Plaintiffs duplicated arguments and Federal Defendants should not have to pay for redundant briefing. (*Id.* at 40–48.)  They fourth take issue with Guardians' inefficient work practices— for example, Mr. Bishop, its highest paid attorney performed numerous clerical tasks and briefed unsuccessful claims.  (*Id.* at 48–52.)  Federal Defendants then assert that Northern Cheyenne was excessively staffed which resulted in extensive conferencing.  (*Id.* at 52–54.)  Finally, they argue that Plaintiffs should not be able to recover hours spent in pursuit of their fee motions.  (*Id.* at 54–56.)

The Court will address each argument below.

### A. Plaintiffs' hours are not excessive based on Federal Defendants' comparative table.

Federal Defendants argue Plaintiffs' requested attorney fees are unreasonable because they "billed roughly triple the number of hours . . . to achieve the same task and same result as the other plaintiff-groups."  (Doc. 355 at 2–3.)  To demonstrate this point, Federal Defendants generated a table[9] comparing

---

[9]

| Tasks | Crow Tribe | Alliance | Humane Society | Guardians | Northern Cheyenne |
|---|---|---|---|---|---|
| Background Research, NOI & Complaint | 308.4 | 107.12 | 106.2 | 214.2 | 194.5 |
| Case Management | 18.7 | 8.7 | 9.7 | 26.4 | 8.5 |
| Response to Motion to Stay | 25.5 | 32.05 | 94.5 | 81.14 | 138.8 |

the hours each individual Plaintiff devoted to various tasks during litigation.  For example, the table divides litigation into categories such as "Background Research, NOI & Complaint," "Case Management," "Summary Judgment and Related Filings," and "Appeal."  In comparing the total hours across each Plaintiff, Federal Defendants note that, "[i]n almost every category, Plaintiffs spent more hours on their tasks, sometimes significantly more, than their colleagues."  (*Id.* at 19.) Specifically, Federal Defendants highlight that Plaintiffs spent considerably more time on their summary judgment briefs, related filings, and their appellate briefing. *Id*.  Federal Defendants acknowledge that Plaintiffs played a different role in the litigation, but they contend that this alone does not explain the degree of difference in their hours.  (*Id.* at 22.)

As an initial matter, the Court is skeptical of Federal Defendants' basic assertion that, in a complex multiparty case, the hours expended by one attorney on a given task provide a fair benchmark for a reasonable expenditure of hours by

| Summary Judgment & Related Filings | 33.7 | 302.45 | 293.1 | 593.17 | 546.1 |
|---|---|---|---|---|---|
| Administrative Record Review & Disputes | 13.9 | 97.59 | 155.9 | 268.61 | 97.9 |
| Plaintiffs' TRO/PI Motion | 27.2 | 4 | 30.3 | 40.02 | 41 |
| Fees | 1 | 11.2 | 1.6 | 72.4 | 1.8 |
| Appeal | 108.9 | 82 | 114.6 | 291.2 | 194.1 |
| Consolidation, Conferencing & Strategy | 53.4 | 16.3 | 17.2 | 29.33 | 36.5 |
| **Total** | **590.7** | **661.41** | **823.1** | **1,616.47** | **1259.2** |

another attorney.  Individual attorneys have different work styles and distribute time across tasks in a way that best aligns with their work habits.  For example, some attorneys conduct exhaustive research prior to putting pen to page.  Such an attorney might formulate every argument in his or her mind even before filing a complaint.  Other attorneys research while they draft and develop the nuances of their arguments over time.  Federal Defendants' comparative table is fundamentally flawed because it would portray the first attorney's extensive time devoted to "background research" as excessive and the second attorney's significant expenditure on "summary judgment" as unnecessary, when in reality, the difference in hours' worked merely reflects different workstyles, neither of which is less effective than the other.

Northern Cheyenne criticizes Federal Defendants' table as an overly simplistic characterization of its litigation efforts.  (Doc. 360 at 9–10.)  For example, they observe that Federal Defendants' table lumps 138.8 hours into a category titled "Response to Federal Defendants' Motion to Stay" when in reality, this time encompassed briefing and preparing oral argument in response to Federal Defendants' motion to stay pending the FWS' administrative comment period following *Human Society v. Zinke* and opposing Federal Defendants' request to stay briefing on Northern Cheyenne's Partial Motion for Summary Judgment.  (*Id.* at 12–13.)

14

Northern Cheyenne also argues that it is misleading of Federal Defendants to include time spent preparing for oral argument on a motion in the same category as time spent briefing a motion.  For example, Federal Defendants' table notes that Northern Cheyenne spent approximately 194 hours on its appeal, as compared to only 82 hours spent by Alliance and 108 hours spent by the Crow Tribe.  (*Id.* at 10–13.)  Northern Cheyenne contends that the comparison is unfair because its "counsel took a lead role, including at times presenting argument on behalf of other plaintiffs."  (*Id.* at 13.)

Northern Cheyenne's concerns are well taken.  Federal Defendants cannot themselves drive up the litigation costs by attempting to postpone and delay time-sensitive litigation and then contend that Northern Cheyenne expended unnecessary effort opposing those motions.  That Northern Cheyenne devoted more time to these tasks than the other Plaintiffs does not mean their time was wasted.  Northern Cheyenne took on an unofficial role as lead counsel in opposing the motion to stay, and its sense of urgency in resolving the case is understandable given that Wyoming and Idaho intended to release grizzly bear hunting licenses in the fall of 2018.

Federal Defendants' comparative model break downs even further given the different roles taken by each Plaintiff during this litigation.  Northern Cheyenne's lead counsel, Mr. Timothy Preso, also took a leadership role in briefing the

arguments presented on appeal, and, along with Guardians' lead counsel, Mr.

Bishop, represented the Crow Tribe, the Humane Society, and Alliance who did

not argue before the Ninth Circuit.  This explains the difference in hours between

Northern Cheyenne, Guardians, and the remaining Plaintiffs on appeal.

Guardians similarly objects to Federal Defendants' comparative table.

Although they acknowledge that they spent the most hours completing all tasks on

the table (with the exception of the "Response to Federal Defendants' Motion to

Stay,") they contend their hours are reasonable because their higher totals reflect

the fact that they did more work than their co-Plaintiffs—not that they worked less

efficiently.  (Doc. 360 at 6–7.)  Guardians also justifies its fee request by

comparing its efforts to those deemed reasonable by Judge Molloy in *Defenders of*

*Wildlife v. Hall*, No. CV-08-56-M-DWM (D. Mont. Feb. 17, 2009).[10]  (Doc. 342 at

24–25.)

The Court agrees that there is nothing suspicious about Guardians' accrual

of higher hourly totals than its co-Plaintiffs.  The Court is aware of Guardians'

diligent efforts in this litigation, as counsel took every opportunity to prosecute his

client's position.  In contrast to the Crow Tribe's reserved litigation style (they did

---

[10] Because the Court ultimately concludes that Federal Defendants' use of a comparative model is an inappropriate gauge for determining a reasonable expenditure of time between attorneys involved *in the same litigation*, the Court will not rely on hours determined to be reasonable in a different case as persuasive here.

not oppose Federal Defendants' motion to stay, independently brief their summary judgment motion, or appear on appeal) Guardians took every opportunity to be heard; Guardians opposed the motion to stay and vigorously argued at the Court's hearing on that motion, counsel thoroughly briefed Guardians' position at every juncture, and, together with Northern Cheyenne, led Plaintiffs' charge on appeal. Guardians' appellate role was so central to the litigation that it adopted the Humane Society's population recalibration issue—which would otherwise have been abandoned, as the Human Society elected not to personally appear before the Ninth Circuit. In sum, the Court finds Federal Defendants' comparison of Plaintiffs' time spent on discrete tasks uncompelling given that counsel for these parties did comparatively more work than their co-Plaintiffs.

More broadly speaking, the Court is troubled by Federal Defendants general insinuation that Mr. Preso and Mr. Bishop's vigorous advocacy was unnecessary, improper, or—even worse—unethical. Nothing could be further from the truth. The Court is very familiar with Mr. Preso and Mr. Bishop, both of whom are experienced environmental attorneys that have appeared before the Court many times. Mr. Preso and Mr. Bishop are attorneys of the highest caliber, who—by all appearances—exercised sound judgment with regard to their case management decisions here. Their briefs were clear and concise, and distilled the environmental science into a digestible form which aided the Court in its analysis of the issues.

17

Both attorneys are exceptional oral advocates with impeccable courtroom demeanor, and they argued persuasively at the Court's hearing on summary judgment and on appeal.  Given their experience, it is not surprising that the other attorneys involved in this case looked to Mr. Preso and Mr. Bishop to coordinate strategy and to speak for the group.  Perhaps most importantly, the Court knows both attorneys to have an unimpeachable record of integrity.  This integrity is evident in their timesheets—which are detailed, well organized, and have already been reduced to account for redundant time.

### B. Plaintiffs' experts are reliable.

Plaintiffs submitted four affidavits from four expert attorneys who reviewed their timesheets and concluded that the time devoted to various tasks was reasonable.  (Docs. 342-5; 342-6; 344-2; 344-3.)  Federal Defendants argue that Plaintiffs' expert attorneys' opinions are unreliable because they did not review the timesheets of attorneys for the Crow Tribe, Human Society, or Alliance.  (Doc. 355 at 28-30.)  They argue that "[t]he Court should exclude the proffered fee valuation testimony [here] because the methodology is highly unreliable, and the opinions are deeply flawed."  (Doc. 355 at 40.)

Northern Cheyenne insists that its experts' opinions remain valid because the evidence Federal Defendants claim they overlooked—the timesheets of the other attorneys in this case—is irrelevant given that its attorneys did comparatively

18

more work.  (Doc. 360 at 15.)  Guardians similarly asserts that the timesheets of the other attorneys are irrelevant because "[t]he other plaintiffs brought different cases, involving different claims, with different amounts of effort, and ultimately different results."  (Doc. 359 at 14.)

The Court will not expend excessive effort responding to Federal Defendants' argument on this score.  Simply stated, the expert opinions submitted by Plaintiffs are reliable because their experts considered the relevant evidence in forming their opinions: they considered Plaintiffs' timesheets and they reviewed documents filed in the case to gain a sense for the scale of this litigation.  (Docs. 342-5 at 3–4; 342-6 at 4; 344-2 at 4; 344-3 at 6–7.)  As noted above, Federal Defendants' attempt to use the timesheets of the Crow Tribe, Humane Society, and Alliance to create a fictional benchmark for what is reasonable is just that— fictional.  The experts' affidavits, along with Plaintiffs' lengthy and detailed timesheets are sufficient evidence as required by the ESA to substantiate the requested fees.  *See Greenpeace*, 2020 WL 2465321, at *8.

**C. Plaintiffs' efforts were not "needlessly duplicative."**

Federal Defendants argue that Plaintiffs' fee award should be reduced to account for the "needless duplication" of their efforts in researching, briefing, and litigating similar arguments.  (Doc. 355 at 32–40.)  According to them, these efforts "ran afoul of Rule 1 [to 'secure the just, speedy, and inexpensive

19

determination of every action and proceeding'] and the Court's consolidation order adding unnecessary expense." (*Id.* at 42.)  By reducing fees for duplication, Federal Defendants implicitly ask this Court to send a message to environmental attorneys over (what they perceive to be a) growing trend where multiple plaintiffs file "serial" complaints challenging the same federal action thus driving up costs for the government.  (*See id.* at 40–43.)  Federal Defendants note that the Court's consolidation order instructed the parties to coordinate amongst themselves to limit duplication and they contend that Plaintiffs largely failed this goal as evident by the sheer hours they devoted to the litigation above and beyond their colleagues. (*Id.* at 42.)

Federal Defendants similarly take issue with the fact that Plaintiffs filed multiple complaints.  They note that in the earlier 2007 GYE grizzly delisting case, the co-plaintiffs submitted a single coordinated complaint.  (*Id.* at 45.)  Federal Defendants argue that the Organizational Plaintiffs here could have been more efficient if they had consolidated their filings.  (*See id.* at 45–46.)

As an initial matter, there is nothing duplicative about the fact that multiple complaints were filed in this case in contrast to the single complaint filed in the 2007 litigation.  Organizational Plaintiffs' five complaints were filed in five separate cases with each plaintiff paying a separate filing fee.  The Court did not

consolidate the cases until after the complaints were filed.  Thus, Federal Defendants charge of duplication fails.

The Court similarly rejects Federal Defendants' claim that the Court scrutinize and reduce Plaintiffs' time devoted to overlapping arguments.  In *Association of California Water Agencies v. Evans*, the Ninth Circuit recognized that "[i]t is not unreasonable to have several plaintiffs sue for the same relief," nor does "double-billing" occur when plaintiffs bring separate cases challenging the same conduct.  386 F.3d 879, 887 (9th Cir. 2004).[11]  Moreover, a lawyer can recover for duplicated efforts where those efforts are necessary to effectively litigate its case.  *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

Here, Plaintiffs made every effort to comply with the Court's consolidation order.[12]  Although each Plaintiff shared the ultimate goal of preventing the delisting of the GYE grizzly bear, Plaintiffs pursued different paths to relief.

---

[11] Federal Defendants' attempt to distinguish *Evans* is not persuasive.  They note that in that case, the court did not enter a consolidation order and the prevailing plaintiff was the first to file a complaint.  (Doc. 355 at 42–43.)  While true, the Court does not read *Evans* to imply that these are the only circumstances in which a plaintiff may recover fees for related litigation.  Regardless, the fact that the recovering plaintiff's case was dismissed as moot renders *Evans* imminently distinguishable.  *See id.* at 881.

[12] Federal Defendants even acknowledged as much in its motion for excess pages, where they wrote that Plaintiffs' briefs addressed "largely discrete, unique arguments contesting the Final Rule."  (Doc. 195 at 2.)

Northern Cheyenne's three primary arguments—that the FWS: (1) failed to consider the effect of the GYE grizzly bear's change to a meat-based diet when it determined that population levels would remain stable; (2) failed to consider the delisting's impact on the remnant population; and (3) procedurally failed to allow for sufficient time for public comment on last minute adjustments to the 2017 Grizzly Bear Conservation Strategy—were unique and were not independently briefed by any other Plaintiff.  (Docs. 314 at 7–8; 360 at 3.)  The other Plaintiffs adopted and incorporated Northern Cheyenne's arguments on the remnant population in light of *Humane Society*.  (*Id.* at 6.)  And to the extent there was any duplication on this issue, Alliance's brief three-page treatment of the issue was not a substitute for Northern Cheyenne's in-depth 12-page treatment that covered largely untouched ground.  (*Id.*)  Additionally, on appeal, Northern Cheyenne briefed and argued the remnant/*Humane Society* issue on behalf of all Plaintiffs in addition to pursuing its individual claim regarding the grizzly's dietary changes.  The Court fails to see any "needless duplication" here.

Nor is there any argument duplication that warrants a fee decrease as it applies to Guardians.  Although both Plaintiffs claimed that grizzly populations continue to face population threats, Guardians approached this issue from a different angle than Northern Cheyenne—they emphasized that long term survival rates required geographic connectivity or "linkage" between recovery zones (Doc.

186 at 36–39) whereas Northern Cheyenne contended that the FWS erred in failing to address the consequences of the grizzly's transition to a largely meat-based diet (Doc. 190 at 9–14).  The same is true at the appellate level where Guardians focused on questions of population genetics and recalibration of the 2017 Conservation Plan, while Northern Cheyenne focused on questions of jurisdiction, redressability, and the impact of delisting the GYE grizzly on the remnant lower-48 population.

While the bulk of Plaintiffs' arguments were fundamentally unique, to the extent the litigation on whole could have benefitted from greater collaboration, the Court will not scrutinize Plaintiffs' timesheets with a red pen—Federal Defendants simply picked the wrong parties to try to make this argument.  Where all players share the goal of getting the ball down the field, not every player is a quarterback, and no one would call the quarterback's work "needlessly duplicative" simply because his goal is shared by others.  Without diminishing the skilled contributions of counsel for the Crow Tribe, Humane Society, and Alliance, Plaintiffs took the lead role in this case, and Plaintiffs' lead counsel—Mr. Preso and Mr. Bishop— were the leading players on the field.  To the extent any "needless duplication" occurred, the Court will not dock the attorneys who acted as lead counsel.

### D. Guardians' timesheets reflect reasonable billing judgment.

Federal Defendants assert that Guardians' request of $512,591.00 in attorneys' fees, which is roughly three times more than the amount requested by the other Plaintiffs (Northern Cheyenne aside), is unreasonable because its "attorneys spent way too much time prosecuting their case." (Doc. 355 at 48.) "At some point diligence becomes overkill," they claim. (*Id.*) Specifically, Federal Defendants object to the fact that Mr. Bishop, "the attorney with the highest hourly rate performed most of the tasks"—some of which were administrative. (*Id.* at 49.) Federal Defendants also characterize much of Guardians' efforts as foolish, asserting that its attorneys spent an "inordinate amount of time arguing" unsuccessful issues. (*Id.* at 50.)

Guardians does not hide the ball on the fact that Mr. Bishop did "the lion's share of [its] work,"—such as reviewing the administrative record and drafting the briefs—which was important as the case was "potentially precedent-setting[.]" (Doc. 359 at 16.) As for the contention that Mr. Bishop conducted administrative or mundane work, Guardians asserts that the majority of the relatively few hours devoted to tasks like "printing and organizing" was time devoted to prepping his personal materials for oral argument—which could not have been delegated to anyone else. (*Id.* at 16–17.) Finally, Guardians notes that it already excluded 210 hours from Mr. Bishop's timesheet to reflect non-compensable hours. (*Id.* at 15.)

24

The Court has already communicated its regard for Mr. Bishop.  There is nothing improper about Guardians placing Mr. Bishop—its most experienced and thus highly paid attorney—at the helm of a high profile case with critical consequences.  The vast majority of Mr. Bishop's billed time (which tops 1,000 hours) was spent on complex legal work.  Therefore, the seven hours that Federal Defendants characterize as "mundane" and ministerial is minimal and Federal Defendants wrongly characterized Mr. Bishop's time spent organizing documents in preparation for argument as a clerical task that could have been delegated to another, non-arguing, attorney.  The Court knows from experience that lead counsel must, from time to time, engage in mundane, ministerial tasks in order to be fully prepared, and to delegate such tasks is not always time-effective or wise.

Additionally, the fact that Guardians briefed legal issues that the Court elected not to consider does not mean those claims were unsuccessful nor does it mean that the Court's consideration of those issues was not important in its processing of the case.  An attorney's time briefing alternate theories in a complex case is reasonable and compensable.  *Hensley*, 461 U.S. at 440, 435–36.  The Court will not reduce Mr. Bishop's pay on this account.  Federal Defendants have not met their burden of refuting the reasonableness of Guardians' time.

**E. Northern Cheyenne's timesheets reflect reasonable billing judgment.**

Federal Defendants claim Northern Cheyenne was over staffed since it employed nine attorneys and four law clerks on the case.  (Doc. 355 at 52.)  They note that Northern Cheyenne utilized "almost as many attorneys as the other five plaintiff-groups *combined*," which resulted in "inherent duplication" such as excessive internal conferencing.  (*Id.* at 52–53 (emphasis in original).)  Federal Defendants estimate that because of this "excessive staffing" Northern Cheyenne spent 13.7 hours devoted to internal conferencing which otherwise could have been avoided.  *Id*.

Northern Cheyenne asserts that it efficiently used short-term junior attorney and law clerk time for "discrete tasks such as citation checks or research assignments," and that the majority of work was performed by Mr. Preso and Joshua Purtle, his associate.  (Doc. 360 at 16.)  Moreover, Northern Cheyenne notes that its allegedly inappropriate 13.7 hours of internal conferencing translates to "4.6 hours per year over the three years of this litigation[.]"  (*Id.* at 17.)

Contrary to Federal Defendants' assertion, Northern Cheyenne's use of lower paid staff to complete basic and time limited tasks suggests it actively worked to reduce attorneys' fees here.  Moreover, 13.7 hours of conferencing is reasonably minimal.  To the extent such time constitutes duplication, the Court is convinced such time was necessary for coordinating legal strategy amongst the

group.  Federal Defendants have not met their burden to demonstrate that Northern Cheyenne's requested fees are unreasonable.

### F. Plaintiffs are entitled to fees on fees.

Federal Defendants argue that Plaintiffs should not be compensated for time spent on their attorneys' fee and cost motions.  "Building on an unreasonable starting point is unwarranted[,]" they claim.  (Doc. 355 at 54.)  Recognizing the broad discretion provided to courts in deciding whether to compensate an attorney for fees litigation ("fees on fees"), Federal Defendants ask the Court to exercise that discretion to deny those hours or to reduce Plaintiffs' request by an across-the-board percentage reduction commensurate with any reduction taken elsewhere in the case.  (*Id.* at 55.)

The Court declines to do so.  The Court has discretion to award fees on fees. *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir.1986).  Fee-shifting statutes largely treat cases holistically, allowing counsel to demand fees accrued during fee litigation in addition to those accumulated during the original case. *Comm'r, INS v. Jean*, 496 U.S. 154, 161-62 (1990).  Furthermore, attorney fee disputes should not extend litigation.  *Hensley*, 461 U.S. at 437.  Parties are strongly encouraged to settle such matters between them.  *Id.*

The Court has already determined that Plaintiffs' hours spent on the merits of the case are reasonable and thus fully compensable.  On whole, the Court has

found Federal Defendants arguments to the contrary unpersuasive.  Although this case was "not about the ethics of hunting" grizzly bears . . . as a "philosophical matter," Plaintiffs served as lead counsel in a case that garnered significant public interest from "ranchers and big-game hunters to conservationists and animal rights activists" alike.  (Doc. 266 at 1–2.)  Plaintiffs' success in stopping the impending grizzly bear hunt and requiring FWS to go back to the drawing board in its attempt to delist the GYE grizzly bear was a significant victory for them.  The hours they spent in pursuit of this goal were commensurate with the stakes of the litigation. Against this backdrop, the hours Plaintiffs spent on the case are imminently reasonable.  It is not fair to ask Plaintiffs to bear the burden of Federal Defendants' decision to drive up litigation costs by failing to settle within the ballpark of Plaintiffs' reasonable fee request.  Plaintiffs are entitled to fair pay for the entirety of the work performed.

## II.     Reasonable Hourly Rate

As previously noted, Federal Defendants do not directly contest Plaintiffs' requested hourly rates. They acknowledge that Plaintiffs are good attorneys, and their requested wage rates are reasonable.  (Doc. 355 at 3, 26.)  However, Federal Defendants observe that given the high award request in this case "either Plaintiffs' hourly rates are too high, or they spent too much time.  Both cannot be true." (Doc. 355 at 26.)  Given that the Court has concluded that Plaintiffs' hours were

28

reasonable, it finds it necessary to briefly address the reasonableness of their requested hourly rates.

A reasonable hourly rate is determined by the market rate of members of the corresponding legal community for a lawyer of comparable expertise, reputation, and experience in similarly complex litigation. *Blum v. Stenson*, 465 U.S. 886, 892–95 (1984). This Court has previously "limit[ed] the relevant community to environmental attorneys in Montana with commensurate experience, reputation, and skill." *All. for the Wild Rockies v. U.S. Dep't of Ag.,* 2016 WL 4766234, at *7 (D. Mont. Sept. 13, 2016).

In 2019, the Court determined that $350 hourly rate for an experienced environmental attorney with an additional $100 per hour for appellate work was reasonable. *All. for the Wild Rockies v. Savage*, 2019 WL 2393425, at *7 (D. Mont. July 22, 2019). Additionally, the District of Montana has historically deemed annual $10 wage increases to be reasonable. *Native Ecosystems Council v. Krueger*, 2019 WL 1489839, at *4 (D. Mont. April 4, 2019) (citing *Native Ecosystems Council v. Weldon*, 921 F. Supp. 2d 1069 (D. Mont. 2013)).

Northern Cheyenne requests $330 for Mr. Preso's 2017 hourly rate, an additional $100 an hour for appellate work, and a $10 hour per annum raise. Mr. Preso is its highest paid attorney and brings valuable experience to his team. Mr. Preso is a Georgetown Law School graduate with over 20 years of environmental

practice experience at EarthJustice.  (Doc. 344-2 at 3.)  In his affidavit, Mr. Goetz

found that Northern Cheyenne's hourly billing rates were reasonable based on its

attorneys' credentials, rates charged by similar attorneys, and the context of this

particular case.  *Id*. at 4.  Goetz concluded that ". . . Plaintiffs' [hourly rates] in this

case are well within the range of prevailing market rates for attorneys with

comparable expertise and skill in Montana and are reasonable and . . . quite

conservative."  *Id*.  Sullivan agreed.  (Doc. 344-3).  Having reviewed each of

Northern Cheyenne's timesheets, the Court concludes the hourly rates requested

are reasonable across the board.

Guardians requests the same rate for Mr. Bishop as Northern Cheyenne

requests for Mr. Preso.  Mr. Bishop is Guardians' highest paid and most

experienced attorney.  He graduated in the top 25% of his class with a

specialization in environmental law from Vermont Law School in 1998.  (Doc.

342-1 at 1–3.)  He then joined the Western Environmental Law Center, where he

has spent the past 23 years working exclusively in environmental and natural

resource law.  (*Id.* at 13.)  During this time there, Mr. Bishop has litigated over 40

environmental cases.  (*Id.* at 4–8.)  Furthermore, expert attorney L. R. Bishop,

found that Guardians charged "hourly rates that [he] consider[ed] reasonable, if not

low," given their attorneys' experience, qualifications, and the context of this

specific case.  (Doc. 342-6 at 3.)  Reviewing Guardians' requested hourly rates, the Court finds them similarly fair.

## III. Costs

Guardians seeks $3,150 and Northern Cheyenne seeks $1,428.50 in costs. (Docs. 342 at 30; 344 at 26.)  Federal Defendants object, arguing that the Ninth Circuit's opinion foreclosed their ability to claim costs.  (Doc. 355 at 56 (citing *Crow Indian Tribe*, 965 F.3d at 681 (concluding the opinion by stating the matter was "[a]ffirmed in part; remanded in part. Each party to bear its own costs.")).) Federal Defendants contend that this statement should be interpreted as barring Plaintiffs from collecting *all* incurred costs.  (*Id.*)  Plaintiffs respond that the Ninth Circuits' bar on costs should only be interpreted as only applying to costs incurred on appeal.  (Doc. 360 at 15.)

The Court agrees.  Appellate Rule 39 states that "if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed *only as the court orders*."  Fed. R. App. P. 39(a)(4) (emphasis added).  The Ninth Circuit's order did not plainly bar Plaintiffs from recovering costs before this Court.  It will therefore allow Plaintiffs to recover their costs associated with litigation as requested. Accordingly,

IT IS ORDERED that Plaintiffs' Motions for attorney fees (Docs. 341; 343) are GRANTED.  Plaintiffs' initially filed motions (Docs. 310; 313) are DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs shall be awarded fees and costs as follows:

1. Guardians is awarded $512,590.50 in attorneys' fees and $3,150.00 in costs for a total of $515,740.50 consistent with their timesheets (Docs. 342-1 at 17–36, 342-2 at 17–26; 342-3 at 11–16) as summarized in Doc. 341 at 28–30.

2. Northern Cheyenne is awarded $354,606.00 in attorneys' fees and $1,428.50 in costs for a total of $356,034.50 consistent with their timesheets (Docs. 345-5 at 2–15; 345-6 at 2–3; 345-7 at 2) as summarized in Doc. 344 at 22–23.

DATED this 26th day of July, 2021.

Dana L. Christensen, District Judge
United States District Court